## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC.,** | § | |
| **and HNR ENERGIA B.V.** | § | |
| | § | |
| **Plaintiffs,** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **v.** | § | |
| | § | |
| **JUAN JOSE MENDOZA GARCIA,** | § | |
| **PETRO CONSULTORES S.C.,** | § | |
| **PETRO CONSULTORES INTERNATIONAL** | § | |
| **TRADING COMPANY, INC.,** | § | |
| **AZURE 904 LLC,** | § | |
| **RAFAEL DARIO RAMIREZ CARRENO,** | § | |
| **EULOGIO ANTONIO DEL PINO DIAZ, and** | § | |
| **JOSE ANGEL GONZALEZ ACOSTA,** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V. (collectively, "Harvest") file this Original Complaint against Juan Jose Mendoza Garcia, Petro Consultores S.C., Petro Consultores International Trading Company, Inc., Azure 904 LLC, Rafael Dario Ramirez Carreno, Eulogio Antonio Del Pino Diaz, and Jose Angel Gonzalez Acosta.

## INTRODUCTION

1. For over a decade, Venezuelan national oil company Petroleos de Venezuela, S.A. ("PDVSA"), the Defendants, other high-ranking PDVSA executives, third party "agents," and business partners, and various financial institutions conspired to force American companies to pay-to-play in Venezuela's oil and gas industry in one of the largest bribery and money-laundering schemes in history. Harvest is just one, but perhaps one of the largest, known victims of this scheme. In short, because Harvest and its business partners refused four separate $10 million bribe demands solicited by the Defendants, Venezuela's Ministerio del Poder Popular de

726544.1

Petroleo y Mineria withheld final approval for Harvest to sell its Venezuelan energy assets to two different buyers in 2013 and 2014 (first for $725 million and then for $400 million). As a result, Harvest was forced to sell the same assets for approximately $255 million, at a loss of $470 million, and unexpectedly to cease doing business and wind up its affairs.

2.    Harvest was directly and immediately harmed by Defendants' wrongful conduct. Harvest was never complicit in that conduct, refusing to participate at every turn. Harvest seeks compensation for the harm suffered from the Defendants' pattern of wrongful behavior, and for the loss of rights that Harvest otherwise would have been able to obtain in a fair and competitive market untainted by bribery. Harvest accordingly brings this action asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Sherman Act; the Robinson-Patman Act; and the Texas Free Enterprise and Antitrust Act.

## PARTIES

3.    Harvest is a corporation organized under the laws of Delaware, with its principal place of business in Houston, Texas. From 1989 until May 2017, Harvest operated as a publicly-held independent energy company engaged in the development and production of oil and gas properties. Harvest formally dissolved on May 4, 2017, and no longer operates as an oil and gas company. However, as required by Delaware law, Harvest continues to exist for a period of at least three years (until May 2020) for the purposes of prosecuting lawsuits, liquidating, and closing its business. *See* Del. Code Title 8 § 278.

4.    HNR Energia B.V., a Curacao company ("HNR Energia"), is Harvest's wholly-owned subsidiary.

5.    Defendant Petro Consultores S.C. is an entity organized under the laws of Venezuela, with its principal place of business in Caracas, Venezuela. Petro Consultores S.C.

2

726544.1

operates permanent offices in Surfside, Florida, and in Madrid, Spain, and conducts business in Houston, Texas. Defendant Petro Consultores International Trading Company, Inc. is an entity organized under the laws of Panama, with its principal place of business in Panama.

6. Defendant Azure 904 LLC is an entity organized under the laws of Florida, with its principal place of business in Florida.

7. Defendant Juan Jose Mendoza Garcia is an individual residing in Surfside, Florida. Garcia works as a consultant in the oil and gas industry for companies, including U.S. and Texas-based companies, that conduct business in Venezuela. Garcia is an owner, officer, and employee of Petro Consultores S.C. and Petro Consultores International Trading Company, Inc. Garcia also was an owner and manager of Azure 904 LLC during the relevant timeframe. On information and belief, Garcia operates or at the time relevant to the allegations herein operated each of these entities as conduits for illegal activity, including that described herein.

8. Defendant Rafael Dario Ramirez Carreno ("Ramirez") is a former president of PDVSA and Venezuela's former Minister of Energy. Ramirez held both positions simultaneously between 2004 and 2014. PDVSA is Venezuela's state-owned oil and gas company, which does business with companies across the globe, including those located in the United States and Texas.

9. Defendant Eulogio Antonio Del Pino Diaz ("Del Pino") is a former president of PDVSA and Venezuela's former Minister of Oil. Del Pino held both positions simultaneously between 2014 and 2017. From 2008 until 2013, Del Pino was the Vice President for Exploration and Production at PDVSA.

