United States District Court
Southern District of Texas
**ENTERED**
June 09, 2020
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HARVEST NATURAL RESOURCES, INC. | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-18-483 |
| | § | |
| RAFAEL DARIO RAMIREZ CARRENO | § | |
| | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

This case plays out on an international stage. It involves age-old themes of corruption and political persecution, yet the central legal issue is seemingly dry. When may, and should, a court set aside a default judgment? The answer is that even if this court need not do so in this case, it should, and it does.

Rafael Dario Ramirez Carreno asks the court to set aside the February 2019 final default judgment and to dismiss the case for lack of personal jurisdiction, insufficient service of process, and because of a waiver of the claims against him. Based on careful consideration of the motion, the many responses and replies, the record, and the applicable law, the court holds that, although the attempt at service was in good-faith and adequate; the court has personal jurisdiction over Ramirez; and the waiver issue is too ambiguous to justify disturbing the default judgment, there is good cause to set aside the default judgment and resolve this billion dollar international corruption case on the merits.

Ramirez's motion to set aside the default judgment is granted, but his request to dismiss the case is denied. The reasons for these rulings are set out below.

## I.     Background: The Parties, People, and Issues

### a.     The Cast of Characters

The major players in this case are:

- **Rafael Dario Ramirez Carreno ("Ramirez")**: the former President of Petroleos de Venezuela S.A. and the Venezuelan Minister of Energy and Oil from 2004 to 2014. (Docket Entry No. 14 at ¶ 8).  Harvest alleges that Ramirez, the defendant, participated in an international bribery scheme.  His whereabouts are unknown and he claims to be in hiding from the current Venezuelan government.

- **Petroleos de Venezuela S.A.**: Venezuela's state-owned oil and gas company, which does business around the world, including in Texas.  (*Id.*).  Through its wholly owned subsidiary **Corporacion Venezolana del Petroleo**, Petroleos was a majority owner of the Venezuelan exploration and production company **Petrodelta, S.A.**  (*Id.* at ¶ 18).

- **Juan Jose Garcia Mendoza ("Garcia")**: a consultant for oil and gas companies that do business in Venezuela.  Garcia allegedly facilitated the bribery scheme in which Ramirez participated, and he allegedly acted on Ramirez's behalf.  Garcia was a defendant in this case.  He allegedly operated three Florida entities—**Azure 406 LLC, Azure 904 LLC,** and **Selle LLC**—"as conduits for illegal activity."  (*Id.* at ¶¶ 7, 25–26).

- **Harvest Natural Resources**: a Houston-based, Delaware-incorporated "independent energy company [that] engaged in the development and production of oil and gas properties from 1989 until May 2017."  (*Id.* at ¶¶ 3, 17).  Through the subsidiaries described below, Harvest held a minority interest in Petrodelta.  Harvest is the plaintiff.

- **James Edmiston**: Harvest's CEO.  (*Id.* at ¶ 21).

- **Keith Head**: Harvest's former vice-president and general counsel, who prepared an affidavit in this case.  (Docket Entry No. 65-1).

- **HNR Energia B.V.**: a Harvest wholly owned subsidiary.  (Docket Entry No. 14 at ¶ 18).

- **Harvest-Vinccler Dutch Holding B.V. ("Harvest Holding")**: a Netherlands company in which HNR Energia held an 80% interest.  Through its own subsidiaries, Harvest Holding held a 40% interest in Petrodelta.  (*Id.* at ¶ 18).

- **PT Pertamina**: an Indonesian state-owned company that attempted to buy—through HNR Energia and HNR Energia's subsidiaries—Harvest's interests in Venezuela. (*Id.* at ¶ 19). The deal fell through in 2013. (*Id.* at ¶ 33).

- **Petroandina Resources Corporation N.V.**: a company that, with the involvement of its parent company, **Pluspetrol Resources Corporation B.V.**, attempted to buy Harvest's interests in Venezuela. (*Id.* at ¶ 36). The second part of the deal fell through in late 2014 and officially ended on January 1, 2015, because it did not receive approval from the Venezuelan government. The first part of the deal did not require this approval. (*Id.* at ¶¶ 36–42).

- **Javier Alfredo Iguacel**: the vice-president of business development at Pluspetrol. He allegedly received a bribe demand from Garcia and conveyed it to Harvest CEO Edmiston. (*Id.* at ¶ 39).

- **CT Energy Holding SRL**: a Barbados Society with Restricted Liability that successfully bought Harvest's remaining Venezuelan interests in 2016. (*Id.* at ¶ 44).

**b.    Factual Background**

In February 2018, Harvest sued Ramirez and others under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C §§ 1961, *et seq.*, and bribery and antitrust statutes. (*See* Docket Entry Nos. 1, 14). Harvest's first amended complaint alleges that Petroleos de Venezuela and its executives, including Ramirez, "withheld final approval for Harvest to sell its Venezuelan energy assets to two different buyers in 2013 and 2014" as part of a "pay-to-play" scheme. (Docket Entry No. 14 at ¶ 1). Harvest alleges that Juan Jose Garcia Mendoza demanded bribes "at Ramirez's request," in exchange for approval of Harvest's proposed asset sales. (*Id.* at ¶¶ 25–26, 39). Harvest refused to pay the bribes. After two deals to sell its Venezuelan assets allegedly fell through, Harvest sold the last of those assets in 2016. Ramirez had left Petroleos de Venezuela at that point. (*Id.* at ¶¶ 19–49). Harvest alleges that it received over $470 million less than the price of its original deal and had to close its business entirely because of the loss Ramirez's bribe demands allegedly caused. (*Id.* at ¶¶ 1, 43–49, 76–116). Ramirez denies Harvest's claims.

3

The court entered default judgment against Ramirez in December 2018, finding that he was properly served under Rule 4(e) and that he had failed to answer, respond, or otherwise defend against the lawsuit within the Rule 12(a)(1)(A)(i) time limit.  (Docket Entry No. 66).  The court entered a corrected judgment at Harvest's request on February 13, 2019.  (Docket Entry No. 68).  On February 28, 2019, the court entered a final default judgment awarding treble damages of $1,416,118,657.98, postjudgment interest from the date of the judgment at a rate of 2.55% per year, and attorneys' fees and costs.  (Docket Entry No. 71).

Ramirez filed the pending motion to set aside that judgment and dismiss the case in June 2019.  (Docket Entry No. 72).  Before requiring Harvest to respond, the court heard argument on, and allowed, targeted jurisdictional discovery.   (Docket Entry Nos. 88, 98).   Ramirez supplemented his motion in December 2019.  (Docket Entry No. 106).

The parties dispute whether the default judgment is void under Federal Rule of Civil Procedure 60(b)(4) for lack of personal jurisdiction and insufficient service of process; whether the judgment should be set aside for good cause under Rule 60(b)(1); whether Harvest's 2016 share purchase agreement waived Harvest's claims against Ramirez and negates the basis in the pleadings for the default judgment; and whether the case should be dismissed under Rules 12(b)(2), 12(b)(5), and 12(c).   The court considers the parties' arguments against the record and the applicable legal standards.

## II.   The Legal Standards

### a.   Default Judgment

"[A] 'party is not entitled to a default judgment as a matter of right.'"  *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) (per curiam) (quoting *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996)). "Defaults are 'generally disfavored.'"  *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910

4

F.3d 221, 225 (5th Cir. 2018) (quoting *Mason & Hanger-Silas Mason Co. v. Metal Trades Council of Amarillo, Tex. & Vicinity, AFL-CIO*, 726 F.2d 166, 168 (5th Cir. 1984)).  The Fifth Circuit favors "resolving cases on their merits."  *Sindhi v. Raina*, 905 F.3d 327, 331 (5th Cir. 2018) (citation omitted).  "This policy, however is 'counterbalanced by considerations of social goals, justice[,] and expediency, a weighing process [that] lies largely within the domain of the trial judge's discretion.'"  *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 936 (5th Cir. 1999) (quoting *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990)).  The court may enter default judgment "when the adversary process has been halted because of an essentially unresponsive party."  *Sun Bank of Ocala v. Pelican Homestead & Savings Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

"A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true."  *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  For a default judgment to stand, the complaint must satisfy Rule 8's requirements.  *See Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 497–98 (5th Cir. 2015).  "On appeal, the defendant, although he may not challenge the sufficiency of the evidence, is entitled to contest the sufficiency of the complaint and its allegations to support the judgement."  *Nishimatsu*, 515 F.2d at 1206.

### i.      Setting Aside a Default Judgment Under Rule 60(b)(1)

Rule 55(c) allows courts to set aside default judgments under Rule 60(b).  FED. R. CIV. P. 55(c).  "Rule 60(b), in turn, allows the trial court to 'correct obvious errors or injustices.'"  *Sontay v. Hin's Garden*, No. H-13-3721, 2014 WL 6722507, at *1 (S.D. Tex. Nov. 26, 2014) (quoting *Fackelman v. Bell*, 564 F.2d 734, 736 (5th Cir. 1977)).

