## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA B.V.,** § § § | |
| *Plaintiffs*, § | |
| § | **CIVIL ACTION: 4:18-cv-00483** |
| *v.* § | |
| § | **FILED UNDER SEAL** |
| **JUAN JOSE GARCIA MENDOZA,** *et al.*, § | |
| § | |
| *Defendants.* § | |

## HARVEST'S SEALED RESPONSE IN OPPOSITION TO RAMIREZ'S MOTION TO SET ASIDE DEFAULT JUDGMENT AND MOTIONS TO DISMISS UNDER RULES 12(B)(2) AND 12(B)(5)

# **TABLE OF CONTENTS**

**Page**

Table of Contents ................................................................................................................ i

Table of Authorities ......................................................................................................... iii

Factual and Procedural Background .................................................................................. 1

Summary of Argument ...................................................................................................... 2

Standard of Review ........................................................................................................... 4

Argument ........................................................................................................................... 5

I.      Ramirez has not established good cause for his default. ...................................... 5

      A.     Ramirez willfully ignored Harvest's lawsuit, which ends the good-cause inquiry. ............................................................................................ 6

            1.     Ramirez had contemporaneous actual notice of the filing of the lawsuit and the entry of default judgment. ............................... 6

            2.     Ramirez had the ability to timely respond. ................................... 8

      B.     Harvest would be significantly prejudiced if the default judgment were set aside. ............................................................................................ 12

II.     Service at the New York Address, Ramirez's last and only known residence at the time of service, was legally sufficient. ..................................... 14

      A.     Courts liberally construe Rule 4's "dwelling or usual place of abode" requirement when the defendant has actual notice of the lawsuit. ............................................................................................. 15

      B.     Harvest made good-faith efforts to properly serve Ramirez, who intentionally disguised his whereabouts and cannot benefit from the confusion he created ........................................................................ 16

            1.     All available information pointed to the New York Address as Ramirez's only "dwelling or usual place of abode" within the meaning of Rule 4(e)(2)(B). ...................................... 16

            2.     Ramirez intentionally disguised his whereabouts. ...................... 20

III.    The Court has personal jurisdiction over Ramirez. ......................................... 23

A.    Ramirez has forfeited a challenge to personal jurisdiction by failing to assert the defense as a ground to set aside the default judgment. .................................................................................23

B.    The Court has multiple bases for personal jurisdiction that Ramirez does not challenge. ........................................................................24

    1.    The Court has personal jurisdiction over Ramirez pursuant to RICO's provision for nationwide service of process. ...........................25

        a.    Garcia transacted affairs in this district ..........................27

        b.    Ramirez has minimum contacts with the United States ..............................................................29

    2.    The Court also has personal jurisdiction over Ramirez because he committed RICO predicate acts in this district. ......................32

C.    Personal jurisdiction over Ramirez does not offend due process. .........................34

IV.    In no event is dismissal of the lawsuit warranted. ...........................................37

Conclusion ......................................................................................................................39

Certificate of Service ...................................................................................................40

930343.1

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Access Telecom, Inc. v. MCI Telecomms. Corp.*,
  197 F.3d 694 (5th Cir. 1999) ....................................................30

*American Ass'n of Naturopathic Physicians v. Hayhurst*,
  227 F.3d 1104 (9th Cir. 2000) .............................................23, 24

*Antonio Leonard TNT Prods., LLC v. Goossen-Tutor Promotions, LLC*,
  47 F. Supp. 3d 500 (S.D. Tex. 2014) .......................................30

*Ayika v. Sutton*,
  378 F. App'x 432 (5th Cir. 2010) ............................................17

*Bally Exp. Corp. v. Balicar, Ltd.*,
  804 F.2d 398, 401 (7th Cir. 1986) .............................................5

*Bancroft Life & Cas. ICC, Ltd. V. FFD Res. II, LLC*,
  884 F. Supp. 2d 535 (S.D. Tex. 2012) .....................................31

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*,
  97 F.3d 822 (1996) ..................................................................27

*Blackhawk Heating & Plumbing Co. v. Turner*,
  50 F.R.D. 144 (D. Ariz. 1970) ...........................................18, 19

*Burda Media, Inc. v. Viertel*,
  417 F.3d 292 (2d Cir. 2005) .......................................................5

*Busch v. Buchman, Buchman & O'Brien, Law Firm*,
  11 F.3d 1255 (1994) ................................................................26

*Caldwell v. Palmetto State Sav. Bank of S. Carolina*,
  811 F.2d 916 (1987) ................................................................28

*Clemens v. McNamee*,
  615 F.3d 374 (5th Cir. 2010) ..................................................33

*Compass Bank v. Kleve*,
  2012 WL 12895414 (S.D. Tex. Dec. 10, 2012) ......................22

*Conwill v. Greenberg Traurig, L.L.P.*,
  2010 WL 2773239 (E.D. La. July 13, 2010) ...............15, 16, 17, 19

*Dale v. Frankel*,
    131 F. Supp. 2d 852 (S.D. Miss. 2001)..............................................................................26

*David v. Signal Int'l, LLC*,
    588 F. Supp. 2d 718 (E.D. La. 2008)................................................................................26

*In re Dierschke*,
    975 F.2d 181 (5th Cir. 1992) ..............................................................................................6

*Dimas v. Vanderbilt Mortg. and Fin., Inc.*,
    2010 WL 1875803 (S.D. Tex. May 6, 2010)..............................................................27, 34

*Fed. Land Bank Ass'n of S. Ala., FLCA v. H&H Worldwide Fin. Serv., Inc.*,
    2008 WL 11389261 (S.D. Tex. May 1, 2008) ..................................................................30

*Frank Keevan & Son, Inc. v. Callier Steel Pipe & Tube, Inc.*,
    107 F.R.D. 665 (S.D. Fla. 1985)......................................................................16, 17, 20, 22

*GC Servs. Ltd. P'ship v. Little*,
    2019 WL 2647690 (S.D. Tex. June 27, 2019) ............................................................33, 34

*Gale v. Compania Transatlantica*,
    1997 WL 266738 (E.D. La. May 16, 1997).......................................................................30

*Harvest Nat. Res., Inc. v. Garcia*,
    2018 WL 2183968 (S.D. Tex. May 11, 2018) ...............................................25, 26, 30, 32

*Hawkins v. Upjohn Co.*,
    890 F. Supp. 601 (E.D. Tex. 1994)...................................................................................26

*Hazen Research, Inc. v. Omega Minerals, Inc.*,
    497 F.2d 151 (5th Cir. 1974) ..............................................................................................5

*Hazim v. Schiel & Denver Pub. Ltd.*,
    2015 WL 4545534 (S.D. Tex. Jul. 28, 2015).....................................................................34

*Hazim v. Schiel & Denver Book Grp.*,
    2012 WL 12894747 (S.D. Tex. July 18, 2012) .................................................................38

*Henderson v. United States*,
    517 U.S. 654 (1996)..........................................................................................................15

*Hoover v. Fla. Hydro, Inc.*,
    2009 WL 10678888 (E.D. La. July 31, 2009) ..................................................................37

930343.1

*Ima Jean Robinson Springs v. Security Fin. Corp. of Tex.*,
    2011 WL 13324311 (W.D. Tex. Nov. 21, 2011) ............................................................26

*Jim Fox Enter., Inc. v. Air France*,
    664 F.2d 63 (5th Cir. 1981) ........................................................................................38

*Jones v. Petty-Ray Geophysical Geosource, Inc.*,
    954 F.2d 1061 (5th Cir. 1992) ....................................................................................34

*Karlsson v. Rabinowitz*,
    318 F.2d 666 (4th Cir. 1963) ......................................................................................16

*Kellogg Brown & Root Servs., Inc. v. Altanmia Commercial Mktg. Co. W.L.L.*,
    2007 WL 4190795 (S.D. Tex. Nov. 21, 2007) ...........................................................15

*Kelly, Sutter, Mount & Kendrick, P.C. v. Alpert*,
    2006 WL 3316821 (S.D. Tex. Oct. 25, 2006).......................................................5, 6, 12

*La Blanche v. Prairie View A&M Univ.*,
    2006 WL 3488926 (S.D. Tex. Dec. 4, 2006) ...............................................................17

*Lacy v. Sitel Corp.*,
    227 F.3d 290 (5th Cir. 2000) ......................................................................................12

*Ladder Man, Inc. v. Manufacturer's Distribution Servs., Inc.*,
    2000 WL 1679439 (6th Cir. Oct. 31, 2000)................................................................23

*Lahman v. Cape Fox Corp.*,
    2019 WL 1150628 (E.D. Tex. Mar. 13, 2019) ............................................................38

*In re Lloyd's Register N. Am., Inc.*,
    780 F.3d 283 (5th Cir. 2015) ......................................................................................31

*Lloyd's Syndicate 457 v. Am. Global Maritime, Inc.*,
    346 F. Supp. 3d 908 (S.D. Tex. 2018) ........................................................................30

*MaxEn Capital, LLC v. Sutherland*,
    2009 WL 936895 (S.D. Tex. Apr. 3, 2009) ................................................................31

*Mid-Continent Wood Prods., Inc. v. Harris*,
    1992 WL 33881 (N.D. Ill. Feb. 14, 1992) .............................................................23, 24

*Minneapolis & St. L. R. Co. et al. v. Peoria & P.U. Ry. Co.*,
    270 U.S. 580 (1926)....................................................................................................27

*N.L.R.B. v. Atlanta Metallic Casket Co.*,
    205 F.2d 931 (1953) ............................................................................27, 28

*N.L.R.B. v. Clark*,
    468 F.2d 459 (1972) ............................................................................20, 22

*Nagravision SA v. Gotech Int'l Tech. Ltd.*,
    882 F.3d 494 (5th Cir.),
    *cert. denied,* 139 S. Ct. 480 (2018) ...........................................................5

*Nowell v. Nowell*,
    384 F.2d 951 (1967) ...................................................................16, 17, 23

*People's United Equip. Fin. Corp. v. Hartmann*,
    447 F. App'x 522 (5th Cir. 2011) ..............................................................14

*Rana v. Islam*,
    305 F.R.D. 53 (S.D.N.Y. 2015) ................................................................21

*Rolls-Royce Corp. v. Heros, Inc.*,
    576 F. Supp. 2d 765 (N.D. Tex. 2008) .....................................................26

*SEC v. Internet Solutions for Bus. Inc.*,
    509 F.3d 1161 (9th Cir. 2007) ....................................................................5

*St. Luke's Episcopal Hosp. v. La. Health Serv. & Indem. Co.*,
    2009 WL 47125 (S.D. Tex. Jan. 6, 2009) .................................................26

*In re State Exchange Fin. Co.*,
    896 F.2d 1104 (7th Cir. 1990) .............................................................23, 24

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*,
    517 F.3d 235 (5th Cir. 2008) .....................................................................32

*Waraich v. Nat'l Australia Bank Ltd.*,
    2019 WL 2296795 (S.D. Tex. May 30, 2019) .............................................4

*Way v. Mueller Brass Co.*,
    840 F.2d 303 (5th Cir. 1988) .....................................................................17

*Wooten v. McDonald Transit Assocs., Inc.*,
    788 F.3d 490 (5th Cir. 2015) ......................................................4, 5, 6, 12

*In re Worldwide Web Sys., Inc.*,
    328 F.3d 1291 (11th Cir. 2003) ...................................................................5

*Wyatt v. Kaplan*,
  686 F.2d 276 (5th Cir. 1982) .........................................................................37

**Statutes**

18 U.S.C. § 1965 ..............................................................................................25, 26, 27

**Rules**

FED. R. CIV.P. 4(e) ..................................................................................... *passim*

FED. R. CIV. P. 4(f) ..............................................................................19, 38, 39

FED. R. CIV. P. 5(a)–(b) ................................................................................19

FED. R. CIV. P. 12(b) ......................................................................2, 23, 37, 38, 39

FED. R. CIV. P. 12(c)..........................................................................2, 37, 39

FED. R. CIV. P. 12(g) .........................................................................................23

FED. R. CIV. P. 55 ..............................................................................................13

FED. R. CIV. P. 60(b) ................................................................................. *passim*

**Other Authorities**

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1391 (1990).................................................................................................24

Convention on the Service Abroad of Judicial and Extrajudicial Documents in
Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361 .......................22

930343.1

## FACTUAL AND PROCEDURAL BACKGROUND

From 2002 to 2014, defendant Rafael Dario Ramirez Carreno ("Ramirez") was Venezuela's Minister of Energy and Oil and president of Petroleos de Venezuela, S.A. ("PDVSA"), Venezuela's state-owned oil company. During his tenure, Ramirez and others carried out a widespread bribery and money-laundering conspiracy, personally profiting by requiring American companies to pay to play in Venezuela's oil and gas industry. That scheme has resulted in multiple indictments, including in the Southern District of Texas.

