# EXHIBIT 17



1700 K Street, NW
Washington, DC 20006
T +1 202 282 5000
F +1 202 282 5100

August 30, 2019

*Via email to Lisa_Eddins@txs.uscourts.gov*
The Honorable Lee H. Rosenthal
United States District Court
515 Rusk Street
Houston, Texas 77002

Re:   *Harvest Natural Resources, Inc. v. Garcia*; No. 4:18-cv-00483 (S.D. Tex.)

Dear Chief Judge Rosenthal:

We write in response to Harvest's letter dated August 28, 2019.  As a preliminary matter, we are, again, surprised by Harvest's tactic of rushing to the Court prematurely and unnecessarily in an effort to litter the record with their accusations and one-sided, incomplete narratives.  Their letter does not seek any relief and there is no discernable reason for having filed it on the heels of Tuesday's hearing given that it contained no "new" information and that Harvest was well-aware of the issue it wanted to raise before the hearing (but chose not to raise it then when it could be addressed, if relevant).  Indeed, according to the time stamp on the screenshots attached to Harvest's letter, Harvest had knowledge of Mr. Ramirez's travel to Geneva by August 20, at the latest.  Harvest could have easily brought its so-called "evidence" to the Court's attention at the August 27 hearing, or raised its concern with Mr. Ramirez's counsel when they visited directly after the hearing.  Instead, Harvest waited until the next day to file this letter, without notice or trying to meet and confer with Mr. Ramirez beforehand.  This is nothing short of gamesmanship.

Moreover, Harvest's letter is also premature.  As Harvest acknowledged in its letter, the Court is aware that Harvest is challenging Mr. Ramirez's credibility—a challenge that Mr. Ramirez intends to fully rebut during discovery.  The Court has also made clear that Harvest is to produce discovery to Mr. Ramirez supporting Harvest's challenge to Mr. Ramirez's credibility and not to provide it by way of attorney assertions or to do it piecemeal to the Court in one-sided, incomplete letters.  The Court also stated clearly that it will "defer decision on whether to compel a deposition, and if so, where it should be, until" document discovery is completed.  *See* Dkt. Nos. 88, 98; July 17 Hearing Tr. 29:23-30:5.  As such, to the extent Harvest believes there are any remaining issues of accuracy or thoroughness following the completion of discovery, Harvest can raise those issues with the Court at the appropriate time and in the appropriate manner with a chance for Mr. Ramirez to respond.  That time is not Wednesday's curious letter.

Mr. Ramirez will defend himself on any challenges to the accuracy of the statements he has made at the appropriate time.  But to address the specific issue raised by Harvest in its letter, Mr. Ramirez has traveled to Geneva twice to meet with U.N. High Commissioner for Human Rights Michelle Bachelet at her invitation regarding the human rights crisis in Venezuela.  As I previously asserted, Mr. Ramirez does not have a passport.  That does in fact limit his ability to travel.  Notably, travel to an adjacent country by car does not require a passport.  Mr. Ramirez will explain the status of his passport and travel ability, as requested, in his discovery responses.  Had Harvest bothered to wait for those responses or understood the



August 30, 2019<br>Page 2

nature of how he could travel to meet with the High Commissioner without an operative passport, the Court could have been provided with the full story. This is not the first time that Harvest has rushed to the Court without providing all the information—e.g., when Harvest told the Court in its "Emergency Motion" that Juan Jose "Garcia's emails produced in this litigation indicate that in 2010, he attended a 7-hour long meeting that included Ramirez" and deliberately withheld from the record Mr. Garcia's sworn testimony that he has never met or talked to Mr. Ramirez and "[a]bsolutely" did not meet with him at that 7-hour meeting. *See* Ex. A, Garcia June 7, 2018 Deposition Tr. 137:25-138:10; 168:10-169:1.

Any additional issues that have to be addressed will be at the time and in the method ordered by the Court.


Respectfully submitted,

Abbe David Lowell


cc:    Shaun Clarke, sclarke@skv.com
       Dane Ball, dball@skv.com
       Alex Wolf, awolf@skv.com