3

10.    Defendant Jose Angel Gonzalez Acosta ("Gonzalez") was a member of PDVSA's executive committee and Venezuela's former Vice Minister for Hydrocarbons.  Gonzalez held these positions throughout the period of the two thwarted deals described herein.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 and 1337 because the claims arise under federal law, including RICO violations under 18 U.S.C. § 1961 *et seq*. and antitrust violations under 15 U.S.C. § 1.

12.    Subject matter jurisdiction also exists over the RICO claims under 18 U.S.C. § 1964(c) and the antitrust claims under Section 4 of the Sherman Act, 15 U.S.C. § 4, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

13.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the federal claims.

14.    This Court has personal jurisdiction over Defendants because they committed unlawful acts in this judicial district.  Defendants also committed acts elsewhere with the purpose and intent that their acts would cause harm to Harvest in this judicial district. Additionally, Defendants' acts in fact had immediate and direct consequences in this judicial district.  28 U.S.C. § 1605(a)(2).

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.  Venue is proper in this judicial district against those Defendants not resident in the United States under 28 U.S.C. § 1391(c)(3).  Venue is also proper against Defendants under 28

4

U.S.C. § 1391(b)(3) because they are subject to the Court's personal jurisdiction with respect to this civil action.

16.     Venue is also proper under 18 U.S.C. § 1965(a) because one or more of the Defendants transact their affairs in this judicial district.  Additionally, venue is proper under 18 U.S.C. § 1965(b) because the ends of justice require that Defendants be brought before this Court to the extent that the federal RICO claims against them would not otherwise be subject to venue in this Court.

## FACTS

17.     Incorporated in 1988, Harvest was a publicly-held independent energy company engaged in the development and production of oil and gas properties from 1989 until May 2017. Harvest operated at all times with its principal place of business in Houston, Texas.

18.     Harvest conducted substantial business in Venezuela, including with PDVSA, through various subsidiaries and holding companies.  HNR Energia, a wholly-owned subsidiary of Harvest Natural Resources, Inc., held an 80 percent interest in Harvest-Vinccler Dutch Holding B.V., a Netherlands company ("Harvest Holding").  Harvest Holding indirectly owned, through wholly-owned subsidiaries, 40 percent of Petrodelta, S.A., an exploration and production company organized under Venezuelan law ("Petrodelta").  Corporacion Venezolana del Petroleo ("CVP"), a wholly-owned subsidiary of PDVSA, owned the remaining 60 percent of Petrodelta.

**The Thwarted Pertamina Deal: Harvest Rejects 2012 and 2013 Bribe Solicitations**

19.     In June 2012, Harvest entered into a share purchase agreement with PT Pertamina, a state-owned limited liability company existing under the laws of the Republic of Indonesia.  HNR Energia agreed to sell, indirectly through subsidiaries, all of Harvest's interests in Venezuela for a cash purchase price of $725 million ("the Pertamina Deal").  The Pertamina

5

Deal was subject to approval by the governments of Venezuela and Indonesia. Harvest reported the deal in its Form 8-K filed with the Securities and Exchange Commission on June 21, 2012. The agreement was public and was reported on by industry publications. Securities and Exchange Commission, "Filing Detail" (June 21, 2012), *available at* https://www.sec.gov/Archives/edgar/data/845289/000119312512278671/0001193125-12-278671-index.htm.

20.     Defendant Del Pino, at the time a Vice President at PDVSA, was directly involved in the proposed sale and in subsequent dealings and negotiations with Harvest in the United States.

21.     On July 19, 2012, Harvest CEO James Edmiston sent from Houston, Texas, an email to Defendant Del Pino regarding an inquiry that Edmiston and Harvest had received from an energy reporter. The reporter wrote Edmiston that his "sources tell [him] that Caracas [i.e., individuals at PDVSA or the Oil Ministry] will block the sale of your Venezuelan assets." Edmiston also wrote to Del Pino that Edmiston had "heard some rumors that a bonus of some type will be required for the sale to be approved."

22.     Defendant Del Pino never responded to the email. The sale process continued.

23.     On September 4, 2012, Del Pino commented to reporters that a decision by Venezuela's Oil Ministry could be reached in the "upcoming days." On September 7, 2012, *The Jakarta Post* reported that Del Pino said the acquisition plan "looked positive." In October 2012, Del Pino met with representatives from Pertamina.

24.     Unfortunately, the following month, the dreaded rumor—that a "bonus" would be required—turned out to be true.

6

726544.1

25.    In November 2012, Defendant Garcia approached Juan Francisco Clerico, a director of Harvest-Vinccler, S.A., in Caracas, Venezuela, regarding the agreed sale of Harvest's stake in Petrodelta.  Garcia informed Clerico that Garcia was speaking on behalf of Defendant Ramirez and at Ramirez's request.  Garcia stated that Harvest must pay USD $10 million in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria.  Garcia solicited this bribe knowing and intending that the solicitation would be conveyed to Harvest in Houston, Texas, and that any bribe, if paid, would necessarily come from Harvest's bank accounts in the United States.