In determining whether there is good cause to set aside a default judgment under Rule 60(b)(1), district courts consider: (1) "whether the defendant willfully defaulted"; (2) "whether a meritorious defense is presented"; and (3) "whether setting aside the default judgment would prejudice the plaintiff." *Scott v. Carpanzano*, 556 F. App'x 288, 293 (5th Cir. 2014) (citing *Jenkens & Gilchrist v. Groia & Co.*, 542 F.3d 114, 119 (5th Cir. 2008)). "Of these factors, two can be determinative: a district court may refuse to set aside a default judgment if it finds either that the default was willful or that the defendant failed to present a meritorious defense." *Id.* "Courts may also consider whether the public interest was implicated, whether there was significant financial loss to the defendant, and whether the defendant acted expeditiously to correct the default." *Jenkens*, 542 F.3d at 119. "Rule 60(b) is applied most liberally to judgments of default, since trial on the merits is to be favored over such a truncated proceeding. Unless it appears that no injustice results from the default, relief should be granted." *In re OCA, Inc.*, 551 F.3d 359, 370–71 (5th Cir. 2008). "In light of the general disfavor of default judgments, 'where there are no intervening equities any doubt should, as a general proposition, be resolved in favor of the movant to the end of securing a trial upon the merits.'" *Id.* at 371 (quoting *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000)). That said, "[t]he burden of showing good cause lies with the party challenging the default entry." *Sindhi*, 905 F.3d at 332.

"[I]f a district court finds a defendant's default to be willful, then the district court need not make any other finding." *Jenkens*, 542 F.3d at 120 (citing *In re Dierschke*, 975 F.2d 181, 184 (5th Cir. 1992)). "A willful default is an 'intentional failure' to respond to litigation." *In re OCA*, 551 F.3d at 370 n.32 (quoting *Lacy*, 227 F.3d at 292) (emphasis omitted). "[P]erfection of service is not determinative—the defendant's knowledge of the perfected service, and the defendant's actions post-service also play a role in measuring the willfulness of a defendant's default."

*Jenkens*, 542 F.3d at 122–23.   The Fifth Circuit has warned against adopting a "willfulness presumption" that would "render[] meaningless" "the instruction to apply Rule 60(b) most liberally when considering whether to vacate a default judgment."   *In re OCA*, 551 F.3d at 372 (internal quotation marks and citations omitted).   Instead, the "defendant has the burden of showing by a preponderance of the evidence that its neglect was excusable, rather than willful." *Wooten*, 788 F.3d at 500–501.

A plaintiff has not suffered prejudice when setting a default judgment aside does "no harm to [the] plaintiff except to require it to prove its case."   *Lacy*, 227 F.3d at 293 (quoting *Gen. Tel. Corp. v. Gen. Tel. Answering Serv.*, 277 F.2d 919, 921 (5th Cir. 1960)).   To show prejudice, the plaintiff must demonstrate that setting the judgment aside will result in "loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion."   *Scott*, 556 F. App'x at 298 (quoting *Lacy*, 227 F.3d at 293).

### ii.     Setting Aside a Default Judgment Under Rule 60(b)(4)

A judgment is "void" under Rule 60(b)(4) if "the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law."   *Williams v. New Orleans Pub. Serv., Inc.*, 728 F.2d 730, 735 (5th Cir. 1984) (citations omitted); *see generally United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270–71 (2010) (collecting authorities).   The Fifth Circuit has held that a judgment is void if the district court "lacked personal jurisdiction over the defendant because of defective service of process."   *Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 393 (5th Cir. 2001).   Granting a Rule 60 motion is ordinarily in the district court's discretion, but "[w]hen . . . the motion is based on a void judgment under rule 60(b)(4), the district court has no discretion—the judgment is either void or it is not."   *Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 314 (5th Cir. 1986).

7

This is one reason why "there is no time limit on Rule 60(b)(4) motions." *Jackson v. FIE Corp.*, 302 F.3d 515, 523 (5th Cir. 2002). "If the judgment is void, 'the district court *must* set it aside.'" *Id.* at 524 (quoting *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988)). Rule 60(b)(4) "embodies the principle that in federal court, a 'defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds.'" *Id.* at 522 (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982)).

   **b.   Service of Process**

   Rule 4(e)(2)(B) permits service of process in a United States judicial district by "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." FED. R. CIV. P. 4(e)(2)(B). The "practicalities of the particular fact situation," not any "hard and fast rule," "determine what is or is not a party's dwelling house or usual place of abode." *Norris v. Causey*, 869 F.3d 360, 369 n.5 (5th Cir. 2017) (internal quotation marks and citation omitted). The Fifth Circuit has held that Rule 4's "provision concerning usual place of abode should be liberally construed to effectuate service if actual notice has been received by the defendant." *Nowell v. Nowell*, 384 F.2d 951, 953 (1967) (internal quotation marks and citations omitted); *accord Windecker v. Hang Wei*, No. 1:18-cv-00898-LY, 2020 WL 248689, at *3 (W.D. Tex. Jan. 16, 2020); *see also Henderson v. United States*, 517 U.S. 654, 672 (1996) ("[T]he core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections."); 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 1061 (4th ed. Apr. 2020) (Rule 4 was designed in part to "eliminate unnecessary technicality in connection with service of process").

### c.    Personal Jurisdiction

Generally, if there has not been an evidentiary hearing on personal jurisdiction, "the plaintiff bears the burden of establishing only a *prima facie* case of personal jurisdiction." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). "Proof by a preponderance of the evidence is not required." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). The court may consider the well-pleaded allegations and "the record at the time of the motion," accepting the uncontroverted allegations as true and resolving factual conflicts in the nonmovant's favor. *Sangha*, 882 F.3d at 101 (quoting *Paz v. Brush Engineering Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006)); *Halliburton Energy Servs., Inc. v. Ironshoe Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019); *Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). The district court is not required "to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

When a defendant attacks a default judgment on personal jurisdictional grounds under Rule 60(b)(4), the Fifth Circuit is not clear on which side bears the burden of proof. *See Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 498 (5th Cir. 2018) (alteration, internal quotation marks, and citations omitted) ("In a case involving a default judgment allegedly rendered in the absence of personal jurisdiction, we stated that, of course, the burden of undermining a default judgment rests heavily upon the assailant. . . . More recently, however, we stated that the question who bears the burden of proof in a Rule 60(b)(4) challenge to personal jurisdiction is one that has not been answered for this circuit. . . . Under the rule of orderliness, the older case would govern, . . . but we need not address all potential permutations of this rule to address the circumstance here."). The Fifth Circuit clarified the burden in the "very specific" context of "when a Rule

60(b)(4) challenge is made solely on the argument that the requirement of Rule 4(k)(2)(A)—that [the] defendant is not subject to jurisdiction in any state's courts of general jurisdiction—is not met," but that is not the posture of this case.  *Id.* at 499.

The Fifth Circuit instructs that "when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien*, 11 F.3d 1255, 1258 (5th Cir. 1994); *see also Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 825 (1996) (the Fifth Circuit "placed no limitation on [its] conclusion in *Busch* regarding personal jurisdiction in cases involving federal statutes providing for nationwide service of process.").  As this court held in its May 11, 2018, Memorandum and Order, although the Fifth Circuit has not ruled on the issue, RICO allows for nationwide service of process.  (Docket Entry No. 48 at 5).

RICO provides that:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. 1965(a)–(b).

"[A] number of courts have construed § 1965(a)'s 'transacts his affairs' language to require traditional minimum contacts analysis under the state's long arm statute." *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 780 (N.D. Tex. 2008) (collecting cases but not reaching the statutory interpretation issue); *see also Bonvillain v. La. Land & Expl. Co.*, 702 F. Supp. 2d 667,

10

683 (E.D. La. 2010) (collecting cases).  The parties in this case agree that RICO requires the forum court to have "personal jurisdiction over at least one defendant under § 1965(a) before other nonresident defendants become subject to nationwide service of process."  *David v. Signal Int'l, LLC*, 588 F. Supp. 2d 718, 723 (E.D. La. 2008); (Docket Entry No. 109 at 34–35; Docket Entry No. 119 at 20).

The parties dispute whether now-terminated defendant Juan Jose Garcia Mendoza had minimum contacts with the Southern District of Texas, whether Ramirez had minimum contacts with the United States, and how Garcia's removal from the case impacts the personal jurisdiction analysis.  The parties also contest whether, RICO aside, Harvest has made a *prima facie* showing of specific jurisdiction over Ramirez in Texas.