Plaintiffs, Houston-based Harvest Natural Resources, Inc., a publicly-held energy company, and HNR Energia B.V., Harvest's wholly-owned subsidiary (together "Harvest"), were among the victims of this conspiracy. In 2012 and again in 2014, Harvest attempted to sell its share of a Venezuelan asset that it jointly owned with PDVSA, a transaction that required Venezuela's approval. Ramirez, through co-conspirator Juan Jose Garcia Mendoza ("Garcia"), repeatedly demanded that Harvest pay him millions of dollars in bribes to secure Venezuela's approval. Harvest repeatedly refused to pay, and the deals fell through. Ramirez eventually left PDVSA to become Venezuela's ambassador to the United Nations in New York, and in 2016, Harvest was finally able to sell its assets—for $470 million less than its original purchase agreement.

Seeking to recover the damages its shareholders suffered from Ramirez's bribe demands, Harvest filed this lawsuit against Ramirez, Garcia, and others on February 16, 2018, asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Sherman Act, the Robinson-Patman Act, and the Texas Free Enterprise and Antitrust Act. Doc. 1. The same day, Harvest served Ramirez by leaving a copy of the Original Complaint and Summons with a domestic employee who resided at Ramirez's last and only known address: 16 E. 81st Street, New York, New York 10028 ("New York Address"). Doc. 10. Ramirez undisputedly

had actual notice of the lawsuit when it was filed, and he communicated with the press and his legal counsel about it.  *Infra* at I(A)(1).  But Ramirez chose not to respond in this Court, even when he learned of the entry of default judgment.  Instead, during the two days following entry of judgment, he condemned the judgment on social media and to the press.  *Id.*  This Court ultimately determined that a final default judgment was proper.  Doc. 71.

Harvest then investigated Ramirez's assets—Ramirez holds virtually nothing in his own name—so that Harvest could execute the Court's judgment.   As Harvest began closing in, Ramirez finally appeared, moving to set aside the Court's final default judgment (1) for good cause under Federal Rule of Civil Procedure 60(b)(1) on the ground that his default was not willful, and (2) as void under Rule 60(b)(4) on the ground that service of process was insufficient.  Doc. 72.  He also moved to dismiss the lawsuit (1) under Rule 12(b)(2) for lack of Texas contacts sufficient for personal jurisdiction, and (2) under Rule 12(b)(5) for insufficient service.  *Id.*  In a supplemental motion, Ramirez later moved to dismiss under Rules 12(b)(6) or 12(c) for failure to state a claim, on the ground that Harvest waived its right to sue him.  Doc. 106.  Pursuant to the Court's order, Harvest has already responded to the supplemental motion. Doc. 107.

Following Ramirez's motion to set aside the default judgment, the Court permitted limited written discovery relating to service and jurisdiction, the period for which has now closed.  Doc. 99.  The parties have confirmed that their discovery responses and productions are complete.

## SUMMARY OF ARGUMENT

Ramirez has not met his heavy burden to establish that the Court's default judgment should be set aside.  Before entering default judgment, the Court correctly concluded that Harvest properly served Ramirez and that the Court has personal jurisdiction over him.  The

Court did so with knowledge of all of the relevant facts, and Ramirez has presented nothing that should alter the Court's prior determination.

First, there is no good cause to set aside the default judgment. Ramirez submits only his bare declaration that his default was not willful, but the evidence overwhelmingly discredits him. Ramirez had actual notice of Harvest's lawsuit on the day it was filed and he had the ability to respond, yet he chose to ignore the lawsuit. That ends the good-cause inquiry. But even had Ramirez not willfully defaulted, the prejudice Harvest would suffer militates against finding good cause to set aside the judgment. Were the judgment set aside, Harvest now would be less able to discover evidence to support its claims and unable to pursue claims against the other defendants it dismissed to obtain the default judgment, circumstances that would not have existed had Ramirez timely appeared. Ramirez also would have more time to conceal assets.

Second, the default judgment is not void for insufficient service of process. Ramirez's only asserted basis for challenging service is that he was no longer living at the New York Address at the time of service. But the Court was aware of that before finding service proper and entering default judgment. Service at Ramirez's former residence was legally sufficient because Ramirez received actual notice of the lawsuit, Harvest's service at Ramirez's last and only known residence was a good-faith effort to comply with the federal service rules, and Ramirez admittedly disguised his whereabouts.

Third, the Court had personal jurisdiction over Ramirez before entering the default judgment. As an initial matter, Ramirez has forfeited a personal-jurisdiction challenge by withholding that defense as a ground to set aside the judgment and asserting it only as a basis for a subsequent motion to dismiss. A personal-jurisdiction challenge must be raised as part of a defendant's first significant defensive move or it is forfeited. In any event, the Court has

930343.1

multiple bases for personal jurisdiction that Ramirez does not challenge. Because RICO authorizes nationwide service of process, the Court has personal jurisdiction over Ramirez based on his indisputable minimum contacts with the United States. The Court also has personal jurisdiction over Ramirez because, aside from the bribe demand he directed at Harvest in Houston, Harvest has also pleaded that Ramirez committed multiple other acts in this judicial district that are predicate acts to Harvest's RICO claims—well-pleaded allegations that Ramirez does not controvert.

The Court should deny Ramirez's motion to set aside the final default judgment and need not reach the motions to dismiss. If the Court reaches the motions to dismiss, they should be denied.

### STANDARD OF REVIEW

"Before a court may enter default judgment, the court must be sure that jurisdiction exists, service was proper, and the complaint states a plausible claim for relief." *Waraich v. Nat'l Australia Bank Ltd.*, 2019 WL 2296795, at *5 (S.D. Tex. May 30, 2019) (Rosenthal, J.).[1] Accordingly, the Court's default judgment against Ramirez included an express finding of proper service of process, as well as implied findings of personal jurisdiction and that Harvest's allegations entitled it to relief. Doc. 66.

The burden of overcoming the Court's default judgment is now on Ramirez. The defendant bears the burden to establish excusable neglect or other good cause under Rule 60(b)(1) to set aside a default judgment. *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 500–01 (5th Cir. 2015). And, like every other circuit to consider the question, the Fifth Circuit has held that the burden to establish that a default judgment is void for insufficient

---

[1] All quotation marks and citations are omitted and all emphasis is added in this brief unless otherwise indicated.

service or lack of personal jurisdiction under Rule 60(b)(4) "rests heavily" upon the defendant. *Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 498 (5th Cir.), *cert. denied,* 139 S. Ct. 480 (2018) (affirming denial of Rule 60(b) motion) (quoting *Hazen Research, Inc. v. Omega Minerals, Inc.*, 497 F.2d 151, 154 (5th Cir. 1974)); *see also SEC v. Internet Solutions for Bus. Inc.*, 509 F.3d 1161, 1165 (9th Cir. 2007); *Burda Media, Inc. v. Viertel,* 417 F.3d 292, 299 (2d Cir. 2005); *In re Worldwide Web Sys., Inc.,* 328 F.3d 1291, 1298–99 (11th Cir. 2003); *Bally Exp. Corp. v. Balicar, Ltd.*, 804 F.2d 398, 401 (7th Cir. 1986).

Placing the burden on the defendant "comports with general principles of fairness," since "[a] defendant who has notice of an action against him may force the plaintiff to prove that service has been made and that jurisdiction is proper by filing a Rule 12(b) motion to dismiss." *Internet Solutions for Bus. Inc.*, 509 F.3d at 1165. "The defendant who chooses not to put the plaintiff to its proof, but instead allows default judgment to be entered and waits, for whatever reason, until a later time to challenge the plaintiff's action, should have to bear the consequences of such delay." *Id.*

## ARGUMENT

### I.   Ramirez has not established good cause for his default.

Ramirez urges this Court to set aside its default judgment for good cause under Federal Rule of Civil Procedure 60(b)(1), which authorizes relief from judgment upon a showing of "excusable neglect." "[T]he decision whether to grant relief under Rule 60(b)(1) falls within the district court's sound discretion." *Kelly, Sutter, Mount & Kendrick, P.C. v. Alpert*, 2006 WL 3316821, at *1 (S.D. Tex. Oct. 25, 2006) (Rosenthal, J.). To determine whether good cause exists, courts examine "whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Wooten*, 788 F.3d at 500.

A.     **Ramirez willfully ignored Harvest's lawsuit, which ends the good-cause inquiry.**

To show good cause to set aside the judgment, Ramirez "has the burden of showing by a preponderance of the evidence that [his] neglect was excusable, rather than willful." *Wooten*, 788 F.3d at 500–01.  If he fails, the Court does not analyze any other factors such as prejudice to Harvest: "A finding of willful default ends the inquiry." *Id.* at 500; *see also In re Dierschke*, 975 F.2d 181, 184 (5th Cir. 1992); *Kelly*, 2006 WL 3316821, at *1.

Ramirez has not carried his burden to show that his neglect was excusable, rather than willful.  He undisputedly had actual notice of Harvest's lawsuit on the day it was filed.  And contrary to his uncorroborated declaration, the evidence overwhelmingly confirms his ability to timely respond in this Court.

1.     **Ramirez had contemporaneous actual notice of the filing of the lawsuit and the entry of default judgment.**

Ramirez does not deny in either his motion or his supporting declaration that he had contemporaneous actual notice of Harvest's lawsuit.  Nor could he.  The same day that Harvest filed and served its lawsuit, Ramirez spoke to the Associated Press, whose report demonstrates Ramirez knew of the lawsuit's existence and the substance of its allegations: "Ramirez, contacted Friday [February 16, 2018] by AP, declined to comment on the suit but reiterated that he never asked for bribes or played a role in the selection of PDVSA's business partners."[2] Ramirez admits in his interrogatory responses that he spoke with a reporter about a lawsuit "a day or two after" Harvest sued him in February 2018.  Ex. 1.