# Exhibit A

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3  HARVEST NATURAL              )
    RESOURCES, INC., and HNR     )
 4  ENERGIA, B.V.,               )
         Plaintiffs,             )
 5                               )
    vs.                          )Civil Action NO. 4:18-cv-00483
 6                               )
    JUAN JOSE GARCIA MENDOZA,    )
 7  PETRO CONSULTORES, S.C.,     )
    PETRO CONSULTORES            )
 8  INTERNATIONAL TRADING        )
    COMPANY, INC.,               )
 9  PETROCONSULTORES             )
    (BARBADOS), LTD.,            )
10  PETROCONSULTORES, INC.,      )
    AZURE 904, LLC, RAFAEL       )
11  DARIO RAMIREZ CARRENO,       )
    EULOGIO ANTONIO DEL PINO     )
12  DIAZ, and JOSE ANGEL         )
    GONZALEZ ACOSTA,             )
13       Defendants.             )
```



1  one of the top managers, on the very top.  So I didn't
2  have any contact with the people who were low levels
3  that became the new big guys.  And they didn't know me
4  either.
5       Q.   Okay.  So Rafael Ramirez one of those people?
6       A.   I don't know Rafael Ramirez.  I never met him.
7       Q.   No, no.  I said was he one of those people that
8  was at PDVSA and then rose up the ranks when you left?
9       A.   Rafael Ramirez was never at PDVSA.  He just
10 came as a minister.
11      Q.   Okay.  So was he at the oil ministry when
12 you -- during your time at PDVSA?
13      A.   No.
14      Q.   You knew of him, though, didn't you?
15      A.   No.
16      Q.   You had never heard of Rafael Ramirez?
17      A.   I know of him, but I never met him.
18      Q.   Okay. You knew of him.  During your time --
19 when you joined Chevron in 2003, you knew who Rafael
20 Ramirez was, right?
21      A.   When I joined Chevron, Rafael Ramirez, I think,
22 was not minister.
23      Q.   Okay.
24      A.   I think.
25      Q.   You said you don't know Rafael Ramirez.



1    A.   Yes.  I don't know Rafael Ramirez.
2    Q.   Have you met him?
3    A.   Never.
4    Q.   Have you talked to him ever?
5    A.   Never.
6    Q.   Have you ever communicated with him in any way?
7    A.   Never.
8    Q.   Never even sent him a letter?
9         MR. NGUYEN:  Objection.
10   A.   Never.
11   Q.   (By Mr. Ball)  Have you ever helped write a
12 letter on Chevron's behalf to go deliver to him?
13   A.   What is your definition of "help"?
14   Q.   I don't know.  Let's use your definition.
15 What's your definition of "help"?
16   A.   Normally in Chevron documents would be drafted
17 by, say, lawyers or, you know, a person that owns the
18 particular case, in English; and it got translated by
19 the professional translators, like the one that you use
20 here.  And on occasions they ask of me to review the
21 Spanish version of a document.
22   Q.   Okay.  What about Eulogio Del Pino?  Do you
23 know him?
24   A.   No.
25   Q.   Ever met him?



1  where high-level managers confirm," and then you go on.
2              What do you mean by high-level managers?
3     A.   Maybe I talked to the director of hydrocarbons,
4  or in this particular case I would say I talked to
5  director of gas, Yeirys Gerder.
6              (Reporter inquired.).
7              THE WITNESS:  Yeirys Gerder.  It's
8  G-e-i-r-i-s [sic].  Gerder is G-e-r-d-e-r.  Director of
9  gas.
10    Q.   (By Mr. Ball)  You see at the end of the
11 paragraph you say, "This was a 7-hour meeting with
12 Ramirez included."  Do you see that?
13    A.   Yes.
14    Q.   So explain to us the "7-hour meeting with
15 Ramirez included."
16    A.   Well, this is very simple.  This is my poor
17 English.  Here, what I'm saying, what I am actually
18 saying is that I had meetings with high-level managers
19 in which they convey me that the Iranians had a meeting
20 with Ramirez.
21    Q.   You read where I was going without me going
22 there.
23    A.   No, I --
24    Q.   So you're saying that this is not you meeting
25 with Ramirez and others for seven hours?



1  A.  Absolutely not.
2  Q.  Got it.  You're going to be answering things
3 before I even ask a question by the end of this.
4  A.  Some of these are easy.
5           (Exhibit 25 marked.)
6  Q.  (By Mr. Ball)  Now, some of these positions in
7 the ministry are very important to Chevron, Chevron's
8 business in Venezuela, right?
9           MR. NGUYEN:  Objection.
10  A.  I'm sorry.  I wasn't paying attention to your
11 question.
12  Q.  (By Mr. Ball)  The high-level positions in the
13 ministry are important to Chevron for its business in
14 Venezuela, right?
15           MR. NGUYEN:  Objection.
16  A.  Yes.
17  Q.  (By Mr. Ball)  Yeah.  The relationships between
18 Chevron and those people, they're important?
19  A.  Yes.
20  Q.  Right.  Okay.
21           In this e-mail to Mr. Moshiri you say,
22 "Boss," because he is, "... Maduro ... finally announced
23 decisions of which I summarize the only relevant to us
24 as follows."
25           We don't need to go through it all, but