26.    As intended, following the meeting with Garcia, Clerico contacted Edmiston in Houston and requested an immediate meeting in Miami.  Clerico and Edmiston met in Miami on November 7, 2012, at Miami International Airport, where Clerico informed Edmiston that Garcia had demanded a $10 million bribe, on behalf of Ramirez and at Ramirez's request, for final contract approval.  Edmiston and Harvest were unwilling to pay the bribe and declined to do so.

27.    In late November or early December 2012, Pertamina informed Edmiston that Pertamina had received a similar bribe demand from Defendant Garcia.  Pertamina also declined to pay the bribe.

28.    In the subsequent months, Defendants made unreasonable demands to try to force Harvest to pay the bribe.  For example, for no legitimate business reason, Defendants made ongoing changes to the financing requirements to approve the contract.

29.    On January 23, 2013, Defendant Del Pino again met with Pertamina.  Pertamina reported to Harvest in a January 27, 2013 email that "basically there was no further movement from [Del Pino] on the Business Plan."

7

726544.1

30.     On February 13, 2013, Defendant Ramirez, then Venezuela's oil minister, was quoted in a *Bloomberg* article as stating that Venezuela was "still analyzing a proposed asset sale." Tellingly, Ramirez stated: "Both the buyer and seller know what they need to do in order to obtain government approval."

31.     What Harvest and Pertamina "need[ed] to do to obtain government approval" was pay a $10 million bribe. Both companies nevertheless refused.

32.     Because Harvest refused to pay the $10 million bribe, the Pertamina Deal fell through.

33.     On February 20, 2013, one week after Defendant Ramirez's comments to the press, Harvest announced the termination of the Pertamina Deal. Defendants had substantially and materially changed the conditions for contract approval by the Venezuelan government because of Harvest and Pertamina's refusal to pay the bribes. As a result of the increased financing obligations, among other onerous terms and conditions demanded by Defendants because their bribes were refused, and the resulting withholding of final contract approval in Venezuela, the Indonesian government, too, refused to approve the deal.

**The Thwarted Petroandina Deal: Harvest Rejects 2013 and 2014 Bribe Solicitations**

34.     Throughout the remainder of 2013, Harvest searched for other sale opportunities for its Venezuelan assets.

35.     Defendant Garcia visited Houston from October 10, 2013, to October 20, 2013.

36.     On December 16, 2013, Harvest entered into a share purchase agreement with Petroandina Resources Corporation N.V. ("Petroandina") and Petroandina's parent company, Pluspetrol Resources Corporation B.V. ("Pluspetrol"), to sell Harvest's entire 80 percent equity interest in Harvest Holding to Petroandina ("the Petroandina Deal"). The Petroandina Deal

8

726544.1

would involve two closings for a total cash purchase price of $400 million. The first closing occurred on December 16, 2013, contemporaneously with the signing of the share purchase agreement, where Harvest sold a 29 percent equity interest in Harvest Holding to Petroandina for $125 million. This closing did not require contract approval from the Venezuelan government.

37.　The second closing under the share purchase agreement, for the sale of the remaining 51 percent equity interest in Harvest Holding for a cash purchase price of $275 million, was subject to contract approval by Venezuela's Ministerio del Poder Popular de Petroleo y Mineria. Harvest reported the deal in its Form 8-K filed with the Securities and Exchange Commission on December 20, 2013. The agreement was public and was reported on by industry publications. Securities and Exchange Commission, "Filing Detail" (Dec. 20, 2013), *available at* https://www.sec.gov/Archives/edgar/data/845289/000119312513480266/000119312 5-13-480266-index.htm.

38.　Once again, however, the Defendants delayed approval of the second closing and actively took steps to scuttle it. For example, after the parties agreed on and made arrangements for $850 million in financing—a figure that the Venezuelan government had previously indicated would be acceptable—the Defendants increased the demand to $1.5 billion for no legitimate reason. The Defendants made it clear that a bribe was required to resolve such issues and secure Venezuelan approval.

39.　In approximately fall 2014, Javier Alfredo Iguacel, Vice President of Business Development at Pluspetrol, informed Edmiston in Houston that he had been contacted by Defendant Garcia. Yet again, Garcia demanded a bribe payment in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria. Garcia

9

726544.1

demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States.  Harvest and Pluspetrol refused to pay the bribe.