"For there to be minimum contacts, a defendant must have purposefully availed himself of the benefits and protections of the forum state such that he should reasonably anticipate being haled into court there."  *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (internal quotation marks and citations omitted).  This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person."  *Id.* at 193–94 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  "[J]urisdiction is proper only where the 'defendant *himself*' made deliberate contact with the forum."  *Id.* at 194 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

"'Minimum contacts' can give rise to either specific jurisdiction or general jurisdiction."  *Sangha*, 882 F.3d at 101 (quoting *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001)).  "Specific jurisdiction may exist 'over a nonresident defendant whose contacts with the forum state are singular or sporadic only *if* the cause of action asserted arises out of or is related to those contacts.'"

*Id.* (quoting *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 212 (5th Cir. 2016)).  "A court may assert general jurisdiction over [non-resident defendants] to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

"Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of jurisdiction would be unfair." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).  The defendant must make a "compelling case" against jurisdiction; it is "rare to say the assertion is unfair after minimum contacts have been shown." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).  The court must balance "the burden on the defendant having to litigate in the forum; the forum state's interests in the lawsuit; the plaintiff's interests in convenient and effective relief; the judicial system's interest in efficient resolution of controversies; and the state's shared interest in furthering fundamental social policies." *Id.*

### d. Judgment on the Pleadings

"A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam)).  The Rule 12(c) and Rule 12(b)(6) standards are the same. *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2002).  Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in

conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Supreme Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

A court generally considers only the pleadings in deciding a motion for judgment on the pleadings, *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 904 (5th Cir. 2002), but "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). A court may also consider "any judicially noticed facts." *Hebert Abstract Co., Inc. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990).

## III. Analysis

### a. Service of Process

On February 16, 2018, Harvest filed its original complaint. (Docket Entry No. 1). The same day, acting under Rule 4(e)(2)(B), Harvest served the original complaint and summons with a house employee at what it called Ramirez's "last and only known residence" in New York City, where Ramirez had lived when he was Venezuela's ambassador to the United Nations. (Docket Entry No. 10; Docket Entry No. 109 at 22). Ramirez wrote in his declaration that he had left the New York residence with no intent to return when he resigned from his ambassadorship more than two months before the attempted service. (Docket Entry No. 72-1 at 3). Ramirez declared that he

fled the country to protect himself against persecution by the Venezuelan government, which he had criticized publicly.  (*Id.*).

Ramirez argues that Harvest's attempted service under Rule 4(e) was improper for three reasons.  First, the New York address was no longer Ramirez's place of abode.  Second, Harvest should have known that Ramirez no longer lived there, given that the first amended complaint cites an article discussing Ramirez's resignation from the United Nations.[1]  Third, Harvest should have served Ramirez by an internationally agreed means of service authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, under Federal Rule of Civil Procedure 4(f).  (Docket Entry No. 72 at 13–16).[2]

Ramirez cites *Rana v. Islam*, 305 F.R.D. 53 (S.D.N.Y. 2015), in which the Southern District of New York could not determine that service was proper under Rule 4(e) because the plaintiff had attempted to serve the defendants, the former Consulate General of Bangladesh and his wife, one day after they left their New York residence.  The plaintiff had not provided "evidence that [the] defendants intend[ed] to return to the United States."  *Id.* at 64.  The court distinguished cases in which service was made at a defendant's former residence, to which the defendant still had access, because in those cases there were "indicia of permanence [that] made it reasonably likely that service at the former address would result in the defendant receiving notice of the pending action."  *Id.*  The court still denied the motion to dismiss for improper service because the defendants had actual notice of the lawsuit and it appeared that proper service could still be obtained.  *Id.* at 65–66.

---

[1]  *See* (Docket Entry No. 14 at ¶ 57).
[2]   Ramirez also disputes that Harvest served him with its first amended complaint, the current pleading, noting that it lacks a certificate of service.  (Docket Entry No. at 72 at 15).  Harvest responds that it sent the first amended complaint and other filings to Ramirez in February, March, and April 2018, and that each mailing was accepted and signed for.  (Docket Entry Nos. 109-20, 109-21, 109-22).

Harvest responds that its good-faith efforts to properly serve Ramirez were legally sufficient under the circumstances.  (Docket Entry No. 109 at 24).  Harvest argues that, when it prepared to sue Ramirez in February 2018, news sources indicated that Ramirez could be hiding anywhere in the world.  (Docket Entry No. 122 at 11–12).  Harvest hired a professional investigative firm, which found only the New York address from Ramirez's time as the United Nations ambassador.  (Docket Entry No. 122-2 at 4).  From February to April 2018, staff at the residence accepted and signed for the original complaint, the first amended complaint, and other mailings.  (Docket Entry Nos. 10, 109-20, 109-21, 109-22).  One mailing was returned as undeliverable in May 2018, (Docket Entry No. 109-23), but residence staff accepted correspondence for Ramirez again in December 2018 and January 2019.  (Docket Entry Nos. 109-24, 109-25).  Harvest points out that in May 2018 and November 2019, Ramirez told the press that he had been moving between countries since he left the United States in December 2017.  (Docket Entry No. 122 at 14–15 (citing Joshua Goodman, *Venezuela's Ex-Oil Czar Sees Economic Collapse Accelerating*, ASSOCIATED PRESS (May 25, 2018), https://apnews.com/84ee4625e79c4d35a9284062b4e07612/Venezuela%27s-ex-oil-czar-sees-economic-collapse-accelerating); Docket Entry No. 109-35 at 3)).

Harvest cites *N.L.R.B. v. Clark*, 468 F.2d 459, 462–64 (5th Cir. 1972), which held that, under an older version of Rule 4, "[a] defendant who beclouds his whereabouts should not be entitled to benefit from the process server's consequent confusion."  The court held that service was adequate at the defendant's former place of business because he "created the appearance that the [nursing] home remained his principal place of business."  *Id.* at 64.  *Clark*'s facts do not match these circumstances, but Harvest emphasizes, among other things, that: Ramirez listed New York as his location on his Twitter profile until at least June 2018 (Docket Entry No. 109-26); his

15

Wikipedia profile began listing his resident as New York as his residence in December 2017 (Docket Entry No. 109-27); Ramirez admits he did not give the New York residence staff a forwarding address when he left New York in December 2017 (Docket Entry No. 72-1 at 3); the New York residence was associated with telephone records in Ramirez's wife's name until two months after service (Docket Entry No. 109-30); Ramirez maintained a New York phone number as of March 2018, which was after service (Docket Entry No. 109-3); Harvest called Ramirez and texted him via iMessage and WhatsApp messenger to inform him of the lawsuit, ask if he would appear, and ask whether he had counsel with whom Harvest should communicate (Docket Entry Nos. 109-3, 109-32, 109-33); and Ramirez received at least one WhatsApp message and "referred [it] to his counsel" (Docket Entry No. 109-1 at 6). Finally, Harvest stresses, and Ramirez does not dispute, that in February 2018 Ramirez had actual notice of the lawsuit and told a journalist that he denied the bribery allegations. That comment happened on the day of service. (Docket Entry No. 109 at 14 n.2 (citing Joshua Goodman, *Houston Firm Sues Ex Venezuelan Oil Czar Ramirez Over Bribes*, ASSOCIATED PRESS (Feb. 16, 2018), https://apnews.com/f173499a09364fc492713fe056801024/Houston-firm-sues-ex-Venezuelan-oil-czar-Ramirez-over-bribes); Docket Entry No. 109-1 at 5–6.

Ramirez argues that Harvest could not have expected him to have a continued presence at a government address owned by the very regime he was hiding from, contending that Harvest should have tried to serve him under the Hague Convention. (Docket Entry No. 119 at 9–10, 12, 17). Ramirez accuses Harvest of using social media posts and other data in a post-hoc attempt to justify its failure to look for him at the time of service, claiming that Harvest provided no evidence of a pre-service investigation. (Docket Entry No. 119 at 8). Harvest responds that it described its

16

investigation in its verified discovery response.   (Docket Entry No. 122 at 12–13; Docket Entry No. 122-2).