Ramirez and his counsel were further notified of the lawsuit a little over a month after it was filed.  On March 27, 2018, Harvest's counsel informed Ramirez of the lawsuit via a

---

[2] *See* Joshua Goodman, "Houston firm sues ex Venezuelan oil czar Ramirez over bribes," *Associated Press* (Feb. 16, 2018), *available at* https://www.apnews.com/f173499a09364fc492713fe056801024; *see also* Ex. 2.

WhatsApp message to the New York phone number that Harvest's search confirmed was current for Ramirez.  Exs. 3–5.  Ramirez admits in his interrogatory responses that he was notified of the lawsuit through a WhatsApp text from a person purporting to be Harvest's lawyer, and that Ramirez "referred the text to his counsel."  Ex. 1.

Moreover, shortly after this Court's February 13, 2019 entry of a default judgment against him, Ramirez revealed his actual knowledge of the judgment.  The next day, February 14, 2019, Ramirez commented to the press that "he was not surprised by the order."[3]   On February 15, 2019, he criticized the default judgment on Twitter and linked to a post he put on Medium.com about the judgment.  Ex. 6.[4]  Having seen Ramirez's public comments about the default judgment, Harvest's counsel texted and sent a WhatsApp message to Ramirez on February 20 and 21, 2019, respectively, in another attempt to communicate with him.  WhatsApp confirms Ramirez received the message.  Exs. 7–8.  (To contact Ramirez on WhatsApp, Harvest used a United Kingdom phone number that Harvest obtained for Ramirez.  Ex. 9–10.  A recent tweet further confirmed that the United Kingdom phone number is Ramirez's.[5])  Yet, despite his and his counsel's actual knowledge of the lawsuit and the non-final default judgment, Ramirez still chose to ignore Harvest and this Court.

The Court entered final judgment on March 1, 2019.  Doc. 71.  Harvest's counsel again messaged Ramirez via WhatsApp on March 3, March 15, and March 17, 2019, to ask if Harvest

---

[3] Reuters Staff, *Reuters*, "U.S. judge rules former Venezuelan oil minister owes $1.4 billion" (Feb. 14, 2019), *available at* https://www.reuters.com/article/us-venezuela-ramirez/u-s-judge-rules-former-venezuelan-oil-minister-owes-1-4-billion-idUSKCN1Q401J.

[4] Twitter post by @RRamirezVE (Feb. 15, 2019), *available at* https://twitter.com/rramirezve/status/1096525153914273792 (linking to Medium post dated Feb. 15, 2019 and available at http://bit.ly/2Ecs4vn).

[5] On November 10, 2019, former Venezuelan official Diego Arria condemned Ramirez via Twitter for his support of recently-ousted Bolivian president Evo Morales and published Ramirez's United Kingdom phone number as a way for others displeased with Ramirez to contact him.  Arria subsequently tweeted Ramirez's response, sent via WhatsApp, denouncing Arria for publishing "the number of my WhatsApp."  Ex. 11.

930343.1

could speak with Ramirez now that final judgment had been entered.  Exs. 12–13.  Ramirez received that message at well, responding to the March 3 message, "Who is this?"  Ex. 12.  After Harvest's counsel identified himself yet again, Ramirez did not reply.  *Id.*

### 2.     Ramirez had the ability to timely respond.

Despite his contemporaneous knowledge of this lawsuit and the Court's orders, Ramirez did not appear until June 24, 2019, moving to set aside the default judgment nearly four months after final judgment was entered and sixteen months after receiving actual notice of the lawsuit. Relying solely on his declaration to establish that his default was excusable, Ramirez claims he could not have responded sooner because "English is not his native language" and, as a target of Venezuelan President Nicolas Maduro, he is "avoiding the public spotlight," which makes him "cautio[us] about any communications" and makes it "difficul[t] to coordinate with U.S. counsel while abroad."  Mot. 11; *see also id.* at 1 (Ramirez stays "out of the public eye").[6]

The evidence overwhelmingly refutes Ramirez's declared inability to timely respond to Harvest's lawsuit.  First, Ramirez's command of the English language is sufficient to have allowed him to timely respond.  Numerous public interviews show Ramirez fielding questions in English and responding in English on a wide range of topics without translators, interpreters, or notes.[7]  He tweeted in English on February 15, 2019 about the Court's entry of default judgment

---

[6] "Mot." is Doc. 72, Defendant Rafael Dario Ramirez Carreno's Motion to Set Aside Final Default Judgment and Motion to Dismiss in Accordance with Rules 12(B)(2) and 12(B)(5).

[7] *See YouTube*, "Rafael Darío Ramírez Carreño (Venezuela) on Venezuela - SC Stakeout (17 May 2017)," *available at* https://www.youtube.com/watch?v=8Ic0KE-I49c (answering questions in English that are posed in English at the following times: 16:38, 18:04, 19:17, 20:33, 21:27, 22:21, and 24:04); *YouTube*, "HASTA LA (CHA)VISTA? Ft. Rafael Ramirez, Former Permanent Representative of Venezuela to the UN" (posted Feb. 10, 2019), *available at* https://www.youtube.com/watch?v=hYogxnFCu2U (live English-language interview with Russian journalist, lasting more than 20 minutes, via high-quality video conferencing in February 2019); *YouTube*, "Entrevista a Rafael Ramírez en la OPEP (Inglés)" (posted June 26, 2012 by PDVSA Videos), *available at* https://www.youtube.com/watch?v=KS_yoOXhq5Q (live English-language interview); *UN Web TV*, "SC President, Rafael Ramírez (Venezuela) on Central Asia, Sudan and Syria - Security Council Media Stakeout (4 February 2016)," *available at* http://webtv.un.org/watch/sc-president-rafael-ram%C3%ADrez-venezuela-on-central-asia-sudan-and-syria-security-council-media-stakeout-4-february-2016/4739313145001 (answering questions in English

930343.1

against him.  Ex. 6.  And Ramirez's declaration to this Court is in English, a language he understands and speaks sufficiently to certify the accuracy of his declaration under penalty of perjury.  *See* Decl. at 6.[8]

Further, whatever Ramirez's relationship with Venezuela's Maduro regime, the evidence discredits his assertions that he has so "avoided the public spotlight" and been "cautio[us] about any communications" that he could not timely respond to Harvest's lawsuit.  While Ramirez had actual notice of the lawsuit, he was active on social media, giving English-language interviews to the international press, updating a personal website, and publishing articles.  Specifically:

- An active Twitter user with 281,000 followers, Ramirez tweeted 2,651 times between the filing of Harvest's lawsuit and his motion to set aside the Court's default judgment.[9]

- Ramirez gave at least nine public interviews in the first half of 2019 alone, before he moved to set aside the Court's default judgment.  These interviews are available on the highly-polished, media-heavy, up-to-date personal website Ramirez maintains, https://www.rafaelramirez.net, where visitors can submit an interview request, read Ramirez's press releases and weekly newsletters, and view videos of his television interviews.[10]

- Ramirez has maintained an Instagram account (rafaelramirezve) since August 2018, which has more than 1,000 followers and which he also publicizes to his Twitter followers.  Ex. 14.[11]  He regularly posted to Instagram for months before moving to set aside the default judgment.

---

that are posed in English at the following times: 4:30, 5:47, 6:31, and 7:19); *UN Web TV*, "SC President, Rafael Dario Ramirez Carreño (Venezuela) on Sudan and Burundi - Security Council Media Stakeout (10 February 2016)," *available at* http://webtv.un.org/watch/sc-president-rafael-dario-ramirez-carre%C3%B1o-venezuela-on-sudan-and-burundi-security-council-media-stakeout-10-february-2016/4750156652001/?term= (answering questions in English that are posed in English at the following times: 4:10, 4:56, 6:29, and 7:06).  The UN's Web TV website includes more than a dozen other videos of Ramirez.  Harvest's counsel has not reviewed every video but believes that most, if not all, will show Ramirez responding extemporaneously in English to questions posed in English.

[8] "Decl." is Doc. 72-1, Declaration of Mr. Rafael Dario Ramirez Carreno In Support of His Motion to Set Aside the Default Judgment and Motion to Dismiss in Accordance with Rules 12(B)(2) and 12(B)(5).

[9] Twitter profile for Rafael Ramirez, @RRamirezVE, *available at* https://twitter.com/rramirezve.

[10] *See generally* Wayback Machine search result for www.rafaelramirez.net, *available at* https://web.archive.org/web/*/www.rafaelramirez.net.

[11] Twitter post by @RRamirezVE (June 27, 2019), *available at* https://twitter.com/RRamirezVE/status/1144259340859269121.

- Ramirez publishes a weekly newsletter to which users can subscribe to receive his articles and other content of interest.  Ex. 15.[12]  He advertised the newsletter on his Twitter account at least five times before moving to set aside the default judgment.

- Ramirez weekly writes a Sunday article that is carried by the Venezuelan periodical *Panorama* and several other media.  He advertised this fact on his website in April 2019, before he moved to set aside the default judgment.[13]

If Ramirez could publicly communicate in all of these ways in the sixteen months between learning of Harvest's lawsuit and moving to set aside the default judgment, he could have timely responded to the lawsuit in this Court.

The evidence also belies Ramirez's protestation that "difficulty coordinating with U.S. counsel while abroad" prevented him from timely responding to Harvest's lawsuit.  Ramirez's counsel told the Court at a July 2019 hearing that Ramirez could not be deposed in London because he has no passport and "can't travel."  Ex. 16 at Ex. A (Doc. 90).  When Harvest later discovered and informed the Court that Ramirez had recently tweeted about his May 2019 travel to Geneva, Switzerland (complete with his photograph in front of Geneva's United Nations building), Ex. 16, Ramirez's counsel responded that Ramirez, allegedly residing ███, could only "travel to an adjacent country," Ex. 17.  Ramirez's interrogatory responses *now* admit, however, that ████████████████████████████████████████████ ████████████████████████████████  Ex. 18.  That is, Ramirez *can* travel to ███ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

---

[12] Twitter post by @RRamirezVE (June 26, 2019), *available at* https://twitter.com/RRamirezVE /status/1144025128642256897 (advertising newsletter and providing sign-up link).

[13] "RAFAEL RAMÍREZ LANZA BLOG PARA ABRIR ESPACIOS A LA BATALLA DE IDEAS Y ORGANIZAR AL PUEBLO" (Apr. 24, 2019), *available at* https://web.archive.org/web/20200108155443/http://web.archive.org/screenshot/https://www.rafaelramirez.net/sala-de-prensa/notas-de-prensa/rafael-ramirez-lanza-blog-para-abrir-espacios-a-la-batalla-de-ideas-y-organizar-al-pueblo (referencing Ramirez's "Sunday articles" published by *Panorama* and other websites and periodicals).

as well as to ███████████████████████████████████████████████████████

███    Thus, among many other places, Ramirez has been free to travel to his counsel's ███

███████████ offices.[14]   Indeed, Ramirez has recently acknowledged that he has a United

Kingdom phone number.  Ex. 11.  Ramirez has not been truthful with this Court about his ability

to travel, including to ██████

Even assuming, however, that Ramirez were unable to travel, the evidence demonstrates

he is capable of communicating remotely with counsel and others when he deems it important.

Ramirez's many interviews with reporters on different continents show his ready access to the

internet and sophisticated audio/visual equipment; consider, for example, a live, high definition

video interview from February 2019, with no granularity or buffering during the entire 20+

minutes of the interview.[15]   Further, in a May 2019 press release that Ramirez authored while he

was supposedly staying "out of the public eye," Mot. 1, Ramirez claimed that he "is in touch

with governments and key members of the international community."  Ex. 19.[16]   And Ramirez

now admits that when he received a WhatsApp message from Harvest's counsel in February

2018, informing him of this lawsuit, he "referred the text to his counsel."  Ex. 1.