40.     On November 19, 2014, Defendant Del Pino sent a letter to Harvest in Houston explaining that CVP, PDVSA's subsidiary, would block the second closing unless Harvest both paid an extra "bonus" to the Ministerio del Poder Popular de Petroleo y Mineria, "in addition to those [bonuses] approved in the original Business Plan," and satisfied other new, stringent financing requirements.  Del Pino carbon-copied Defendant Gonzalez and Asdrubal Chavez. The letter was sent on CVP letterhead.

41.     In late 2014, in Buenos Aires, Argentina, Defendant Gonzalez, PDVSA executive committee member, met with Francisco Pulit, Senior Vice President of Corporate Development at Pluspetrol, the agreed buyer of Harvest's assets.  The meeting concerned the deal with Harvest, including the financing requirements that Venezuela would demand in order to approve the deal.  Gonzalez informed Pulit that "a bribe can make it all go away"—i.e., resolve the fabricated issues that were delaying approval.  Gonzalez demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States.  Pulit conveyed this information to Edmiston in Houston, Texas, but both Harvest and Pluspetrol again refused to pay any bribe.

42.     On January 1, 2015, knowing that it would never receive Venezuelan approval because of its refusal to pay the bribe demand, Harvest exercised its right through HNR Energia to terminate the share purchase agreement for the Petroandina Deal in accordance with the Deal's terms. Thus, the second closing, and the sale of Harvest's remaining 51 percent interest in Harvest Holding, never took place.

10

726544.1

**Harvest Finally Sells its Venezuelan Assets at a $470 Million Loss**

43.     After losing a second deal because of its refusal to pay bribes, Harvest spent 2015 and 2016 searching for yet another buyer of its remaining Venezuelan assets.

44.     Finally, on June 29, 2016, Harvest entered into a share purchase agreement for the sale of HNR Energia's remaining interest in Harvest Holding to CT Energy Holding SRL, a Barbados Society with Restricted Liability.  The sale was completed on October 7, 2016.

45.     No bribe demands were made during this third and final attempted sale. Defendant Ramirez had left PDVSA after the second attempted sale, and thus was no longer PDVSA's President (rather, he was serving as Venezuela's ambassador to the United Nations).

46.     The sale price, including cash, promissory notes, and other assets, was approximately $130 million.

47.     Thus, Harvest sold the same assets that it had previously found buyers for at $725 million (the Pertamina Deal) for a total of $255 million: $125 million (the 29 percent interest in Harvest Holding sold to Petroandina) plus $130 million (the 51 percent interest in Harvest Holding sold to CT Energy).  This amounted to a loss of approximately USD $470 million.

48.     Harvest Natural Resources, Inc. sold its remaining assets in other countries in late 2016 and early 2017.  On February 23, 2017, its stockholders authorized its dissolution following the sale of its last remaining operating assets.  Harvest Natural Resources, Inc. dissolved on May 4, 2017.

49.     HNR Energia B.V. continues to exist in all capacities.

**Criminal Investigations into Corruption in Venezuela's Oil and Gas Industry**

50.     The U.S. Bureau of Economic and Business Affairs ranks Venezuela as the most corrupt country in Latin America (11th most corrupt country in the world).  The Bureau has explained that "[c]orruption is endemic in Venezuela."  U.S. Department of State, Bureau of

11

726544.1

Economic and Business Affairs, "Investment Climate Statements for 2017: Venezuela" (no date), *available at*

https://www.state.gov/e/eb/rls/othr/ics/investmentclimatestatements/index.htm?year=2017&dlid =270104#wrapper.

51.　The oil and gas sector is responsible for a substantial part of Venezuela's economy; PDVSA "still accounts for nearly all the country's export earnings, roughly half of government revenues and about a quarter of the shrinking gross domestic product." Unsurprisingly, the oil sector has seen rampant corruption. "Corruption has been a chronic and well-known problem for years at Pdvsa and has helped to undercut its operations and profits." Kirk Semple & Clifford Krauss, *The New York Times*, "Politics Shadow Arrests of Citgo Executives in Venezuela Graft Inquiry" (Nov. 22, 2017), *available at* https://www.nytimes.com/2017/11/22/world/americas/venezuela-citgo-oil-arrests-corruption.html.

52.　In October 2017, the U.S. Department of Homeland Security arranged for the arrest by Spanish authorities of Venezuelan national Rafael Ernesto Reiter Munoz ("Reiter"), PDVSA's head of security and loss prevention under Defendant Ramirez, "as part of a broadening inquiry of Pdvsa stemming from allegedly fraudulent contracts dispensed for bribes." *Id.*

53.　Spanish police also arrested Nervis Gerardo Villalobos Cardenas ("Villalobos"), "former deputy Venezuelan energy minister [under Ramirez]. . . on a U.S. warrant for alleged involvement in [a] $1 billion bribery scheme involving Venezuela's state-run oil company PDVSA." Aritz Parra & Joshua Goodman, *Associated Press*, "Venezuelan ex-official detained

12

726544.1

in Spain on US warrant" (Oct. 27, 2017), *available at* http://www.chicagotribune.com/sns-bc-lt--spain--venezuela-ex-officials-arrested-20171026-story.html.