The court does not have a reason to doubt the truthfulness of Harvest's interrogatory response describing its pre-service investigation into Ramirez's place of abode.   A more detailed statement of the service investigation is not necessary to show that Harvest acted in good faith. The cases Ramirez cites do not support his assertion that Harvest must provide additional documentation, such as a sworn affidavit, when Harvest has submitted a sworn discovery response to the court.   *See Compass Bank v. Kleve*, No. L-12-46, 2012 WL 12895414, at *1–3 (S.D. Tex. Dec. 10, 2012) (discussing the need to file an affidavit under Texas law, not under Rule 4(e)(2)(B) or 4(f)); *BP Products North America, Inc. v. Dagra*, 232 F.R.D. 263 (E.D. Va. 2005) (holding that a plaintiff's unsuccessful efforts to locate and serve the defendant in Pakistan were reasonable but not stating that the plaintiff had to document its attempts in an affidavit).[3]

Under the circumstances, Harvest took reasonable steps to find Ramirez, who it reasonably could not locate given that he was in hiding.   Service was adequate under Rule 4(e)(2)(B).   Harvest did not need to attempt service under the Hague Convention because the only address it could find was the New York address, and it was not clear what other country Ramirez might be in; whether that country was a Hague-Convention signatory; or if Ramirez had actually left the United States. *See Compass Bank*, 2012 WL 12895414, at *4 (quoting *Opella*, 2011 WL 2600707, at *5) (the

---

[3]   Ramirez also criticizes Harvest for not directly asking him for his address, citing *Opella v. Rullan*, No. 10-21134-CIV, 2011 WL 2600707, at *5–6 (S.D. Fla. June 29, 2011), *report and recommendation adopted*, No. 10-21134-CIV, 2011 WL 13220496 (S.D. Fla. Aug. 9, 2011) and *Kott v. Beachport Entertainment Corp.*, 45 Cal. App. 4th 1126, 1137–39 (Cal. Ct. App. 1996).   (Docket Entry No. 119 at 18). But Harvest reasonably countered that it attempted repeatedly and unsuccessfully to make contact with Ramirez and his counsel, explaining that it did not ask too many questions for fear of "unethically communicat[ing] directly with a represented party."   (Docket Entry No. 122 at 16; *see* Docket Entry No. 109-3 at 3 (a WhatsApp message from Harvest's counsel to Ramirez saying, "I'd like to speak with you – or if you have a lawyer on this matter, would like to speak with your lawyer. . . . Again, if you have a lawyer I should talk to instead, please advise.")).

Hague Convention does not apply when the address of the person to be served "is unknown to the plaintiff after the plaintiff exercised reasonable diligence in attempting to discover that address.").[4] In the cases Ramirez cites holding that the plaintiff was insufficiently diligent, each plaintiff at least had some idea of the country the defendant was in.  *See*, *Opella*, 2011 WL 2600707, at *6–7; *BP Products*, 232 F.R.D. at 264; *Kott*, 45 Cal. App. 4th at 1138–39.

Harvest's reasonable efforts described in its sworn discovery response, combined with Ramirez's actual notice, prevents the court from concluding that improper service is a ground for setting aside the default judgment.  *See Nowell*, 384 F.2d at 953 (Rule 4's "provision concerning usual place of abode should be liberally construed to effectuate service if actual notice has been received by the defendant"); *accord Windecker*, 2020 WL 248689, at *3; *see also Conwill v. Greenberg Traurig, L.L.P.*, No. 09-4365, 2010 WL 2773239, at *3 (E.D. La. July 13, 2010) ("Where the defendant receives actual notice and the plaintiff makes a good faith effort to serve the defendant pursuant to the federal rule, service of process has been effective.").[5]

This ruling is in some tension with the Southern District of New York decision Ramirez cites, *Rana*, 305 F.R.D. at 64–65.  But in that case, the plaintiff knew the defendants had moved to Morocco.  *Id.* at 56–57.  Here, in contrast, Ramirez was hiding his whereabouts.  This supports Harvest's good-faith efforts to serve him, regardless of whether Ramirez hid to evade service or

---

[4]  The cases Ramirez cites do not support the proposition that, despite his actual notice of the suit and the uncertainty about whether he actually left the United States and was in a country that signed the Hague Convention, Harvest's good-faith efforts at service were inadequate because Harvest did not first ask the court for leave to serve Ramirez at his last-known address.  (*See, e.g.*, Docket Entry No. 119 at 17–18).  Rule 4(f)(3)'s provision for service abroad "by other means . . . as the court orders" applies only to service that occurs "at a place not within any judicial district of the United States."  FED. R. CIV. P. 4(f).  Here, Harvest served Ramirez at his last-known address in the United States.

[5]  The Fifth Circuit has not considered the validity of the "'good faith' rule" that *Conwill* and other district court decisions have adopted.  *See Norris*, 869 F.3d at 371.  In other words, the Fifth Circuit has not ruled that, as a general matter, the defendant's actual notice of a lawsuit plus the plaintiff's good faith effort at service equals adequate service.  This court finds *Conwill* persuasive in this case, especially given the Fifth Circuit's statement about construing "usual place of abode" liberally when the defendant has actual notice of the suit.  *Nowell*, 384 F.2d at 953.

escape political persecution (a matter the parties dispute).  It is also inevitable that courts will rule differently when there is no "hard and fast rule" for determining an individual's dwelling or usual place of abode in a particular case.  *See Norris*, 869 F.3d at 369 n.5; *see also Nowell*, 384 F.2d at 953.

### b.    Personal Jurisdiction

Harvest argues unpersuasively that Ramirez waived his personal jurisdiction argument "by failing to assert the defense as a ground to set aside the default judgment."  (Docket Entry No. 109 at 31–32).  Rule 12(g)(2) provides that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  FED. R. CIV. P. 12(g)(2).  Ramirez's first filing was a combined motion to set aside the default judgment and to dismiss.  (Docket Entry No. 72).  Harvest is correct that much of Ramirez's personal jurisdiction analysis falls under the motion-to-dismiss heading, but Ramirez also argued that the "default judgment is void for insufficient service of process *and lack of personal jurisdiction*."  (Docket Entry No. 72 at 12 (emphasis added)).  The court construes Ramirez's arguments for dismissal based on lack of personal jurisdiction as additional arguments for setting aside the default judgment.

On the substance of the personal jurisdiction issue, the court will not rely on Harvest's argument that Juan Jose Garcia Mendoza transacted business in the Southern District of Texas and that Ramirez is subject to RICO's nationwide service provision.  But Harvest did make a *prima facie* showing of specific personal jurisdiction over Ramirez in this district and demonstrated that exercising personal jurisdiction over him would not be unfair or offend due process.  As explained above, the Fifth Circuit is unclear on who bears the burden of proof when a defendant moves to

set aside a default judgment for lack of personal jurisdiction, but Harvest met the *prima facie* standard even if it had the burden.

"Personal jurisdiction and venue are determined at the outset of litigation and are not affected by subsequent events."[6]  *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003) (per curiam); *see also Michigan Trust Co. v. Ferry*, 228 U.S. 346, 353 (1913) ("[I]f a judicial proceeding is begun with jurisdiction over the person of the party concerned, it is within the power of a state to bind him by every subsequent order in the cause.")).[7]  This litigation began in February 2018, and Garcia's eventual dismissal from the case in November 2018 does not, in itself, negate the court's personal jurisdiction over Ramirez.  The court allowed jurisdictional discovery about Garcia to be completed by July 6, 2018, before Harvest moved to dismiss him as a defendant in October 2018. (Docket Entry Nos. 48, 63, 64).

Harvest identifies—and Ramirez does not rebut—evidence that Garcia had business contacts with Houston.  (Docket Entry No. 109 at 36–37).  Harvest alleges that, among other things, that Garcia worked for Chevron and regularly communicated by phone, email, and text with his boss and other Houston-based colleagues; repeatedly traveled to Houston on business; advertised his services to Texas companies and individuals; purchased health insurance from a Texas-based company; and transferred funds to the company's Texas bank account.  (*Id.*).

---

[6]  Ramirez argues that this view would "allow any plaintiff to assert a baseless RICO claim against a party over whom a court maintains personal jurisdiction just to bootstrap a foreign defendant in the plaintiff's chosen district, based purely on this procedural gamesmanship."  (Docket Entry No. 119 at 22). But as Harvest observes, case law already provides that there is no jurisdiction when a "claim was clearly made 'for the purpose of obtaining jurisdiction' or is 'frivolous.'"  *Stem v. Gomez*, 813 F.3d 205, 210 (5th Cir. 2016) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)).  Ramirez has not alleged that Harvest sued Garcia frivolously or to obtain jurisdiction.

[7]  Ramirez contends that *Ferry* does not address RICO and simply "forestalls the tactic of a litigant moving outside of the court's jurisdiction after jurisdiction first attaches."  (Docket Entry No. 126 at 12). He does not cite a case to confirm that narrow reading.

Harvest assumes that § 1965(a) requires only that one defendant literally "transact[ed] . . . affairs" in this district. (*Id.* at 36).[8]  But, as explained above, "a number of courts have construed § 1965(a)'s 'transacts his affairs' language to require traditional minimum contacts analysis under the state's long arm statute." *Rolls-Royce Corp.*, 576 F. Supp. 2d at 780; *Bonvillain*, 702 F. Supp. 2d at 683.  Harvest has not alleged or shown that Garcia was sufficiently "at home" in Texas for the court to have general jurisdiction over him, and it has not shown that Garcia's transactions were sufficiently related to the case to create specific jurisdiction. *See Sangha*, 882 F.3d at 101.