In sum, the evidence discredits Ramirez's assertion that he could not coordinate with

counsel in time to respond to Harvest's lawsuit before entry of final judgment.  Because Ramirez

has not carried his burden to establish that his default was excusable—indeed, all of the credible

---

[14]   *See*  "The International Law Offices of Winston & Strawn L.L.P.," *available at* https://www.winston.com/en/where-we-are/index.html.

[15]   *See YouTube*, "HASTA LA (CHA)VISTA? Ft. Rafael Ramirez, Former Permanent Representative of Venezuela to the UN" (posted Feb. 10, 2019), *available at* https://www.youtube.com/watch?v=hYogxnFCu2U.

[16]   "Ramirez Consigno a Bachelet Mas Pruebas de Persecucion Politica y Violaciones de DDHH en Venezuela" (May 27, 2019), *available at* https://www rafaelramirez net/sala-de-prensa/notas-de-prensa/ramirez-consigno-a-bachelet-mas-pruebas-de-persecucion-politica-y-violaciones-de-ddhh-en-venezuela.

930343.1

evidence supports a conclusion that his default was willful—the Court should deny his motion to set aside the default judgment under Rule 60(b)(1).

**B.    Harvest would be significantly prejudiced if the default judgment were set aside.**

Ramirez's willful default "ends the inquiry" into good cause to set aside the default judgment, so the Court need not consider other factors such as prejudice to Harvest. *Wooten*, 788 F.3d at 500; *see also Kelly*, 2006 WL 3316821, at *1. Nevertheless, Ramirez's cavalier assertion that "[t]here would be no prejudice" to Harvest is incorrect. Mot. 13. As Ramirez acknowledges, *id.*, a default judgment should remain undisturbed when the plaintiff would be prejudiced by "loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion." *Lacy v. Sitel Corp.*, 227 F.3d 290, 293 (5th Cir. 2000). Harvest would suffer such prejudice and more were the Court to set aside its default judgment.

If the case proceeded on the merits now, it would be extremely difficult for Harvest to discover evidence to support its claims. When Harvest sued Ramirez in February 2018, applied for entry of a default in July 2018, and obtained a default judgment in December 2018, Venezuela was still a relatively stable country. Had Ramirez appeared when he should have and the case proceeded to merits discovery, Harvest and its counsel could have visited Venezuela to meet with witnesses and further investigate its allegations, as well as requested documents from government entities. But Venezuela has since spiraled into chaos, making such investigation all but impossible now.[17]

---

[17] *See* BBC Staff, *BBC News*, "Venezuela crisis: How the political situation escalated" (Apr. 30, 2019), *available at* https://www.bbc.com/news/world-latin-america-36319877 (detailing mounting tensions since January 2019, when President Maduro was sworn in for another term and Guaido declared himself acting president; discussing mass protests, hyperinflation, difficulty obtaining food, and mass migration out of Venezuela); Chris Sanders & Luc Cohen, *Reuters*, "U.S. orders suspension of flights between the U.S. and Venezuela" (May 15, 2019), *available at* https://www.reuters.com/article/us-venezuela-politics-usa-airlines/us-orders-suspension-of-flights-between-the-us-and-venezuela-idUSKCN1SL2F2 (noting U.S. suspension of all commercial flights to Venezuela).

Setting aside the default judgment would also provide Ramirez greater opportunities for fraud or collusion that would hinder Harvest's ability to collect on any judgment against him. Ramirez has had actual notice of Harvest's lawsuit for nearly two years, actual notice of the Court's preliminary entry of default judgment for nearly a year, and actual notice of final default judgment for ten months.  Though he is alleged to have accumulated more than $11 billion in ill-gotten gains during his tenure as president of PDVSA and Venezuela's Minister of Energy and Oil,[18] he holds virtually nothing in his name anywhere in the world, suggesting that he is going to great lengths to conceal his assets.  Additional delay caused by setting aside the default judgment would give Ramirez even more time to move and hide assets.  This, in turn, would render the results of Harvest's global asset search increasingly stale—a search in which Harvest has invested significant amounts of time and money.  This is particularly prejudicial to Harvest because it dissolved in 2017 due to the losses it suffered from Ramirez's bribe solicitations, ceased operations, and has limited cash available for a renewed asset search.  Doc. 14, 1st Am. Compl. ("FAC") ¶ 3.

Finally, in reliance upon Ramirez's non-appearance and Harvest's determination that Ramirez had assets sufficient to remedy Harvest's harm, Harvest dismissed Ramirez's co-defendants in order to obtain a final judgment against Ramirez.  Doc. 63; *see* FED. R. CIV. P. 55, Committee Note on Rules, 2015 Amendment ("A default judgment that does not dispose of all the claims among all parties is not a final judgment unless the court directs entry of final judgment under Rule 54(b).").  The statute of limitations would now prevent Harvest from renewing claims against the other defendants if the default judgment were set aside, further prejudicing Harvest.

---

[18] "Rubio Calls For Sanctions Against Corrupt Former Head of Venezuela's State-Owned Oil Company" (Oct. 21, 2016), *available at* https://www.rubio.senate.gov/public/index.cfm/press-releases?ID=A4E50648-F90A-4D77-B317-46C6821385FF.

930343.1

For this additional reason, Ramirez has not established good cause to set aside the default judgment under Rule 60(b)(1).

## II.    Service at the New York Address, Ramirez's last and only known residence at the time of service, was legally sufficient.

Pursuant to Federal Rule of Civil Procedure 60(b)(4), Ramirez also moves to set aside the default judgment as void for insufficient service of process.  Federal Rule of Civil Procedure 4(e)(2)(B) authorizes service on an individual by leaving the complaint and summons at "the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there."  On February 16, 2018, Harvest served the Original Complaint and Summons at the New York Address, Ramirez's last and only known residence, leaving them with Alexandra Leonardo, a 60-year-old domestic employee of suitable discretion who had resided there for 20 years.  Doc. 10 (process server's declaration); *see People's United Equip. Fin. Corp. v. Hartmann,* 447 F. App'x 522, 524 (5th Cir. 2011) (process server's declaration that process was served on person of suitable age and discretion is prima facie evidence of valid service, "which can be overcome only by strong and convincing evidence").

Ramirez acknowledges that upon his appointment as Venezuela's ambassador to the United Nations in January 2015, he and his family resided at the New York Address.  Mot. 3. But he asserts that Harvest's service there was invalid because, upon resigning as Venezuela's ambassador to the United Nations in December 2017, he left the United States with no intent to return.  Mot. 8; Decl. ¶ 5–6.  He thus argues that the New York Address was no longer his "dwelling or usual place of abode" in February 2018, and he accuses Harvest of failing to tell the Court that he had left the United States at the time of service.  Mot. 1.

Contrary to Ramirez's claims, Harvest informed the Court when Harvest moved for default judgment that Ramirez was believed to have fled the United States and to be on the run.

Doc. 65 at ¶ 14; Doc. 67 at 3.  Nevertheless, Harvest correctly explained that the New York Address was Ramirez's last and only known address, that Ramirez had actual notice of the lawsuit, and that the law permitted the Court to deem service at the New York Address sufficient. Doc. 65 at ¶¶ 9–19.

The Court subsequently concluded that service was proper, and that conclusion was correct. *See* Doc. 66 at 1 (holding that "Defendant Ramirez was properly served in accordance with Federal Rule of Civil Procedure 4(e), and that he failed to answer, respond, or otherwise defend the claims brought against him within the time period prescribed by Federal Rule of Civil Procedure 12(a)(1)(A)(i)").  When, as here, the defendant had actual notice of the lawsuit, the plaintiff made a good-faith effort to comply with the federal rules of service, and the defendant intentionally disguised his whereabouts, service at the defendant's former residence is legally effective.  Ramirez's sole argument for insufficient service—that he did not presently live at the New York Address at the time of service—thus misses the mark.  The Court should deny Ramirez's Rule 60(b)(4) motion to set aside the default judgment as void for insufficient service of process.

### A.  Courts liberally construe Rule 4's "dwelling or usual place of abode" requirement when the defendant has actual notice of the lawsuit.

"[T]he core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections."  *Henderson v. United States*, 517 U.S. 654, 672 (1996); *see also Kellogg Brown & Root Servs., Inc. v. Altanmia Commercial Mktg. Co. W.L.L.*, 2007 WL 4190795, at *8 (S.D. Tex. Nov. 21, 2007) (Rosenthal, J) ("[T]he purpose of Rule 4 and service of process is only to ensure that all defendants … no matter where they might be located, [have] notice of the commencement of the action.").  The rules of service "are not designed to create an

930343.1

obstacle course for plaintiffs to navigate, or a cat-and-mouse game for defendants." *Conwill v. Greenberg Traurig, L.L.P.*, 2010 WL 2773239, at *3 (E.D. La. July 13, 2010).

The Fifth Circuit has thus instructed that Rule 4's "provision concerning usual place of abode" and other service rules "should be liberally construed to effectuate service if actual notice has been received by the defendant." *Nowell v. Nowell*, 384 F.2d 951, 953 (1967). Other courts have agreed, employing this principle to deem service at a defendant's former residence legally sufficient. In *Karlsson v. Rabinowitz*, 318 F.2d 666 (4th Cir. 1963), for example, the defendant proved that at the time of service he had left his residence with no intent to return, producing evidence that he was then residing in another city, had reached an employment agreement with an employer there, and had contracted to purchase a home there. *Id.* at 667. Nonetheless, the court held that given the defendant's actual notice of the lawsuit, Rule 4's purpose had been served and the rule should be liberally construed to effectuate service. *Id.* at 668–69; *see also Frank Keevan & Son, Inc. v. Callier Steel Pipe & Tube, Inc.*, 107 F.R.D. 665, 671 (S.D. Fla. 1985) (collecting cases).

Ramirez does not and cannot deny that he had actual notice of Harvest's lawsuit from its inception. *See supra* at I(A)(1). Thus, even if Ramirez no longer lived at the New York Address at the time of service, the purpose of Rule 4's service provisions has been satisfied and Rule 4 "should be liberally construed to effectuate service." *Nowell*, 384 F.2d at 953.

**B.      Harvest made good-faith efforts to properly serve Ramirez, who intentionally disguised his whereabouts and cannot benefit from the confusion he created.**

**1.      All available information pointed to the New York Address as Ramirez's only "dwelling or usual place of abode" within the meaning of Rule 4(e)(2)(B).**

Ignoring *Nowell* and accompanying cases, Ramirez insists that Harvest's service was insufficient despite his actual notice of the lawsuit. Mot. 10. Each case he cites in support,

930343.1

however, involved a plaintiff who made no effort to properly serve the defendant according to the service rules.  In *Way v. Mueller Brass Co.*, 840 F.2d 303 (5th Cir. 1988), the plaintiff simply ignored a statute requiring summons in a suit against the government to be served on the state attorney general, even after the defendant pointed the deficiency out in an answer.  *Id.* at 305–06.  In *Ayika v. Sutton*, 378 F. App'x 432 (5th Cir. 2010), the *pro se* plaintiff attempted to serve process via certified mail without obtaining return receipts signed by the defendants, though signatures were plainly required by the rules.  *Id.* at 433–34.  And in *La Blanche v. Prairie View A&M Univ.*, 2006 WL 3488926 (S.D. Tex. Dec. 4, 2006), the plaintiff himself executed personal service on the defendant in direct violation of the rule allowing personal service only by a non-party, and then refused to execute lawful service despite learning of the violation.  *Id.* at *1.