54.   Also in October 2017, Venezuelan authorities arrested the President of PDVSA subsidiary CVP as part of a corruption investigation. *Telesur*, "Venezuela: Ex-Pdvsa Vice President, 10 Managers Arrested for Corruption, Sabotage (Oct. 27, 2017), *available at* https://www.telesurtv.net/english/opinion/Venezuela-Ex-Pdvsa-Vice-President-10-Managers-Arrested-for-Corruption-Sabotage-20171027-0012.html.

55.   On November 30, 2017, Venezuelan authorities arrested Defendant Del Pino as part of a corruption probe. The Chief Prosecutor announcing the arrest stated: "We're talking about the dismantling of a cartel of organized crime that had taken over PDVSA." Nestor Martinez, the former President of PDVSA, was also arrested. Alexandra Ulmer & Deisy Buitrago, *Reuters*, "Venezuela arrests ex-oil bosses for graft in widening purge" (Nov. 30, 2017), *available at* https://ca.reuters.com/article/topNews/idCAKBN1DU1X4-OCATP.

56.   It was reported in December 2017 that Defendant Ramirez "is believed to be the ultimate target of the PDVSA housecleaning as well as an ongoing probe in the U.S. that has led to the arrest of more than 10 individuals for paying bribes and kickbacks, including two former close aides to Ramirez arrested last month in Spain." Jorge Rueda & Joshua Goodman, *Associated Press*, "Venezuela arrests top oil officials in corruption probe" (Dec. 1, 2017), *available at* http://www.chicagotribune.com/news/nationworld/sns-bc-lt--venezuela-oil-arrests-20171130-story.html.

57.   It was also reported that "U.S. officials have sought to enlist [Ramirez] as an informant as federal prosecutors looked into alleged corruption and drug-profit laundering through the state oil company, known as PdVSA, according to people familiar with those

13

requests." A "former senior U.S. official" told the *Wall Street Journal* that he "can confirm that the U.S. has had an interest in possible criminal activity by Mr. Ramirez since 2011." Kejal Vyas, Jose de Cordoba & Anatoly Kurmanaev, *Wall Street Journal*, "Venezuela's U.N. Envoy Rafael Ramirez Resigns" (Dec. 5, 2017), *available at* https://www.wsj.com/articles/venezuelas-u-n-envoy-rafael-ramirez-resigns-1512499605.

58.     Similarly, another publication reported that "[y]et another diplomat cited Caracas sources who intimated Ramirez may already be working a deal with U.S. authorities who have implicated him in illegal activities, to inform on higher-ups and receive asylum in the United States." Benny Avni, *Daily Beast*, "Will the Feds Nail Venezuela's (Ex) U.N. Ambassador?" (Nov. 30, 2017), *available at* https://www.thedailybeast.com/will-the-feds-nail-venezuelas-ex-un-ambassador.

59.     Also in December 2017, it was reported that the Venezuelan Attorney General's office "opened a criminal investigation into former oil minister and ex-head of state oil company PDVSA, Rafael Ramirez, over documents [the Attorney General] said show he illegally acted as an intermediary in oil sales." "The top prosecutor said the investigation was part of a probe the AG's office is carrying out into the use of Andorran lender Banca Privada D'Andorra to launder some 4.2 billion euros ($5 billion) in state oil funds since 2006." *Latin American Tribune*, "Venezuela AG's Office Opens Criminal Probe into Ex-Oil Minister" (no date), *available at* http://www.laht.com/article.asp?ArticleId=2447592&CategoryId=10717.

60.     Similarly, the United States Department of the Treasury issued a Notice of Finding in 2015 concluding that Banca Privada D'Andorra was involved in a money-laundering scheme to deposit the proceeds of public corruption in Venezuela. The network engaged in the scheme "was well connected to Venezuelan government officials and relied on various methods

14

to move funds, including false contracts, mischaracterized loans, over- and under-invoicing, and other trade-based money laundering schemes." The Department of the Treasury found that a third party money lender "gave High-Level Manager B false contracts to support transactions purported to be on behalf of Venezuelan public institutions including Petroleos de Venezuela S.A. ('PDVSA'), the public oil company of Venezuela." In total, Banca Privada D'Andorra "facilitated the movement of $4.2 billion in transfers related to Venezuelan money laundering." *Federal Register*, "Notice of Finding that Banca Privada d'Andorra Is a Financial Institution of Primary Money Laundering Concern" (Mar. 13, 2015), *available at* https://www.federalregister.gov/documents/2015/03/13/2015-05911/notice-of-finding-that-banca-privada-dandorra-is-a-financial-institution-of-primary-money-laundering.