Harvest's focus on Garcia's general business activities is puzzling given the amended complaint's allegation that Garcia played a key role in Ramirez's alleged bribery scheme.  The amended complaint alleges that:

> 25. In November 2012, Defendant Garcia approached Juan Francisco Clerico, a director of Harvest-Vinccler, S.A., in Caracas, Venezuela, regarding the agreed sale of Harvest's stake in Petrodelta.  Garcia informed Clerico that Garcia was speaking on behalf of Defendant Ramirez and at Ramirez's request.  Garcia stated that Harvest must pay USD $10 million in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria.  Garcia solicited this bribe knowing and intending that the solicitation would be conveyed to Harvest in Houston, Texas, and that any bribe, if paid, would necessarily come from Harvest's bank accounts in the United States.

> . . .

> 27. In late November or early December 2012, [the] Pertamina [company] informed [Harvest CEO James] Edmiston that Pertamina had received a similar bribe demand from Defendant Garcia.  Pertamina also declined to pay the bribe.

---

[8]  At oral argument, Harvest cited three cases for this proposition, but none persuasively rebuts the authority requiring the traditional minimum contacts inquiry. *Caldwell v. Palmetto State Sav. Bank of South Carolina*, 811 F.2d 916, 918 (5th Cir. 1987), states that "a number of district courts have held that [§ 1965(a)] requires that a defendant be conducting business in the forum," but does not opine on whether minimum contacts analysis is necessary.  It was undisputed that "the defendants [in that case] did not [even] conduct business in [the forum state]." *Id.  Meganathan v. Signal Int'l L.L.C.*, No. 1:13-cv-497, 2014 WL 11512241, at *2 (E.D. Tex. July 3, 2014), *report and recommendation adopted*, No. 1:13-cv-497, 2014 WL 11512244 (E.D. Tex. Sept. 9, 2014) applies § 1965(a)'s language literally, as Harvest does, but does not explain this interpretation or address the contrary authority. *Dimas v. Vanderbilt Mortg. & Fin., Inc.*, No. C-10-68, 2010 WL 1875803 (S.D. Tex. May 6, 2010) does not interpret § 1965(a).

. . .

35. Defendant Garcia visited Houston from October 10, 2013, to October 20, 2013.

. . .

39. In approximately fall 2014, Javier Alfredo Iguacel, Vice President of Business Development at Pluspetrol, informed Edmiston in Houston that he had been contacted by Defendant Garcia. Yet again, Garcia demanded a bribe payment in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria. Garcia demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States. Harvest and Pluspetrol refused to pay the bribe.

(Docket Entry No. 14 at ¶¶ 25, 27, 35, 39). The court quoted these same accusations in May 2018 when it gave Harvest leave to take jurisdictional discovery to develop them. (Docket Entry No. 48 at 3–4, 7–8 (finding that Harvest had made a preliminary showing of jurisdiction, but not yet a *prima facie* showing)). Harvest has not significantly added to these allegations here, and, conclusory as the accusations are, the court need not credit them. *Panda Brandywine*, 253 F.3d at 869.

Given the number of other courts that construe § 1965(a) to mandate traditional minimum contacts analysis, the court resolves the personal jurisdiction dispute in Harvest's favor on a firmer basis that does not require deciding what § 1965(a) requires or invoking nationwide RICO service of process. "A single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis*, 252 F.3d at 358–59. "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien Air Alaska*, 195 F.3d at 213; *see also id.* at 211 ("Even if the parties formed their relationship [outside the United States], however, a single act by [the defendant] directed toward Texas that gives rise to a cause of action by [the plaintiff] can support a finding of minimum contacts."). Harvest meets this burden.

22

According to Harvest, as part of the conspiracy that harmed it, Ramirez "committed illegal acts of bribery and money laundering as described in the indictment in *United States v. De Leon et al.*, No. 4:17-cr-00514 in the Southern District of Texas." (Docket Entry No. 109 at 40; Docket Entry No. 14 at ¶¶ 66–69). Citing an anonymous United States government source, Harvest alleges that Ramirez—who was President of Petroleos de Venezuela and Venezuela's Minister of Energy and Oil at the time of the events alleged in the *De Leon* indictment—was the senior Venezuelan government official and unindicted coconspirator the indictment calls "Official B." (Docket Entry No. 14 at ¶ 68 (citing Joshua Goodman, *Official: US Says Ex-Venezuela Oil Czar Took Bribes*, ASSOCIATED PRESS, (Feb. 13, 2018), *available at* https://apnews.com/8fa2dd0c13c74cd4af7a1086eebefb56/Official:-US-says-ex-Venezuela-oil-czar-took-bribes)). The *De Leon* indictment states that from around 2011 to "at least" 2013, Official B and others conspired to obtain bribes from companies seeking approval for Petroleos de Venezuela-related contracts, laundering the payments through a series of international transactions. (*Id.* at ¶ 66; Docket Entry No. 109-75 at ¶¶ 4–6, 61). Companies that allegedly received bribe demands and also laundered the payments were based in the Southern District of Texas and made payments using bank accounts in this district. (Docket Entry No. 109-75 at ¶¶ 20–22, 24–25, 27, 60–61, 84, 148). The indictment alleges that Official B had intermediaries acting on his behalf, that he shared in the scheme's proceeds, and that a Houston company and its owner received and paid invoices for Official B's children's school tuition. (*Id.* at ¶¶ 20, 22, 61, 124, 139–140, 148, 240). The *De Leon* indictment does not mention bribes directed at Harvest, but the indictment's 2011 to 2013 timeline is close to the timing of the bribe demands that Harvest alleges it and its business partners received from 2012 to 2014. (Docket Entry No. 14 at ¶¶ 1, 19–42).

In his interrogatory responses, Ramirez stated that he did not know most of the *De Leon* defendants and coconspirators, and that he did not "recall" receiving payments, goods, or services from any of them.  (Docket Entry No. 109-76 at 5–6).  His court filings emphasize that the *De Leon* indictment contains allegations, not evidence, and that it does not name Ramirez or identify Official B.  (Docket Entry No. 119 at 25).  Ramirez states that he was not in the United States when the alleged bribe demands occurred, and that he has no ties to Texas.  (Docket Entry No. 126 at 14; *see also* Docket Entry No. 72-1 at ¶¶ 9–10).  Ramirez has repeatedly told reporters, Harvest's counsel, and the court that he never solicited bribes.  (Docket Entry No. 119 at 25–26).  Ramirez also points out that he and Garcia—who is not mentioned in the *De Leon* indictment—deny knowing each other and that Garcia denies communicating anyone's bribe demands, including any demands directed at Harvest.  (*Id.* at 26; *see also* Docket Entry No. 72 at 23).  Finally, Ramirez argues that "the alleged attenuated line of communication [from Ramirez], through multiple intermediaries, to Plaintiff Harvest . . . is legally insufficient to establish personal jurisdiction" or to show that Ramirez intended a bribe demand to reach Texas.  (Docket Entry No. 119 at 26 (citing *Walden*,  571 U.S. at 284 (internal quotation marks and citation omitted) (holding that the relationship between the defendant and the forum "must arise out of contacts that the defendant *himself* creates with the forum")); *see also* Docket Entry No. 72 at 23–24).

Ramirez responds primarily to Harvest's accusations about Garcia, rather than to the arguments about the broader conspiracy alleged in the *De Leon* indictment.  He does not respond to Harvest's argument in its surreply, (Docket Entry No. 122 at 27–29), that evidence undermining Ramirez's own statements supports the inference that he was involved in a bribery conspiracy directed at companies in the Southern District of Texas, including Harvest.  Harvest alleges the following discrepancies.

24

- Ramirez stated in his declaration that "[b]ecause I was not directly involved in negotiations with private companies, I had no prior knowledge of or participation in the negotiations related to Harvest's sale of its stake in PETRODELTA, S.A." (Docket Entry No. 72-1 at ¶ 15). But he told the press in February 2013 that he spoke to both Harvest and the company seeking to buy its stake in Petrodelta ("the buyer and seller"), stating that the companies knew "what they need[ed] to do in order to obtain government approval"[9] and expressing "satisf[action] with the negotiations." Nathan Crooks & Corina Pons, *Harvest Rises Most in Month on Venezuela Comments: Caracas Mover*, BLOOMBERG (Feb. 13, 2013), https://webcache.googleusercontent.com/search?q=cache:wakHgFhS6CcJ:http s://www.bloomberg.com/news/articles/2013-02-13/harvest-rises-most-in-month-on-venezuela-comments-caracasmover+&cd=1&hl=en&ct=clnk&gl=us. The parties dispute whether Ramirez was referring to paying a bribe or meeting the requirements of a bona fide approval process, but at minimum the admission that he spoke with Harvest and the potential buyer and was satisfied with the negotiations undermines his claim that he had no involvement in Harvest's attempted asset sale.