By contrast, when the plaintiff *does* make a good-faith effort to follow the service rules and the defendant has actual notice, service is deemed sufficient. "Where the defendant receives actual notice and the plaintiff makes a good faith effort to serve the defendant pursuant to the federal rule, service of process has been effective."  *Conwill*, 2010 WL 2773239, at *3; *see also Nowell*, 384 F.2d at 953; *Frank Keevan & Son, Inc.*, 107 F.R.D. at 671.  Here, unlike the facts in the cases he cites, Ramirez cannot credibly contend that Harvest did not make a good-faith effort to serve him in accordance with the federal rules.

As the Fifth Circuit has explained, there is "no hard and fast rule … to determine what is or is not a party's 'dwelling or usual place of abode'" within the meaning of Rule 4(e)(2)(B).  *Nowell*, 384 F.2d at 953.[19]  Instead, the "practicalities of the particular fact situation determine whether service meets the requirements of [the rule]."  *Id.*   On the facts of this case, it was

---

[19] When *Nowell* was decided, Rule 4(e)(2)(B) was 4(d)(1).

reasonable for Harvest to conclude that the New York Address qualified as Ramirez's only

dwelling or usual place of abode within the meaning of Rule 4(e)(2)(B) at the time of service.

- Harvest's independent investigation of Ramirez's residence in February 2018 located *only* the New York Address for Ramirez.  Doc. 65 at 4–8.

- A long-time domestic employee who lived at the New York Address accepted service on Ramirez's behalf.  Doc. 10.

- For months after initial service, staff at the New York Address continued to accept pleadings that Harvest sent to Ramirez there.  On March 15, 2018, the First Amended Complaint, sent by U.S. first-class certified mail on February 23, 2018 with return receipt requested, was accepted and signed for.  Ex. 20.   Harvest also sent pleadings via certified mail on March 9, 2018 and April 6, 2018, which were accepted and signed for.[20]  Ex. 21; Ex. 22.

- Ramirez listed New York as his location in his Twitter biographical information at the time of service and until at least June 2018.  Ex. 26.

- Ramirez's Wikipedia profile—which Ramirez or the teams managing his public image and profile can change—*began* listing his residence as "New York, United States" in December 2017 (when he supposedly ended his residence), continued to do so at the time of service, and continues to do so today.[21]

- Reverse phone searches using Ramirez's New York phone number still lists the New York Address as Ramirez's current address.  Ex. 28.

- An Experian credit header from Westlaw still lists the New York Address as Ramirez's last known address.  Ex. 29.

- An Equifax credit header from Westlaw still lists the New York Address as Ramirez's current address.  *Id.*

- Ramirez admits that he did not provide a forwarding address when he left New York in December 2017.  Decl. ¶ 6.  *See Blackhawk Heating & Plumbing Co. v. Turner*, 50 F.R.D. 144, 149 (D. Ariz. 1970) (concluding that a defendant's failure to leave a forwarding address is evidence that the defendant has not established a new place of

---

[20] A certified mailing to Ramirez at the New York Address was eventually returned as undeliverable on May 23, 2018.  Ex. 23.  In December 2018 and January 2019, however, staff there resumed their acceptance of mailings for Ramirez.  Ex. 24; Ex. 25.

[21] *See       Wikipedia*,       "Rafael       Ramirez       (politician)",       *available       at* https://en.wikipedia.org/wiki/Rafael_Ram%C3%ADrez_(politician) (listing residence as New York, United States); Ex. 27 (showing addition of "New York, USA" residence on December 1, 2017).

abode and that service at his last known abode was proper, particularly when the defendant had actual notice of the lawsuit).

- Telephone records in Ramirez's wife's name were associated with the New York Address from October 2015 through April 2018, two months after service and four months after Ramirez and his wife supposedly stopped residing at the New York Address.  Ex. 30. See *Blackhawk*, 50 F.R.D. at 149 (a defendant's failure to "disconnect telephone service until after the date of service" of process is further evidence that service at his last abode is proper).

- Ramirez maintained a New York phone number in March 2018, after the time of service. Ex. 1; Ex. 3.

Further, even though Ramirez had publicly confirmed his actual notice of the lawsuit, Harvest took additional measures to contact him promptly after service at the New York Address.  On February 16, 2018, Harvest sent the Original Complaint and Summons to the New York Address via overnight FedEx.  Ex. 31.  In March 2018, Harvest called Ramirez and texted him via WhatsApp to inform him of the complaint, ask if he would be appearing, and ask whether he was represented by counsel with whom Harvest should communicate.  Ex. 3; Ex. 32; Ex. 33.  Ramirez now admits he received a WhatsApp message and "referred [it] to his counsel." Ex. 1.

Harvest's service at the New York Address was a good-faith attempt to properly serve Ramirez at his last and only known dwelling or usual place of abode, and Ramirez undisputedly received actual notice of the lawsuit.  "Where the defendant receives actual notice and the plaintiff makes a good faith effort to serve the defendant pursuant to the federal rule, service of process has been effective."  *Conwill*, 2010 WL 2773239, at *3.[22]

---

[22] Ramirez also contends that Harvest never served him with the First Amended Complaint, which Harvest filed five days after the Original Complaint to add two entity defendants related to defendant Garcia and to correct Garcia's name in the case caption.  To the contrary, Harvest served Ramirez with the FAC by certified mail, return receipt requested, to the New York Address, where it was delivered and signed for.  Ex. 20.  Such service was proper under Federal Rule of Civil Procedure 5, which permits a "pleading filed after the original complaint" to be served by "mailing it to the person's last known address—in which event service is complete upon mailing."  FED. R. CIV. P. 5(a)(1)(B), (b)(2)(C).

### 2.      Ramirez intentionally disguised his whereabouts.

In addition to Ramirez's actual notice and Harvest's good-faith service efforts, evidence that Ramirez was hiding his present residence at the time of service further supports the conclusion that service at the New York Address, even if a former residence, was proper.  When a defendant with actual notice of a lawsuit has intentionally disguised his whereabouts, courts have found that "strict compliance with [Rule 4] is unnecessary."  *Frank Keevan & Son, Inc.*, 107 F.R.D. at 672.

In *N.L.R.B. v. Clark*, 468 F.2d 459 (1972), the Fifth Circuit held that service on a defendant at his former business satisfied a requirement that the defendant be served at his principal place of business, because "a defendant who beclouds his whereabouts should not be entitled to benefit from the process server's consequent confusion."  *Id.* at 464.  In concluding that service was proper, the court of appeals emphasized that "process servers are not entirely at the mercy of elusive defendants."  *Id.*  Similarly, in *Frank Keevan & Son, Inc.*, the court held that serving the receptionist at the defendant's office was "as close to service on an adult at [the defendant's] abode as anyone could reasonably hope to achieve under the unique circumstances of this case."  107 F.R.D. at 673.  The defendant "admitted that during the period of time [the plaintiff] attempted to serve him, he traveled from city to city," "shroud[ing] his whereabouts" in a "veil of secrecy."  *Id.*

Ramirez likewise "becloud[ed] his whereabouts" at the time of service (and continues to do so now).  *Clark*, 468 F.2d at 464.  He admits this.  In his declaration in support of his motion to set aside the default judgment, he was willing to specify only the *continent* of his alleged residence—he has been  "living in Europe" to escape political persecution—and he asserts that no Venezuelan embassy personnel "know where I am."  Decl. ¶ 6.  At various times he has disabled the location indicator from his social media accounts, and when he did disclose a

location, *he chose New York* (during times he now says he had permanently left the United States). *Supra* at II(B)(1). Despite an active, sophisticated social media and web presence, Ramirez has not updated his Wikipedia profile, which lists him as still residing in "New York, United States." *Id.* Following his alleged permanent departure from the United States, he maintained a New York phone number and phone services associated with the New York Address for months. *Id.* [23]

Indeed, Ramirez specifically identified his alleged actual residence at the time of service *only* when pressed through court-ordered interrogatories after his motion to set aside, responding that ███████████████████████████████████████████████████████

███████████████████████████████ Ex. 34. Yet Ramirez's own public statements and discovery responses contradict that representation, indicating instead that after leaving New York, Ramirez purposefully moved about to conceal his whereabouts (and continues to do so now). In May 2018, Ramirez gave an interview to the Associated Press, which reported that "[s]ince leaving the U.S. last year, [Ramirez] said he's moved among cities around the world."[24] In November 2019, Ramirez gave another interview in which he stated that he lives "between several European countries." Ex. 35.[25] (These statements contradict both his representations to

---

[23] For these reasons, *Rana v. Islam*, 305 F.R.D. 53 (S.D.N.Y. 2015), on which Ramirez relies, does not support his attempt to invalidate service. There, the court refused to deem service at a former residence sufficient because "there is no evidence that [defendants] maintained a connection" to the former residence after they left the country, *id.* at 66, distinguishing cases in which the defendant had "never changed his address with the post office and continued to refer to the [former] residence as his home," *id.* at 64. Moreover, there was no assertion in *Rana* that the defendants had disguised their actual residence at the time of service. This case is unlike *Rana*, and is instead like the cases *Rana* distinguished, because Ramirez remained connected to the New York Address well after service and actively beclouded his whereabouts.

[24] *See* Joshua Goodman, "Venezuela's ex-oil czar seeks economic collapse accelerating," *Associated Press* (May 25, 2018), *available at* https://www.apnews.com/84ee4625e79c4d35a9284062b4e07612.

[25] Certified English translation of interview by David Placer, "Rafael Ramírez le reclama a la hija preferida de Chávez cómo puede estar subordinada a los malandros de Maduro (I)", *ALnavio* (Nov. 29, 2019), *available at* https://alnavio.com/noticia/19998/rafael-ramirez-le-reclama-a-la-hija-preferida-de-chavez-como-puede-estar-subordinada-a-los-malandros-de-maduro-i.html).

this Court that he cannot travel, Ex. 16 at Ex. A, Ex. 17, and his interrogatory response that █████

█████████████████████████████████████████████████████████ Ex. 36.)  Ramirez's

discovery responses acknowledge ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*id.*, yet he has produced no documents showing corresponding hotel information.   He also

produced an ████████████████████████████████████████████, *see* Ex.

18, ███████████████████████████████████████████████████████████

██████████████████████████████████ Ex. 37.

Ramirez's suggestion that Harvest should have served him abroad under Rule 4(f),

pursuant to The Hague Convention on the Service Abroad of Judicial and Extrajudicial

Documents, is thus empty.  Mot. 7, 21.  The Convention expressly "shall not apply where the

address of the person to be served with the document is not known."  Convention on the Service

Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965,

20 U.S.T. 361, at Art. 1; *see, e.g.*, *Compass Bank v. Kleve*, 2012 WL 12895414, at *4 (S.D. Tex.

Dec. 10, 2012) (quoting this text and holding that Hague Convention did not apply; allowing

service by email).  At the time of service, Ramirez's present address was unknown—because he

was intentionally hiding it (if he even had one).

Under these circumstances, Harvest's service at Ramirez's last and only known New

York Address, where staff continued to accept pleadings on Ramirez's behalf for months, was

"as close to service on an adult at [the defendant's] abode as anyone could reasonably hope to

achieve."  *Frank Keevan & Son, Inc.*, 107 F.R.D. at 673.   Ramirez, who is intentionally and

admittedly elusive, "should not be entitled to benefit from the process server's consequent

confusion."  *Clark*, 468 F.2d at 464.