61.    In October 2016, U.S. Senator Marco Rubio issued a press release "urg[ing] the Obama Administration to sanction Venezuelan government official Rafael Ramirez for corruption during his tenure as head of [PDVSA]." The press release quoted Senator Rubio as stating: "Rafael Ramirez oversaw corruption at PDVSA to the tune of $11 billion, which is not just criminal; it's downright cruel and inhumane when you consider the daily challenges confronting the Venezuelan people. Mr. Ramirez belongs in jail along with everyone else who stole this $11 billion, and it's an outrage that he can instead be seen gallivanting today around Manhattan, living the high life as Venezuela's United Nations envoy." Marco Rubio Senate Website, Press Releases, "Rubio Calls For Sanctions Against Corrupt Former Head of Venezuela's State-Owned Oil Company" (Oct. 21, 2016), *available at* https://www.rubio.senate.gov/public/index.cfm/press-releases?ID=A4E50648-F90A-4D77-B317-46C6821385FF.

15

62.     In a Southern District of Texas indictment, the government has alleged that PDVSA officials were involved in a widespread bribery conspiracy.  The indictment identifies "Officials A–E" as foreign officials who were employed by PDVSA at all relevant times. Indictment, Doc. 1, *United States v. Rincon et al.*, No. 4:15-cr-00654 (S.D. Tex. Dec. 10, 2015).

63.     In a press release, the Department of Justice stated that one of the defendants in that matter was "the sixth individual to plead guilty as part of a larger, ongoing investigation by the U.S. government into bribery at PDVSA."  In March 2016, the Court "also unsealed charges against four other individuals charged in connection with the ongoing investigation, including three foreign officials.  The foreign officials admitted that while employed by PDVSA or its wholly owned subsidiaries or affiliates, they accepted bribes from [the named defendants in that matter] in exchange for taking certain actions to assist companies owned by [the defendants] in winning energy contracts with PDVSA.  The foreign officials also conspired with [the defendants] to launder the proceeds of the bribery scheme, they admitted."  *See* Department of Justice, "Businessman Pleads Guilty to Foreign Bribery and Tax Charges in Connection with Venezuela   Bribery   Scheme"   (June   16,   2016),   *available   at* https://www.justice.gov/opa/pr/businessman-pleads-guilty-foreign-bribery-and-tax-charges-connection-venezuela-bribery-scheme.

64.     In the same matter, the government filed a response to a motion by Bariven S.A., a PDVSA subsidiary, in which Bariven sought recognition of its rights as a "victim" and entitlement to restitution.  Government's Response, Doc. 113, *United States v. Rincon et al.*, No. 4:15-cr-00654 (S.D. Tex. Feb. 20, 2017).  In its response, the government explained that its "investigation into corruption at PDVSA and Bariven remains ongoing."  *Id*. at 6.  The government opposed Bariven's attempt to seek victim status, arguing that "Bariven's extensive

16

726544.1

participation in the bribery and money laundering schemes charged in these related cases" preclude it from being recognized as a victim. *Id*. at 11.

65. At the end of December 2017, it was reported that the Venezuelan state prosecutor announced that his office was "investigating Rafael Ramirez, a once powerful oil minister and former head of state oil company PDVSA, in connection with an alleged $4.8 billion Vienna-based corruption scheme." "Prosecutor Tarek Saab said Ramirez and at least four other oil executives from the South American OPEC nation sold crude oil at below market prices in exchange for bribes." Saab informed the press that "(Ramirez) appears as the main intellectual author of what happened." Deisy Buitrago & Marianna Parraga, *World Energy News*, "Ex-PDVSA oil czar Ramirez Probed in $4.8B Scandal" (Dec. 30, 2017), *available at* https://www.worldenergynews.com/news/pdvsa-oil-czar-ramirez-probed-scandal-667979.

66. In February 2018, the government unsealed an August 2017 indictment against five former Venezuelan government officials—including Nervis Villalobos and Rafael Reiter, both of whom were arrested in Spain in 2017. The indictment alleged that from at least 2011 to 2013 the former officials, both inside and outside PDVSA, were part of a "management team" that wielded significant influence at PDVSA, and conspired with each other and others to solicit bribes from companies seeking approval for PDVSA-related contracts. The conspirators laundered the bribery scheme proceeds through a complex series of international financial transactions. Indictment, Doc. 1, *United States v. De Leon et al*., No. 4:17-cr-00514 (S.D. Tex. Aug. 23, 2017).