- Ramirez stated that he "never conducted business in Texas or with Texas companies." (Docket Entry No. 72-1 at ¶ 10). Not only is this assertion inconsistent with Ramirez's public comments about having spoken with Harvest during its negotiations concerning the Petrodetla deal, but also with the fact that when Ramirez ran Petroleos de Venezuela, it owned at least one Houston-based company, CITGO Petroleum Corporation. (Docket Entry No. 122 at 28).[10] Ramirez has commented to the media on litigation about a Petroleos de Venezuela joint venture in southeast Texas,[11] and he and Harvest CEO James Edmiston signed a business contract that stated that Edmiston lives in Houston.[12]

---

[9]  In his declaration, Ramirez acknowledged telling the press that the buyer and seller knew what they needed to do to get government approval, claiming that he only learned about the proposed transaction after another official had decided to initially deny approval. (Docket Entry No. 72-1 at ¶¶ 15–16). Ramirez explained that he "meant that [the buyer and seller] knew (or should have known) that the proposal . . . did not meet the requirements for asset sales as set out under the Organic Hydrocarbon Law and would have to go back through the approval process." (*Id.* ¶ 16). Ramirez's admission still undermines the previous paragraph of the declaration, in which he denied participating in negotiations related to Harvest's sale of its stake in Petrodelta.

[10]  *See*, Petroleos de Venezuela SEC Filing, *Offers to Exchange*, (Sept. 16, 2016), https://www.sec.gov/Archives/edgar/data/906424/000119312516712239/d171369dex99t3e.htm ("Through PDV Holding, [Inc.,] a wholly-owned subsidiary, [Petroleos de Venezuela] indirectly own[ed] 100% of . . . [Houston-based] CITGO Petroleum Corporation[.]").

[11]  Dan Molinski & Isabel Ordóñez, *Venezuela Sues Conoco Over Joint Venture*, WALL ST. J. (Mar. 1, 2010), https://www.wsj.com/articles/SB10001424052748703795004575087711132897860 (citing a statement by Ramirez about the case).

[12]  *See*, *Transitory Agreement*, (Aug. 4, 2005), https://www.sec.gov/Archives/edgar/data/845289/000095013405019807/h29602exv10w1.txt.

- There is evidence contradicting Ramirez's claim that he does not know Garcia or recall ever communicating with him.  (Docket Entry No. 72-1 at ¶ 17; *see also* Docket Entry No. 109-17 at 7 (in his deposition, Garcia said, "I don't know Rafael Ramirez.")).  Garcia's resume stated that he was the "main contact person within Chevron's [Latin America Business Unit] to the Ministry of Energy and Petroleum and [Petroleos de Venezuela]" between 2002 and 2017.  (Docket Entry No. 81-1).  As Harvest puts it, "[i]t stretches belief to conclude that Ramirez, who headed both the Ministry and [Petroleos de Venezuela from 2004 to 2014], does not know the [Petroleos de Venezuela] liaison from Chevron, one of the world's largest oil companies."  (Docket Entry No. 122 at 29).  Moreover, in an email, Garcia referred to having a seven-hour meeting with Ramirez in November 2010, and in an August 2016 message Garcia called "RR" a "friend."  (Docket Entry Nos. 81, 122-6).

In addition to the evidence undermining Ramirez's denials of Harvest's allegations, Harvest offers its verified interrogatory responses and the affidavit of its former vice-president and general counsel, Keith Head, who described how Ramirez and other coconspirators solicited bribes from Harvest.  (Docket Entry No. 65-1; Docket Entry No. 122-2 at 29).

The personal jurisdiction question is a close one.  But, particularly because the court must resolve jurisdictional factual disputes in Harvest's favor, the court holds that Harvest has made a *prima facie* case supporting specific jurisdiction over Ramirez.  *See Luv N'care*, 438 F.3d at 469; *see also Johnston*, 523 F.3d at 609 ("Proof by a preponderance of the evidence is not required.").  Ramirez's strongest argument highlights the many intermediaries and geographic distance between him and the Texas companies he allegedly sought to bribe.  But Harvest has adequately alleged that Ramirez and his alleged coconspirators made bribe demands that were intended to, and did, reach Texas firms.  The combination of Head's supporting affidavit, the United States official publicly (though anonymously) identifying Ramirez as Official B in the *De Leon* indictment (which a grand jury found was supported by probable cause), and the evidence calling Ramirez's denials into question, is enough at this stage.

26

Because Harvest has made a *prima facie* showing of specific jurisdiction, the court considers fairness concerns. Ramirez has not made a "compelling case" that exercising personal jurisdiction over him would be unfair or offend due process. *See Wien Air*, 195 F.3d at 215. He argues that Texas has "no particular interest . . . in hearing the case" and that it would be an "extraordinary" burden for him to litigate here when he is hiding from Venezuelan authorities. (Docket Entry No. 72 at 25). Ramirez argues that "forcing him to expose himself by litigating this dispute in Texas" would undermine the American interest in combatting political persecution and terrorism. (*Id.* at 26). Finally, because the litigation has "barely proceeded" and most witnesses "will be foreign citizens," he argues that judicial efficiency "is not threatened by terminating the case now." (*Id.*).

Ramirez's arguments fail because their logical conclusion is that he should not have to litigate this case *anywhere*. He does not suggest an alternative forum, and almost none of his concerns apply uniquely to this court or country. The most obvious alternative forum would be a Venezuelan court, but Ramirez would surely object to that option given the instability in the country and his statement that he is fleeing from the current government. No matter where the litigation happens, Ramirez could object that he is unfairly exposed to persecution.

Ramirez can, and has, relied on the experienced lawyers who have represented him in this court since June 2019 without publicly revealing his whereabouts. He can readily communicate with counsel. Texas has an interest in hearing this case because it involves alleged bribe demands directed at a Texas company, which has an interest in obtaining relief, particularly given that Ramirez has delayed appearing in this lawsuit. Finally, because the case has been pending in this court for more than two years, and this court has used that time to become familiar with its complex

27

facts, exercising jurisdiction is more efficient than transferring the lawsuit elsewhere.  Ramirez

has not shown that fairness requires another approach.

### c.    Harvest's Share-Purchase Agreement's Waiver of Claims

Ramirez also argues that the court should set aside the default judgment and dismiss the

case because Harvest waived its claims against him under the terms of the agreement Harvest

entered into in 2016 to sell its Venezuelan energy assets.  (Docket Entry Nos. 106, 110).  The

agreement had a "Waiver of Claims" section providing in relevant part that:

> Notwithstanding anything to the contrary contained in this Agreement and effective
> upon the consummation of the transactions contemplated by this Agreement,
> *[Harvest] does hereby, for itself and each of its Subsidiaries*, their respective
> Affiliates, or any of their respective successors or assigns, and all Persons who at
> any time prior to the Closing Date have been directors, officers, agents or
> employees of [Harvest] or any of its Subsidiaries (in each case, in their respective
> capacities as such), *waive, release and forever discharge Petróleos de Venezuela
> S.A. ("PDVSA") or the Bolivarian Republic of Venezuela (including any
> Governmental Authority thereof) and all Persons who have been or are directors,
> officers, agents or employees of PDVSA* (in each case, *in their respective
> capacities as such) from any and all* debts, guarantees, *liabilities*, costs, expenses,
> interest and obligations whatsoever, whether accrued or fixed, absolute or
> contingent, matured or unmatured, reserved or unreserved, or determined or
> determinable, *including those arising under any Law, claim (including any third
> Person claim), demand, action, whether asserted or unasserted, or order, writ,
> judgment, injunction, decree, stipulation, determination or award entered by or
> with any Governmental Authority*, or any fines, damages or equitable relief that is
> imposed, in each case, including all costs and expenses relating thereto, whether at
> law or in equity, whether *arising under any Contract, release or warranty, by
> operation of Law or otherwise, whether known or unknown, to the extent existing
> or arising from any acts or events occurring or failing to occur* or alleged to have
> occurred or to have failed to occur or any conditions existing or alleged to have
> existed *prior to the Closing Date* in respect of the assets, operations or business of
> [Harvest] and its Subsidiaries, including [HNR Energia].

(Docket Entry No. 106-1 at 78–79).

Ramirez argues that this provision waived Harvest's claims arising before the October 7,

2016, closing date.  The claims he seeks to dismiss arose when he was President of Petroleos de

Venezuela, a post he left in 2014.  (Docket Entry No. 106 at 10; Docket Entry No. 14 at ¶¶ 8, 44).

28

Ramirez emphasizes that in Harvest's 2016 Form 8-K, which Harvest filed with the Securities and Exchange Commission along with the share purchase agreement, Harvest disclosed that:

> From the date of the Share Purchase Agreement and continuing in effect after the Closing, [Harvest], on behalf of itself and its subsidiaries, waived all rights to exercise any legal action against Petrodelta Petroleos de Venezuela S.A., the Venezuelan national oil company, the Government of Venezuela or any of their directors, officers, agents or employees.

(Docket Entry No. 106 at 10; Docket Entry No. 106-2 at 5).[13]   Finally, Ramirez points out that the Waiver of Claims provision applies "[n]otwithstanding anything to the contrary contained in [the share-purchase] Agreement."  (Docket Entry No. 106-1 at 78; Docket Entry No. 110 at 9).