930343.1

Given Harvest's good-faith service efforts, as well as Ramirez's actual notice of the lawsuit and intentional concealment of his whereabouts, Rule 4's "provision concerning usual place of abode … should be liberally construed to effectuate service." *Nowell*, 384 F.2d at 953. The default judgment is not void for insufficient service, and the Court should thus deny Ramirez's motion to set aside the judgment under Rule 60(b)(4).

## III.   The Court has personal jurisdiction over Ramirez.

### A.   Ramirez has forfeited a challenge to personal jurisdiction by failing to assert the defense as a ground to set aside the default judgment.

A defendant's Rule 60(b) motion to set aside a default judgment must raise every available Rule 12 defense as grounds to set aside the judgment, or the defense is waived.  In *American Association of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104 (9th Cir. 2000) (O'Scannlain, J.), the issue presented was "whether a party who raises only one defense in a [Rule 60(b)] motion to vacate default judgment thereby waives all other defenses." *Id.* at 1106. The court of appeals explained that a "fundamental tenet of the Federal Rules of Civil Procedure is that certain defenses under Fed. R. Civ. P. 12 must be raised at the first available opportunity or, if they are not, they are forever waived." *Id.*; *see also* FED. R. CIV. P. 12(g) ("If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted.").  The court thus held that a defendant who asserted the Rule 12 defense of improper service, but not the Rule 12 defense of lack of personal jurisdiction, as a ground to set aside a default judgment had waived the personal jurisdiction defense. *Id.* at 1107; *see also Ladder Man, Inc. v. Manufacturer's Distribution Servs., Inc.*, 2000 WL 1679439, at *2 (6th Cir. Oct. 31, 2000) (per curiam) (failure to raise lack of personal jurisdiction in Rule 60(b) motion to vacate default judgment waived defense); *In re State Exchange Fin. Co.*, 896

F.2d 1104, 1106 (7th Cir. 1990) (same); *Mid-Continent Wood Prods., Inc. v. Harris*, 1992 WL

33881, at *5 (N.D. Ill. Feb. 14, 1992) (same).

Ramirez's Rule 60(b) motion to set aside the default judgment asserts only the Rule 12

defense of insufficient service.  Mot. 1, 5–10.  Contingent upon the Court granting his motion to

set aside the judgment, Ramirez then moves to dismiss the lawsuit under Rule 12(b) for lack of

personal jurisdiction due to allegedly insufficient contacts with Texas.  Mot. 1, 14–20.  Ramirez

has presumably withheld the personal-jurisdiction challenge from his Rule 60(b) motion to set

aside because he would bear the burden to prove a lack of personal jurisdiction in that procedural

posture, but Harvest would bear the burden to affirmatively establish jurisdiction in response to a

Rule 12 motion to dismiss.  *See* Mot. 14 ("Plaintiffs Bear the Burden to Establish Personal

Jurisdiction over Ramirez").

This maneuvering is unavailing.  The Federal Rules of Civil Procedure require "a litigant

to exercise great diligence in challenging personal jurisdiction, venue, or service of process.  If

he wishes to raise [any] of these defenses he must do so at the time he makes his first significant

defensive move."  5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure

§ 1391 (1990); *see also, e.g.*, *Hayhurst*, 227 F.3d at 1106–07.  By failing to assert a lack of

contacts requisite for personal jurisdiction as a ground for his motion to set aside the default

judgment—his first defensive move before the Court—Ramirez has waived the defense.

### B. The Court has multiple bases for personal jurisdiction that Ramirez does not challenge.

If the Court nevertheless construes Ramirez's Rule 60(b)(4) motion to include lack of

personal jurisdiction as a basis to set aside the default judgment, then Ramirez bears the burden

to establish that this Court has no personal jurisdiction.  *Supra* at 4–5.  He has not done so.

24

Ramirez argues that he lacks continuous and systematic contacts with Texas. Mot. 2, 14 n.13. But Texas contacts are not required for this Court to have personal jurisdiction over Ramirez. As the Court has already recognized in this case, Harvest has pled RICO causes of action, RICO provides for nationwide service of process, and thus minimum contacts with the *United States* are sufficient for this Court to exercise personal jurisdiction. *Harvest Nat. Res., Inc. v. Garcia*, 2018 WL 2183968, at *3 (S.D. Tex. May 11, 2018). Ramirez does not and cannot dispute his minimum contacts with the United States.

Ramirez also contends that specific personal jurisdiction is lacking because the only connection this case has with Texas is the fact that Harvest is based here, and Harvest's complaint does not establish that Ramirez himself, as opposed to third parties, directed a bribe with the intent that it would reach Harvest in Texas. Mot. 16–18. But even if Ramirez were correct (and he is not), Ramirez ignores Harvest's allegations that the bribe demands that injured Harvest were part of a broader bribery and money-laundering scheme that included other predicate acts of racketeering activity that Ramirez committed in the Southern District of Texas. Those alleged activities, which Ramirez does not controvert, are litigation-related contacts with this district that confer specific personal jurisdiction.

        1.      **The Court has personal jurisdiction over Ramirez pursuant to RICO's provision for nationwide service of process.**

Harvest's complaint alleges that Ramirez and his co-defendants engaged in a pattern of racketeering activity that harmed Harvest, in violation of RICO, 18 U.S.C. §§ 1962(c)–(d), among other statutes. FAC ¶¶ 76–97. RICO contains special jurisdictional and venue provisions, which provide in relevant part:

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965.

Applying § 1965, which was designed to permit plaintiffs to sue all members of a RICO conspiracy in a single forum, courts have held that if one defendant "resides, is found, has an agent, or transacts his affairs" in the forum under § 1965(a), then other defendants outside the forum are subject to nationwide service of process and personal jurisdiction pursuant to § 1965(b). *See, e.g.*, *Ima Jean Robinson Springs v. Security Fin. Corp. of Tex.*, 2011 WL 13324311, at *13 (W.D. Tex. Nov. 21, 2011); *David v. Signal Int'l, LLC*, 588 F. Supp. 2d 718, 723 (E.D. La. 2008); *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 789–80 (N.D. Tex. 2008); *Dale v. Frankel*, 131 F. Supp. 2d 852, 861–62 (S.D. Miss. 2001); *Hawkins v. Upjohn Co.*, 890 F. Supp. 601, 606 (E.D. Tex. 1994).  This Court has likewise concluded, in this case, that § 1965(b) authorizes nationwide service of process.  *Garcia*, 2018 WL 2183968, at *3.

Because § 1965(b) authorizes nationwide service of process, a non-resident defendant need only have had minimum contacts with the United States, not the forum state, to satisfy the requirements of personal jurisdiction.  The Fifth Circuit held in *Busch v. Buchman, Buchman & O'Brien, Law Firm* that "when a federal court is attempting to exercise personal jurisdiction over a defendant based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States."  11 F.3d 1255, 1258 (1994).  Thus, as *Busch* instructs, this Court has already recognized in this case that the proper personal-jurisdiction inquiry is whether a defendant has had "minimum contacts with the United States."  *Garcia*, 2018 WL 2183968, at *3; *accord St. Luke's Episcopal Hosp. v. La. Health Serv. & Indem. Co.*, 2009 WL 47125, at *12 (S.D. Tex. Jan. 6, 2009) (Rosenthal, J.)

(recognizing that court would have personal jurisdiction over defendant if plaintiff asserted ERISA claims because ERISA provides for nationwide service of process and defendant had minimum contacts with the United States).[26]

At least one defendant that Harvest sued as part of the alleged RICO conspiracy, Ramirez's co-conspirator Garcia, transacted affairs in the Southern District of Texas under § 1965(a). Ramirez is therefore subject to nationwide service of process under § 1965(b) and his undisputed minimum contacts with the United States are sufficient for this Court to exercise personal jurisdiction over him.

### a.    Garcia transacted affairs in this district.

Harvest's action is properly before the Court if at least one defendant "transact[ed] his affairs" in this district. 18 U.S.C. § 1965(a). When Harvest filed this lawsuit, it sued not only Ramirez, but also Garcia and other co-conspirators. *See* FAC ¶¶ 3–10. Harvest ultimately dismissed Garcia and the other co-defendants to finalize default judgment against Ramirez, but the Court must still analyze Garcia's contacts with the forum for purposes of its RICO jurisdictional analysis. It is long-settled law that "jurisdiction . . . depends upon the state of things existing at the time the suit was brought." *Minneapolis & St. L. R. Co. et al. v. Peoria & P.U. Ry. Co.*, 270 U.S. 580, 586 (1926). As the Fifth Circuit has explained, "the issue of existence or nonexistence of Federal jurisdiction is determinable from the facts at the time the

---

[26] *Busch* involved the Securities Exchange Act's nationwide service of process provision, but the Fifth Circuit subsequently held in *Bellaire General Hospital v. Blue Cross Blue Shield of Michigan* that national-contacts analysis applies in any suit based upon a federal statute authorizing nationwide service of process. 97 F.3d 822, 825 (1996) ("we placed no limitation on our conclusion in *Busch* regarding personal jurisdiction in cases involving federal statutes providing for nationwide service of process"). Accordingly, courts have required only minimum contacts with the United States under RICO's nationwide service of process provision. *See, e.g., Dimas v. Vanderbilt Mortg. and Fin., Inc.*, 2010 WL 1875803, at *3 (S.D. Tex. May 6, 2010) ("[I]n any suit brought under a statute providing for nationwide service of process, a court need only conclude that Defendant has sufficient minimum contacts with the United States as a whole, not with any state in particular.").

suit or proceeding is commenced, and … subsequent changes can neither confer nor divest it."

*N.L.R.B. v. Atlanta Metallic Casket Co.*, 205 F.2d 931, 936 (1953).

The Court permitted jurisdictional discovery related to Garcia before he was dismissed, and that discovery confirms he "transact[ed] his affairs" in this district. The Fifth Circuit has indicated that "this language requires that a defendant be conducting business in the forum." *Caldwell v. Palmetto State Sav. Bank of S. Carolina*, 811 F.2d 916, 918 (1987). Discovery into Garcia's Houston connections revealed that he conducted substantial business in Houston. For one thing, Garcia worked for Chevron. Specifically:

- Garcia worked for Chevron's Latin American business unit, which was overseen and run from Chevron's Houston offices. Ex. 38 at 181.

- Garcia's boss and others who oversaw projects that Garcia worked on were based in Houston. *Id.* at 181, 209; Ex. 39; Ex. 40 (Garcia informing his Houston-based supervisor that one of his Venezuelan colleagues is "keeping a close eye on what I do with Houston").

- Garcia regularly communicated by phone, text, and email with his boss and with other Houston-based Chevron colleagues. Ex. 38 at 181; Exs. 41–47.

- Garcia repeatedly traveled to Houston to meet with his boss at Chevron, attend the Offshore Technology Conference, and meet with others in the oil and gas industry. Ex. 38 at 61–62, 77, 246–48; *id.* at 81–82 (admitting he attended OTC in Houston multiple times); Ex. 48 (March 2015 trip); Ex. 49 (additional trip); Ex. 50 (June 2014 trip); Exs. 51–52 (October 2013 trip).