67. The *De Leon* indictment identifies "Official B" as "an individual whose identity is known to the Grand Jury, [who] was at all relevant times a senior Venezuelan government

17

official." *Id*. ¶ 35. The indictment alleges that he was part of the "management team" engaged in bribery and money laundering. *Id*. ¶¶ 51, 132, 134. The indictment also alleges that the bribes were split between the defendants and other unindicted co-conspirators, including Official B, and that illicit funds were used, e.g., to pay tuition for Official B's children in 2014. *Id*. ¶¶ 51, 126–27, 132, 134.

68.    According to a U.S. official who spoke on condition of anonymity, Official B is Defendant Ramirez. Joshua Goodman, *Associated Press*, "Official: US says ex-Venezuela oil czar took bribes" (Feb. 13, 2018), *available at* http://www.chicagotribune.com/news/nationworld/sns-bc-lt--venezuela-corruption-20180213-story.html.

69.    The bribery and money-laundering scheme and RICO and antitrust violations discussed herein, which directly harmed Harvest, were part of this same conspiracy and criminal activity outlined above.

**Defendants Harmed Competition and Caused a Substantial Effect in the United States**

70.    In addition to constituting RICO violations, as set forth herein, the Defendants' bribery and related conduct has harmed competition in multiple markets in violation of the antitrust laws and caused a substantial effect in the United States.

71.    The Defendants' unlawful conduct affected the market for American and other companies engaged in oil and gas production in Venezuela. Because of the Defendants' unlawful conduct, companies doing business lawfully in Venezuela that refused to engage in anticompetitive bribery, such as Harvest, were effectively crippled in the market. The Defendants ensured that Harvest and similarly law-abiding companies either could not sell assets, purchase assets, or otherwise conduct business in Venezuela, or could do so only subject

18

726544.1

to frequent, unnecessary, anticompetitive, and expensive hurdles. As a result of the Defendants' behavior, U.S. oil and gas companies could not engage in fair and lawful competition activity.

72.     The Defendants' unlawful conduct also affected the consumer market for gasoline in the United States. Because of the Defendants' unlawful conduct, consumers were required to pay for an end product that effectively included a "corruption tax" as a cost of producing oil from Venezuela. The Defendants' behavior negatively affected competition activity in the consumer market.

73.     Harvest was not the only entity injured by the Defendants' actions. The agreed buyers for Harvest's first two deals, Pertamina and Petroandina, were also injured, as were other American companies engaged in business in Venezuela.

74.     Bribery is not competition on the merits, and injuries resulting from anticompetitive bribery are injuries of the type that the antitrust laws were designed to prevent. The Department of Justice recognizes this; as the Assistant Attorney General for the Criminal Division explained in 2016: "The effects of foreign corruption are not just felt overseas. In today's global economy, the negative effects of foreign corruption flow back to the United States. American companies are harmed by global corruption when they are denied the ability to compete in a fair and transparent marketplace. Instead of being rewarded for their efficiency, innovation and honest business practices, U.S. companies suffer at the hands of corrupt governments and lose out to corrupt competitors." Leslie Caldwell, "Remarks Highlighting Foreign Corrupt Practices Act Enforcement at The George Washington University School of Law" (Nov. 3, 2016), *available at* https://www.justice.gov/opa/speech/assistant-attorney-general-leslie-r-caldwell-delivers-remarks-highlighting-foreign.

726544.1

75.     The Defendants' unlawful conduct had a substantial effect in the United States because it directly harmed Harvest, other American companies, and the consumer market for fuel.

## CAUSES OF ACTION

### Count I: RICO § 1962(c)

76.     Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

77.     At all relevant times, Harvest was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

78.     At all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

79.     At all relevant times, Defendants formed an association-in-fact for the purpose of bribing Harvest.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

80.     At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

81.     At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

82.     Specifically, at all relevant times, Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above, including: Defendant Garcia's solicitation of a $10 million bribe from Harvest in November 2012 on behalf of Defendant Ramirez; Defendant Garcia's solicitation of a bribe from Harvest's agreed buyer, Pertamina, in November or December 2012; Defendant Garcia's solicitation of a bribe from

20

726544.1

Harvest's agreed buyer, Pluspetrol, in fall 2014; and Defendant Gonzalez's solicitation of a bribe from Pluspetrol in late 2014.  The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 371; and 15 U.S.C. § 78dd-1 *et seq.* (FCPA).  Defendants each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

83.     The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, a common victim (Harvest), a common method of commission, a common purpose (obtaining a bribe from Harvest), and the common result of scuttling purchase and sale agreements entered into by Harvest and other companies.  The illegal scheme continued for many years—and as to Harvest's failed deals, for over two years, from approximately July 2012 through the end of 2014—and threatens to continue against other American companies conducting business in Venezuela.