Harvest responds that Ramirez cannot raise the affirmative defense of waiver unless the court sets aside the default judgment; that the share-purchase agreement's waiver provision does not apply to the claims against Ramirez; and that Ramirez cannot enforce the waiver provision as a third-party beneficiary.  (Docket Entry Nos. 107, 116).

### i.     Whether Ramirez Can Use the Waiver Provision to Attack the Default Judgment

Harvest argues that Ramirez's waiver argument is premature because "a party who has defaulted must succeed in setting aside the default before they can file motions that go to the merits of the case."  (Docket Entry No. 107 at 9 (emphasis omitted) (quoting *Wilhite v. Reg'l Employers' Assurance Leagues VEBA Tr.*, No. B-11-59, 2011 WL 13254064, at *4 (S.D. Tex. Nov. 5, 2011))).  Harvest cites the Supreme Court's recent statement that, "[i]n civil litigation, a release is an

---

[13]   Both parties agree that the court may take judicial notice of the share purchase agreement (or consider it without taking judicial notice).  (Docket Entry No. 107 at 8).  The court takes judicial notice of the agreement and Harvest's statement in its 2016 Form 8-K as matters of public record under Federal Rule of Evidence 201.  FED. R. EVID. 201(b)(2); *see Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017) ("[W]e may take judicial notice of matters of public record."); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) ("[T]he district court took appropriate judicial notice of publicly-available documents and transcripts produced by the FDA, which were matters of public record directly relevant to the issue at hand.").

affirmative defense to a plaintiff's claim for relief, not something the plaintiff must anticipate and negate in her pleading." (Docket Entry No. 116 at 7 (quoting *Perry v. Merit Sys. Protection Bd.*, 137 S. Ct. 1975, 1986 n.9 (2017))). Harvest also contends that Ramirez waived the affirmative defense of waiver by failing to respond to the lawsuit and defaulting in the first place. (*Id.*).

Ramirez argues that the waiver provision is not only a ground for judgment on the pleadings or dismissal, but also it shows that Harvest's first amended complaint is insufficient to support the default judgment. *See Wooten*, 788 F.3d at 497 (in an appeal challenging a district court's entry of a default judgment and order denying a motion to set that judgment aside, the Fifth Circuit "beg[a]n by determining whether [the] complaint . . . supplied an adequate foundation for the default judgment."). Ramirez argues that because the complaint cites the share-purchase agreement and the agreement is "central" to Harvest's claims, the agreement is "part of the pleadings," and the agreement's waiver provision is a fact present on the face of the complaint that defeats Harvest's claims against Ramirez. (Docket Entry No. 106 at 7, 14–15, 19; Docket Entry No. 119 at 31; Docket Entry No. 126 at 17).

Although a defendant may "introduce [a] document as an exhibit to a motion attacking the sufficiency of the pleading if the plaintiff has referred to the item in the complaint and it is central to the affirmative case," 5A WRIGHT & MILLER, FED. PRAC. & PROC. § 1327 (4th ed. Apr. 2020), Ramirez has not identified cases in which a defendant has attached such a document to a motion to set aside a default judgment (as opposed to a motion to dismiss). The Fifth Circuit case Ramirez cites, *Nishimatsu*, 515 F.2d at 1206, vacated a default judgment as to one claim because a document *attached to the complaint* disclosed "a fact that would defeat the appellee's claim." Harvest did not attach the share-purchase agreement to its complaint.

The court need not resolve this procedural gray area.  As explained below, even if the court agreed with Ramirez that it could consider whether the waiver provision made the complaint an insufficient basis for the default judgment, the waiver clause is too ambiguous to make the complaint facially invalid.

### ii.    Whether the Waiver Provision Applies to Harvest's Claims Against Ramirez

The parties agree that Delaware law governs the share-purchase agreement.  (Docket Entry No. 106 at 16 n.4; Docket Entry No. 107 at 14 n.5).  Ramirez contends that the waiver provision is a "general release" of all claims against former Petroleos de Venezuela officers that bars suit against him under Delaware law.  (Docket Entry No. 106 at 16 (quoting *Webb v. Dickerson*, No. CIV.A. 01C-02-269JRJ, 2002 WL 388121, at *3 (Del. Super. Ct. Mar. 11, 2002))).  Harvest argues that the waiver provision applies only to former Petroleos de Venezuela officers "in their respective capacities as such," and that Harvest's claims are against Ramirez in his personal rather than official capacity.  (Docket Entry No. 107 at 10; *see* Docket Entry No. 106-1 at 79).  Ramirez replies that "the purported bribe request[s] would have been completely meaningless if he were not acting in his capacity as a [Petroleos de Venezuela] officer and threatening to withhold his official approval when allegedly soliciting those bribes," and that Harvest's alleged damages were allegedly caused by the delay in Petroleos de Venezuela's approval of Harvest's request to sell assets.  (Docket Entry No. 110 at 6).

Harvest counters that, when analyzing whether a foreign government official acted in an official or personal capacity in order to decide immunity, courts have held that "'suits against officers in their personal capacities' pertain to 'actions that exceed the scope of authority vested in that official so that the official cannot be said to have acted on behalf of the state.'"  (Docket Entry No. 116 at 11 (quoting *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 232 (D.D.C. 2018))).  Harvest

31

contends that because Ramirez's alleged illegal bribery scheme exceeded his authority as an officer of Petroleos de Venezuela, the share-purchase agreement's release provision does not preclude Harvest's claims.  (*Id.*).  Harvest also cites corporate law providing that corporate officers act outside their official capacities when they have "an independent, personal conspiratorial purpose, wholly separate and apart from the [corporate] entity."  (*Id.* (quoting *Reich v. Lopez*, 38 F. Supp. 3d 436, 463 (S.D.N.Y. 2014))).

Ramirez replies that the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et seq.*, prohibits "bribery of a foreign official to induce him to perform an official duty in a corrupt manner."  (Docket Entry No. 110 at 6 (quoting *United States v. Kay*, 359 F.3d 738, 761 (5th Cir. 2004))).  Ramirez argues that "[i]f Harvest's argument is taken to its logical conclusion, any government official who solicits and receives a bribe is acting in a personal capacity unless the government entity they are working for explicitly supports them and approves the bribe."  (Docket Entry No. 110 at 6).  Harvest responds that the Foreign Corrupt Practices Act "does not directly apply to a foreign official's receipt of a bribe," emphasizing that those officials may be prosecuted for offenses such as money laundering, bribery, and extortion—crimes that exceed their authority. (Docket Entry No. 116 at 12–13).

The court holds that—as Harvest argues in the alternative—it is ambiguous whether the waiver provision applies here.  (Docket Entry No. 107 at 17).  Under Delaware law, a contract is ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Halliburton Energy Servs., Inc. v. NL Indus.*, 553 F. Supp. 2d 733, 757 (S.D. Tex. 2008) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992))).  "When a contract is ambiguous, a court may consider extrinsic evidence to determine the parties' intent, and such evidence includes

'overt statements and acts of the parties, the business context [of the contract], prior dealings between the parties, business custom, and usage in the industry.'" *Id.* (quoting *Dittrick v. Chalfant*, 948 A.2d 400, 406 (Del. Ch. 2007)).  This analysis beyond the pleadings precludes dismissal of the lawsuit under Rule 12(b)(6) or 12(c).  *See, e.g.*, *Dolan v. Altice USA, Inc.*, No. 2018-0651-JRS, 2019 WL 2711280, at *2 (Del. Ch. June 27, 2019) (denying a motion to dismiss in part when conflicting contract provisions created ambiguity that required analysis of parol evidence).

Both Ramirez and Harvest have plausible interpretations of the share-purchase agreement's waiver provision.  The waiver clause is not a fact that makes the complaint facially insufficient to support the default judgment.  The court need not resolve at this time the parties' disagreement about whether Ramirez has third-party standing to enforce the waiver provision.

Because all of Ramirez's grounds for dismissal or judgment on the pleadings are refuted above, his motion to dismiss is denied.

### d.    Good Cause for Setting Aside the Default Judgment under Rule 60(b)(1)

Although Harvest has defeated most of Ramirez's arguments for setting aside the default judgment, at bottom this dispute is about whether Ramirez should be forced to pay $1.4 billion and suffer significant reputational harm without a chance to defend himself on the merits, now that he has appeared.  The court says no, notwithstanding Harvest's legitimate objections to, and frustration with, Ramirez's delayed response to this litigation.  The court finds that: (1) Ramirez's default was not willful because he believed he had not been served; (2) Ramirez presented a meritorious defense; and (3) the policy disfavoring default judgments, especially one of this magnitude, outweighs the potential prejudice Harvest would suffer if the default judgment is vacated.