On his website, Garcia advertised his work for Chevron until Harvest sued him in this judicial district; he then removed that information from the website, but not before Harvest obtained screenshots documenting his Houston connections. *See* Doc. 33 at 5–6.

In addition to Garcia's Chevron work, discovery also revealed that Garcia transacted other business in Texas on behalf of various companies that he owns or owned. Specifically:

- Garcia admitted that he is an owner of EPS Consultoria and that his business partner in that venture is Carlos Camera, who lives in Houston. Ex. 38 at 221, 228. The documents he produced corroborate that his business partner is based in Houston. Exs. 53–55.

- Garcia's websites advertised his work with companies that have major operations in Houston, including Chevron, Shell, Total, Repsol, Suelopetrol, and Eni.  *See* Doc. 33 at 5.

- Garcia's business partner boasted of booming business in Texas.  Ex. 56.  Garcia informed others of his plans to use this business venture to purchase a Texas franchise.  Ex. 57.

- Garcia pitched his services to individuals and companies in Texas.  Ex. 58.

- Garcia and his business partners financed their operations using backers in Houston.  Ex. 59.

- A Houston-based colleague at Chevron provided Garcia with the contact information for a Houston-based import company.  Ex. 60.  One of Garcia's companies subsequently shipped product into Houston via George H. Bush International Airport.  Ex. 61.

- Garcia asked the Houston-based supervisor to whom he reported at Chevron to help him set up business meetings in Houston for one of his companies.  As part of his pitch, Garcia sent presentation materials to his supervisor in Houston.  Ex. 45; Ex. 62; *see also* Ex. 38 at 234 (admitting to asking his supervisor to assist with setting up the business meetings).

- Garcia planned a "road show" for one of his new businesses in Houston in January 2018, shortly before Harvest sued him.  Ex. 63.

Finally, Garcia conducted other personal affairs in Houston:

- Garcia helped his daughter secure employment with Chevron in Houston, where she lives, shipped a car for her to Houston, and transferred money to her in Houston.  Exs. 64–66.

- Garcia purchased medical insurance from a Texas-based insurer and made transfers to the insurer's Texas-based bank account.  Ex. 67.

- Garcia researched doctors and medical care for himself in Houston.  Exs. 68–71.

In sum, Garcia unquestionably transacted affairs in the Southern District of Texas under § 1965(a).

### b.    Ramirez has minimum contacts with the United States.

Because at least one defendant sued by Harvest transacted affairs in this district, § 1965(b) of the RICO statute authorizes nationwide service of process and gives this Court

personal jurisdiction over all other defendants with minimum contacts with the United States.  A defendant has "minimum contacts" with a forum if he "purposefully avails [himself] of the privilege of conducting activities with the forum," thereby "invoking the benefits and protections of its laws."  *Garcia*, 2018 WL 2183968, at *3.  Minimum contacts are such that a defendant could "reasonably anticipate being haled into court" there.  *Antonio Leonard TNT Prods., LLC v. Goossen-Tutor Promotions, LLC*, 47 F. Supp. 3d 500, 506 (S.D. Tex. 2014) (Rosenthal, J.).  Courts "evaluat[e] contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed."  *Lloyd's Syndicate 457 v. Am. Global Maritime, Inc.*, 346 F. Supp. 3d 908, 936 (S.D. Tex. 2018) (Rosenthal, J.) (quoting *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999)); *see also Gale v. Compania Transatlantica*, 1997 WL 266738, at *1 (E.D. La. May 16, 1997) ("The relevant time period for determining jurisdiction is the filing of the complaint," and it is also "appropriate … to examine contacts for a period of years prior to filing suit").

Ramirez does not dispute that he has had minimum contacts with the United States.  *See* Mot. 1, 15–19 (denying Texas contacts only).  Nor could he.  "United States' residency is sufficient to establish the requisite amount of minimum contacts" in national minimum-contacts analysis.  *Fed. Land Bank Ass'n of S. Ala., FLCA v. H&H Worldwide Fin. Serv., Inc.*, 2008 WL 11389261, at *5 (S.D. Tex. May 1, 2008); *see also Garcia*, 2018 WL 2183968, at *4 (this Court concluding that Garcia having "resided and operated business entities out of Florida … could establish the requisite continuous and systematic contacts" with the United States sufficient for the Court's personal jurisdiction).  Ramirez admits that he and his family lived in New York from January 2015 through at least December 2017.  Mot. 3.  There he could be "seen

gallivanting … around Manhattan, living the high life."  FAC ¶ 61 (quoting October 2016 statement from U.S. Senator Marco Rubio).[27]

In addition to his residency, which alone is sufficient, Ramirez has had and continues to have contacts with the United States such that he could reasonably anticipate being haled into court here.  Ramirez admits that he took numerous personal trips to Vermont, New Jersey, Boston, Philadelphia, Chicago, and Washington, D.C. while he lived in New York.  Ex. 72. Ramirez also admits that he maintained United States bank accounts beginning in January 2015, and that he still has bank accounts in the United States.  *See* Exs. 73–74.

Ramirez's new assertion—albeit incorrect—of third-party-beneficiary rights under Harvest's 2016 Share Purchase Agreement with CT Energy Holding SRL further underscores that he could reasonably anticipate being required to litigate in the United States.  *See* Doc. 106. Under the "direct-benefits estoppel" doctrine, a non-signatory to a contract becomes bound to the contract's forum selection clause "by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract."  *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 291 (5th Cir. 2015).  As this Court has put it, a non-signatory "cannot exploit th[e] Agreement while refusing to be bound by provisions in it."  *MaxEn Capital, LLC v. Sutherland*, 2009 WL 936895, at *6 (S.D. Tex. Apr. 3, 2009) (Rosenthal, J.) (binding non-signatory to forum selection clause); *see also Bancroft Life & Cas. ICC, Ltd. V. FFD Resources II, LLC*, 884 F. Supp. 2d 535, 550 (S.D. Tex. 2012) (binding non-signatory to forum selection clause because "[u]nder direct-benefits estoppel, a nonsignatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens").  Here, Ramirez, a non-signatory to the Share Purchase Agreement, has sought to derive a direct

---

[27] *See also supra* n.18.

benefit—alleged immunity from Harvest's lawsuit—from the Agreement's Waiver of Claims. *See* Doc. 106. But the Share Purchase Agreement also contains provisions specifying exclusive jurisdiction in the state and federal courts of Delaware over any actions arising out of or related to the Share Purchase Agreement. *See* Doc. 107-2 at § 10.10. By asserting that he is a third-party beneficiary of a Share Purchase Agreement that invokes exclusive jurisdiction in United States courts, Ramirez has only confirmed that he could reasonably expect to litigate in a United States forum.

Ramirez has minimum contacts with the United States sufficient for the Court to exercise personal jurisdiction over him pursuant to RICO's provision for nationwide service of process.

### 2. The Court also has personal jurisdiction over Ramirez because he committed RICO predicate acts in this district.

Even if minimum contacts with Texas were required, Ramirez has litigation-related contacts with this state that are sufficient for specific personal jurisdiction. "Specific jurisdiction applies when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or are related to those activities." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008); *see also Garcia*, 2018 WL 2183968, at *4.

Harvest's complaint alleges that, as "part of th[e] same conspiracy" that "directly harmed" Harvest, Ramirez also committed illegal acts of bribery and money laundering as described in the indictment in *United States v. De Leon et al.*, No. 4:17-cr-00514 in the Southern District of Texas. FAC ¶ 69; *see also id.* ¶¶ 66–68. The *De Leon* indictment charges five former Venezuelan officials—including two of Ramirez's closest associates, Nervis Villalobos (Ramirez's deputy energy minister) and Rafael Reiter (head of Ramirez's personal security)—for their part in a PDVSA "management team" that solicited and obtained bribes from Houston

32

companies in exchange for awarding them PDVSA-related contracts and giving them payment priority. Ex. 75 at ¶¶ 60–61 (*De Leon* superseding indictment). An unindicted co-conspirator on the management team is "Official B," a "senior Venezuelan government official." *Id.* at ¶ 42. Citing the statement of a U.S. official, Harvest has pled that Ramirez—who was president of PDVSA and Venezuela's Minister of Energy and Oil during the events described in the *De Leon* indictment—is Official B. FAC ¶ 68.

Ramirez's illegal activities in *De Leon*, which are predicate acts of racketeering that relate to Harvest's injuries and that Harvest pled to support its RICO claims, were purposefully directed at this judicial district. Most of the companies that bribed Ramirez and others in exchange for PDVSA contracts are headquartered in Houston. Ex. 75 at ¶¶ 20–22, 24–25, 27. Intermediaries communicated bribe demands on behalf of Ramirez to the Houston companies. *Id.* at ¶ 124. Those companies paid bribes to Ramirez from their bank accounts in this district. *Id.* at ¶¶ 61, 84, 148, 240. Indeed, in exchange for favorable treatment from PDVSA, one Houston company and its owner were sent invoices for the school tuition of Ramirez's children. *Id.* at ¶¶ 22, 139. That company paid the school from bank accounts in this district. *Id.* at ¶¶ 84, 140.

Ramirez has not controverted any of these well-pleaded allegations, which must be accepted as true. *See, e.g.*, *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010); *GC Servs. Ltd. P'ship v. Little*, 2019 WL 2647690, at *3 (S.D. Tex. June 27, 2019) (Rosenthal, J.). In response to interrogatories, Ramirez has stated only that he "does not *personally* know" some (but not all) of the defendants and unindicted co-conspirators in *De Leon* and that he "does not recall" receiving anything of value from any of them during the relevant period. Ex. 76. That is not even a denial of Harvest's allegations, much less evidence sufficient to carry his burden to

930343.1

establish a lack of litigation-related contacts with Texas.  For this independent reason, the Court has personal jurisdiction over Ramirez. [28]

### C.     Personal jurisdiction over Ramirez does not offend due process.

Despite Ramirez's minimum contacts with the United States and with Texas, Ramirez insists that the Court's exercise of personal jurisdiction over him offends due process because it violates traditional notions of fair play and substantial justice.  Mot. 19–20.  The due process inquiry examines (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.  *Little*, 2019 WL 2647690, at *5.  Ultimately, "it is incumbent on the defendant to present a compelling case that the presence of some consideration would render jurisdiction unreasonable."  *Hazim v. Schiel & Denver Pub. Ltd.*, 2015 WL 4545534, at *7 (S.D. Tex. Jul. 28, 2015) (Rosenthal, J.) (quoting *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992)).

Ramirez has failed to do so.  He first claims that "[t]he burden on him to defend this case in Texas is extraordinary" because he is living in Europe.  Mot. 19.  But that is overblown.  He has already shown that he has ready access to the internet and sophisticated communications equipment, and he routinely interviews with reporters from around the globe.  *Supra* at I (A)(2). He has the financial resources to hire a major international law firm to represent him, with offices in Europe and attorneys on the pleadings from offices in New York, Washington, and Houston.  *Id.*  Indeed, he is alleged to have stolen billions of dollars.  Ramirez has given no compelling reason why it was or is an "extraordinary" burden for him to litigate here.

---

[28] The Court has pendent personal jurisdiction over Ramirez as to Harvest's non-RICO claims because they arise from the same nucleus of operative facts: Ramirez's bribery scheme.  *See, e.g.*, *Dimas v. Vanderbilt Mortg. and Fin., Inc.*, 2010 WL 1875803, at *6–7 (S.D. Tex. May 6, 2010).

Ramirez also suggests the forum has no interest in this litigation, Mot. 19, but that is also incorrect.  The United States, the relevant forum in a civil action asserting violations of RICO, has an interest in its courts adjudicating alleged violations of federal racketeering and antitrust statutes.  *Supra* at III(B)(1).  And Texas also has an interest, given that the bribery and money-laundering scheme alleged against Ramirez targeted not only Houston-based Harvest, but several other Houston companies who received bribe solicitations in this judicial district and paid bribe demands from this judicial district.  *Supra* at III(B)(2).

Harvest also has an interest in securing relief in this forum.  The company ceased operations in 2017 after an over $470 million loss of profits caused by Ramirez's conduct, and this lawsuit is Harvest's attempt to obtain some recompense for its shareholders before it ceases to exist under Delaware law.  FAC ¶ 3.  Harvest has already described the prejudice it would suffer if the default judgment were set aside now.  *Supra* at I(B).  And, contrary to Ramirez's suggestion, Harvest did not dismiss the other defendants because it does "not consider adjudicating [its] claims in this forum to be [its] best means of obtaining effective relief."  Mot. 20.  Harvest dismissed the other defendants to obtain a final judgment against Ramirez, who Harvest believes can remedy the harm Harvest has suffered.

The efficient administration of justice also counsels against disturbing this Court's prior finding of jurisdiction on fairness grounds.  Ramirez declares "the case has barely proceeded," Mot. 20, but in truth, this case has been pending nearly two years, Ramirez had actual notice of it from the start and chose to respond in the media rather than in this Court, the Court has entered a final judgment after finding that Harvest established proper service and personal jurisdiction and that the complaint's well-pleaded allegations entitled Harvest to relief, and Harvest has invested

significant time and money to investigate and locate Ramirez's assets to satisfy the judgment. There would be nothing efficient, much less fair, about terminating the case now.

Finally, no fundamental social policy is jeopardized by the Court's exercise of jurisdiction over Ramirez. Giving no reasons, Ramirez states that litigating here risks exposing him to violence at the hands of Maduro's regime. Mot. 20. But this is not compelling, because the United States is a safe haven for opponents of Maduro. The United States has recognized Venezuelan opposition leader Juan Guaido as the country's lawful president,[29] and has shifted control of many Venezuelan assets in the United States to Guaido, including companies (like Citgo), gold reserves, and financial accounts.[30] Multiple high-profile Maduro critics either reside here or are seeking to come here. Guaido's attorney general resides in Boston, where he was recently a visiting fellow at Harvard.[31] And President Maduro's intelligence chief fled Venezuela in May 2019 to Bogota, Colombia, where he met with U.S. officials, and arrived in the United States in June 2019.[32] Moreover, Ramirez's information about his current physical whereabouts—unreliable though it is—has been sealed in these proceedings.

---

[29] *See* Jessica Donati, Vivian Salama, and Ian Talley, *Wall Street Journal*, "U.S. Push to Oust Venezuela's Maduro Marks First Shot in Plan to Reshape Latin America" (Jan. 30, 2019), *available at* https://www.wsj.com/articles/u-s-push-to-oust-venezuelas-maduro-marks-first-shot-in-plan-to-reshape-latin-america-11548888252.

[30] *E.g.,* Andrew Scurria, Kejal Vyas & Rebecca Elliott, *Wall Street Journal*, "Venezuela Opposition's Citgo Takeover Disappoints U.S." (Feb. 20, 2019), *available at* https://www.wsj.com/articles/venezuela-oppositions-citgo-takeover-disappoints-u-s-11550658602.

[31] *See* Patricia Laya & Fabiola Zerpa, *Bloomberg*, "Guaido's Legal Adviser in Talks With Citi to Extend Gold Swap" (Feb. 28, 2019), *available at* https://www.bloomberg.com/news/articles/2019-02-28/guaido-s-legal-adviser-in-talks-with-citi-to-extend-gold-swap (reporting on Venezuelan attorney general Jose Ignacio Hernandez, who interviewed with reporters from Boston); CESAR ALVAREZ ALONSO & JOSE IGNACIO HERNANDEZ, EDS., LATIN AMERICAN GEOPOLITICS: MIGRATION, CITIES AND GLOBALIZATION (2019), Contributor Notes, *available at* https://link.springer.com/content/pdf/bfm%3A978-3-319-99552-6%2F1.pdf (listing Hernandez as visiting researcher at Harvard Kennedy School from 2017–19).

[32] *See* Anthony Faiola, *Washington Post*, "Maduro's ex-spy chief lands in U.S. armed with allegations against Venezuelan government" (June 24, 2019), *available at* https://www.washingtonpost.com/world/the_americas/maduros-ex-spy-chief-lands-in-us-armed-with-allegations-against-venezuelan-government; *The Week*, "Now in the U.S., Venezuela's former spy chief says he was part of plot to oust Maduro" (June 25, 2019), *available at* https://theweek.com/speedreads/848989/now-venezuelas-former-spy-chief-says-part-plot-oust-maduro; *CNN Espanol*, "Desertor del Gobierno Maduro, pero 'chavista de corazón': así es Manuel Cristopher Figuera, el

Ramirez has offered no compelling reason why this Court's exercise of personal jurisdiction over him, despite his national and state contacts, is unfair.

## IV.    In no event is dismissal of the lawsuit warranted.

Ramirez urges the Court to set aside its default judgment for either good cause or insufficient service of process, then to dismiss Harvest's lawsuit under Rule 12(b)(2) for lack of contacts sufficient for personal jurisdiction, under Rule 12(b)(5) for insufficient service, or under Rules 12(b)(6) or 12(c) on the ground that Harvest waived its right to sue.  Mot. 1; Doc. 106. Because there are no grounds to set aside the Court's default judgment, the Court need not consider Ramirez's motions to dismiss.  Assuming, however, that the Court were to set aside its judgment and reach the motions to dismiss, they should be denied.

The Rule 12(b)(2) motion should be denied because Ramirez has forfeited his challenge to personal jurisdiction and, in any event, the Court has jurisdiction over Ramirez due to his minimum contacts with the United States and the RICO predicate acts that Harvest alleges he committed in this judicial district—neither of which Ramirez challenges.  *See supra* at III(B)(1)– (2).  If the Court were nevertheless to conclude that a bribe demand Ramirez purposefully directed at Harvest in Texas is the *only* available basis for personal jurisdiction, it should defer resolution of that jurisdictional question until after discovery on the merits, or even trial, because that jurisdictional question is intertwined with the merits of the case.  *See Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982) ("When, as in this case, the jurisdictional question intertwines with the merits of the case, some discovery on the merits may be necessary, and general discovery may be permitted."); *Hoover v. Fla. Hydro, Inc.*, 2009 WL 10678888, at *2 (E.D. La. July 31, 2009) ("This Court has ruled that when a determination of personal jurisdiction and venue is

---

exdirector del Sebin" (June 26, 2019), *available at* https://cnnespanol.cnn.com/2019/06/26/desertor-del-gobierno-maduro-pero-chavista-de-corazon-asi-es-manuel-cristopher-figuera-el-exdirector-del-sebin/      (Spanish language; noting that U.S. Special Representative for Venezuela confirmed that Figuera was in the U.S.).

930343.1

intertwined with the merits of the case, that determination should be deferred until trial."). Ramirez's challenge to personal jurisdiction is intertwined with the merits because he denies instructing Garcia to make the bribe demands that Harvest alleges were purposefully directed at Harvest in Texas.  Mot. 17; Decl. ¶¶ 17–18.

The Rule 12(b)(5) motion should be denied because Harvest properly served Ramirez. *See supra* at II.  If the Court nevertheless concludes that service was insufficient, it still should not dismiss the case.  Dismissal based on improper service is generally disfavored.  *Jim Fox Enter., Inc. v. Air France*, 664 F.2d 63, 64 (5th Cir. 1981) (the court "must not dismiss" if "there is any possibility" the plaintiff may obtain valid service).  This is "especially true" when the defendant has had actual notice of the lawsuit and thus was not prejudiced by invalid service. *Lahman v. Cape Fox Corp.*, 2019 WL 1150628, at *5 (E.D. Tex. Mar. 13, 2019).  Instead, the Court should deem Ramirez now served or permit Harvest to serve him through his attorneys. Federal Rule of Civil Procedure 4(f)(3) permits plaintiffs to serve defendants who reside abroad, not only pursuant to international agreements like the Hague Convention, but also "by other means not prohibited by international agreement, as the court orders."  As this Court has recognized, Rule 4(f)(3) "is not subsumed within or in any way dominated by Rule 4(f)'s other subsections," but rather "stands independently, on equal footing"; it "serves as a safety valve for unanticipated situations and is not an unusual procedural technique"; and its use is "committed to the sound discretion of the district court" based on the "particularities and necessities of a given case."  *Hazim v. Schiel & Denver Book Grp.*, 2012 WL 12894747, at *1 (S.D. Tex. July 18, 2012) (Rosenthal, J.).  Exercise of the Court's Rule 4(f)(3) discretion is warranted, for example, when the "court's intervention will avoid further unduly burdensome or futile attempts at service." *Id.*  Given that Harvest filed its lawsuit nearly two years ago and immediately served

930343.1

Ramirez at his last and only known address, Ramirez had contemporaneous actual notice of the lawsuit, Ramirez willfully defaulted and waited sixteen months to move to set aside the default judgment for insufficient service, and service by the Italian Central Authority pursuant to the Hague Convention would likely take up to six more months,[33] Harvest requests that the Court exercise its Rule 4(f)(3) discretion to deem Ramirez now served or to permit service through his attorneys, thereby preventing further delay.

Finally, the Rule 12(b)(6)/Rule 12(c) motion on waiver grounds should be denied for the reasons stated in Harvest's Response in Opposition to Ramirez's Supplemental Motion to Dismiss Under Rules 12(b)(6) or 12(c), which Harvest filed on January 10, 2020 in compliance with the Court's order.  *See* Doc. 107.  In the interests of economy, Harvest incorporates those arguments by reference here.

## CONCLUSION

Before entering final default judgment against Ramirez, the Court ensured that service was proper, that the Court had personal jurisdiction, and that Harvest's well-pleaded allegations entitled it to relief.  Ramirez's motion to set aside the default judgment, supported only by a declaration that is discredited by Ramirez's own public statements and conduct, does not carry his burden to establish good cause for his default or that the Court's prior evaluation of service and jurisdiction was incorrect.  The Court should deny Ramirez's motion to set aside the default judgment.  If the Court reaches the motions to dismiss, they should be denied.

---

[33]   *See*   "Hague   Convention   May   Help   Foreign   Defendants   in   IPR,"   *available   at* https://www.finnegan.com/en/insights/hague-convention-may-help-foreign-defendants-in-ipr html.

930343.1

Respectfully submitted,

**SMYSER KAPLAN & VESELKA, L.L.P.**

*/s/ Michelle S. Stratton*
Craig Smyser (Fed. Bar No. 848)
Dane Ball (Fed. Bar No. 784400)
Ty Doyle (Fed. Bar No. 1373873)
Michelle S. Stratton (Fed. Bar No. 2592215)
Alexander M. Wolf (Fed. Bar No. 2470631)
717 Texas, Suite 2800
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
mstratton@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS
HARVEST NATURAL RESOURCES,
INC. AND HNR ENERGIA B.V**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of January, 2020, a true and correct copy of this pleading was sent by email to all counsel of record.

*/s/ Michelle S. Stratton*
Michelle S. Stratton