84.     As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Harvest was injured in its business and property, losing approximately $470 million.  Harvest lost two deals to sell its assets, the first for $725 million and the second for $400 million, and as a result, was forced to sell those same assets at a significant loss.

85.     As a result of their misconduct, Defendants are liable to Harvest for its losses in an amount to be determined at trial.

86.     Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum

21

726544.1

amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

### Count II: RICO Conspiracy § 1962(d)

87.     Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

88.     At all relevant times, Harvest was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

89.     At all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

90.     At all relevant times, Defendants formed an association-in-fact for the purpose of bribing Harvest.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

91.     At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

92.     At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

93.     At all relevant times, Defendants each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).  Defendants knew that their predicate acts were part of a racketeering activity and agreed to the commission of those acts to further the schemes described above.

726544.1

94.     Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

95.     As a direct and proximate result of Defendants' conspiracy, acts taken in furtherance of the conspiracy, and other violations of 18 U.S.C. § 1962(d), Harvest was injured in its business and property, losing approximately $470 million.  Harvest lost two deals to sell its assets, the first for $725 million and the second for $400 million, and as a result, was forced to sell those same assets at a substantial loss.

96.     As a result of their misconduct, Defendants are liable to Harvest for its losses in an amount to be determined at trial.

97.     Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

## Count III: Sherman Act § 1

98.     Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

99.     Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the relevant markets in violation of 15 U.S.C. § 1.

100.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

23

726544.1

101.    To the extent Defendants' activities concerned trade outside the United States, they had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

102.    Harvest has suffered antitrust injury and has been proximately and directly injured in its business by reason of Defendants' aforementioned Sherman Act violations with respect to the relevant markets.

103.    Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

## Count IV: Robinson-Patman Act § 2(c)

104.    Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

105.    Defendants engage and have engaged in commerce by consulting on oil and gas contracts in Venezuela.  Defendants have solicited unlawful bribe payments from Harvest and planned purchasers of Harvest's assets in order for the sales to be approved by Venezuela.

106.    By soliciting bribes and preventing Harvest from selling its assets, Defendants have engaged, attempted to engage, and/or conspired to engage in commercial bribery in violation of Section 2 of the Robinson-Patman Act, 15 U.S.C. § 13(c).

107.    Defendants' bribery scheme is *per se* unlawful and constitutes *per se* competitive injury.

108.    Defendants' unlawful commercial bribery and attempted commercial bribery has injured Harvest because Venezuela failed to approve two separate share purchase agreements that Harvest entered into with specific purchasers to sell its Venezuela assets.  Harvest ultimately

24

726544.1

sold the same assets for approximately $470 million less than the previously agreed market value. Thus, as a direct, substantial, and proximate result of Defendants' unlawful conduct, Harvest has suffered an antitrust injury and has been injured in its business.

109.　Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

## Count V: Texas Free Enterprise and Antitrust Act

110.　Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

111.　Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce in violation of Texas Business & Commercial Code § 15.05(a).

112.　Defendants' wrongful conduct substantially affected Texas, interstate, and foreign commerce, and occurred within the flow of Texas, interstate, and foreign commerce.

113.　To the extent Defendants' activities concerned trade outside Texas and the United States, they had direct, substantial, and reasonably foreseeable effects on competition in Texas.

114.　Harvest has suffered antitrust injury and has been proximately and directly injured in its business or property by reason of Defendants' aforementioned violations with respect to the relevant markets.

115.　Relief would promote competition in Texas and benefit Texas consumers.

116.　Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this

25

726544.1

suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

## PRAYER

For the foregoing reasons, Harvest prays that Defendants be commanded to answer the foregoing claims and allegations, and that Harvest recover the following orders and judgments from Defendants:

a)  actual damages suffered by Harvest;

b)  treble damages;

c)  Harvest's reasonable attorneys' fees incurred in prosecuting this action;

d)  Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law;

e)  any and all other relief to which Harvest may be entitled at law or in equity.

726544.1

Respectfully Submitted,

**SMYSER KAPLAN & VESELKA, L.L.P.**

*/s/ Lee Kaplan*

Lee L. Kaplan
Attorney-in-Charge
Federal Bar No. 1840
State Bar No. 11094400
Dane Ball
Federal Bar No. 784400
State Bar No. 24051642
Ty Doyle
Federal Bar No. 1373873
State Bar No. 24072075
Anthony J. Phillips
Federal Bar No. 1123515
State Bar No. 24094089
Alexander M. Wolf
State Bar No. 24095027
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
lkaplan@skv.com
dball@skv.com
tdoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS
HARVEST NATURAL
RESOURCES, INC. AND HNR
ENERGIA B.V**

27