### i.    Willfulness

Harvest makes a good case for finding that Ramirez's default was willful.  It emphasizes that, based on his comments to the press and admissions in this litigation, Ramirez had actual notice of the lawsuit just after it was filed, when a Harvest lawyer contacted him via WhatsApp in the weeks afterwards, and after the court entered final default judgment.  (Docket Entry No. 109 at 14–16)  Yet Ramirez did not appear in the case until 16 months after it was filed, which suggests willfulness.  (*Id.* at 16).

Harvest also cuts through many of Ramirez's excuses.  Ramirez alleges that he "acted as expeditiously as he could" while fleeing the Venezuelan government, explaining that English is not his native language; that he could not access his records in Venezuela; and that he struggled to coordinate with American counsel while abroad and trying to avoid the spotlight.  Ramirez also emphasizes that he responded within approximately six months of the initial entry of default, "well under the one-year deadline under Rule 60(b)(1)."  (Docket Entry No. 72 at 7, 17–18; *see also* Docket Entry Nos. 66 (the court entered the initial default judgment on December 19, 2018, and Ramirez filed his motion on June 24, 2019)).  But, as Harvest points out, Ramirez admitted that he referred one of Harvest's WhatsApp messages about the lawsuit to his counsel, who then could have investigated and monitored the case for months before the initial entry of default in December 2018.  (*See* Docket Entry No. 109-1 at 6).  Ramirez's lawyers have shown in the last year that they are fully capable of representing him while he is in hiding.  In addition, Ramirez hardly attempted to avoid the spotlight.  Between the beginning of this litigation and the final default judgment, he gave numerous interviews, including in English,[14] and posted on social media thousands of times.

---

[14]  *See, e.g.*, YouTube, "Rafael Darío Ramírez Carreño (Venezuela) on Venezuela - SC Stakeout (17 May 2017)," https://www.youtube.com/watch?v=8Ic0KE-I49c (answering questions in English that are posed in English at the following times: 16:38, 18:04, 19:17, 20:33, 21:27, 22:21, and 24:04); YouTube, "HASTA LA (CHA)VISTA? Ft. Rafael Ramirez, Former Permanent Representative of Venezuela to the

(Docket Entry No. 109 at 16–17).  Finally, Ramirez made his declaration to this court in English and certified it under the penalty of perjury.  (*Id.* at 17; Docket Entry No. 72-1).

On the other hand, Ramirez argues convincingly that he believed he was not properly served, and therefore had no obligation to respond.  (Docket Entry No. 72 at 17); *see Jenkens*, 542 F.3d at 123 n.6 (internal quotation marks and citation omitted) (even "intentionally evading service is insufficient to make a defendant's failure to answer willful, . . . because the duty to answer only arises after service has been perfected"); *see also Lacy*, 227 F.3d at 292 n.5 ("[W]illful evasion of process is not grounds to support entry of default judgment."); *id.* at 292–93 (noting the defendant's awareness of the case and "mistaken belief that service had not yet been effected"; holding that "although service had in fact been validly effected, there is nothing in the record to indicate that [the defendant's] failure to respond was willful.").[15]  As the lengthy analysis about service in this case shows, Ramirez had better grounds to think he was improperly served than the defendant in *In re Dierschke*, 975 F.2d at 183–84, a case that Harvest cites.[16]  In that case, the defendant claimed to believe he had not been properly served even though both he and his lawyer were served and the lawyer "testified that he had discussed the complaint with [the defendant] and had mailed a copy of same to his client well before an answer was due."  *Id.*  In this case, service was at the American address that Ramirez alleged he had vacated when he left the country months

---

UN" (posted Feb. 10, 2019), https://www.youtube.com/watch?v=hYogxnFCu2U (live English-language interview with a journalist, lasting more than 20 minutes, in February 2019).

[15] *Lacy* is not directly analogous because in that case, the defendant "made repeated contacts with [the plaintiff] in an attempt to resolve the suit." *Lacy*, 227 F.3d at 292.  The record contains no evidence that Ramirez made any similar effort before having his counsel attempt to vacate the default judgment.  But *Lacy* still shows that a defendant's mistaken belief that he had been improperly served supports finding that his default was not willful.  *But see In re Dierschke*, No. CA6-91-0076-W, 1992 WL 333904, at *3 (N.D. Tex. Feb. 25, 1992) (affirming bankruptcy court's ruling that "[w]hether [the defendant had] been served or not, he and his attorney both knew of this matter and could have filed an answer, but they chose to play games."), *aff'd*, 975 F.2d at 183–84 (5th Cir. 1992).

[16] Harvest also cites *United States v. Tellez*, 678 F. Supp. 2d 437, 440 (W.D. Tex. July 13, 2009) for the proposition that "[i]f . . . the Defendant[] w[as] aware of this case, then the Defendant['s] default was willful."  That case is distinguishable because proper service was uncontested.  *Id.* at 439.

before.  The court finds that Harvest's good-faith attempt was sufficient service, but it also finds, by a preponderance of the evidence, that Ramirez's default was not willful because he believed service was inadequate.

### ii.    The Meritorious Defense

Ramirez's argument that Harvest waived its claims against him by entering into the 2016 share-purchase agreement is a meritorious defense.  "In determining whether a meritorious defense exists, '[t]he underlying concern is . . . whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default.'"  *In re OCA*, 551 F.3d at 373 (quoting *Jenkens*, 542 F.3d at 122).  The party opposing the default judgment must present "definite factual allegations" instead of "mere legal conclusions" to support a finding of a meritorious defense.  *Jenkens*, 542 F.3d at 122.  Here, as explained above, Ramirez has a detailed and plausible interpretation of the share-purchase agreement's waiver provision, which shows "some possibility" that he might win at trial.  *See In re OCA*, 551 F.3d at 373.  This factor favors setting aside the default judgment.

### iii.   Prejudice to Harvest and Ramirez's Potential Loss

Harvest argues that setting aside the default judgment will cause the "loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion." *Scott*, 556 F. App'x. at 298 (quoting *Lacy*, 227 F.3d at 293).  Harvest argues that although Venezuela was "a relatively stable country" when it filed the case and even when the court entered the initial default judgment in December 2018, "Venezuela has since spiraled into chaos."  (Docket Entry No. 109 at 20).  That political instability will make it difficult for Harvest "to meet with witnesses and further investigate its allegations, as well as request[] documents from government entities."  (*Id.*).

If Harvest's allegations against Ramirez are true, Ramirez's delayed appearance may have also given him time to hide his assets to avoid a court judgment. (*Id.* at 21).

But Harvest cannot put all of the blame for its predicament on Ramirez, who did not cause the current Venezuelan turmoil. In late 2018, Harvest moved to voluntarily dismiss the other defendants and pursue default judgment against Ramirez, assuming the risk that Ramirez might appear. (Docket Entry Nos. 63–65). The court rejects Harvest's asserted "reliance" interest in Ramirez's failure to appear on time. (*See* Docket Entry No. 109 at 21 (objecting that "[t]he statute of limitations would now prevent Harvest from renewing claims against the other defendants" it voluntarily dismissed)). The potential prejudice to Harvest weighs in favor of maintaining the default judgment, but Harvest's litigation strategy reduces this factor's significance. The difficulties in obtaining evidence from Venezuela will also prejudice Ramirez.

The court may also consider "whether there was significant financial loss to the defendant, and whether the defendant acted expeditiously to correct the default." *Jenkens*, 542 F.3d at 119. The $1.4 billion loss Ramirez faces vastly exceeds amounts courts have considered significant in other cases. *See, e.g.*, *Servicios Misiones S.A. de C.V. v. B R Crane & Equipment, LLC*, No. H-17-3347, 2018 WL 2864286, at *3 (S.D. Tex. June 11, 2018) ("[T]he default judgment is significant—more than $375,000."); *Windsor Worldwide Grp., Inc. v. Veho UK Ltd.*, No. H-17-329, 2017 WL 4551363, at *2 (S.D. Tex. Oct. 12, 2017) ("A six-figure sum is at stake in this litigation, a substantial loss for [the defendant] if a default judgment were entered."). Ramirez also faces serious reputational damage if the court judges, even by default, that he helped run an international bribery scheme. These factors strongly support setting aside the default judgment.

Ramirez does not get credit for responding to the default judgment within months of its entry, especially given that he had actual notice of the suit when it was filed, but this factor does

not outweigh the considerations in his favor.  The size of the default judgment, the meritorious defense Ramirez raised, and the policy favoring resolving cases on the merits, are decisive.  *See In re OCA*, 551 F.3d at 370–71.

**IV.     Conclusion**

Ramirez's motion to set aside the final default judgment and dismiss the case, (Docket Entry No. 72 supplemented by Docket Entry No. 106), is granted in part and denied in part.  The default judgment is vacated, but the case is not dismissed.

The court sets a scheduling and status conference for June 25, 2020, at 8:30 a.m., CDT, by Zoom.  The parties must submit a proposed scheduling order by June 18, 2020.

SIGNED on June 9, 2020, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge