# EXHIBIT 23

MR. RAFAEL DARIO RAMIREZ CARRENO
16 E 81ST ST
NEW YORK, NY 10028-0201

MR. RAFAEL DARIO RAMIREZ CARRENO
16 E 81ST ST
NEW YORK, NY 10028-0201

Craig  Smyser
700 Louisiana, Suite 2300
Houston, TX 77002

9314 8699 0430 0046 9420 09

0.47
3.45
1.50
0.00
5.42

Craig  Smyser
700 Louisiana, Suite 2300
Houston, TX 77002

MR. RAFAEL DARIO RAMIREZ CARRENO
16 E 81ST ST
NEW YORK, NY 10028-0201



9314 8699 0430 0046 9420 09
RETURN RECEIPT (ELECTRONIC)

# Please Discard

HARVEST_RDR_000139

## Transaction Details

Recipient:
MR. RAFAEL DARIO RAMIREZ CARREÑO
16 E 81ST ST
NEW YORK, NY 10028-0201

Sender:
Craig  Smyser
700 Louisiana, Suite 2300
Houston, TX 77002

Transaction created by:  FrancoiseBernier
User ID: 17419
Firm Mailing Book ID:  None
Batch ID:

Certified Mail Article Number:  9314869904300046942009
Return Receipt Article Number:

Service Options:        Return Receipt - Electronic
Mail Service:           Certified
Reference #:
Postage:                $0.47
Fees:                   $4.95
Status:                 To be Returned

## Transaction History

| Event Description | Event Date | Details |
|---|---|---|
| USPS® Certified Mail | 05-23-2018 03:09 PM | [USPS] - PRESHIPMENT INFO SENT  USPS AWAITS ITEM at TEMECULA,CA |
| USPS® Certified Mail | 05-23-2018 10:26 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at NORTH HOUSTON,TX |
| USPS® Certified Mail | 05-25-2018 12:00 AM | [USPS] - PROCESSED THROUGH USPS FACILITY at NEW YORK,NY |
| USPS® Certified Mail | 05-25-2018 06:28 AM | [USPS] - DEPART USPS FACILITY at NEW YORK,NY |
| USPS® Certified Mail | 05-25-2018 06:29 AM | [USPS] - DEPART USPS FACILITY at NEW YORK,NY |
| USPS® Certified Mail | 05-25-2018 06:30 AM | [USPS] - DEPART USPS FACILITY at NEW YORK,NY |
| USPS® Certified Mail | 05-25-2018 06:38 AM | [USPS] - DEPART USPS FACILITY at NEW YORK,NY |
| USPS® Certified Mail | 05-25-2018 07:00 AM | [USPS] - ARRIVE USPS FACILITY at NEW YORK,NY |
| USPS® Certified Mail | 05-26-2018 03:24 PM | [USPS] - NO AUTHORIZED RECIPIENT AVAILABLE at NEW YORK,NY |
| USPS® Certified Mail | 05-31-2018 04:40 AM | [USPS] - REMINDER TO SCHEDULE REDELIVERY at NEW YORK,NY |
| USPS® Certified Mail | 06-10-2018 03:20 AM | [USPS] - PACKAGE RETURN NOTICE GENERATED at NEW YORK,NY |

HARVEST_RDR_000140

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.**, | § § § | |
| *Plaintiffs*, | § § | |
| **vs.** | § § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| *Defendants*. | § § § | |

**DEFENDANTS' MOTION TO DISMISS**
**FOR LACK OF PERSONAL JURISDICTION**

HARVEST_RDR_000141

<u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION...............................................................................................................1

II.     JURISDICTIONAL FACTS.............................................................................................4

      A.      The FAC Alleges Two Transactions, Neither of Which has a
           Meaningful Connection to Texas.........................................................................6

           1.      *The Pertamina Deal.*..............................................................................6

           2.      *The Petroandina Deal.*..........................................................................7

III.    LEGAL ANALYSIS ...........................................................................................................8

      A.      Plaintiffs Bear the Burden to Establish Personal Jurisdiction over
           Garcia and the Garcia Corporate Defendants. ...................................................8

      B.      The Court Lacks Personal Jurisdiction over Garcia and the Garcia
           Corporate Defendants. .........................................................................................8

           1.      *Neither Garcia nor any Garcia Corporate Defendant has Sufficient
                 Contacts with Texas to Support a Theory of General Jurisdiction.*..............9

                a.      Garcia has No "Continuous and Systematic" Contacts with
                      Texas. ..........................................................................................9

                b.      The Garcia Corporate Defendants are Foreign Corporations
                      that Lack any Meaningful Contacts with Texas. ..........................11

           2.      *There is No Viable Theory of Specific Jurisdiction over Garcia or the
                 Garcia Corporate Defendants.*.............................................................12

                a.      The Case-Specific Connections between Garcia and Texas
                      are Random, Fortuitous, and Resulted Solely from the
                      Actions of Others. ......................................................................13

                  b.      Garcia's Case-Related Connections with Texas are
                      Random, Fortuitous, and Attenuated. ..........................................15

                  c.      Garcia Did Not Purposefully Establish any Contacts with
                      Texas. ........................................................................................16

                  d.      Garcia's Inconsequential Contacts with Texas are
                      Unrelated to Plaintiffs' Claims. ...................................................17

                  e.      Asserting Specific Jurisdiction over Defendants Would Be
                      Patently Unfair. .........................................................................18

                  f.      Plaintiffs Fail to Allege a Plausible Theory of Specific
                      Jurisdiction Against the Garcia Corporate Defendants.................19

IV.     CONCLUSION .................................................................................................................19

HARVEST_RDR_000142

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Access Telecom, Inc. v. MCI Telecomm. Corp.*,
   197 F.3d 694 (5th Cir. 1999) .................................................................................11

*AllChem Performance Prods., Inc. v. Aqualine Warehouse, LLC*,
   878 F. Supp. 2d 779 (S.D. Tex. 2012) ...................................................................13

*Best Little Promohouse in Tex. LLC v. Yankee Pennysaver, Inc.*,
   2014 WL 5431630 (N.D. Tex. Oct. 27, 2014) ........................................................11

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).................................................................................9, 13, 16

*Cardinal Health Sol., Inc. v. St. Joseph Hosp. of Port Charlotte, Fla. Inc.*,
   314 Fed. Appx. 744 (5th Cir. 2009)........................................................................17

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014).........................................................................9, 10, 12

*Evergreen Media Holdings, LLC v. Safran Co.*,
   68 F. Supp. 3d 664 (S.D. Tex. 2014)..............................................................15, 16

*Freudensprung v. Offshore Tech. Serv., Inc.*,
   379 F.3d 327 (5th Cir. 2004) .........................................................................16, 17

*Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*,
   255 F. App'x 775 (5th Cir. 2007)...........................................................................16

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011).........................................................................9, 12, 16

*Hanson v. Denckla*,
   357 U.S. 235 (1958).................................................................................16

*Holt Oil & Gas Corp. v. Harvey*,
   801 F.2d 773 (5th Cir. 1986) ...........................................................................16

*Int'l Energy Ventures Mgmt., LLC v. United Energy Grp., Ltd.*,
   800 F.3d 143 (5th Cir. 2015) .................................................................... *passim*

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945).......................................................................................9

*Johnston v. Multidata Sys. Int'l Corp.*,
   523 F.3d 602 (5th Cir. 2008) .........................................................................11, 12

ii

**HARVEST_RDR_000143**

*Jones v. Petty-Ray Geophysical Geosource, Inc.*,
    954 F.2d 1061 (5th Cir. 1992) ................................................................10

*Lewis v. Fresne*,
    252 F.3d 352 (5th Cir. 2001) .............................................................8, 16

*Luv N' Care v. Insta-Mix, Inc.*,
    438 F.3d 465 (5th Cir. 2006) .............................................................9, 18

*McFadin v. Gerber*,
    587 F.3d 753 (5th Cir. 2009) ................................................................18

*Michiana Easy Livin' Country, Inc. v. Holten*,
    168 S.W.3d 777 (Tex. 2005) .................................................................16

*Mink v. AAAA Dev., LLC.*,
    190 F.3d 333 (5th Cir. 1999) ..................................................................9

*Moncrief Oil Int'l, Inc. v. OAO Gazprom*,
    481 F.3d 309 (5th Cir. 2007) ................................................................17

*Monkton Ins. Servs., Ltd. v. Ritter*,
    768 F.3d 429 (5th Cir. 2014) ................................................................12

*Panda Brandywine Corp. v. Potomac Elec. Power Co.*,
    253 F.3d 865 (5th Cir. 2001) .............................................................8, 15

*RCT Growth Partners, LLC v. Quad Ocean Grp. LLC*,
    2015 WL 286531 (S.D. Tex. Sept. 03, 2015) ........................................3

*Rush v. Savchuk*,
    444 U.S. 320 (1980) .............................................................................15

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ................................................................*passim*

*Wilson v. Belin*,
    20 F.3d 644 (5th Cir. 1994) ..................................................................16

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(2) .....................................2, 4, 8, 20

**Other Authorities**

Harvest Nat. Res., Inc., *Form 8-k*, U.S. S.E.C. (June 21, 2012)...........*passim*

Harvest Nat. Res., Inc., *Form 8-k*, U.S. S.E.C. (Dec. 16, 2013) ...................8

HARVEST_RDR_000144

## I.   <u>INTRODUCTION</u>

The Court should dismiss Defendant Juan José Garcia Mendoza ("Garcia") and the Garcia Corporate Defendants[1] from this case pursuant to Federal Rule of Civil Procedure 12(b)(2) because they lack contacts with Texas sufficient to establish personal jurisdiction.

The only party with a supposed connection to Texas is Plaintiff Harvest Natural Resources, Inc. ("Harvest"), which was a Delaware corporation that had an office in Houston, Texas, prior to its formal dissolution in May 2017.  Even if Harvest's purported connections to Texas were relevant to the jurisdictional analysis — which they are not — Harvest's involvement in the allegations of the First Amended Complaint ("FAC") is remote.[2]

The FAC alleges that Harvest is the parent company of Plaintiff HNR Energia, B.V. ("HNR"), a Curacao company that conducts business in Venezuela.  HNR owns an interest in Harvest-Vinccler Dutch Holding, B.V. ("H-V Dutch Holding"), a Dutch company doing business in Venezuela.  H-V Dutch Holding held a 40% interest in Petrodelta, S.A. ("Petrodelta"), a Venezuelan State-owned company doing business in Venezuela.[3]  Diagram One on the next page illustrates this relationship for clarity:

---

[1] The Garcia Corporate Defendants are (1) Azure 904, LLC; (2) Petroconsultores, Inc.; (3) Petroconsultores (Barbados), Ltd.; (4) Petro Consultores, S.C.; and (5) Petro Consultores International Trading Company, Inc. Plaintiffs amended their initial Complaint to sue two additional entities — Azure 406, LLC, and Selle, LLC — and claimed that Defendant Garcia "operated each of these entities as conduits for illegal activity . . . ."  First Am. Compl., ECF No. 14 at 3, ¶ 7.  After serving these entities, Plaintiffs immediately nonsuited them.  *See* Summons, ECF No.s 15, 19; Ret. Serv., ECF No.s 24–27; Vol. Dismissal, ECF No.s 29, 31.  Garcia has no relationship with these nonsuited entities, the undersigned do not represent them, and they are not movants in this Motion.

[2] Plaintiffs commenced this action on February 16, 2018.  Compl., ECF No. 1.  Plaintiffs filed their First-Amended Complaint on February 23, 2018.  First Am. Compl., ECF No. 14 (hereinafter, "FAC").  Garcia and the Garcia Corporate Defendants waived service of the Summons on February 28, 2018.  Waiver, ECF No. 20.

[3] Corporacion Venezolana del Petroleo ("CVP"), which is a corporate subsidiary of PDVSA, the Venezuelan national oil company, owned the other 60% of Petrodelta.  FAC at 5–6, ¶ 18.

HARVEST_RDR_000145

**DIAGRAM 1**



The FAC alleges that in June 2012 Juan Franciso Clerico ("Clerico"), a Venezuelan national and a director of H-V Dutch Holdings, and Garcia, also a Venezuelan national, had a conversation in Caracas, Venezuela, during which Garcia stated that a sum of money must be paid to the Venezuelan Oil Ministry before the Venezuelan government would approve H-V Dutch Holding's sale of its 40% stake in Petrodelta[4] to an Indonesian company.  In other words, this lawsuit involves an alleged conversation between two _Venezuelans_, in _Venezuela_, about _Venezuelan_ government approval of the sale of a private _Venezuelan_ company's interest in a _Venezuelan_ State company to an _Indonesian_ company.

Plaintiffs' jurisdictional theory consists of the conclusory and unsupported claim that Garcia "knew and intended" that his conversation with Clerico in Caracas eventually would be communicated — apparently from Clerico through a series of Venezuelan and Dutch

_____

[4] Plaintiffs do not state that the Garcia Corporate Defendants played any specific role in the FAC's allegations.

2

intermediaries[5] — to Harvest's office in Houston, Texas, and that the payment would "come from Harvest's bank accounts in the United States." The alleged bribe was never paid.

Likewise, Plaintiffs claim that in "approximately fall 2014," another person allegedly told Harvest's CEO that Garcia — through an unspecified manner and means, and at an unspecified location — had demanded a second bribe in connection with a sale of H-V Dutch Holdings' Venezuelan assets to a Netherlands-based company. Again, Plaintiffs make the conclusory and unsupported allegation that Garcia "demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States." This alleged bribe, too, was never paid.

Neither Garcia nor any of the Garcia Corporate Defendants has contacts with Texas sufficient to support a finding of general jurisdiction. Likewise, Plaintiffs' unsupported allegation that Garcia "kn[ew] and intend[ed]" that a conversation in Venezuela, between Venezuelans, and about Venezuelan governmental approval of the sale of a Venezuelan company, would weave its way to Texas from Venezuela, through a series of corporations and individuals in Venezuela, Curacao, Amsterdam, and/or the Netherlands, does not support a theory of specific jurisdiction.

"Due Process requires that a defendant be haled [sic] into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *RCT Growth Partners, LLC v. Quad Ocean Grp. LLC*, 2015 WL 286531, at *3 (S.D. Tex. Sept. 03, 2015) (quoting *Walden v.*

---

[5] As stated above, Harvest (a now defunct Delaware company that formerly had an office in Texas) is the parent company of the HNR (a Curacao company doing business in Venezuela), which was the investor in H-V Dutch Holding (a Netherlands company doing business in Venezuela). FAC at ¶¶ 3, 4, 18. Clerico (a Venezuelan national) is alleged to have been a director from the Vinccler side of H-V Dutch Holdings. *Id.* at ¶ 25. The FAC neither alleges nor explains how or why Garcia intended the conversation to be, or knew that the conversation would be, communicated to Texas.

HARVEST_RDR_000147

*Fiore*, 134 S. Ct. 1115, 1123 (2014)).  Therefore, pursuant to Rule 12(b)(2), the Court should dismiss all claims against Garcia and the Garcia Corporate Defendants with prejudice.

## II.   JURISDICTIONAL FACTS

1.      Plaintiff Harvest Natural Resources, Inc., is a Delaware corporation that Plaintiffs state "operated at all times with its principal place of business in Houston, Texas."  FAC at ¶¶ 3, 17.  However, according to the SEC filings that Plaintiffs cite in the FAC, *id*. at ¶ 19, "Harvest Natural Resources, Inc., headquartered in Houston, Texas, is an independent energy company with principal operations in Venezuela, exploration assets in Indonesia, West Africa, China and Oman and business development offices in Singapore and the United Kingdom."  Harvest Nat. Res., Inc., *Form 8-k, Exhibit 99.1: Harvest Natural Resources Announces Share Purchase Agreement to Sell Interests in Venezuela Form*, U.S. S.E.C. at 1 (June 21, 2012) (hereinafter, "Harvest Press Release").[6]  Harvest dissolved in May 2017, and now exists solely for the purposes of prosecuting lawsuits and closing its business.  FAC at ¶ 19.

2.      Plaintiff HNR Energia, B.V., is a Curacao company and wholly-owned subsidiary of Harvest.  *Id*. at ¶ 4.  According to the SEC filing cited in the FAC, *id*. at ¶ 19, HNR's principal place of business is the Netherlands.  Harvest Press Release at 1.  However, during the timeframe relevant to the FAC, HNR conducted business in Venezuela.  FAC at ¶¶ 18–19.

3.      Non-party Harvest-Vinccler Dutch Holding, B.V., is a Netherlands company with its principal place of business in the Netherlands.  Harvest Press Release at 1.  However, during the timeframe relevant to the FAC, H-V Dutch Holding conducted business in Venezuela.  FAC at ¶ 18.  HNR owns 80% of H-V Dutch Holding.  *Id*.

---

[6] Available at:
https://www.sec.gov/Archives/edgar/data/845289/000119312512278671/d370176dex991.htm

HARVEST_RDR_000148

4.     Non-party Petrodelta, S.A., is a Venezuelan company with its principal place of business in Venezuela.   FAC at ¶ 18.   H-V Dutch Holding owns 40% of Petrodelta.   *Id*. Corporacion Venezolana del Petroleo, a Venezuelan company that is a subsidiary of PDVSA (the Venezuelan national oil company), owns 60% of Petrodelta.   *Id*.

5.     Defendant Juan-José Mendoza Garcia is a citizen of Venezuela, who resides in Madrid, Spain.   Garcia Decl. at ¶ 1, attached as **Exhibit 1** and incorporated fully by reference. Garcia is not — and never has been — a U.S. Citizen.   *Id*. at ¶ 2.   He is legally permitted to visit the United States periodically pursuant to a visa and owns real estate in Florida through Azure 904, LLC.   *Id*. at ¶¶ 2, 13.   Garcia works as a consultant in the oil and gas industry for companies that do business in Venezuela.   *Id*. at ¶ 9.

6.     Defendant Petro Consultores, S.C. ("Petro, S.C."), is a Venezuelan company with its principal place of business in Venezuela.   Garcia Decl. at ¶ 9.   Petro, S.C., conducts oil and gas consulting for Venezuelan businesses.   *Id*.   Petro, S.C., does not have any Texas bank accounts, owns no property or assets in Texas, does not perform services for any Texas resident or entity, and never has conducted any business in Texas.   *Id*.

7.     Defendant Petroconsultores, Inc. ("Petro, Inc."), is an Anguilla British Virgin Islands company.   *Id*. at ¶ 10.   Petro, Inc., has no headquarters and has no present business operations of any kind.   *Id*.   The company has never had any assets, liabilities, or real property in the United States.   *Id*.   Petro, Inc., has no U.S. or Texas bank accounts whatsoever.   *Id*.   Nor has the company communicated with any Texas residents, registered to do business in Texas, or conducted business with any Texas entities.   *Id*.

8.     Defendant Petro Consultores International Trading Company, Inc. ("Petro International"), is a Panamanian company.   *Id*. at ¶ 11.   Petro International has no headquarters,

HARVEST_RDR_000149

and has never had any business operations of any kind.  FAC at ¶ 11.  The company never has

had any assets, liabilities, or bank accounts in the United States or elsewhere.  *Id.*

9.      Defendant Petro Consultores (Barbados), Ltd. ("Petro Barbados"), is a Barbados

company.   *Id.* at ¶ 12.   Petro Barbados has no headquarters, and never has conducted any

business of any kind in the United States or elsewhere.  *Id.*   The company never has had any

assets, liabilities, or bank accounts in the United States or elsewhere.  *Id.*

10.      Defendant Azure 904, LLC ("Azure 904") is a Florida limited liability company.

*Id.* at ¶ 13.  Azure 904 currently owns a condominium in Florida where Garcia's elderly mother

resides.   *Id.*  The company has never owned any property or other assets outside of Florida and

has no bank accounts in the United States or elsewhere.   *Id.*   The company has also never

conducted any business in Texas or with Texas residents, and is not registered to do business in

Texas.  *Id.* at ¶¶ 8, 13.

11.      None of Garcia Corporate Defendants maintains a place of business, registered

agent, bank account, license, or employees in Texas.  *Id.* at ¶ 8.  Nor has any entity ever owned

or leased real property in Texas.   *Id.*   No entity has registered to do business in Texas.   *Id.*

Plaintiffs have not alleged otherwise.  *See generally* FAC.

**A.      The FAC Alleges Two Transactions, Neither of Which has a Meaningful
Connection to Texas.**

***1.       The Pertamina Deal.***

12.      According to the FAC, in June 2012, HNR agreed to sell its Venezuelan holdings

(primarily consisting of its interest in H-V Dutch Holding) to Pertamina, an Indonesian State-

owned company.  FAC at ¶ 19.  Both the Venezuelan and Indonesian governments were required

to approve the Pertamina Deal before it could be consummated.  *Id.*

6

13.     In November 2012, Garcia allegedly approached Clerico (a Venezuelan national and a director of H-V Dutch Holdings[7]) in Caracas, Venezuela, and stated that the Venezuelan government would approve the Pertamina Deal in exchange for a sum of money.  FAC at ¶ 25.

14.     In late November or early December 2012, Pertamina allegedly informed Harvest's CEO that Pertamina had received a similar demand from Garcia.  *Id*. at ¶ 27.  The FAC does not identify the location or other details of the supposed communication between Garcia and Pertamina.  Plaintiffs and Pertamina both allegedly declined to make any payments.  *Id*. at ¶¶ 26–27, 31–32.

15.     On February 20, 2013, Harvest announced the termination of the Pertamina Deal, apparently after the Indonesian government had communicated its rejection of the Pertamina Deal.  *See id*. at ¶ 33.

### 2.     *The Petroandina Deal.*

16.     In December 2013, HNR allegedly entered into an agreement to sell its Venezuelan holdings to Petroandina Resources Corporation, N.V. ("Petroandina Corp."), and its parent company, Pluspetrol Resources Corporation, B.V. ("Pluspetrol Corp.").  *Id*. at ¶¶ 36–37.  Both Petroandina and Pluspetrol are Netherlands companies.  Harvest Nat. Res., Inc., *Form 8-k*, U.S. S.E.C. at 1 (Dec. 16, 2013) (hereinafter, "Harvest 8-k").[8]  *See* FAC at ¶ 37.

---

[7] Plaintiffs claim that Clerico is a director of an entity called "Harvest-Vinccler, S.A."  FAC at ¶ 25.  The undersigned cannot find any company by this name.  The SEC filings cited in the FAC, *id*. at ¶ 19, reference an entity called "Harvest-Vinccler, S.C.A.," which it describes as a company organized under the laws of Venezuela.  Harvest Nat. Res., Inc., *Form 8-k, Exhibit 2.1: Share Purchase Agreement*, U.S. S.E.C. at 5 (June 21, 2012) (hereinafter, "Harvest Purchase Agreement").  The same document lists Clerico as a director of H-V Dutch Holdings.  *Id*. at 66.  Whether Clerico was a director of H-V Dutch Holdings (a Dutch company), Harvest-Vinccler, S.C.A. (a Venezuelan company), or both is irrelevant from a jurisdictional perspective, particularly in light of the fact that he is a Venezuelan national who had a conversation in Venezuela about Venezuelan government approval of the sale of an interest in a Venezuelan company.

[8] Available at: https://www.sec.gov/Archives/edgar/data/845289/000119312513480266/d645117d8k.htm

HARVEST_RDR_000151

17.     Non-party Javier Alfredo Iguacel, a Pluspetrol employee, allegedly informed Harvest's CEO in "approximately fall 2014" that Garcia demanded a bribe in order for the Venezuelan government to approve the Petroandina Deal.  *Id*. at ¶ 39.  Plaintiffs do not identify the date that this supposed demand occurred, where it occurred, or who was present.  The only purported connection to the *United States* (not *Texas*) is Plaintiffs' allegation that "Garcia demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States."  *Id*.  No payment was made.  *Id*.

18.     On January 1, 2015, HNR terminated the Petroandina Deal.  *Id*. at ¶ 42.

### III.    LEGAL ANALYSIS

### A.    Plaintiffs Bear the Burden to Establish Personal Jurisdiction over Garcia and the Garcia Corporate Defendants.

When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the resident plaintiff has the burden of establishing personal jurisdiction over the nonresident.  *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001).  When evaluating a complaint under Rule 12(b)(2) a court must take uncontroverted allegations as true, but the court is not required to credit conclusory jurisdictional allegations.  *See, e.g.*, *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

### B.    The Court Lacks Personal Jurisdiction over Garcia and the Garcia Corporate Defendants.

"The Due Process Clause of the Fourteenth Amendment guarantees that no federal court may assume jurisdiction *in personam* of a non-resident defendant unless the defendant has meaningful 'contacts, ties, or relations' with the forum state."  *Luv N' Care v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  Personal jurisdiction may be established pursuant to a theory of general or specific jurisdiction.  *Mink v. AAAA Dev., LLC.*, 190 F.3d 333, 336 (5th Cir. 1999).  Under either

HARVEST_RDR_000152

analysis, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum [s]tate." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985) (citing *Int'l Shoe,* 326 U.S. at 316).

### 1.   *Neither Garcia nor any Garcia Corporate Defendant has Sufficient Contacts with Texas to Support a Theory of General Jurisdiction.*

In the FAC, Plaintiffs do not allege any sustained or meaningful contacts that would support a theory of general jurisdiction over Garcia or any of the Garcia Corporate Defendants. In fact, they allege only that (1) Garcia works as a consultant in the oil and gas industry for companies, "including U.S. and Texas-based companies," and (2) Garcia visited Houston from October 10, 2013, to October 20, 2013. FAC at ¶¶ 7, 35. These contacts fall far short of the "continuous and systematic" contacts required to sustain a theory of general jurisdiction.

### a.   Garcia has No "Continuous and Systematic" Contacts with Texas.

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ." *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923–25 (2011)). Garcia is citizen of Venezuela and has resided in Venezuela for most of his adult life. Garcia Decl. at ¶ 1. He now resides in Madrid, Spain. *Id.* He is not, has never been, nor has applied to be a U.S. Citizen or a Texas resident. *Id.* at ¶¶ 2, 3. He is legally permitted to visit the United States periodically pursuant to a visa. *Id.* at ¶ 2. Garcia currently owns one condominium in Florida where his elderly mother lives. *Id.* at ¶ 13. He owns no real property, bank accounts, or business interests in Texas. *Id.* at ¶ 3.

Garcia has traveled to Texas (at most) only seven times in his entire life. *Id.* His first visit was during college when Garcia went to watch a baseball game in the Houston Astrodome with his father. *Id.* at ¶ 4. Since 2013, Garcia has traveled to Houston approximately three times

HARVEST_RDR_000153

to visit his daughter, who lives and works in the area. *Id.* at ¶ 5. Finally, Garcia attended two or three educational conferences in Houston — the last of which was around 2009. *Id.* at ¶ 6. Under the Supreme Court's "domicile" analysis, the "paradigm forum" for this dispute is Venezuela — not Texas. *Daimler*, 134 S. Ct. at 760.

Garcia has never resided in Texas, and the other types of contacts that Plaintiffs must use to establish a case of general jurisdiction are nonexistent. Garcia Decl. at ¶ 3. For instance, Garcia never has owned, directly or indirectly, any property, bank accounts, or business interests in Texas. *Id.* Other than his approximately seven educational and personal visits to Texas, Garcia has never conducted any business related to the allegations in the FAC with any Texas businesses or residents. *Id.* at ¶¶ 3, 8. He has never been issued a Texas driver's license or registered to vote in Texas. *Id.* at ¶ 3. In short, Garcia's contacts with Texas are not "continuous and systematic," but rather isolated and immaterial. *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992) ("[T]he minimum contacts inquiry is broader and more demanding when general jurisdiction is alleged, requiring a showing of substantial activities in the forum state.").

Plaintiffs summarily allege that Garcia "works as a consultant in the oil and gas industry for companies, including U.S. and Texas-based companies . . . ." FAC at ¶ 7. To the contrary, Garcia has never conducted any business related to the allegations in the FAC with any Texas businesses or individuals. Garcia Decl. at ¶ 3. Garcia performs oil and gas consulting for Venezuelan businesses. *Id.* at ¶ 9. Garcia has not performed services for any Texas resident or entity, registered to do business in Texas, or conducted business with any Texas entities. *Id.* at ¶¶ 3, 8, 9.

HARVEST_RDR_000154

But even if Garcia had such interactions, they could not be a basis to assert general jurisdiction. *Best Little Promohouse in Tex. LLC v. Yankee Pennysaver, Inc.*, 2014 WL 5431630, at *3 (N.D. Tex. Oct. 27, 2014) ("An out-of-state defendant that merely does business with Texas businesses or customers will not be subject to general jurisdiction if it does not have a lasting physical presence in the state.") (citing *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999)). Moreover, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 610 (5th Cir. 2008).

In light of his minimal and inconsequential contacts with Texas, there is no basis for a theory of general jurisdiction over Garcia.

<blockquote>
b.    The Garcia Corporate Defendants are Foreign Corporations that Lack any Meaningful Contacts with Texas.
</blockquote>

There are no recognizable jurisdictional allegations of any kind against the Garcia Corporate Defendants. The FAC only references them once as the subjects of a conclusory allegation that "Garcia operates the [Garcia Corporate Defendants] as conduits for illegal activity, including that described herein." FAC at ¶ 7. They are never mentioned in the FAC again.

With the exception of the Florida LLC, Azure 904, the Garcia Corporate Defendants are non-U.S. entities. Garcia Decl. at ¶¶ 8–13. None maintain a place of business, ownership or lease of real property, registered agent, bank account, license, or employee in Texas. *Id.* at ¶ 8. None is registered to do business with Texas and/or has done any business with Texas. *Id.* In fact, Plaintiffs do not allege to the contrary except for Petro, S.C., which Plaintiffs claim in conclusory fashion, "conducts business in Houston, Texas." FAC at ¶ 5. This is incorrect. Garcia Decl. at ¶ 9. Moreover, "vague and overgeneralized assertions that give no indication as

HARVEST_RDR_000155

to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 610.

For a foreign corporation, general jurisdiction exists only if the corporation's "'affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State.'" *Daimler*, 134 S. Ct. at 761 (quoting *Goodyear*, 564 U.S. at 919). "It is therefore incredibly difficult to establish general jurisdiction [over a corporation] in a forum other than the place of incorporation or principal place of business." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014) (citing *Goodyear*, 564 U.S. at 919).

Because the Garcia Corporate Defendants are foreign corporations with no connections to Texas, there is no basis to allege a theory of general jurisdiction over any of them.

> **2.      There is No Viable Theory of Specific Jurisdiction over Garcia or the Garcia Corporate Defendants.**

A four-step inquiry determines whether a court may exercise specific jurisdiction over a defendant.  First, Plaintiffs must show that "there are sufficient (i.e., not random, fortuitous, or attenuated) pre-litigation connections between the nonresident defendant and the forum." *Int'l Energy Ventures Mgmt., LLC v. United Energy Grp., Ltd.,* 800 F.3d 143, 153 (5th Cir. 2015) (quotation marks and alterations omitted).  Second, Plaintiffs must show that "the connection has been purposefully established by the defendant." *Id.*  Third, Plaintiffs must show that "the plaintiffs' cause of action arises out of or is related to the defendant's forum contacts." *Id.*  And fourth, if Plaintiffs can satisfy the first three elements, "the defendant can then defeat the exercise of specific jurisdiction by showing . . . that it would fail the fairness test, i.e., that the balance of interest factors show that the exercise of jurisdiction would be unreasonable." *Id.*

Plaintiffs have not, and cannot, satisfy its burden to demonstrate <u>*any*</u> of these elements for Garcia or any of the Garcia Corporate Defendants.

HARVEST_RDR_000156

a.   The Case-Specific Connections between Garcia and Texas are Random, Fortuitous, and Resulted Solely from the Actions of Others.

For a defendant's connections with the forum to be sufficient for the exercise of specific jurisdiction, they cannot be random, fortuitous, or attenuated.  *See Burger King*, 471 U.S. at 475; se*e also AllChem Performance Prods., Inc. v. Aqualine Warehouse, LLC*, 878 F. Supp. 2d 779, 787 (S.D. Tex. 2012).  Under this standard, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Walden*, 134 S. Ct. at 1122–23 ("[P]laintiff cannot be the only link between the defendant and the forum."); *see AllChem Performance*, 878 F. Supp. 2d at 787 ("[S]pecific jurisdiction may not be based on the mere fortuity that a plaintiff is a Texas resident.").

Here, Plaintiffs allege that Garcia and Clerico — two Venezuelans — had a conversation in Caracas, Venezuela, about a supposed payment that would be required to receive Venezuelan government approval for H-V Dutch Holdings, a Netherlands company doing business in Venezuela, to sell its assets to Pertamina, an Indonesian company.  FAC at ¶¶ 19–25.  The only alleged connection between this conversation and Texas is the conclusory and unsupported allegation that Garcia "kn[ew] and intend[ed]" that the solicitation would be conveyed to Houston, Texas, and that any bribe, if paid, would come from Harvest's bank accounts "in the United States."  *Id*. at ¶ 25.[9]

In conclusory fashion and without any support, Plaintiffs state that Garcia had an alleged conversation with Clerico "knowing and intending" it would reach Texas.  *Id.* at ¶ 25.  The facts — even as Plaintiffs have pled them — however, do not support Plaintiffs' own theory.  First, Plaintiffs claim implausibly that Garcia knew and intended the supposed bribe to be conveyed

---

[9] Plaintiffs do not allege that the payment would come from a <u>Texas</u> bank account.  FAC at ¶ 25.  Indeed, no supposed bribe was paid from a bank account in Texas or elsewhere.  *Id.* at ¶¶ 26, 31, 41.

HARVEST_RDR_000157

from Clerico to H-V Dutch Holdings, from H-V Dutch Holdings to HNR, and from HNR to Harvest. This did not happen. To the contrary, Clerico allegedly contacted Harvest's CEO "and requested an immediate meeting in Miami," Florida, where the substance of the alleged bribe was communicated. *Id.* at ¶ 26. Thus, Plaintiffs do not even claim that Garcia's conversation with Clerico *ever made its way to Texas*. Second, Plaintiffs not only allege that the payment would have come from a "United States" — not a *Texas* — bank account, but Plaintiffs also plead that no such bribe was actually paid from *any* bank account. FAC at ¶¶ 25, 26, 31, 41. Meaning, Plaintiffs have not pled that Garcia's alleged bribe demand even reached Texas.

Likewise, with regard to the Petroandina Deal, the only allegation is that Petroandina employee Iguacel informed Harvest's CEO in Houston that Iguacel had supposedly received a bribe demand from Garcia. *Id.* at ¶ 39. Other than alleging the demand occurred "[i]n approximately fall 2014," Plaintiffs do not explain when Garcia allegedly demanded the bribe, how the demand was conveyed, where the demand occurred, or any other details. *Id.* Again, Plaintiffs claim in conclusory fashion that Garcia "demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States." *Id.* As with the allegations involving the Pertamina Deal, this allegation relies upon the unsupported and implausible premise that Garcia knew the supposed demand would be communicated from Iguacel, through Petroandina, to Pluspetrol, to HNR, to Harvest, to *somewhere* "in the United States" — alleging no *Texas* connection. *Id.* The Court need not credit conclusory allegations, particularly when they defy logic as they do here. *Panda Brandywine*, 253 F.3d at 869.

14

HARVEST_RDR_000158

        b.     <u>Garcia's Case-Related Connections with Texas are Random,
Fortuitous, and Attenuated.</u>

Plaintiffs must also show that "there are sufficient (i.e., not random, fortuitous, or attenuated) pre-litigation connections between the nonresident defendant and the forum." *Int'l Energy*, 800 F.3d at 153.

Notwithstanding the conclusory nature of what Garcia "kn[ew] and intend[ed]" about his alleged conversation with Clerico in Venezuela, the allegation fails to support a theory of specific jurisdiction because the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Walden*, 134 S. Ct. at 1122; *see Rush v. Savchuk*, 444 U.S. 320, 332 (1980) ("[H]owever significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"). In addition to the fact that the supposed bribe was allegedly communicated to Harvest in *Florida*, not *Texas*, the communication resulted entirely due to unilateral actions of Clerico and others — not Garcia. *See* FAC at ¶ 26.

Furthermore, even if Plaintiffs had alleged a direct communication between Garcia and Texas, which they have not, "[i]t is black letter law that communications between parties during contract negotiations, by themselves, are insufficient to support personal jurisdiction." *Evergreen Media Holdings, LLC v. Safran Co.*, 68 F. Supp. 3d 664, 676 (S.D. Tex. 2014) (citations omitted). Indeed, even "contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986); *see Freudensprung v. Offshore Tech. Serv., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004).

HARVEST_RDR_000159

Thus, Plaintiffs failed to meet their burden to establish the first prong of the specific jurisdiction test.

    c.    <u>Garcia Did Not Purposefully Establish any Contacts with Texas.</u>

Under the next prong of the specific jurisdiction test, Plaintiffs must show that Garcia's connection with Texas were purposefully established by him, rather than someone else. *Int'l Energy*, 800 F.3d at 153. It is not enough for a defendant to have foreseen being sued in Texas, the defendant must have "reasonably anticipate[d] being haled [sic] into court" there. *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 794 (5th Cir. 2007) (finding no basis for personal jurisdiction where defendants did not travel to or direct communications at Texas in connection with their business, even though the parties held a meeting in Michigan) (citations omitted). *Compare Wilson v. Belin*, 20 F.3d 644, 648–49 (5th Cir. 1994) (holding that communication into the forum state was not purposefully directed into the state), *with Lewis*, 252 F.3d at 359 (permitting the exercise of jurisdiction where defendant knowingly signed and sent contracts to plaintiff in Texas).

A defendant must have sought some benefit, advantage, or profit by "availing" himself of the jurisdiction. *Evergreen Media Holdings*, 68 F. Supp. 3d at 675 n.7 (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). As such, courts examine the "contacts that the 'defendant *himself* creates with the forum State[,]'" *Walden*, 134 S. Ct. at 1121–22 (quoting *Burger King*, 471 U.S. at 475), looking for "'some act by which the defendant purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[,]'" *Goodyear*, 564 U.S. at 924 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

The Fifth Circuit, furthermore, has held that "[a]n exchange of communications in the course of developing and carrying out a contract . . . does not, by itself, constitute the required

HARVEST_RDR_000160

purposeful availment of the benefits and protections of Texas law." *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007). *See Cardinal Health Sol., Inc. v. St. Joseph Hosp. of Port Charlotte, Fla. Inc.*, 314 F. App'x. 744, 745 (5th Cir. 2009); *Freudensprung*, 379 F.3d at 344.

Here, Plaintiffs do not — and cannot — make allegations that Garcia purposefully availed himself of any privileges in Texas. To the contrary, the FAC alleges the opposite. Both attempted transactions involved conversations in Venezuela about Venezuelan government approval of the sale of a Venezuelan company. There is no allegation that any Texas person or entity was a party to these conversations. To the contrary, the only conceivable connection to Texas is that Clerico was a director of H-V Dutch Holding, which is owned in part by HNR, which is owned by Harvest, which once had an office in Texas.

Thus, Plaintiffs have failed to meet their burden of demonstrating that Garcia purposefully established contacts with Texas sufficient to meet the test for specific jurisdiction.

        d.    <u>Garcia's Inconsequential Contacts with Texas are Unrelated to Plaintiffs' Claims.</u>

Under the last prong of the specific jurisdiction test, Plaintiffs must demonstrate that their claims "arise[] out of or [are] related to the defendant's forum contacts." *Int'l Energy*, 800 F.3d at 153. Garcia's sporadic and inconsequential connections to Texas — attending a ballgame, educational conferences, and/or visiting his daughter for a total of seven visits — have nothing to do with the claims at issue. Garcia Decl. at ¶¶ 3–7. Although Plaintiffs (correctly) contend that Garcia traveled to Houston from October 10–20, 2013, they do not attempt to connect this visit to their claims. FAC at ¶ 35. Nor could they, because this was a family visit. Garcia Decl. at ¶ 5.

17

Thus, Plaintiffs have failed to meet their burden to establish the final prong of the specific jurisdiction test.

        e.    <u>Asserting Specific Jurisdiction over Defendants Would Be Patently Unfair.</u>

Plaintiffs cannot meet their burden to establish any of the first three prongs of the specific jurisdiction test, which makes any further analysis unnecessary.  But even if the Court were inclined to engage in a fairness analysis — the only prong for which Garcia carries the burden of proof — the abundant fairness considerations dictate dismissal of Garcia and the Garcia Corporate Defendants.

To determine if the exercise of jurisdiction is fair and reasonable, a court takes into account five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies.  *McFadin v. Gerber*, 587 F.3d 753, 759–60 (5th Cir. 2009) (citing *Luv N' Care*, 438 F.3d at 473).  Here, these factors demonstrate how unfair and unreasonable it would be to assert specific jurisdiction over Garcia and the Garcia Corporate Defendants.

Garcia is a Venezuelan national.  Garcia Decl. at ¶ 1.  The Garcia Corporate Defendants have no connections to Texas.  *Id.* at ¶ 8.  Even the other three named Defendants (Ramirez, Del Pino, and Acosta) appear to be Venezuelan nationals.  *See* FAC at ¶¶ 8–10.  The individuals who received the purported bribe demands (Clerico and Iguacel) are also likely Venezuelan or Argentine nationals.  H-V Dutch Holding, which was trying to broker the sale of its interest in Petrodelta to an Indonesian company, is Dutch.  *Id.* at ¶ 18.  The oil ministers and government officials, who allegedly would receive the purported bribe, are Venezuelan.  *See id.* at ¶¶ 8–10.  A dispute regarding H-V Dutch Holding's sale of interests in Petrodelta — the majority owner of

HARVEST_RDR_000162

which is a Venezuelan state-owned corporation — is best adjudicated by a Venezuelan court under Venezuelan law.

The only alleged witness who may reside in Texas is Harvest's former CEO.  *See* FAC at ¶ 21.  Harvest itself was a Delaware entity that dissolved in May of 2017 — it exists only as a litigation trust.  *Id.* at ¶ 3.  Texas' interests in resolving this dispute, therefore, are minimal.  *See Walden*, 134 S.Ct. at 1121 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.").

If the Court dismisses Garcia and the Garcia Corporate Defendants — as it should — Plaintiffs are not without recourse.  If Plaintiffs truly believe that they were harmed by Garcia or another Defendant, they may bring a case in Venezuela or some other jurisdiction with a meaningful connection to the underlying transactions.

      f.    <u>Plaintiffs Fail to Allege a Plausible Theory of Specific Jurisdiction Against the Garcia Corporate Defendants.</u>

Plaintiffs do not plead any case-specific conduct by any of the Garcia Corporate Defendants.  Plaintiffs list the companies as parties, claim they are "conduits for illegal activity," and never mention them again.  FAC at ¶¶ 5–7.  The Garcia Corporate Defendants are entities with no connections to Texas or the claims of this lawsuit.  Garcia Decl. at ¶¶ 8–13.  As such, there is no viable theory of specific jurisdiction for any of them.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Garcia and the Garcia Corporate Defendants respectfully request that this Court grant this Motion, dismiss all of Plaintiffs' claims against them pursuant to Federal Rule of Civil Procedure 12(b)(2) with prejudice, and grant any further legal or equitable relief that this Court deems just.

HARVEST_RDR_000163

Date:  April 13, 2018.

Respectfully submitted,

_s/ Paul E. Coggins_

**Paul E. Coggins**
 *Attorney-in-Charge*
 Federal ID No. 33190
 State Bar No. 04500700
 PCoggins@LockeLord.com

**Kip Mendrygal**
 Federal ID No. 1026277
 State Bar No. 24041472
 KMendrygal@LockeLord.com

**"Mario" Hoang Nguyen**
 Federal ID No. 3173111
 State Bar No. 24105873
 Mario.Nguyen@LockeLord.com

**LOCKE LORD, LLP.**
 2200 Ross Avenue, Suite 2800,
 Dallas, Texas 75201
 T: (214) 740-8000
 F: (214) 740-8800

**ATTORNEYS FOR DEFENDANTS JUAN-
JOSÉ MENDOZA GARCIA; PETRO
CONSULTORES, S.C.; PETRO
CONSULTORES INTERNATIONAL
TRADING COMPANY, INC.;
PETROCONSULTORES (BARBADOS), LTD.;
PETROCONSULTORES, INC.; and AZURE
904, LLC.**

## CERTIFICATE OF SERVICE

On April 13, 2018, I electronically submitted this Motion to Dismiss for Lack of Personal Jurisdiction with the Clerk of Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court.  I certify that I have served all counsel and/or pro se parties of record electronically.

_s/ Kip Mendrygal_
Kip Mendrygal

20

HARVEST_RDR_000164

**DEF.S' EXHIBIT NO. 1**

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.,** | § § § § | |
| *Plaintiffs,* | § § § | |
| **vs.** | § § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| *Defendants.* | § § § | |

### DECLARATION OF MR. JUAN JOSÉ GARCIA MENDOZA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

My name is Juan José Garcia Mendoza. I am an adult male over 21 years of age, and am capable of making this Declaration. I submit this Declaration in support of Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and state the following to the best of my personal knowledge:

1.      I am a citizen of Venezuela. I have resided in Venezuela for most of my adult life. Indeed, on or around April 5, 2018, I paid my taxes in Venezuela. While I was a resident of Venezuela during the time period of the allegations in this case, I recently moved and established residency in Madrid, Spain.

2.      I am not — and never have been — a U.S. Citizen, nor have I ever applied for U.S. Citizenship. At most, I periodically visit the United States on a visa.

### A.      My Seven Personal Visits to Texas.

3.      I have never been a resident of the State of Texas, nor have I ever intended to establish residency in Texas. I have never knowingly owned — directly or indirectly — any real property, bank accounts, or business interests in Texas. I have never been issued a Texas

*Garcia Decl.*
Page **1** of **4**

**DEF.S' EXHIBIT NO. 1**

driver's license and never registered to vote in Texas. Furthermore, I have never conducted any business related to the allegations in this Complaint with any Texas businesses or individuals. Over my lifetime, I have visited Texas approximately seven times as described below.

4.       When I was in college at San Michael College in Vermont, I took a trip with my father to watch a baseball game at the Houston Astrodome. This trip lasted approximately three days. Other than purchasing meals and other typical tourist activities, I conducted no business with the State of Texas or any Texas resident during these personal visits.

5.       I have traveled to Texas on three occasions for the sole purpose of visiting my daughter, who lives in Houston, Texas. My first visit was on or around October 10, 2013. I stayed with my daughter at her Houston apartment for approximately ten days, and then returned home to Venezuela. My second visit was around August 12, 2014. Again, I stayed with my daughter at her Houston apartment (a different apartment than my first visit) for approximately three days, and then returned home to Venezuela. My third visit was around September 4, 2015. Again, I stayed with my daughter at her Houston condominium for approximately three days, and then returned home to Venezuela. Other than purchasing meals at restaurants and other typical tourist activities, I conducted no business with the State of Texas or any Texas resident during these personal visits.

6.       Other than the three family visits described above, I have been to Texas two or three additional — but separate — times to attend educational conferences in Houston. The last time I attended a conference in Texas, was around 2009. On each trip, I visited for approximately three or four days, stayed at a Houston-area hotel, and attended the conference. I then returned home to Venezuela. Other than purchasing meals at restaurants and other typical tourist activities, I conducted no business with the State of Texas or any Texas resident during these conference visits.

7.       Not once during any of these personal or educational trips did I conduct business with, meet with, or even speak to any of the parties in this case.

### B.       My Corporate Entities.

8.       I own five corporate entities that are parties to this lawsuit. None of them do — or are registered to do — any business with Texas, directly or indirectly. Nor do any of them maintain a place of business, ownership or lease of real property, registered agent, bank account, license, or employee in Texas. Four of them are not even U.S. entities. Two of them are now defunct and never conducted any actual business at all. And one of them is a property holding company that exists solely to manage the Florida condominium where my elderly mother lives.

9.       I am the sole owner and employee of Petroconsultores, S.C. ("Petro, S.C."), which is a Venezuelan company headquartered in Venezuela with the sole business purpose of conducting oil and gas consulting for Venezuelan businesses. When working for Petro, S.C., I have not performed services for any Texas resident or entity, communicated with any Texas residents, registered to do business in Texas, or conducted business with any Texas entities. Petro, S.C., does not have a Texas bank account, own any real or personal property in Texas, or own any assets in Texas.

10.      I am the sole owner of Petroconsultores, Inc. ("Petro, Inc."), which is a Anguilla British Virgin Islands company. Petro, Inc., is a failed business venture of mine that never got

*Garcia Decl.*
Page **2** of 4

HARVEST_RDR_000166

DEF.S' EXHIBIT NO. 1

off the ground. Petro, Inc., has no headquarters and no present business operations of any kind. Petro, Inc., has no U.S. or Texas bank accounts whatsoever. In fact, Petro, Inc., has never owned any assets, liabilities, or property in any U.S. state or conducted any business in any U.S. state. Petro, Inc., especially, has not communicated with any Texas residents, is not registered to do business in Texas, and has not conducted business with any Texas entities.

11.     I am the majority owner of Petro Consultores International Trading Company, Inc. ("Petro International"), which is a Panamanian company. Petro International was another failed business venture of mine that never got off the ground. Petro International has no headquarters and never had any business operations of any kind. The company has never maintained any assets, liabilities, or bank accounts. Petro International, especially, has never owned any assets or property in the United States or conducted any business in the United States or with U.S. residents. Indeed, I have not paid the annual fees the Panamanian government requires to maintain the company in good standing and, thus, it may no longer exist.

12.     I am the majority owner of Petroconsultores (Barbados), Ltd. ("Petro Barbados"), which is a Barbados company. Petro Barbados was also a failed business venture of mine that never got off the ground. Petro Barbados has no headquarters and never had any business operations of any kind. The company has never maintained any assets, liabilities, or bank accounts. Petro Barbados, especially, has never owned any assets or property in the United States or conducted any business in the United States or with U.S. residents. Indeed, I have not paid the annual fees the Barbados government requires to maintain the company in good standing and, thus, it may no longer exist.

13.     I am the sole owner of Azure 904, LLC ("Azure 904"), a Florida limited liability company. Azure 904 currently owns the Florida condominium where my elderly mother lives. The company, however, has never owned any property or other assets outside of the State of Florida and has no bank accounts in the United States or elsewhere. Azure 904, in fact, has conducted no business aside from acquiring and maintaining real property in Florida. The company, especially, has never conducted any business in Texas or with any Texas residents.

C.     *The Allegations in this Lawsuit.*

14.     To the best of my knowledge, I have never met or communicated with any employees, officers, or directors of Plaintiffs Harvest Natural Resources, Inc. ("Harvest"), or HNR Energia, B.V. ("HNR Energia"), related to any business matter alleged in their Complaint.

15.     On or around November of 2012, I was in Caracas, Venezuela, when Juan Francisco Clerico, a Venezuelan acquaintance who was a director of Harvest-Vinccler Dutch Holding, B.V. ("H-V Dutch Holding"), a Dutch company doing business in Venezuela, contacted me. Mr. Clerico asked me to consult with H-V Dutch Holding's efforts to purchase additional oil reserves from a Venezuelan oil field.

16.     All of my communications with Mr. Clerico occurred while we were in Venezuela. I never asked Mr. Clerico for a bribe nor communicated a bribe request from anyone else. I also never spoke to Harvest, HNR, or anyone associated with either company about business matters. Additionally, I never spoke to anyone in the United States about my conversations with Mr. Clerico, nor did I direct any communications of any kind to the United States. Again, all of our business communications occurred in Venezuela.

*Garcia Decl.*
Page **3** of 4

HARVEST_RDR_000167

**DEF.S' EXHIBIT NO. 1**

17.     During all times, I knew and understood that Mr. Clerico was a Venezuelan national working on behalf of a Dutch company that conducted business in Venezuela. At no point did I have reason to believe — nor did Mr. Clerico tell me otherwise — that any business we conducted could have any effect in Texas. It is false to say that I "knew and intended that any conversation I had with Mr. Clerico would be conveyed to Harvest in Houston, Texas, and that any bribe, if paid, would necessarily come from Harvest's bank accounts in the United States."

18.     Finally, the consulting agreement with Mr. Clerico, if executed, would have been performed solely in Venezuela between Mr. Clerico's Dutch employer and myself.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 13th day of April, 2018.

JUAN JOSÉ GARCIA MENDOZA

*Garcia Decl.*
Page 4 of 4

HARVEST_RDR_000168

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.,** § § § | |
| *Plaintiffs*, § § | |
| **vs.** § § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** § § § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| *Defendants*. § § | |

<u>**ORDER OF DISMISSAL**</u>

BEFORE THE COURT is a Motion to Dismiss for Want of Personal Jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2), filed by Defendant Juan José Garcia Mendoza ("Garcia") and Defendants Azure 904, LLC; Petroconsultores, Inc.; Petroconsultores (Barbados), Ltd.; Petro Consultores, S.C.; and Petro Consultores International Trading Company, Inc (collectively, the "Garcia Corporate Defendants"). Garcia and the Garcia Corporate Defendants request dismissal of all of claims against them in the above-captioned case with prejudice.

After considering the Record, the pleadings filed, Defendants' Motion to Dismiss, and Plaintiffs' Response, the Court finds that it does not have personal jurisdiction over Garcia or the

1

Garcia Corporate Defendants.  As such, the Court **GRANTS** Defendants' Motion to Dismiss for Lack of Personal Jurisdiction in all respects.  Therefore,

**THE COURT ORDERS** that all of Plaintiffs' claims against Defendant Garcia and the Garcia Corporate Defendants in this case are **DISMISSED WITH PREJUDICE** and that this is a **FINAL JUDGMENT** as to all claims asserted against Defendant Garcia and the Garcia Corporate Defendants in this case.

**SO ORDERED.**

On April _____, 2018.

_____
**KEITH P. ELLISON**
**UNITED STATES DISTRICT JUDGE**

2

HARVEST_RDR_000170

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and** | § | |
| **HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE MENDOZA GARCIA,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' EMERGENCY MOTION TO PERMIT LIMITED JURISDICTIONAL DISCOVERY AND TO STAY RESPONSE TO AND CONSIDERATION OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### I.  Introduction

Defendant Juan Jose Garcia Mendoza on three separate occasions demanded a bribe from Houston-based Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V. (collectively, "Harvest") or their agreed buyers in return for Venezuelan government approval of Harvest's publicly-announced asset sales.  Harvest refused to pay the bribes and lost hundreds of millions of dollars as a result.  After Harvest filed this lawsuit against Garcia and his entities (collectively, "Defendants") and served Garcia and various Defendants at the oceanfront condominium outside Miami where Garcia and his wife resided:

- Garcia fled the country;
- Garcia's wife immediately vacated the condominium;
- Garcia's wife sold the condominium;
- Garcia removed his Miami-area business address and phone number from the website for his defendant entities; and finally
- Garcia removed all substantive content from the website for his defendant entities.

Garcia's efforts appear to have been an attempt to conceal the Defendants' jurisdictional ties and set the stage for his motion to dismiss on personal jurisdiction.  Garcia's motion relies

**HARVEST_RDR_000171**

solely on his own affidavit.  And as set out in more detail below, Garcia's affidavit contains demonstrable falsehoods, material omissions, and half-truths understating and hiding the Defendants' jurisdictional ties.  *See* Def. Mtn. to Dismiss, Dkt. 32, Ex. 1.  This Motion seeks discovery from Garcia—a deposition and limited document production—to enable Harvest to respond fully to Garcia's effort to escape this Court's jurisdiction.

Harvest's factual allegations in the First Amended Complaint suggest, with reasonable particularity, the possible existence of the Defendants' requisite jurisdictional contacts.  Nothing more is required under the law.  This motion and its exhibits, however, further support Harvest's allegations.   Nonetheless, in order to assist the Court in evaluating the issue of personal jurisdiction fully and fairly, Harvest requests under well-established Fifth Circuit precedent limited jurisdictional discovery from Defendants, as well as a stay of Harvest's response to—and the Court's consideration of—Defendants' motion to dismiss until limited jurisdictional discovery is complete.

## II.  Background

Harvest Natural Resources, Inc. is a Houston-based Delaware corporation that until May 2017 was engaged in the development of oil and gas properties around the world, principally in Venezuela.  The company formally dissolved in May 2017, but per Delaware law, will continue to exist until at least May 2020.  HNR Energia B.V. is Harvest Natural Resources, Inc.'s wholly-owned subsidiary.  In its First Amended Complaint, Harvest alleges that Garcia demanded from Harvest a $10 million bribe to secure approval by the Venezuelan government of Harvest's planned sale of its Venezuelan assets.  *See* 1st Am. Comp. ¶¶ 25–26.  Harvest alleges that on two more occasions, Garcia demanded a similar bribe from Harvest's agreed buyers.  *See id.* ¶¶ 27, 39.  Within the last several days before the filing of this Motion, two of Garcia's co-employees

743194.5

HARVEST_RDR_000172

with a Chevron corporate entity have been arrested on similar accusations of corruption.[1] Because Harvest and its buyers refused to pay these bribes, two publicly-announced sales were thwarted by the Venezuelan government.  *See id.*  Ultimately, Harvest was able to sell its assets four years after its initial sale agreement, and at a discount of more than $470 million from the original deal that fell through due to Harvest's refusal to give in to Garcia's bribe demands.  *Id.* ¶¶ 43–47.  Harvest believes, and has alleged, that Garcia has used various American business entities as conduits for his illegal activities.  *Id.* ¶ 7.

After Harvest successfully served its Original Complaint on Garcia's wife, who accepted service for Garcia at the condominium where they resided, Exhibit 1, and on Garcia's sister, who accepted service as registered agent for two of the entity defendants, *see* Dkt. 11 & 13, Garcia through his counsel waived service of process as to himself and the entity defendants.[2]  On April 13, 2018, Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction, Dkt. 32, alleging that Garcia's contacts with Texas are "minimal and inconsequential," *see, e.g., id.* at 11, and that his business entities lack any connection to Texas, *id.*  In support of their motion, Defendants rely solely upon an affidavit from Garcia himself, Dkt. 32, Ex. 1, in which he denies having more than an occasional connection to the United States in general and Texas and Houston in particular.  Harvest disputes many, if not all, of Garcia's claims.  The current deadline for Harvest to respond to Defendants' motion is May 4, 2018.

### III.  **Applicable Law**

"To the extent there is a factual dispute regarding the existence of contacts sufficient to support personal jurisdiction, it is the Court's responsibility to determine whether the disputed

---

[1] *See* Alexandra Ulmer & Marianna Parraga, REUTERS, "Venezuela arrests two Chevron executives amid oil purge" (Apr. 17, 2018), *available at https://www.reuters.com/article/us-venezuela-oil-chevron/venezuela-arrests-two-chevron-executives-amid-oil-purge-idUSKBN1HO2V7.*

[2] After filing the Original Complaint, Harvest identified additional entities owned by Garcia that it added as defendants in the First Amended Complaint.  Garcia's counsel has accepted service on behalf of all of these entities.

HARVEST_RDR_000173

contact occurred—'regardless of whether that contact is also an element of liability.'" *Next Techs., Inc. v. ThermoGenisis, LLC*, 121 F. Supp. 3d 671, 675–76 (W.D. Tex. 2015) (internal citation omitted). Towards that end, the Court "has broad discretion to permit a party to conduct jurisdictional discovery." *Id.* at 676 (*quoting Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982)). When a defendant moves to dismiss for lack of jurisdiction, "the district court must give the plaintiff an opportunity for discovery. . . ." *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981); *see also Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001) (same); *Buddle v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975) (same).

To support a request for jurisdictional discovery, Plaintiff need only make "a preliminary showing of jurisdiction." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005). Such a preliminary showing does *not* require *proof* that personal jurisdiction exists, but only "*factual allegations* that *suggest* with reasonable particularity the *possible* existence of the requisite contacts." *Id.* (emphases added). That is, Plaintiff must state what facts discovery is expected to uncover and how those facts would support personal jurisdiction. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000). "'If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts . . . the plaintiff's right to conduct jurisdictional discovery should be sustained.'" *Fielding*, 415 F.3d at 429 (*quoting Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)).

## IV. <u>Argument</u>

The factual allegations in Harvest's First Amended Complaint, Dkt. 14, suggest, with reasonable particularity, the possible existence of the Defendants' requisite jurisdictional contacts. *Fielding*, 415 F.3d at 429. Garcia's affidavit, *see* Dkt. 32, Ex. 1 ("Garcia Affidavit"), attempts to challenge some of these factual allegations, but contains falsehoods, material

HARVEST_RDR_000174

omissions, and half-truths designed to understate and hide his jurisdictional contacts. Thus, before ruling on Garcia's motion, the Court should allow Harvest to take limited jurisdictional discovery to confirm the Defendants' jurisdictional contacts and to test Garcia's unsupported and self-serving assertion that they do not exist.

### A. Defendants' Steps to Hide Ties to Texas.

Garcia has long operated a website for his Petro Consultores entities.[3] There, Garcia touted his and his companies' work for oil and gas supermajors and majors including Chevron, Shell, Total, Repsol, Suelopetrol, and Eni, among others.[4] *See* Exhibit 2 at 3. All of these companies have offices, subsidiaries, refineries, or other major business operations in the Houston area. This, at the very least, "suggests" the "possible existence" of minimum contacts with Texas. *Fielding*, 415 F.3d at 429. Of course, Garcia has attempted to conceal these facts.[5]

In addition to failing to include them in his affidavit, Garcia has removed these facts from his website, *ptrcon.com*. And with good reason—the materials formerly on Garcia's website also contradict multiple assertions in his affidavit:

- "I own five corporate entities that are parties to this lawsuit. *None of them do – or are registered to do – any business with Texas, directly or indirectly*." Garcia Affidavit ¶ 8 (emphasis added).

- "When working for Petro, S.C., *I have not performed services for any Texas resident or entity, communicated with any Texas residents*, registered to do business in Texas, or *conducted business with any Texas entities*." *Id.* ¶ 9 (emphases added).

---

[3] *See, e.g.*, Profile for ptrcon.com, Wayback Machine, *available at https://web.archive.org/web/\*/ptrcon.com* (reflecting snapshots from 2013 through 2017).

[4] "Links & Business Partners" page for ptrcon.com, Wayback Machine, Snapshot for Nov. 2, 2016, *available at https://web.archive.org/web/20161102050922/http://ptrcon.com/company/resources/*.

[5] Garcia has attempted to remove his website, as detailed herein. As of the date of submission of this motion, Exhibit 2, a ShemenSal / Petro Consultores slide deck, is still available on his website at the following address: *http://ptrcon.com/files/ShemenSal-Petro-Ingles1.pdf*. Consistent with his litigation behavior to date, Harvest expects that Garcia will remove this slide deck once he realizes that it is still publicly available. The same slide deck is available permanently at the following link via the Wayback Machine: *https://web.archive.org/web/20160603075931/http://ptrcon.com/files/ShemenSal-Petro-Ingles1.pdf*.

HARVEST_RDR_000175

- (Garcia makes similar points about three of his other entities. *Id.* ¶¶ 10, 11, 12.)

In addition to being contradicted by Garcia's former website, these statements are suspicious on their face, given that Garcia for decades has worked as an oil and gas consultant, yet disclaims any and all business communications with *any* person or entity in Texas, home to the oil and gas capital of the world. It would seem to strain credulity to accept these statements in light of Garcia's admission that he has made multiple trips to Houston to attend industry "educational conferences," *id.* ¶ 6, and his boasting on his website about clients that include Chevron (8,000 Houston employees[6]) and Shell (10,000 Houston employees[7]).

Thus, Harvest seeks discovery to challenge these assertions and to test Garcia's credibility under oath.

**B. Defendants' Steps to Hide Ties to the United States.**[8]

Garcia also claims he has resided in Venezuela for "most" of his adult life before very recently establishing residency in Spain. Garcia Affidavit ¶ 1. He omits, however, his extended residency in Florida.

---

[6] "Although based in San Ramon, [California,] Chevron has more employees and contractors in the Houston area — about 8,000 — than in any other place." David R. Baker, SAN FRANCISCO CHRONICLE, "Harvey closes Chevron's Houston offices, but offshore oil platforms still functioning" (Aug. 29, 2017), *available at https://www.sfgate.com/business/article/Harvey-closes-Chevron-s-Houston-offices-but-12159723.php*.

[7] According to Shell's U.S. External Relations Manager, "Shell had about 10,000 employees, and their famil[ies], in the Houston area during the time of the hurricane [Harvey]." Rebecca Hazen, HOUSTON CHRONICLE, "Shell's Heroes of Houston honors volunteer effort" (Mar. 26, 2018), *available at https://www.chron.com/neighborhood/bellaire/news/article/Shell-s-Heroes-of-Houston-honors-volunteer-effort-12782296.php*.

[8] Though Garcia fails to mention it in his motion, the Defendants' ties to the U.S. (not just Texas) are equally relevant to any jurisdictional analysis in this RICO case. The Fifth Circuit has long held that "'when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the *United States*.'" *Luallen v. Higgs*, 277 F. App'x 402, 405 (5th Cir. 2008) (emphasis original) (quoting *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994)). Civil RICO is such a statute. *See Dimas v. Vanderbilt Mortg. and Finance, Inc.*, No. C-10-68, 2010 WL 1875803, at *3 (S.D. Tex. May 6, 2010).

Similarly relevant is any "act done outside the state that has consequences or effects within the state" because such an act "will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *See, e.g., Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999) (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)).

HARVEST_RDR_000176

First, Garcia acknowledges that, through Azure 904, LLC, one of his entities, he owns a residence in Florida. *Id*. ¶ 13. But Garcia omits that during the relevant time period, he also owned a *second* residence in Florida, where he and his wife *lived*. Garcia and his wife resided at an oceanfront condominium outside Miami. Garcia's wife represented to the process server that the condominium was her usual place of abode, that Garcia at the time was simply away traveling for work, and that she would accept service for Garcia there. *See* Exhibit 1. Shortly after serving Garcia on February 16, 2018, Harvest learned from residents of that same condominium building that Garcia was taking steps to quickly sell the condominium. On March 12, 2018, Garcia and his wife sold the condominium. Exhibit 3. Garcia fled to Spain and his wife reportedly fled as well.

Second, Garcia asserts that he was only a "periodic[]" visitor to the United States, Garcia Affidavit ¶ 1, leaving the impression that his U.S. "visits" were mere vacations. However, Garcia long had a permanent U.S. Petro Consultores office and phone number. Garcia's website listed a "Miami" office address of 8925 Collins Avenue, Surfside, Florida 33154, and a telephone number of 305-864-0825 (area code 305 is the greater Miami area).[9] Following service of Harvest's lawsuit, Garcia promptly *removed* that address and phone number from his website, leaving only Venezuelan contact information. *See* Exhibit 4 at 47 (March 13, 2018 screenshot of the contents of *ptrcon.com*). Again, he later removed the entire website before challenging personal jurisdiction.

Third, Garcia's affidavit omits entirely that the registration information for his companies' website lists "Petro Consultores C.A." as the registrant organization,[10] with yet

---

[9] "Contact" page for ptrcon.com, Wayback Machine, Snapshot for Jan. 21, 2017, *available at https://web.archive.org/web/20170121054609/http://ptrcon.com:80/contact/.*

[10] It is unclear if this is yet another Petro Consultores entity.

HARVEST_RDR_000177

another U.S. address and the same U.S. phone number Garcia previously listed on his website. Exhibit 5.

Fourth, Garcia asserts that in April 2018 he paid taxes in Venezuela, suggesting that he did *not* pay taxes and was *not* a resident elsewhere. Garcia Affidavit ¶ 1. But Garcia omits that he reported zero income to the Venezuelan government for each year between 2001 and 2016, the most recent year on file, Exhibit 6, strongly suggesting taxes and residency elsewhere.

Fifth, Garcia states that he is "the sole owner" of Petroconsultores, Inc. and Azure 904, LLC. Garcia Affidavit ¶ 10. This is demonstrably false as to both companies. Official Venezuelan filings for Petroconsultores Inc. reveal that Garcia's wife, Patricia Piccinini—again, an admitted U.S. resident—is a 50% owner. Exhibit 7. Garcia's wife also owns Azure 904. In the warranty deed selling Azure's condominium where Garcia and his wife lived, his wife signed as a "Member and Manager" of Azure 904. See Exhibit 3. A member of a Florida LLC is an owner. Either the warranty deed or Garcia's affidavit is false, and this falsehood again happens to hide the Defendants' ties to the U.S. (ownership by a U.S. resident and relative).

Again, Harvest seeks discovery to challenge the factual assertions and to test Garcia's credibility, put in issue by his affidavit, under oath.

**C. Other Material Falsehoods in Garcia's Affidavit.**

Other material falsehoods in Garcia's affidavit demonstrate that this Court should not rely upon it in any jurisdictional analysis—especially to contravene factual allegations in the complaint—without subjecting Garcia and his assertions to examination.

For example, Garcia claims that "two of them [his entities] are now defunct and never conducted any actual business at all," Garcia Affidavit ¶ 8; "Petro[consultores], Inc., is a failed business venture of mine that never got off the ground," *id*. ¶ 10; "Petro International was

743194.5

HARVEST_RDR_000178

another failed business venture of mine that never got off the ground," *id.* ¶ 11; and "Petro Barbados was also a failed business venture of mine that never got off the ground," *id.* ¶ 12. These claims, of course, suggest no ties to the U.S. or Texas, but they are demonstrably false:

- According to official filings, Petroconsultores, Inc. contracted with multiple major companies from 2013 to 2016. Exhibit 7.

- A slide deck formerly on Garcia's website explained that Petroconsultores, Inc. is the "exclusive representative" of Mexican company ShemenSal for the distribution of "Blast ATFM." Exhibit 2 at 2. That slide deck also listed a Vice President and multiple directors, each with their own email addresses using the @ptrcon.com domain name. *Id.* at 29.

- A current corporate report for Petro International lists the company's status as valid ("vigente") and lists an agent, president, vice president, multiple directors, treasurer, and secretary, among other positions. Exhibit 8.

- A current corporate report for Petro Barbados says nothing to indicate that the company is inactive or defunct.[11] Moreover, an article by a Mexican investigative reporter references the entity's selection of Barbados as a tax haven, states that it is a subsidiary of Petroconsultores Inc., and notes Petroconsultores, Inc.'s work with ShemenSal.[12]

In short, none of this suggests—as Garcia claims repeatedly in his affidavit—that these companies "never got off the ground" or never conducted business.

### D. Garcia's Incredible Story to Contest his Alleged Overt Acts and Harm Caused in this Judicial District.

By June 2012, Harvest had publicly announced its intention to *sell all of its Venezuelan interests and assets*. Garcia's story—that Harvest supposedly requested a meeting with him in the fall of 2012 to help *buy additional Venezuelan oil reserves* (and thus that he had no knowledge that the meeting could impact Texas), *see* Garcia Affidavit ¶¶ 15–17—is not believable.

---

[11] "Petroconsultores (Barbados) LTD.," Barbados Ministry of Industry, International Business, Commerce and Small Business Development, *available at* https://caipo.gov.bb/home/index.php/search/search-our-database/article/96312-petroconsultores-barbados-ltd.

[12] Jorge Carrasco and Mathieu Tourliere, PROCESO, "Ganancias en México ocultas en Barbados" (Nov. 5, 2017), *available at* http://www.proceso.com.mx/509909/ganancias-en-mexico-ocultas-en-barbados (Spanish language).

HARVEST_RDR_000179

Harvest's announced *sale* of all it Venezuelan assets was covered widely by the business and industry press, including in Venezuela, and was a well-known fact in the Venezuelan oil industry.[13]  As demonstrated by Harvest's public filings and these media stories, Harvest Natural Resources Inc. controlled all its subsidiaries from its Houston headquarters.[14]  These public and widely read sources made clear that Harvest's CEO, James Edmiston, and his Houston team negotiated the deals.  In short, Harvest's subsidiaries at the time were not authorized to, and did not, seek to buy any assets in Venezuela (including using Garcia).  As alleged in the complaint, and as supported by the circumstantial evidence cited in it and above, Harvest was calling the shots and Harvest and its subsidiaries were seeking only to *exit* Venezuela.  It is not credible that Garcia would attend a meeting in November 2012 about consulting for Harvest's wholly-owned subsidiary, Garcia Affidavit ¶ 15, without performing perfunctory due diligence and being aware of these basic facts.  Harvest seeks Garcia's deposition and limited document discovery to challenge the factual basis for these assertions.

Harvest's complaint and these facts, at the very least, "suggest" the "possible existence" of jurisdiction in this district.  *Fielding*, 415 F.3d at 429; *Guidry*, 188 F.3d at 628.  The story in Garcia's affidavit—e.g., his denial of the bribe and claimed purpose of the meeting during which

---

[13] *See, e.g.*, Reuters Staff, REUTERS, "Harvest Natural Resources exits Venezuela" (June 21, 2012), *available at* https://www.reuters.com/article/harvestnatural-stakesale/update-2-harvest-natural-resources-exits-venezuela-idUSL3E8HL5H320120621; Nathan Crooks & Benjamin Haas, BLOOMBERG, "Harvest Shares Soar on Venezuela Oil Sale to Indonesia" (June 22, 2012), *available at https://www.bloomberg.com/news/articles/2012-06-21/harvest-natural-to-sell-venezuela-stake-to-pertamina* (subscription required); OGJ Editors, OIL AND GAS JOURNAL, "Pertamina to buy Harvest's Venezuelan assets" (June 22, 2012), *available at* https://www.ogj.com/articles/2012/06/pertamina-to-buy-harvests-venezuelan-assets.html; David Casallas, BNAMERICAS, "Harvest y Pertamina firman acuerdo de venta de activos" (June 21, 2012), *available at https://www.bnamericas.com/es/noticias/petroleoygas/harvest-y-persero-firman-acuerdo-de-venta-de-activos* (Spanish language).

[14] *See* PR Newswire, "Harvest Natural Resources Announces Share Purchase Agreement to Sell Interests in Venezuela" (June 21, 2012), *available at* https://www.prnewswire.com/news-releases/harvest-natural-resources-announces-share-purchase-agreement-to-sell-interests-in-venezuela-159923825.html; Securities and Exchange Commission, "Filing Detail" (June 21, 2012), *available at* https://www.sec.gov/Archives/edgar/data/845289/000119312512278671/0001193125-12-278671-index.htm.

743194.5

HARVEST_RDR_000180

Harvest alleges he demanded a bribe—doesn't hold water and does not change the fact that the allegations "suggests" the "possible existence" of minimal contacts with this district.  *Fielding*, 415 F.3d at 429.

### E.  Additional Basis to Defer Ruling on Personal Jurisdiction Pending Discovery.

Furthermore, when a defendant challenges jurisdiction in a manner that intertwines with the merits of the case, courts frequently allow discovery and defer deciding personal jurisdiction until the close of discovery, or even trial.  *See Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982) ("When, as in this case, the jurisdictional question intertwines with the merits of the case, some discovery on the merits may be necessary, and general discovery may be permitted."); *see also Amerifactors Financial Group, LLC v. Enbridge, Inc.*, No 6:13-CV-1446, 2013 WL 5954777, at *5 (M.D. Fla. Nov. 7, 2013) ("[T]here is substantial authority supporting the proposition that, in such a case [a challenge to personal jurisdiction that also implicates the merits], the district court may permit the case to proceed to general discovery and even trial before ruling on the question of jurisdiction." (citing *Wyatt*, 686 F.2d at 283)).

Garcia's challenge is the exact kind to trigger permissible discovery.  Garcia's challenge to personal jurisdiction is intertwined with the merits of the case because he denies making a bribe demand that Harvest alleges (and that circumstantial evidence strongly supports) was purposely directed at a corporation based in Texas.  Further, regardless of Garcia's intent, the alleged bribe demand had seriously harmful effects that were highly likely to (and did) follow in Texas.  In similar situations, courts in the Fifth Circuit have deferred deciding personal jurisdiction until after discovery.  *E.g., Hoover v. Fla. Hydro, Inc.*, No. 07-1100, 2009 WL 10678888, at *2 (E.D. La. July 31, 2009) ("This Court has ruled that when a determination of personal jurisdiction and venue is intertwined with the merits of the case, that determination should be deferred until trial.").

743194.5

HARVEST_RDR_000181

Thus, in order to accord Harvest a fair chance to fully respond to Garcia's challenge to the Court's jurisdiction over him, Harvest requests the Court permit it to take Garcia's deposition and to serve on him a limited request for production of documents. *See Royal Ten Cate USA, Inc. v. TTAH Trust Co. Ltd.*, No. A-11-CA-1057, 2012 WL 2376282, at *2 (W.D. Tex. 2012) (granting plaintiff's motion for jurisdictional discovery and allowing multiple depositions, as well as requests for production and interrogatories); *Next Technologies, Inc. v. ThermoGenisis, LLC*, 121 F. Supp. 3d 671, 680 (W.D. Tex. 2015) (granting plaintiff's motion for jurisdictional discovery and ordering that defendants respond to plaintiff's interrogatories and requests for production within 30 days).

## V.  Request for Emergency Consideration

Harvest requests that the Court consider this motion on an expedited basis.  Harvest requests a hearing by April 27, 2018, to allow sufficient time for Harvest to respond, as necessary, to Defendants' Motion to Dismiss.  Harvest's response deadline for the Motion to Dismiss is currently set for May 4, 2018.

## VI.  Conclusion

The factual allegations in Harvest's First Amended Complaint suggest, with reasonable particularity, the possible existence of the Defendants' requisite jurisdictional contacts.  The additional information contained in this motion and the exhibits further satisfy Harvest's preliminary showing of jurisdiction.  Nonetheless, before ruling on Garcia's motion, the Court should allow Harvest to take limited jurisdictional discovery to confirm the Defendants' contacts with this district, Texas, and the United States, and to test his self-serving falsehoods and omissions.

Accordingly, Harvest respectfully requests that the Court allow it to conduct both a deposition of Garcia and limited written discovery related to jurisdictional issues.  Harvest

12

743194.5

**HARVEST_RDR_000182**

submits that the discovery should take place on an expedited basis, within 14 days.  Five narrow

requests for production limited to jurisdictional issues raised by Garcia's affidavit are attached to

this motion as Exhibit A.

Respectfully Submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

*/s/ Lee Kaplan*
Lee L. Kaplan (Fed. Bar No. 1840)
*Attorney-in-Charge*
Craig Smyser (Fed. Bar No. 848)
Dane Ball (Fed. Bar No. 784400)
Ty Doyle (Fed. Bar No. 1373873)
Anthony J. Phillips (Fed. Bar No. 1123515)
Alexander M. Wolf (Fed. Bar No. 2470631)
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
lkaplan@skv.com
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS
HARVEST NATURAL RESOURCES,
INC. AND HNR ENERGIA B.V**

743194.5

HARVEST_RDR_000183

## **CERTIFICATE OF CONFERENCE**

Counsel for Plaintiffs have conferred with counsel for Defendants, who oppose the relief sought in this motion.

*/s/ Alex Wolf*
Alexander M. Wolf


## **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule 5.1 on the 19th day of April, 2018.

*/s/ Alex Wolf*
Alexander M. Wolf

743194.5

HARVEST_RDR_000184

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA B.V. | § § § | |
| *Plaintiffs* | § § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| JUAN JOSE MENDOZA GARCIA, *et al.* | § § | |
| *Defendants.* | § | |

**PLAINTIFFS' EMERGENCY MOTION TO PERMIT LIMITED JURISDICTIONAL
DISCOVERY AND TO STAY RESPONSE TO AND CONSIDERATION OF
DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA B.V. | § § § | |
| *Plaintiffs* | § § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE MENDOZA GARCIA,** *et al.* | § § | |
| *Defendants.* | § § | |

**PLAINTIFF'S REQUESTS FOR PRODUCTION TO GARCIA DEFENDANTS
ON LIMITED JURISDICTIONAL ISSUES**

**DEFINITIONS**

1. "You" means Defendant Garcia and any entity in which Garcia has an ownership interest.

2. "Chevron" means Chevron Corporation and any of its subsidiaries, including but not limited to Chevron Global Technology Service(s) Co./Company, Chevron U.S.A., Inc., Chevron Global Upstream and Gas, and any joint venture in which Chevron owns an interest, including but not limited to Petropiar.

3. "Affidavit" means Defendant Garcia's affidavit dated April 13, 2018, attached to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Dkt. 32.

4. The terms "reflecting" and "showing" mean "relating to," "referring to," "constituting," "containing," "mentioning," "discussing," "concerning," or "commenting upon."

5. "Any" includes the word "all" and "all" includes the word "any."

6. "And" includes the word "or" and "or" includes the word "and."

**REQUESTS FOR PRODUCTION**

You are hereby requested to produce the following documents:

**Request No. 1:** Materials reflecting any communications between you and Juan Francisco Clerico, including about the meeting between you and Clerico on or around November 2012 that you refer to in paragraph 15 of your affidavit; "the consulting agreement with Mr. Clerico" that you refer to in paragraph 18, including any drafts.

**Request No. 2:** Materials directly related to the assertions in your April 13 affidavit:

    a.  Your passport.

    b.  Your U.S. visas from 2010 to date.

    c.  Your U.S. (including any state) tax forms from 2010 to date.

    d.  Your driver's license in any U.S. state.

    e.  Your travel itinerary, reservations, or similar materials for any trip to or within the U.S. from 2010 to date.

    f.  Materials showing the identifying information, including financial institution and account number, for any financial accounts in the U.S.

    g.  Materials showing any real property in the U.S. in which you had any ownership interest from 2010 to date.

**Request No. 3:** Materials reflecting any communications between you and Chevron or any Chevron employee.

**Request No. 4:** Materials reflecting any agreement between you and Chevron, work you performed for Chevron, and payments you received from Chevron.

**Request No. 5:** Materials reflecting any policies, procedures, or training Chevron provided you before or during your work for Chevron.

HARVEST_RDR_000187

# EXHIBIT 1

HARVEST_RDR_000188

## AMENDED RETURN OF SERVICE

### UNITED STATES DISTRICT COURT
### SOTHERN District of TEXAS

Case Number: 18-483

Plaintiff:
HARVEST NATURAL RESOURCES, INC., AND HNR ENERGIA B.V.

vs.

Defendant:
JUAN JOSE MENDOZA GARCIA, ET AL.

For:
Smyser Kaplan & Veselka, L.L.P.
700 Louisiana Street
Suite 2300
Houston, TX 77002

Received by GORMAN PROCESS SERVICE, LLC on the **16th day of February, 2018** at 5:00 pm to be
served on **JUAN JOSE MENDOZA GARCIA, 9401 COLLINS AVENUE, #605, SURFSIDE, FL 33154.**

I, SIMON R. VELA, do hereby affirm that on the **16th day of February, 2018** at 8:42 pm, I:

SUBSTITUTE served by delivering a true copy of the SUMMONS/COMPLAINT with the date and hour of service
endorsed thereon by me, to: PATRICIA GARCIA as WIFE at the address of: 9401 COLLINS AVENUE, #904,
SURFSIDE, FL 33154, the within named person's usual place of ABODE, who resides therein, who is fifteen (15)
years of age or older and informed said person of the contents therein, in compliance with state statutes.

**Military Status:** BASED UPON INQUIRY DEFENDANT IS NOT IN THE MILITARY.

I do hereby certify that I have no interest in the above action, that I am over the age of eighteen, and that I am
a Certified Process Server in the circuit in which it was served. Under penalty of perjury, I declare that I have
read the foregoing Verified Returned of Service and that the facts stated in it are true. I am in good standing in
the circuit in which document was served. PURSUANT TO F.S. 92.525(2), NOTARY NOT REQUIRED

SIMON R. VELA
CPS #2343

GORMAN PROCESS SERVICE, LLC
11767 South Dixie Highway
Suite 201
Miami, FL 33156
(305) 971-9636
Our Job Serial Number: ARG-2018000756

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.5n

# EXHIBIT 2

HARVEST_RDR_000190



HARVEST_RDR_000191

[ 2 ]



## INTRODUCTION

**SHEMENSAL**. Is a Mexican company incorporated in year 2003, manufacturer of **BLAST ATFM** with national and international distribution Thru its exclusive representative Petroconsultores Inc.

**BLAST ATFM** is a descaler for process equipment such as heat exchangers, distillation towers, turbines, offshore installations, docking facilities, gas lines flow stations and pipeline, gas separators, radiators, coils, evaporators, condensers, gas sweetening plants, and the widest range of process equipment.

In addition, **BLAST ATFM** is used for cleaning, metal oxidation removal, removal of incrusted salts such as silica, amines and carbonates, and is also excellent for stainless steel passivation.



ShemenSal



**Petro consultores**

- Is a leading Venezuelan Oil & Gas Consulting firm Established in 2002, Services the Andean and Caribbean Region on Sub Soil, and Surfaces studies.
- Main Clients include:
  - Chevron
  - Shell
  - Suelopetrol
  - Repsol
- The company has partnered with Mexican ShemenSal for the commercialization of Blast ATFM a product that will re-define Equipment Maintenance in the Oil & Gas industry.

3

HARVEST_RDR_000193

[ 4 ]





Petro consultores

## BLAST ATFM

It is the only product of its kind that is **reusable**. It can be used several times depending from the type of equipment, process and application, significantly reducing maintenance and operating costs.

**BLAST ATFM** substitutes SAND BLAST, generating white metal.

**BLAST ATFM** does not damage seals, paint, gaskets or thermal insulation. It does not corrode the stainless steel, bronze or aluminum in treated equipment.



ShemenSal

[ 5 ]

# CLEANING OF TOWER 101-CO-2, GAS PLANT 1 IN PGPB WITH BLAST ATFM [1]

Tower 101-CO-2 of Gas Sweetening Plant 1 started operations in September 16, 2011; showing low processing capacity and high differential pressure.

The following results were obtained after cleaning with BLAST ATFM:

### Design and Operative Conditions and Cleaning Results:

| VARIABLES | DESIGN | BEFORE | AFTER |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 262.5 | 104 | 262.0 |
| DIFFERENTIAL PRESSURE MMHG | 188 | 154 | 188 |
| SWEET GAS TEMP. ° C | 44 | 55 | 44 |

## Actions:

● The tower is cleaned with 7,000 liters.

● Product is injected at 30 GPM and 3 Hp.



101-CO-2: WSG Management

101-CO-2: Differential Pressure

1) PEMEX GAS Y PETROQUIMICA BASICA

HARVEST_RDR_000195

[ 6 ]

# SAFETY AND MAINTENANCE TIME IN TRADITIONAL VS. BLAST ATFM CLEANING

**TRADITIONAL CLEANING:**

- Staff is exposed to the risk of accessing confined areas with high pressure pumps (15,000 psi) and 440v voltage, inside the tower.
- Cleaning by absorber tower is performed in 12 days (Shutdown and Startup).

**CLEANING WITH BLAST ATFM:**

- Staff is not exposed to the risk of accesing confined areas. And no high pressure pumps are involved.
- Cleaning by absorber tower is performed in 5 days (Shutdown and Startup).



**ShemenSal**



[ 7 ]

# COST-BENEFIT ANALYSIS

|  | TRADITIONAL CLEANING | CLEANING WITH BLAST ATFM | SAVINGS |
|---|---|---|---|
| Required time | 12 days | 5 days | 7 days |
| Productivity loss (142 mmcfd) | 29.32 MM$ | 12.02 MM$ | 17.1 MM$ |
| BLAST ATFM Product Cost |  | 1.12 MM$¹ | 0.896 MM$ |
| Total Savings |  |  | 16.204 MM$ |

Note 1:  Initial investment in the BLAST ATFM product was 1.12 MM$ for 7,000 liters, used in the cleaning process of tower 101-CO-2  of Gas plant 1. Once the product is recovered and filtered, it is equivalent to one fifth (0.224 MM$) of the initial investment cost, since it may be reused in the cleaning of equipment such as : heat exchangers, Evaporators and Condensers at least five more times.

Petro consultores

ShemenSal

HARVEST_RDR_000197

[ 8 ]

# CLEANING OF TOWER 102-CO, GAS PLANT 1 WITH SHEMENSAL'S BLAST ATFM.

Tower 102-CO if Gas Regenerating plant 1 began operations in September 14, 2011, showing low processing capacity and high differential pressure.

**Operative Conditions:**

| VARIABLES | DESIGN | BEFORE | AFTER |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 525 | 380 | 500 |
| DIFFERENTIAL PRESSURE MMHG | 88 | 116 | 57 |

**Actions:**

- It was cleaned with 9,000 liters of **BLAST ATFM** at a ratio of 50 GPM

# INITIAL REPORT OF THE VISUAL INSPECTION TO TOWER 102-COM GAS PLANT 1.

**IDENTIFICATION:** REGENERATION TOWER

**TAG No.:** 102-CO

**LOCATION:** GAS SWEETENING P. 1

**INSPECTION DATE:** FEBRUARY 18, 2013



HARVEST_RDR_000199



## COST-BENEFIT ANALYSIS

| | TRADITIONAL CLEANING | CLEANING WITH BLAST ATFM | SAVINGS |
|---|---|---|---|
| Required time | 12 days | 5 days | 7 days |
| Productivity loss (230 mmcfd) [2] | 123.97 MM$ | 51.65 MM$ | 72.32 MM$ |
| BLAST ATFM Product Cost | | 1.54 MM$ [1] | |
| Total Savings | | | 70.78 MM$ |

Note 1: Initial investment in BLAST ATFM was 1.42 MM$ for 9,000 liters, used in the cleaning process of tower 102-CO, Gas plant 1.

Note 2: The production loss of 230 mmcf is obtained from the 930 mmcf usually processed by the Work Center minus the 700 mmcf processed during Gas Plant No. 1 shutdown.

10

Petro consultores

ShemenSal



# CLEANING OF TOWER 101-CO1, GAS PLANT 1 OF PGPB WITH SHEMENSAL'S BLAST ATFM[1]

Gas Sweetening Tower 101-CO1, Sweetening Gas plant 1 started operations in September 05, 2012, showing low processing capacity and high differential pressure.

## Operative Conditions:

| VARIABLES | DESIGN | BEFORE | AFTER 09/17/12 |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 420 MMSCFD | 325 | 451 |
| DIFFERENTIAL PRESSURE MMHG | 125 mm Hg | 182 | 188 |

## Actions:

- It was cleaned with 9,000 liters of **BLAST ATFM** at 50 GPM.

1) PEMEX GAS Y PETROQUIMICA BASICA



# CLEANING OF TOWER 101-CO1, GAS PLANT 2 OF PGPB WITH BLAST ATFM [1].

Tower 101-CO1 of Gas Sweetening Plant 2 started operations in November 15, 2012, showing low processing capacity and high differential pressure.

**Operative Conditions:**

| VARIABLES | DESIGN | BEFORE | AFTER 15/02/13 |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 420 MMSCFD | 278 | 392 |
| DIFFERENTIAL PRESSURE MMHG | 125 mm Hg | 146 | 170 |

* The Plant was inoperative from Oct 8 to Nov 14

**Actions:**

● The tower was cleaned with 9000 lt of **BLAST ATFM** at 50 GPM

1) PEMEX GAS Y PETROQUIMICA BASICA

[ 13 ]

## COST-BENEFIT ANALYSIS
## IN TOWER 101-CO1, GAS PLANT 1 AND
## IN TOWER 101-CO1, GAS PLANT 2

| | TRADITIONAL CLEANING | CLEANING WITH BLAST ATFM | SAVINGS |
|---|---|---|---|
| Required time | 12 days | 5 days | 7 days |
| Production Loss (120 MMSCFD) [2] | 73.76 MM$ | 30.73 MM$ | 43.03 MM$ |
| Product Cost  BLAST ATFM | | 1.42 MM$ | |
| Savings per Tower | | | 41.61 MM$ |
| Total Savings from both Towers | | | 83.22 MM$ |

Note 1: Investment in BLAST ATFM  is 1.42 M$ per 9,000 liters.

Note 2: Production gain of 120 MMCF. It is obtained as an average of the improvement in Gas 1 (126 MMCF) and Gas 2 (114 MMCF) production increase.

Petro consultores

ShemenSal









## GASKET REMOVAL, CLEANING AND ATTACHMENT IN ABSORBER TOWER DA-4401-B

[ 15 ]

# GASKET REPLACEMENT PROCESS FOR ABSORBER TOWER DA-4401-B, GAS SWEETENING PLANT 3

● As we can see, the gasket of absorber tower DA-4401B was dirty, reason why the tower's differential pressure was high and the design load could not be processed, but after the cleaning the gasket recovered its design condition, correcting in that way the high differential pressure and tower channeling problem.

● The behavior test was performed in October 8 to 10, in order to evaluate the operation of gas sweetening plant No. 3, increasing the processing capacity from 80 to 120 mmcfd (in this test the plant recovered its design capacity).



The gasket of absorber tower DA-4401-B shows excessive mud, hydrocarbons and corrosion.





Second (bottom) section of absorber tower DA-4401-B completely filled with the new gasket IMTP-40 KOCH-GLITSCH

HARVEST_RDR_000205





# HEAT EXCHANGERS CLEANING WITH BLAST ATFM

Those Heath Exchangers out of service due to incrustation were selected.

HARVEST_RDR_000208



HEAT EXCHANGERS CLEANING WITH BLAST ATFM

The pipes were immersed for 24 hrs.

CLEANING PROCESS

HARVEST_RDR_000209



[ 20 ]

## HEAT EXCHANGERS CLEANING WITH BLAST ATFM

The result was satisfactory, since it was detected that **BLAST ATFM** cleaned the bundle of pipes well.

Heath Exchangers were in operative conditions.







CLEANING RESULTS

Petro consultores

ShemenSal

HARVEST_RDR_000210

[ 21 ]

# CLEANING OF ALFA LAVAL'S COMPABLOC COOLER

## BACKGROUND

Lean amine plate coolers EA-201 and EA-202 of the Gas Sweetening plant operated with decreased efficiency, with differential input and output MDEA temperatures being observable.

| | | MDEA | Water |
|---|---|---|---|
| EA-201-A | Input temperature | 100° C | 28° C |
| | Output Temperature | 56° C | 45° C |
| EA-201-B | Input temperature | 100° C | 32° C |
| | Output Temperature | 54° C | 43° C |
| EA-202-A | Input temperature | 100° C | 30° C |
| | Output Temperature | 57° C | 45° C |
| EA-202-B | Input temperature | 110° C | 30° C |
| | Output Temperature | 56° C | 45° C |

"Compabloc CP75-V500" Coolers



Coolers were installed in 2009 and received a single preventive maintenance in 2010.

HARVEST_RDR_000211

[ 22 ]

## RESULTS

| MDEA Temperature | | Before Cleaning | After Cleaning | Differential |
|---|---|---|---|---|
| EA-201-A | Input | 100° C | 100° C | |
| | Output | 56° C | 43° C | - 13° C |
| EA-201-B | Input | 100° C | 100° C | |
| | Output | 58° C | 45° C | - 13° C |
| EA-202-A | Input | 100° C | 100° C | |
| | Output | 57° C | 48° C | - 9° C |
| EA-202-B | Input | 110° C | 100° C | |
| | Output | 66° C | 54° C | - 12° C |



[ 23 ]

# BENEFITS

The cost of the plate coolers' maintenance performed through direct management allowed **92%** estimated savings, compared with the costs that have been incurred by the Companies.

| Item | Contract [1] | ATFM Additive |
|---|---|---|
| Labor | | $15,830 |
| Product [3] | $784,402 | $45,600 [2] |
| **Total Cost** | **$784,402** | **$61,025** |
| Expected savings | | 92% |

| Type | Cost |
|---|---|
| Hired | $3,137,608 |
| Direct management | $244,100 |
| **Annual savings** | **$2,893,508** |

The maintenance of the 4 existing equipment is envisaged, in order to maintain heath transfer at suitable levels, with annual savings of **2.9 MM$**.

[1] Reference quotation 0061210050 from the Alfa Laval company.
[2] Works under direct management using ATFM brand antioxidant descaling additive.
[3] The product volume used by each plate cooler was 300 Lts.

HARVEST_RDR_000213

[ 24 ]

Petro consultores

## BENEFITS

### BLAST ATFM

✓ Biodegradable
✓ Operator-friendly
✓ Reusable
✓ Reduces plant downtime by reducing cleaning downtime.
✓ Increases equipment productivity, considering per day production, before and after the cleaning.
✓ Reduces equipment maintenance costs.
✓ Extends the equipment's useful life, reducing new equipment and spare parts investment cost.

ShemenSal

HARVEST_RDR_000214

[ 25 ]

# EXTERNAL CLEANING

FOR USED PAINT, IT IS LIMED AND WHEN THE **BLAST ATFM** PRODUCT IS APPLIED, IT FILLS PORES AND BRIGHTENS THE PAINT, BEING APPLICABLE ON:

• SPHERES
• HORIZONTAL AND
• VERTICAL TANKS





BEFORE



AFTER





CPG SPHERES CLEANING IN POZA RICA

| | MANUAL CLEANING | CLEANING WITH BLAST ATFM ADDITIVE |
|---|---|---|
| REQUIRED TIME | 45 DIAS | 2 DAYS |
| RAW MATERIAL COST | $210,000.00 | $90,000.00 |
| LABOR COST | $225,000.00 | $10,000.00 |
| TIME SAVINGS | | 43 DAYS |
| MONEY SAVINGS | | $335,000.00 |

Petro consultores

ShemenSal

HARVEST_RDR_000215

26

# EXTERNAL CLEANING

## CONSERVATION AND MAINTENANCE OF SPARE PARTS IN GENERAL

- FLANGES
- ELBOWS
- VALVES
- CARBON FILTERS
- STUDS
- LIQUID ABSORBER TOWER RINGS AND GASKETS.



AFTER

BEFORE



AFTER

BEFORE



BEFORE

Petro consultores

ShemenSal



# BLAST ATFM PRODUCT RECYCLING PROGRAM

Cleaning is carried out in regenerator tower DA-4402, using just buckets, sisal brush and wash out water.



AFTER



BEFORE











HARVEST_RDR_000218



[ 29 ]

- **Luciano Piccinini**
  - Director

- Tel. (58) 414 381 7769
- lupi@ptrcon.com

- **Guido Italiani**
  - Director

- Tel. (58) 414 323 8140
- guital@ptrcon.com

- **Freddy Salcedo**
  - Vice - President

- Tel. (41) 990 67204
- Freddy.salcedo@ptrcon.com
- www.petroconsultores.com
- Info @Petroconsultores.com

HARVEST_RDR_000219

# EXHIBIT 3

HARVEST_RDR_000220

4/12/2018                          Miami-Dade Official Records - Print Document

CFN: 20180168927 BOOK 30906 PAGE 795
DATE:03/22/2018  08:48:40 AM
DEED DOC 7,050.00
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

THIS INSTRUMENT PREPARED BY
**Jose H. Garcia, Esq.**
Law Office of Cuevas, Garcia & Torres, P.A.
7300 North Kendall Drive, Suite 680
Miami, FL 33156
AND RETURN TO:
**Joel S. Piotrkowski, Esq.**
Green & Piotrkowski, PLLC
317 – 71ˢᵗ Street
Miami Beach, FL 33141
_____SPACE ABOVE THIS LINE FOR RECORDING DATA_____

# *WARRANTY DEED*

*THIS WARRANTY DEED*, made the \̲7̲2̲_ day of **March, 2018** by **Azure 904, LLC, a Florida limited liability company**, which principal place of business is **9401 Collins Avenue, Unit 605, Surfside, FL 33154**, herein called the grantor, to **Larry Pacht and Marilyn Pacht, husband and wife** whose post office address is **102 Joicey Blvd, Toronto, Ontario, Canada M5M2T6**, hereinafter called the Grantees:

*(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)*

W I T N E S S E T H: That the grantor, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee all that certain land situate in MIAMI-DADE County, State of Florida, viz.:

### SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

**Subject to easements, restrictions and reservations of record and to taxes for the year 2018 and thereafter.**

**TOGETHER,** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**TO HAVE AND TO HOLD,** the same in fee simple forever.

**AND,** the grantor hereby covenants with said grantees that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2017.

**IN WITNESS WHEREOF,** the said grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

File No.: 18522200

HARVEST_RDR_000221

4/12/2018                              Miami-Dade Official Records - Print Document

CFN: 20180165927 BOOK 30906 PAGE 796

Azure 904, LLC, a Florida limited liability
company

_____
Patricia Piccinini Bergiante, Member and
Manager

Witness #1 Signature

Mana Albarian
Witness #1 Printed Name

MARCELA MEJIA
Witness #2 Signature

MARCELA MEJIA
Witness #2 Printed Name

**STATE OF FLORIDA**
**COUNTY OF MIAMI-DADE**

The foregoing instrument was acknowledged before me this 30 day of March, 2018 by Patricia
Piccinini Bergiante, as Member and Manager of Azure 904, LLC, a Florida limited liability
company on behalf of the corporation. He/She is personally known to me or has produced
Passport . as identification.

SEAL                                        _____
                                            Notary Signature

Notary Public State of Florida
Disgla Hernandez
My Commission GG 129669
Expires 11/26/2021

My Commission Expires:                      Printed Notary Name  Disgla Hernandez

File No.: 18522200

HARVEST_RDR_000222

4/12/2018                                     Miami-Dade Official Records - Print Document

CFN: 20180168927 BOOK 30906 PAGE 797

**EXHIBIT "A"**
**(Legal Description)**

Condominium Unit No. 904 of Azure Condominium, according to the Declaration of condominium thereof, recorded in Official Records Book 23738, Page 743, of the Public Records of Miami-Dade County, Florida, and any amendments thereto, together with its undivided share in the common elements.

Property Appraisers Parcel Identification (Folio) Numbers: 14-2235-046-0400

a/k/a 9401 Collins Avenue, Unit 605, Surfside, FL 33154

File No.: 18522200

HARVEST_RDR_000223

4/12/2018                                  Miami-Dade Official Records - Print Document

CFN: 20180168927 BOOK 30906 PAGE 798



**GRS Management, Inc**
8140 NW 155th Street Suite 101
Miami Lakes, FL 33016
PH: (305) 823-0072   Fax: (305) 823-4888
Email: customer@grsmanagement.com

## AZURE CONDOMINIUM ASSOC, INC
### CONSENT TO SALE

March 1, 2018

**Current Owner:**
Acct # 0904
AZURE 605 LLC
9401 COLLINS AVENUE UNIT #605
SURFSIDE, FL 33154

**Property Address:**
9401 COLLINS AVE # 904
SURFSIDE, FL 33154

According to the Declaration of Condominium thereof, recorded in Official Records of the Public Records of DADE County, Florida, as amended of record, including Parking Space(s).

The current annual assessments against said unit for the calendar year or fiscal year ending December 31, 2018, is $15,520.44 which is payable: $1,293.37 (Monthly). This account currently has a balance of $1,293.37 as of March 1, 2018.

WHEREAS, said owner (s) have requested the undersigned to consent to a sale of said condominium unit to:

**Name(s) on contract:**

MARILYN PACHT
LARRY PACHT

**Approved Tenants (18 years or older):**

N/A

WHEREAS, the undersigned, by and through its appropriate Board of Directors and/or officers, complying with the provisions of said Declaration, and its By-Laws, the undersigned consents to such sale of the above-described condominium unit to said BUYER(s). This _____ day of _MARCH_____, 2018

Approval Status: ☒ Approved    ☐ Denied

By: _Marty Sabates Morse_____    As: _Vice President____
Print Name/Signature                                Position on the Board
     MARTY SABATES MORSE

By: _Ronald J. Shaw_____          As: _Treasurer & Secretary___
Print Name/Signature                                Position on the Board

Witnesses:

By: _____            By: _Maria N. Rapiti____
      Signature                           Signature
    _OSE SEIN____                      _MARIA L. SEAPIN____
      Print Name                           Print Name

**HARVEST_RDR_000224**

# EXHIBIT 4

HARVEST_RDR_000225





HARVEST_RDR_000227



HARVEST_RDR_000228





HARVEST_RDR_000230



HARVEST_RDR_000231



HARVEST_RDR_000232



HARVEST_RDR_000233

[ 2 ]



## INTRODUCTION

**SHEMENSAL.** Is a Mexican company incorporated in year 2003, manufacturer of **BLAST ATFM** with national and international distribution Thru its exclusive representative Petroconsultores Inc.

**BLAST ATFM** is a descaler for process equipment such as heat exchangers, distillation towers, turbines, offshore installations, docking facilities, gas lines flow stations and pipeline, gas separators, radiators, coils, evaporators, condensers, gas sweetening plants, and the widest range of process equipment.

In addition, **BLAST ATFM** is used for cleaning, metal oxidation removal, removal of incrusted salts such as silica, amines and carbonates, and is also excellent for stainless steel passivation.



ShemenSal



**Petro consultores**

- Is a leading Venezuelan Oil & Gas Consulting firm Established in 2002, Services the Andean and Caribbean Region on Sub Soil, and Surfaces studies.
- Main Clients include:
  - Chevron
  - Shell
  - Suelopetrol
  - Repsol

- The company has partnered with Mexican ShemenSal for the commercialization of Blast ATFM a product that will re-define Equipment Maintenance in the Oil & Gas industry.



Petro consultores



## BLAST ATFM

It is the only product of its kind that is **reusable**. It can be used several times depending from the type of equipment, process and application, significantly reducing maintenance and operating costs.

**BLAST ATFM** substitutes SAND BLAST, generating white metal.

**BLAST ATFM** does not damage seals, paint, gaskets or thermal insulation. It does not corrode the stainless steel, bronze or aluminum in treated equipment.

 ShemenSal

HARVEST_RDR_000236

# CLEANING OF TOWER 101-CO-2, GAS PLANT 1 IN PGPB WITH BLAST ATFM [1]

Tower 101-CO-2 of Gas Sweetening Plant 1 started operations in September 16, 2011; showing low processing capacity and high differential pressure.

The following results were obtained after cleaning with BLAST ATFM:

## Design and Operative Conditions and Cleaning Results:

| VARIABLES | DESIGN | BEFORE | AFTER |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 262.5 | 104 | 262.0 |
| DIFFERENTIAL PRESSURE MMHG | 188 | 154 | 188 |
| SWEET GAS TEMP. ° C | 44 | 55 | 44 |

## Actions:

● The tower is cleaned with 7,000 liters.

● Product is injected at 30 GPM and 3 Hp.



101-CO-2: WSG Management

101-CO-2: Differential Pressure

1) PEMEX GAS Y PETROQUIMICA BASICA

[ 6 ]

# SAFETY AND MAINTENANCE TIME IN TRADITIONAL VS. BLAST ATFM CLEANING

**TRADITIONAL CLEANING:**

- Staff is exposed to the risk of accessing confined areas with high pressure pumps (15,000 psi) and 440v voltage, inside the tower.
- Cleaning by absorber tower is performed in 12 days (Shutdown and Startup).

**CLEANING WITH BLAST ATFM:**

- Staff is not exposed to the risk of accessing confined areas. And no high pressure pumps are involved.
- Cleaning by absorber tower is performed in 5 days (Shutdown and Startup).





[ 7 ]

# COST-BENEFIT ANALYSIS

| | TRADITIONAL CLEANING | CLEANING WITH BLAST ATFM | SAVINGS |
|---|---|---|---|
| Required time | 12 days | 5 days | 7 days |
| Productivity loss (142 mmcfd) | 29.32 MM$ | 12.02 MM$ | 17.1 MM$ |
| BLAST ATFM Product Cost | | 1.12 MM$[1] | 0.896 MM$ |
| Total Savings | | | 16.204 MM$ |

Note 1:  Initial investment in the BLAST ATFM product was 1.12 MM$ for 7,000 liters, used in the cleaning process of tower 101-CO-2 of Gas plant 1. Once the product is recovered and filtered, it is equivalent to one fifth (0.224 MM$) of the initial investment cost, since it may be reused in the cleaning of equipment such as : heat exchangers, Evaporators and Condensers at least five more times.

Petro consultores

ShemenSal

HARVEST_RDR_000239

[ 8 ]

# CLEANING OF TOWER 102-CO, GAS PLANT 1 WITH SHEMENSAL'S BLAST ATFM.

Tower 102-CO if Gas Regenerating plant 1 began operations in September 14, 2011, showing low processing capacity and high differential pressure.

**Operative Conditions:**

| VARIABLES | DESIGN | BEFORE | AFTER |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 525 | 380 | 500 |
| DIFFERENTIAL PRESSURE MMHG | 88 | 116 | 57 |

**Actions:**

- It was cleaned with 9,000 liters of **BLAST ATFM** at a ratio of 50 GPM



102-CO: Sour Gas Load



102-CO: Differential Pressure

HARVEST_RDR_000240

[ 9 ]

# INITIAL REPORT OF THE VISUAL INSPECTION TO TOWER 102-COM GAS PLANT 1.

IDENTIFICATION: REGENERATION TOWER

TAG No.: 102-CO

LOCATION: GAS SWEETENING P. 1

INSPECTION DATE: FEBRUARY 18, 2013



HARVEST_RDR_000241



[ 10 ]

## COST-BENEFIT ANALYSIS

| | TRADITIONAL CLEANING | CLEANING WITH BLAST ATFM | SAVINGS |
|---|---|---|---|
| Required time | 12 days | 5 days | 7 days |
| Productivity loss (230 mmcfd) [2] | 123.97 MM\$ | 51.65 MM\$ | 72.32 MM\$ |
| BLAST ATFM Product Cost | | 1.54 MM\$[1] | |
| Total Savings | | | 70.78 MM\$ |

Note 1: Initial investment in BLAST ATFM was 1.42 MM\$ for 9,000 liters, used in the cleaning process of tower 102-CO, Gas plant 1.

Note 2: The production loss of 230 mmcf is obtained from the 930 mmcf usually processed by the Work Center minus the 700 mmcf processed during Gas Plant No. 1 shutdown.

Petro consultores

ShemenSal

HARVEST_RDR_000242

[ 11 ]

# CLEANING OF TOWER 101-CO1, GAS PLANT 1 OF PGPB WITH SHEMENSAL'S BLAST ATFM[1]

Gas Sweetening Tower 101-CO1, Sweetening Gas plant 1 started operations in September 05, 2012, showing low processing capacity and high differential pressure.

## Operative Conditions:

| VARIABLES | DESIGN | BEFORE | AFTER 09/17/12 |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 420 MMSCFD | 325 | 451 |
| DIFFERENTIAL PRESSURE MMHG | 125 mm Hg | 182 | 188 |

## Actions:

- It was cleaned with 9,000 liters of **BLAST ATFM** at 50 GPM.

1) PEMEX GAS Y PETROQUIMICA BASICA





# CLEANING OF TOWER 101-CO1, GAS PLANT 2 OF PGPB WITH BLAST ATFM [1].

Tower 101-CO1 of Gas Sweetening Plant 2 started operations in November 15, 2012, showing low processing capacity and high differential pressure.

**Operative Conditions:**

| VARIABLES | DESIGN | BEFORE | AFTER 15/02/13 |
|---|---|---|---|
| SOUR GAS LOAD MMCFD | 420 MMSCFD | 278 | 392 |
| DIFFERENTIAL PRESSURE MMHG | 125 mm Hg | 146 | 170 |

* The Plant was inoperative from Oct 8 to Nov 14

**Actions:**

● The tower was cleaned with 9000 lt of **BLAST ATFM** at 50 GPM

1) PEMEX GAS Y PETROQUIMICA BASICA

[ 12 ]

HARVEST_RDR_000244

[ 13 ]

## COST-BENEFIT ANALYSIS
## IN TOWER 101-CO1, GAS PLANT 1 AND
## IN TOWER 101-CO1, GAS PLANT 2

| | TRADITIONAL CLEANING | CLEANING WITH BLAST ATFM | SAVINGS |
|---|---|---|---|
| Required time | 12 days | 5 days | 7 days |
| Production Loss (120 MMSCFD) [2] | 73.76 MM$ | 30.73 MM$ | 43.03 MM$ |
| Product Cost BLAST ATFM | | 1.42 MM$ | |
| Savings per Tower | | | 41.61 MM$ |
| Total Savings from both Towers | | | 83.22 MM$ |

Note 1: Investment in BLAST ATFM is 1.42 M$ per 9,000 liters.

Note 2: Production gain of 120 MMCF. It is obtained as an average of the improvement in Gas 1 (126 MMCF) and Gas 2 (114 MMCF) production increase.

Petro consultores

ShemenSal

HARVEST_RDR_000245



# GASKET REMOVAL, CLEANING AND ATTACHMENT IN ABSORBER TOWER DA-4401-B







[ 15 ]

# GASKET REPLACEMENT PROCESS FOR ABSORBER TOWER DA-4401-B, GAS SWEETENING PLANT 3

● As we can see, the gasket of absorber tower DA-4401B was dirty, reason why the tower's differential pressure was high and the design load could not be processed, but after the cleaning the gasket recovered its design condition, correcting in that way the high differential pressure and tower channeling problem.

● The behavior test was performed in October 8 to 10, in order to evaluate the operation of gas sweetening plant No. 3, increasing the processing capacity from 80 to 120 mmcfd (in this test the plant recovered its design capacity).



The gasket of absorber tower DA-4401-B shows excessive mud, hydrocarbons and corrosion.



Second (bottom) section of absorber tower DA-4401-B completely filled with the new gasket IMTP-40 KOCH-GLITSCH

HARVEST_RDR_000247



HARVEST_RDR_000249



# HEAT EXCHANGERS CLEANING WITH BLAST ATFM

Those Heath Exchangers out of service due to incrustation were selected.



BEFORE

HARVEST_RDR_000250



**HEAT EXCHANGERS CLEANING WITH BLAST ATFM**

The pipes were immersed for 24 hrs.

CLEANING PROCESS

HARVEST_RDR_000251



20

# HEAT EXCHANGERS CLEANING WITH BLAST ATFM

The result was satisfactory, since it was detected that **BLAST ATFM** cleaned the bundle of pipes well.

Heath Exchangers were in operative conditions.





CLEANING RESULTS

Petro consultores

ShemenSal

[ 21 ]

# CLEANING OF ALFA LAVAL'S COMPABLOC COOLER

## BACKGROUND

Lean amine plate coolers EA-201 and EA-202 of the Gas Sweetening plant operated with decreased efficiency, with differential input and output MDEA temperatures being observable.



"Compabloc CP75-V500" Coolers

| EA-201-A | MDEA | Water |
|---|---|---|
| Input temperature | 100° C | 28° C |
| Output Temperature | 56° C | 45° C |
| EA-201-B | MDEA | Water |
| Input temperature | 100° C | 32° C |
| Output Temperature | 54° C | 43° C |
| EA-202-A | MDEA | Water |
| Input temperature | 100° C | 30° C |
| Output Temperature | 57° C | 45° C |
| EA-202-B | MDEA | Water |
| Input temperature | 110° C | 30° C |
| Output Temperature | 56° C | 45° C |

Coolers were installed in 2009 and received a single preventive maintenance in 2010.

HARVEST_RDR_000253

[ 22 ]

## RESULTS

| MDEA Temperature | Before Cleaning | After Cleaning | Differential |
|---|---|---|---|
| **EA-201-A** | | | |
| Input | 100° C | 100° C | |
| Output | 56° C | 43° C | - 13° C |
| **EA-201-B** | | | |
| Input | 100° C | 100° C | |
| Output | 58° C | 45° C | - 13° C |
| **EA-202-A** | | | |
| Input | 100° C | 100° C | |
| Output | 57° C | 48° C | - 9° C |
| **EA-202-B** | | | |
| Input | 110° C | 100° C | |
| Output | 66° C | 54° C | - 12° C |



[ 23 ]

# BENEFITS

The cost of the plate coolers' maintenance performed through direct management allowed **92%** estimated savings, compared with the costs that have been incurred by the Companies.

| Item | Contract [1] | ATFM Additive |
|---|---|---|
| Labor | $784,402 | $15,830 |
| Product [3] | | $45,600 [2] |
| **Total Cost** | **$784,402** | **$61,025** |
| **Expected savings** | | **92%** |

| Type | Cost |
|---|---|
| Hired | $3,137,608 |
| Direct management | $244,100 |
| **Annual savings** | **$2,893,508** |

The maintenance of the 4 existing equipment is envisaged, in order to maintain heath transfer at suitable levels, with annual savings of **2.9 MM$**.

[1] Reference quotation 0061210050 from the Alfa Laval company.
[2] Works under direct management using ATFM brand antioxidant descaling additive.
[3] The product volume used by each plate cooler was 300 Lts.

[ 24 ]

## BENEFITS

### BLAST ATFM

✓ Biodegradable
✓ Operator-friendly
✓ Reusable
✓ Reduces plant downtime by reducing cleaning downtime.
✓ Increases equipment productivity, considering per day production, before and after the cleaning.
✓ Reduces equipment maintenance costs.
✓ Extends the equipment's useful life, reducing new equipment and spare parts investment cost.



Petro consultores

ShemenSal

HARVEST_RDR_000256

[ 25 ]

# EXTERNAL CLEANING

FOR USED PAINT, IT IS LIMED AND WHEN THE **BLAST ATFM** PRODUCT IS APPLIED, IT FILLS PORES AND BRIGHTENS THE PAINT, BEING APPLICABLE ON:

- SPHERES
- HORIZONTAL AND
- VERTICAL TANKS



BEFORE

AFTER

CPG SPHERES CLEANING IN POZA RICA

| | MANUAL CLEANING | CLEANING WITH BLAST ATFM ADDITIVE |
|---|---|---|
| REQUIRED TIME | 45 DIAS | 2 DAYS |
| RAW MATERIAL COST | $210,000.00 | $90,000.00 |
| LABOR COST | $225,000.00 | $10,000.00 |
| TIME SAVINGS | | 43 DAYS |
| MONEY SAVINGS | | $335,000.00 |



Petro consultores

ShemenSal

[ 26 ]

# EXTERNAL CLEANING

## CONSERVATION AND MAINTENANCE OF SPARE PARTS IN GENERAL

- FLANGES
- ELBOWS
- VALVES
- CARBON FILTERS
- STUDS
- LIQUID ABSORBER TOWER
  RINGS AND GASKETS.



BEFORE



AFTER



AFTER



BEFORE

Petro consultores

ShemenSal

HARVEST_RDR_000258



[ 27 ]

# BLAST ATFM PRODUCT RECYCLING PROGRAM

Cleaning is carried out in regenerator tower DA-4402, using just buckets, sisal brush and wash out water.



AFTER



BEFORE















29

- **Luciano Piccinini**
  - Director
- Tel. (58) 414 381 7769
- lupi@ptrcon.com

- **Guido Italiani**
  - Director
- Tel. (58) 414 323 8140
- guital@ptrcon.com

- **Freddy Salcedo**
  - Vice - President
- Tel. (41) 990 67204
- Freddy.salcedo@ptrcon.com
- www.petroconsultores.com
- info @Petroconsultores.com

**Petro consultores**

 

**BLAST ATFM**

Es un desincrustante, para equipos de proceso, como cambiadores de calor, torres de destilación, turbinas, separadores de gas, radiadores, serpentines, evaporadores, condensadores, endulzadoras, y la más amplia gama de equipos para proceso. En adición a esto le **BLAST ATFM**, es un producto para limpieza, remoción de oxidación de los metales, sales incrustadas, sílice, aminas, carbonatos y excelente pasivador de acero inoxidable.

**BLAST ATFM**, es el único producto en su tipo que es reusable. Puede ser usado varias veces según el equipo, proceso y forma de aplicación, disminuyendo considerablemente los costos de mantenimiento y de operación.

**BLAST ATFM**, sustituye al SAND BLAST, cuando generando metal blanco.

El **BLAST ATFM**, es un producto que no daña los sellos, pinturas, empaquetaduras, aislamientos térmicos, y no corroe el metal de los equipos tratados.
**PROPIEDADES FISICOQUÍMICAS**

**BLAST ATFM** es un líquido incoloro, con un ligero olor, no corrosivo, no tóxico, no flamable. Cumple con la Norma ASTM G1-O3, Norma ASTM A389 E ISO 9001 certificado BEREAU VERITAS NO, MX13-196.

**BLAST ATFM**, es un producto **BIODEGRADABLE**, y totalmente amigable al medio ambiente.
**SEGURIDAD E HIGIENE**

**BLAST ATFM**, no representa riego para los operarios que lo aplican y como tal, el producto no daña el medio ambiente.
**VENTAJAS DEL BLAST ATFM**

**BLAST ATFM** incrementa la seguridad para trabajadores. Los equipos se limpian en sito, sin necesidad de desarmarlos se disminuyendo los tiempos muertos de las plantas.

**Shemensal, S. de R.L. de C.V.**
Río Rhin No. 77 5to. Piso Col. Cuauhtémoc C.P. 06500 México, D.F.
Tels. 55-18-74-37 y 52-08-08-31
RFC. SHE031105 GU8
dirección@shemensal.com
asesoría.tecnica@shemensal.com

HARVEST_RDR_000262

**PROMOTORA DE ASESORÍA, INVESTIGACIÓN Y TECNOLOGÍA, A.C.**
Calle 21 Av. Juarez No. 421 entre 24 y 26 Ciudad Industrial, C.P. 97288
Mérida, Yucatán, México,   e-mail: praintec@prodigy.net.mx
Tel/Fax: (999) 946-16-34,  RFC: PAI921022L24
**FACULTAD DE INGENIERÍA QUÍMICA      UNIVERSIDAD AUTÓNOMA DE YUCATÁN**

## LABORATORIO DE ANÁLISIS INDUSTRIALES
## INFORME DE PRUEBAS

PÁGINA 2 DE 2.
O.T. 126.

REPORTE DE:              ANÁLISIS FISICOQUÍMICOS.

SOLICITADO POR:          SHEMENSAL, S. DE R. L. DE C.V.
                         AV. TACUBA No. 32 LOCAL CC17, COLONIA CENTRO
                         DELEGACION CUAUHTEMOC  CP 06010
                         MÉXICO D.F.
                         RFC SHE031105 GU8

TIPO DE MUESTRA:         PRODUCTO QUÍMICO.

CÓDIGO INTERNO DEL LABORATORIO:        $M_1$ 126 - 001

IDENTIFICACIÓN DE LA MUESTRA:          $M_1$ = PRODUCTO BLAST/ATFM

FECHA DE RECEPCIÓN DE LA MUESTRA:                                      12/03/12
FECHA DE INICIO DE  LOS ANÁLISIS:                                     13/03/12
EL ANÁLISIS CONCLUYÓ EL DÍA:                                          16/04/12

LA MUESTRA FUE PROPORCIONADA POR EL CLIENTE.

| PARÁMETRO | MÉTODO DE PRUEBA | RESULTADOS $M_1$ | UNIDADES |
|---|---|---|---|
| BIODEGRADABILIDAD | NMX-AA-028-SCFI-2001 NMX-AA-030-SCFI-2001 | 76,69 | % DE BIODEGRADACIÓN |

Los compuestos con un resultado mayor del 60%, se consideran ampliamente biodegradables en condiciones naturales.

Bibliografía: Biodegradability of organic substances in the aquatic environment.
              Pavel Pitter, M.S., D.S., Ph.D.
              Jan Chudoba, M.S., Ph.D.

**Los efectos de los resultados de los análisis arriba descritos, se relacionan únicamente a la (s) muestra (s) analizada (s). El cliente tiene 7 días para cualquier aclaración respecto a este informe.**

MÉRIDA, YUCATÁN; A 16 DE ABRIL DE 2012.

ATENTAMENTE

ING. HERNANDO JOSE ROSADO TRIAY                    Q.I. HORTENCIA ACOSTA CHAN
COORDINADOR                                        QUIMICA ANALISTA

**Este Informe de Pruebas no debe ser reproducido, excepto en su totalidad, sin la aprobación por escrito del laboratorio.**

FQ-041
Fecha de emisión de
este formato: 05/12/05

HARVEST_RDR_000263

**PROMOTORA DE ASESORIA, INVESTIGACIÓN Y TECNOLOGÍA, A.C.**
Calle 21 Av. Juarez No. 421 entre 24 y 26 Ciudad Industrial, C.P. 97288
Mérida, Yucatán, México,   e-mail: praintec@prodigy.net.mx
Tel/Fax: (999) 946-16-34,  RFC: PAI921022L24
**FACULTAD DE INGENIERÍA QUÍMICA     UNIVERSIDAD AUTÓNOMA DE YUCATÁN**

## LABORATORIO DE ANÁLISIS INDUSTRIALES
## INFORME DE PRUEBAS

PÁGINA 1 DE 2.
O.T. 126.

REPORTE DE:        ANÁLISIS FISICOQUÍMICOS.

SOLICITADO POR:      SHEMENSAL, S. DE R. L. DE C.V.
AV. TACUBA No. 32 LOCAL CC17, COLONIA CENTRO
DELEGACION CUAUHTEMOC  CP 06010
MÉXICO D.F.
RFC SHE031105 GU8

TIPO DE MUESTRA:       PRODUCTO QUÍMICO.

CÓDIGO INTERNO DEL LABORATORIO:     $M_1$ 126 - 001

IDENTIFICACIÓN DE LA MUESTRA:      $M_1$ = PRODUCTO BLAST/ATFM*

FECHA DE RECEPCIÓN DE LA MUESTRA:                                        12/03/12
FECHA DE INICIO DE  LOS ANÁLISIS:                                         13/03/12
EL ANÁLISIS CONCLUYÓ EL DÍA:                                              16/04/12

LA  MUESTRA FUE PROPORCIONADA POR EL CLIENTE.

| PARÁMETRO | MÉTODO DE PRUEBA | RESULTADOS $M_1$ | UNIDADES |
|---|---|---|---|
| pH | INTERNO | 1,50 | UNIDADES |
| DQO | NMX-AA-030-SCFI-2001 | 87 584,02 | mg/L |
| $DBO_5$ | NMX-AA-028-SCFI-2001 | 40 559,69 | mg/L |
| $DBO_7$ | NMX-AA-028-SCFI-2001 | 50 311,24 | mg/L |
| $DBO_{14}$ | NMX-AA-028-SCFI-2001 | 54 751,24 | mg/L |
| $DBO_{21}$ | NMX-AA-028-SCFI-2001 | 57 537,46 | mg/L |
| $DBO_{28}$ | NMX-AA-028-SCFI-2001 | 67 164,05 | mg/L |

*LA MUESTRA SE DILUYO AL 5%

**Los efectos de los resultados de los análisis arriba descritos, se relacionan únicamente a la (s) muestra (s) analizada (s). El cliente tiene 7 días para cualquier aclaración respecto a este informe.**

MÉRIDA, YUCATÁN; A 16 DE ABRIL DE 2012.

ATENTAMENTE

ING. HERNANDO JOSÉ ROSADO TRIAY
COORDINADOR

Q.I. HORTENCIA ACOSTA CHAN
QUIMICA ANALISTA

**Este Informe de Pruebas no debe ser reproducido, excepto en su totalidad, sin la aprobación por escrito del laboratorio.**

FQ-041
Fecha de emisión de
este formato: 05/12/05

HARVEST_RDR_000264

| HOJA DE SEGURIDAD DE MATERIALES | | | | | |
|---|---|---|---|---|---|
| **BLAST ATFM** | Fecha de última revisión: Fecha de actualización: | 30-Enero-09 31-Diciembre-15 | | Versión: | 06 |

| | |
|---|---|
| | Salud — 2 Moderado |
| | Fuego — 0 No inflamable |
| | Reactividad — 0 No reactivo |
| | Específico — Ninguno |

**ShemenSal**

SHEMENSAL, S. DE R.L. DE C.V.
AV. RIO RHIN No. 77 PISO 5 COL. CUAUHTEMOC
DELEGACION CUAUHTEMOC C.P. 06500 MEXICO, D.F.
atencionaclientes@shemensal.com
5518-7437  5208-0831

| Teléfonos de emergencia en transportación: | SETIQ 01-800-00-214-00 | CHEMTREC (USA) 1-800-424-9300 |
|---|---|---|

Sección I IDENTIFICACIÓN DEL PRODUCTO

| Nombre Comercial: | Blast ATFM | Nombre Químico: | Producto base: Acido Ortofosfórico |
|---|---|---|---|
| Familia Química: | Producto base: Minerales (Acido, sal inorgánica) | Información DOT: | Corrosivo, Clase 8 |
| Sinónimos: | Producto base: Ácido ortofosfórico. | Otros Datos: | Uso industrial |

Sección II COMPOSICIÓN DEL PRODUCTO
Producto base: líquido corrosivo básico, inorgánico no clasificado como peligroso por la U.N.

| Componente | % | Clasificación NFPA | | | N° CAS | N° ONU | LD/50 MEDIO, ESPECIE | LC/50, MEDIO | Riesgo Especial |
|---|---|---|---|---|---|---|---|---|---|
| | | S | I | R | | | | | |
| 1.- P2O5 ó H3PO4 2.-OTROS ADITIVOS | 15-40 72-85 | 2 | 0 | 0 | 7664-38-2 CONFIDENCIAL | UN-1805 | 3500 mg/kg ORAL, RATA 1230 mg/kg oral-ratón (prueba DL/50) 1260 mg/kg, cutánea, conejo | NO DISPONIBLE | Ninguno |

Sección III IDENTIFICACIÓN DE RIESGOS

| Efectos adversos a la salud humana: | Ojos: Puede ser irritante a los ojos o a la piel por contacto prolongado. Efectos cancerígenos: desconocidos Efectos mutágenos: desconocidos. Efectos teratogénicos: desconocidos Efectos en el sistema reproductivo: desconocidos. Estudios en animales sugieren que estos componentes pueden causar daños en los siguientes órganos: riñones, hígado, conductos gastrointestinales, vías respiratorias, piel, ojos y sangre |
|---|---|

Sección IV PRIMEROS AUXILIOS (INTOXICACIÓN AGUDA)

| Inhalación: | Permitir a la víctima reposara en un lugar bien ventilado. Suministrar inmediatamente ayuda médica. Desplazar  la víctima a un lugar seguro lo más pronto posible.  Desatar todo lo que pudiera estar apretado, como el cuello de una camisa, una |
|---|---|

1 de 6

HARVEST_RDR_000265

|  | corbata, un cinturón. Si la víctima no respira más practicar la respiración artificial. Consiga ayuda médica. |
|---|---|
| Contacto con la piel | El uso de grandes cantidades de agua es el tratamiento efectivo para remover el producto. Inmediatamente conseguir atención médica |
| Contacto con los ojos: | Lavar inmediatamente con agua en abundancia por lo menos 15 minutos. Haga lavados intermitentes hasta conseguir ayuda médica. La solución buffer es recomendada para el lavado del ojo en el área médica. |
| Ingestión: | Se debe tomar grandes cantidades de agua para diluir el producto. Se puede tomar un neutralizador (leche o magnesia-varias cucharaditas por cada vaso de agua), gel de hidróxido de aluminio. No provoque vómito. Desatar todo lo que pudiera estar apretado, como el cuello de una camisa, una corbata, un cinturón. Si la víctima no respira más practicar la respiración artificial. Consiga ayuda médica. |
| Otros riesgos: | Ninguno |

Sección V MEDIDAS DE LUCHA CONTRA INCENDIOS

| Medios de extinción del fuego: | $CO_2$ | Espuma: | | Polvo químico Seco: | | Otros: | Rocío de agua |
|---|---|---|---|---|---|---|---|
| Apropiados: | Es un material no inflamable, pero en caso de verse envuelto en llamas, utilícese agua en forma de niebla para mantener el contenedor frío y evitar la liberación de vapores. | | | | | | |
| No apropiados: | Ninguno. | | | | | | |
| Riesgos específicos: | Existe liberación de vapores cuando el ácido se calienta, por lo que puede llegar a presentarse una explosión si no hay forma de liberar la presión en un contendedor cerrado. | | | | | | |
| Métodos particulares de intervención: | | | | | | | |
| Protección de los intervinientes: | Para el ataque de cualquier fuego, use equipo de bomberos, siempre tomando en cuenta que este no es resistente a ácidos y álcalis. | | | | | | |
| Otra información: | En caso de ser necesario, usar equipo de protección respiratoria (aire autónomo de presión positiva). | | | | | | |

Sección VI. MEDIDAS EN CASO DE DISPERSIÓN ACCIDENTAL

| Precauciones individuales: | Póngase el equipo de protección personal adecuado antes de entrar al área (ver sección VIII). |
|---|---|
| Precauciones para la protección del medio ambiente: | Construir diques de contención temporales (de tierra, arena o cualquier material disponible) para prevenir de un derrame mayor, así como para evitar escurrimiento hacia cuerpos de agua, posteriormente recupere y los remanentes neutralícelos con cal o agua a chorro |

Métodos de limpieza

| Prohibiciones: | Después de ocurrido un derrame **nunca deje sin limpiar** el sitio contaminado, ya que esto es una infracción de las leyes ecológicas. |
|---|---|
| Recuperación | En caso de ser posible la recuperación del producto realícelo utilizando una bomba de achique o trasvasando el material de un recipiente a otro. |
| Limpieza – Descontaminación: | El área contaminada deberá ser neutralizada con cal o caliza y lavada. Los desechos deben ser recolectados y dependiendo del grado y naturaleza de la contaminación, se deberán disponer en instalaciones autorizadas, o bien podrán utilizarse como fertilizante. |

2 de 6

HARVEST_RDR_000266

Sección VII MANEJO Y ALMACENAMIENTO

Manipulación

| | |
|---|---|
| Protección Personal: | Utilizar guantes de hule, careta facial, chamarra y pantalón antiácido. Para manejo de pequeñas cantidades, solo utilice goggles y guantes de PVC |
| Precauciones necesarias: | Manejar el producto en áreas ventiladas |
| Consejos de utilización: | No poner en contacto con bases fuertes. |
| Medidas técnicas | Utilizar recipientes contenedores resistentes al producto de polipropileno |

Condiciones de almacenamiento

| | |
|---|---|
| Recomendadas: | No almacenarlo con o cerca de bases fuertes.   Almacenar en áreas frescas y ventiladas.   Puede congelarse a bajas temperaturas, especialmente a altas concentraciones. |
| Materias compatibles: | Es compatible con otros ácidos inorgánicos, teniendo en consideración que en contacto con ellos puede generar calor al combinarlos. |
| Condición de embalaje: | Los envases y embalajes deben estar identificados. Cuando el material se almacena en bidones de plástico (aprox. 19 l) debe acomodarse verticalmente en 3 estibas como máximo. Bidones y tambores de plástico de mayor capacidad, acomódelos en no más de 2 estibas. |

Materiales de embalaje

| | |
|---|---|
| Recomendados: | Utilizar recipientes o contenedores en polipropileno. Aplica el grupo de embalaje III en transportación del producto. |

Sección VIII CONTROL  A LA EXPOSICIÓN-PROTECCIÓN PERSONAL

| | |
|---|---|
| Medidas de orden técnico: | Para controlar la exposición se requiere suficiente ventilación local. Contar con regaderas y lavaojos localizados en los lugares donde pueda ocurrir un contacto. |
| Valor límite de exposición: | 3500 mg/kg ORAL, RATA 1230 mg/kg oral-ratón (prueba DL/50) 1260 mg/kg, cutánea, conejo |

Equipos de protección individual

| | |
|---|---|
| Protección respiratoria: | Utilizar respirador con cartuchos químicos para gases ácidos. Si la exposición rebasa los límites recomendados usar equipo de aire autónomo. |
| Protección de las manos: | Guantes de hule neopreno o PVC. |
| Protección a los ojos y cara: | Úsese goggles resistentes a sustancias químicas o careta facial completa. |
| Protección de la piel y del cuerpo: | Uso de botas, chamarra y pantalón fabricados con PVC, neopreno u otro material resistente (traje hermético requerido en caso de control de derrame). |

3 de 6

HARVEST_RDR_000267

| Medios colectivos de urgencia: | Tener disponibles soluciones buffer o material neutralizante, así como agua en abundancia. |
|---|---|
| Medidas de higiene: | Evitar exposición a vapores y neblinas ácidas, además del contacto con la piel. |
| Otras informaciones: | - |

Sección IX PROPIEDADES FÍSICAS Y QUÍMICAS

| Estado Fisico: | Líquido | Olor: | Inoloro |
|---|---|---|---|
| Color: | transparente | PH: | 1.0 a 1% w/w |

Temperaturas características:

| Cristalización: | De - 21 a –17 °C | Temperatura de descomposición (°C): | No aplica |
|---|---|---|---|
| Ebullición: | 135 a 160°C | Presión crítica: | No aplica |

Caracteristicas de inflamabilidad

| | No aplica | Presión de vapor: | 2.1 - 5.7 mmHg @20°C(68°F) |
|---|---|---|---|
| Punto de clarificación: | | | |
| Propiedades comburentes: | No es comburente | Densidad : | 1.1855 g/cm3 |
| Límites de explosividad en el aire: | No es explosivo | Peso molecular: | 98 g/gmol. |

Solubilidad

| En el agua: | Soluble | En solventes orgánicos: | No es soluble |
|---|---|---|---|
| Viscosidad dinámica: | 23–46 cp (centipoises) a 20°C | | |

Sección X DATOS DE REACTIVIDAD Y ESTABILIDAD

| Estabilidad: | El producto es estable bajo condiciones normales de temperatura y presión. |
|---|---|
| Sustancias a evitar: | Alcalis fuertes como el hidróxido de sodio o potasio. |
| Polimerización: | No se polimeriza en ninguna condición. |
| Condiciones a evitar: | Evitar bajas temperaturas debido a riesgos de cristalización. |
| Productos de descomposición peligrosos: | En contacto con el acero al carbón genera hidrógeno debido a la reacción de oxidación del material. |
| Otros datos: | - |

Sección XI INFORMACIÓN TOXICIDAD

| Por exposición aguda: | Contacto con la piel: causa irritación y quemaduras, no siempre inmediatamente. Contacto con los ojos: irritación y quemadura. Inhalación: Irritación del tracto respiratorio. Fibrosis bronquial (en ratas, exposición aguda durante 13 semanas). Ingestión: quemaduras en boca y garganta, irritación gastrointestinal o ulceración. Dolor de estómago y garganta, dificultad para deglutir, sed, náusea, y vómito seguido de diarrea. $LD_{50}$ = 1530 mg/kg (ratas). |
|---|---|

4 de 6

HARVEST_RDR_000268

| Sustancia química considerada como: | Cancerígena | N O | Mutagenica | N O | Teratogenica | N O | Otros | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Sección XII INFORMACIÓN ECOLÓGICA

Movilidad

| Volatilidad: | Baja. |
|---|---|
| Persistencia/degrabilidad: | Se disocia libremente. |
| Destino del producto: | Soluble en agua. |

Ecotoxicidad

| Efectos en el medio ambiente acuático: | En cantidades abundantes, puede provocar el fenómeno de eutrificación, por enriquecimiento de nutrientes (fósforo) que ocasionan un crecimiento abundante de algas, siempre y cuando exista la presencia de nitrógeno amoniacal en el cuerpo de agua. |
|---|---|

Sección XIII CONSIDERACIONES DE DISPOSICIÓN

Residuos del producto

| Destrucción/Eliminación: | Neutralizar con una solución diluida de $CACO_3$ o solución diluida de NAOH y disponer en una planta biológica de aguas residuales domésticas. Disposición en instalaciones autorizadas previa neutralización del material. |
|---|---|

Embalajes sucios:

| Descontaminación/Limpieza: | Lavar abundantemente con agua y colectar la solución de lavado en contendores apropiados para su disposición |
|---|---|
| Destrucción / eliminación | Puede reutilizar los envases en el proceso, previa limpieza o enviarlos a un sitio autorizado por las dependencias de gobierno. |
| Observaciones: | Cuando se envía a disposición final, debe ser realizado por compañías autorizadas. |

Sección XIV INFORMACIÓN PARA TRANSPORTE

Reglamentos internaciones:

| Vía terrestre: | Se transporta en cumplimiento de los requisitos establecidos por la SCT (NOM 027 SCT4 1995) y normas internacionales, cuando es material de exportación. Número de ONU en transportación (UN 1805) |
|---|---|
| Vía marítima: | Debe de cumplir con las leyes emitidas por la Organización Internacional Marítima y el Código Internacional marítimo para mercancías peligrosas. |
| Observaciones: | Las unidades de transporte deben estar identificadas con sus rombos de riesgo, y disponer de la hoja de seguridad de emergencia en transportación. |

Sección XV INFORMACIONES REGLAMENTARIAS

5 de 6

HARVEST_RDR_000269

Etiquetado:

| Reglamentos: | Debe de cumplirse con el Reglamento Federal para el Transporte de Materiales Peligrosos. |
|---|---|
| Identificación del producto: Símbolos e indicaciones de peligro: | Los autotanques deben portar por las cuatro caras de la unidad, la placa de identificación con el número UN 1805.  Placa en forma de diamante con fondo blanco (mitad superior) y negro (mitad inferior) y el símbolo correspondiente a materiales corrosivos (líquido goteando de dos tubos de ensayo sobre una mano y una plancha de metal).  |
| Frases Riesgos/Salud: | "Material Corrosivo" |

Sección XVI OTRA INFORMACIÓN

| Tipos de utilización: | Industrial |
|---|---|
| Usos recomendados: | Para elaboración de detergentes,   fertilizantes, limpieza de metales, preparación de sales usadas como aditivos y conservadores de alimentos, etc... |
| Usos contraindicados: | Nunca mezclar con bases fuertes. |

Información del Producto

| Fórmula química | Producto base $H_3PO_4$ + otros aditivos |
|---|---|
| Peso molecular: | 98 g/gmol |
| Número de registro: | UN 1805 |

**Nota Importante:**
Esta Hoja de Datos de Seguridad completa los folletos Técnicos de utilización, pero no los sustituye. La información que contiene esta basada en los conocimientos generales de carácter técnico, ambiental y de salud de esta sustancias química, la cual fue extraída de fuentes bibliográficas confiables. Tomará bajo su exclusiva responsabilidad las precauciones inherentes a la utilización del producto, que le es conocido. El conjunto de las referencias citadas tiene como único fin, ayudar al destinatario en el cumplimiento de las obligaciones contraídas al utilizar este producto.

HARVEST_RDR_000270





# EXHIBIT 5

HARVEST_RDR_000273



4/18/2018                                    Whois search - Who is the owner of that domain name ? | Netim

## Domain name Whois

Whois are public databases which allow to visualize all details about a domain name. They are published and updated by each extension's registry.

Whois service below allows to query such databases for extensions offered by NETIM.

Home > Domain names > Whois search

### Perform a WHOIS search

The WHOIS service offered by NETIM and the access to the records in the WHOIS database are provided for information purposes only. It allows the public to check whether a specific domain name is still registered or not and to obtain information related to the registration records of existing domain names. NETIM cannot, under any circumstances, be held liable in case the stored information would prove to be wrong, incomplete or not accurate in any sense.

By submitting a query you agree not to use the information made available to:
* allow, enable or otherwise support the transmission of unsolicited, commercial advertising or other solicitations whether via email or otherwise;
* target advertising in any possible way;
* to cause nuisance in any possible way to the registrants by sending (whether by automated, electronic processes capable of enabling high volumes or other possible means) messages to them.

**WWW.** ptrcon.com                                                                Show

Domain Name: PTRCON.COM
Domain ID:
Registrar WHOIS Server: whois.domain.com
Registrar URL: www.domain.com
Updated Date: 2017-08-07T17:31:47Z
Creation Date: 2013-08-22T00:24:10Z
Registrar Registration Expiration Date: 2018-08-22T00:24:10Z
Registrar: Domain.com, LLC
Registrar IANA ID: 886
Reseller: AccountSupport
Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited https://icann.org/epp#clientUpdateProhibited
Registry Registrant ID:
Registrant Name: Juan Garcia
Registrant Organization: Petro Consultores C.A.
Registrant Street: 10208 Sunset Bend Dr
Registrant City: Boca Raton
Registrant State/Province: FL
Registrant Postal Code: 33428
Registrant Country: US
Registrant Phone: +1.3058640825
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: twitter@atwebplace.com
Registry Admin ID:
Admin Name: Juan Garcia
Admin Organization: Petro Consultores C.A.
Admin Street: 10208 Sunset Bend Dr
Admin City: Boca Raton
Admin State/Province: FL
Admin Postal Code: 33428
Admin Country: US
Admin Phone: +1.3058640825
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: twitter@atwebplace.com
Registry Tech ID:
Tech Name: Eric White
Tech Organization: AccountSupport
Tech Street: 10 Corporate Dr., Suite 300
Tech City: Burlington
Tech State/Province: MA
Tech Postal Code: 01803
Tech Country: US
Tech Phone: +1.8666424678
Tech Phone Ext:
Tech Fax: +1.7812726550

HARVEST_RDR_000274

4/18/2018                                           Whois search - Who is the owner of that domain name ? | Netim

Tech Fax Ext:
Tech Email: support@accountsupport.com
Name Server: NS1.ACCOUNTSUPPORT.COM
Name Server: NS2.ACCOUNTSUPPORT.COM
DNSSEC: unsigned
Registrar Abuse Contact Email: compliance@domain-inc.net
Registrar Abuse Contact Phone: +1.6027165396
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2017-08-07T17:31:47Z <<<

"For more information on Whois status codes, please visit https://icann.org/epp"

Registration Service Provider:
AccountSupport, support@accountsupport.com
1-866-642-4678

**Top of page**

Trust us                          Information                                      Stay tuned!

   Excellent                      General terms                    Submit a complaint
based on 127 reviews  ▉   PILOT   Registrant rights (ICANN)        Anti-spam policy
                                  Payment methods                  Whois privacy contact form
                                  Legal notices
                                                                                     Contact us

Copyright © 2018 Netim                                                                      Sitemap

HARVEST_RDR_000275

# EXHIBIT 6

HARVEST_RDR_000276



## Instituto Venezolano de los Seguros Sociales
### La Seguridad Social es tú derecho

### Dirección General de Afiliación y Prestaciones en Dinero
### Cuenta Individual

| Datos del Asegurado | |
|---|---|
| Cédula de Identidad | V-5548420 |
| Nombre y Apellido | GARCIA MENDOZA JUAN JOSE |
| Sexo: | MASCULINO |
| Fecha de Nacimiento: | 24/06/1960 |
| Número Patronal: | D11300057 |
| Nombre Empresa: | PETROLEOS DE VENEZUELA S A |
| Fecha de Egreso: | 30/12/1989 |

| Datos de Afiliación | | | |
|---|---|---|---|
| Último Salario: | 103,85 | Estatus del Asegurado: | CESANTE |
| Fecha Primera Afiliación: | 22/03/1982 | Fecha Contingencia: | 24/06/2020 |

| Semanas y Salarios Acumulados desde la fecha de Inscripción | | | |
|---|---|---|---|
| Semanas Acumuladas: | 1032 | Salarios Acumulados: | 9.343,47 |

| Relación de Semanas y Salarios cotizados en los últimos 15 años | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AÑO | SEM | SALARIO | AÑO | SEM | SALARIO | AÑO | SEM | SALARIO | AÑO | SEM | SALARIO |
| 2001 | 0 | 0,00 | 2002 | 0 | 0,00 | 2003 | 0 | 0,00 | 2004 | 0 | 0,00 |
| 2005 | 0 | 0,00 | 2006 | 0 | 0,00 | 2007 | 0 | 0,00 | 2008 | 0 | 0,00 |
| 2009 | 0 | 0,00 | 2010 | 0 | 0,00 | 2011 | 0 | 0,00 | 2012 | 0 | 0,00 |
| 2013 | 0 | 0,00 | 2014 | 0 | 0,00 | 2015 | 0 | 0,00 | 2016 | 0 | 0,00 |

| Cantidad de Semanas Cotizadas | | | | | |
|---|---|---|---|---|---|
| ARTICULO 92 | DECRETO 4269 | ÚLTIMOS 10 AÑOS | ÚLTIMOS 4 AÑOS | ÚLTIMOS 3 AÑOS | TOTAL SEMANAS COTIZADAS |
| NO APLICA | | 0 | 0 | 0 | 1032 |

| Salarios de Cotización Promedio | | | |
|---|---|---|---|
| MENSUALES | | SEMANALES | |
| ÚLTIMOS 10 AÑOS | ÚLTIMOS 5 AÑOS | ÚLTIMOS 100 COTIZACIONES | TOTAL SALARIOS COTIZADOS |
| 0 | 0 | 53 | 9.343,47 |

**Información Actualizada al: 05 de Diciembre del 2016 a las 8:30 am**

Información Sujeta a Revisión de Documentos Probatorios y de Carácter Completamente Gratuito

Imprimir    Cerrar

HARVEST_RDR_000277

# EXHIBIT 7

HARVEST_RDR_000278

# Gobierno Bolivariano de Venezuela

**INFORMACIÓN DE LA EMPRESA REGISTRADA**

**ACTUALIZADA**

( HABILITADA para contratar con el Estado hasta 4,000 UT en Bienes y Servicios / 5,000 UT en Obras de conformidad con los Artículos 47 y 49 numeral 1, o por estar enmarcada en el supuesto de exclusión de Artículos 5 de la LCP )

HARVEST_RDR_000279

# EXHIBIT 8

HARVEST_RDR_000280

4/19/2018                    PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC. :: OpenCorporates

We're hiring! *See jobs and apply here*

opencorporates

The Open Database Of The Corporate World

Company name or number    [ Search ]

⦿ Companies    ○ Officers

- Log in/Sign up

# PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC.

Company Number
   846031
Native Company Number
   846031S
Status
   Vigente
Incorporation Date
   9 October 2014 (over 3 years ago)
Company Type
   SOCIEDAD ANONIMA
Jurisdiction
   Panama
Registered Address

- PROVINCIA PANAMÁ
- Panama

Agent Name
   ANZOLA ROBLES & ASOCIADOS
Directors / Officers

- ANZOLA ROBLES & ASOCIADOS, agent
- DAVIS ARROCHA MEDINA, suscriptor
- FREDDY RICARDO SALCEDO DESCOMBAZ, director
- FREDDY RICARDO SALCEDO DESCOMBAZ, vicepresidente
- GUIDO ROBERTO DANILO ITALIANI FIRRITO, tesorero
- GUIDO ROBERTO DANILO ITALIANI FIRRITO, director
- ISCA GRAJALES CASTILLO, suscriptor
- JUAN JOSE GARCIA, director
- JUAN JOSE GARCIA, presidente
- LA REPRESENTACION LEGAL DE LA SOCIEDAD LA EJERCERA EL PRESIDENTE DE LA SOCIEDAD EN SU AUSENCIA EL PRESIDENTE SUPLENTE, representante
- LUCIANO FRANCISCO PICCINNINI BERGIANTI, secretario
- LUCIANO FRANCISCO PICCINNINI BERGIANTI, director
- PATRICIA PICCININI BERGIANTE, director

https://opencorporates.com/companies/pa/846031                                                    1/3

4/19/2018                    PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC. :: OpenCorporates

Registry Page
See all
http://www.registro-publico.gob.pa/co...

**Source** Registro Público de Panamá, http://www.registro-publico.gob.pa/co..., 3 Jan 2018
Add data (*website, address, etc*)

update from registry

## Explore company network



## Company network

Not yet available for this company. Click to find out more

**Corporate Grouping User Contributed**

None known. Add one now?
See all corporate groupings
* While we strive to keep this information correct and up-to-date, it is not the primary source, and the
company registry (see source, above) should always be referred to for definitive information
Data on this page last changed January 19 2018

**Problem/question about this data?** Click here

**API** Open Data

Get this info as json, xml, rdf

# About us

- About
- Principles
- Blog
- Team
- Advisory board
- Jobs

# Using our data

- Using our data
- What makes our data special
- Working for the public good
- Legal/Licence
- Contributing

HARVEST_RDR_000282

4/19/2018                              PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC. :: OpenCorporates

# Help

- API Reference
- Glossary
- Status

# Contact

- Twitter
- Medium
- Problems with our data?
- Temporary redaction

# Impact

- Impact
- Corporate network visualisations
- Research

HARVEST_RDR_000283

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and** | § | |
| **HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE MENDOZA GARCIA**, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

**PROPOSED ORDER**

Before the Court is Plaintiffs' Emergency Motion to Permit Limited Jurisdictional Discovery and to Stay Response to and Consideration of Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.  Having considered the Motions, responses, replies, applicable law, and arguments of counsel, Plaintiffs' motion is hereby GRANTED.

Defendant Garcia shall respond in full to Plaintiffs' Requests for Production within fourteen (14) days of the date of this Order.

Defendant Garcia shall submit to a deposition on the jurisdictional issues raised in Plaintiff's Motion within fourteen (14) days of responding to Plaintiffs' Requests for Production.

Plaintiffs' deadline to respond to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is stayed until fourteen (14) days after Plaintiffs receive a transcript of the deposition, to allow Plaintiffs sufficient time to use the deposition in responding to Defendants' Motion to Dismiss.

SIGNED this _____ day of _____, 2018.

_____
HON. KEITH P. ELLISON

HARVEST_RDR_000284

**UNITED STATES DISTRICT COURT**        **SOUTHERN DISTRICT OF TEXAS**

### HOUSTON DIVISION

Harvest Natural Resources, Inc., et al.
    *Plaintiff(s),*

v.                                                                Case No. 4:18−cv−00483

Juan Jose Mendoza Garcia, et al.
    *Defendant(s).*

# NOTICE OF SETTING

## PLEASE TAKE NOTICE

HEARING:   **Motion Hearing**
RE: Emergency Motion − #33
Motion for Discovery − #33
Motion to Stay − #33

DATE:   **4/23/2018**

TIME:   **02:00 PM**

HAS BEEN SET BEFORE

**JUDGE KEITH P. ELLISON**

**UNITED STATES COURTHOUSE**
**515 RUSK COURTROOM 3−A**
**HOUSTON, TEXAS 77002.**

ALL PARTIES MAY APPEAR BY TELEPHONE BY CALLING IN
ON THE COURT'S DIAL−IN NUMBER AT 713−250−5238.

**David J. Bradley, Clerk**                                        Date: April 19, 2018

By Deputy Clerk, A. Rivera

**HARVEST_RDR_000285**

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.**, | § § § § § | |
| *Plaintiffs*, | § | |
| **vs.** | § § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| *Defendants*. | § § | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' "EMERGENCY"**
**MOTION FOR LIMITED JURISDICTIONAL DISCOVERY &**
<u>**STAY OF RESPONSE TO DEFENDANTS' MOTION TO DISMISS**</u>

HARVEST_RDR_000286

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................4

II.   BACKGROUND ................................................................................5

III.  ARGUMENT .....................................................................................8

   A.   Plaintiffs Must Establish a Preliminary Case for Jurisdiction to be Entitled
        to Jurisdictional Discovery, and They Have Not. ...................................8

   B.   Plaintiffs' Allegations, Both in this Motion and their FAC, have Nothing
        to Do with Texas................................................................................8

   C.   Defendants Request a Stay of All Discovery Pending Resolution of
        Jurisdictional Issues. .......................................................................15

IV.   CONCLUSION ...............................................................................15

HARVEST_RDR_000287

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*21st Century Fin. Servs. v. Mandelbaum*,
  No. A-10-CA-803-LY, 2011 WL 3844209 (W.D. Tex. Aug. 30, 2011) ................................13

*Akerblom v. Ezra Holdings Ltd.*,
  848 F. Supp. 2d 673 (S.D. Tex. 2012) ....................................................................................12

*Bar Grp., LLC v. Bus. Intelligence Advisors*,
  215 F. Supp. 3d 524 (S.D. Tex. 2017) .......................................................................................1

*Bell Helicopter Textron, Inc. v. Am. Eurocopter, LLC*,
  729 F. Supp. 2d 789 (N.D. Tex. 2010) ....................................................................................13

*Caldwell v. Palmetto State Sav. Bank of S.C.*,
  811 F.2d 916 (5th Cir. 1987) (per curiam) ................................................................................9

*Domain Prot., LLC v. Keating*,
  No. 3:15-cv-2244-L, 2016 BL 324787 (N.D. Tex. Sept. 30, 2016) ..........................................9

*Farmer v. D & O Contractors, Inc.*,
  40 F. Supp. 3d 793 (N.D. Miss. 2014) .......................................................................................9

*Fielding v. Hubert Burda Media, Inc.*,
  415 F.3d 419 (5th Cir. 2005) .................................................................................................4, 5

*Kelly v. Syria Shell Petroleum v. B.V.*,
  213 F.3d 841 (5th Cir. 2000) .................................................................................................1, 5

*Marine Geotechnics, LLC v. Williams*,
  No. H-07-3499, 2009 WL 2144358 (S.D. Tex. July 13, 2009) ...............................................12

*Mink v. AAAA Dev. LLC*,
  190 F.3d 333 (5th Cir. 1999) .....................................................................................................7

*Mohamed v. Erinys Int'l Ltd.*,
  No. H-09-3362, 2010 WL 3359518 (S.D. Tex. Aug. 23, 2010) ..............................................12

*Nat'l Surety Corp. v. Ferguson Enter., Inc.*,
  No. 3:13-cv-2045-M, slip op. (N.D. Tex. Oct. 8, 2014) ..........................................................12

*Northview Christian Church, Inc. v. Monolithic Constructors, Inc.*,
  No. 3:09-cv-655-M, 2010 WL 2812849 (N.D. Tex. July 13, 2010)...........................................6

HARVEST_RDR_000288

*Patterson v. Dietze, Inc.*,
    764 F.2d 1145 (5th Cir. 1985) ................................................................5

*S.-Owners Ins. Co. v. Tomac of Fla., Inc.*,
    No. 09-CV-1697, 2009 WL 7797049 (S.D. Tex. Oct. 20, 2009) ...........................12

*Saudi v. S/T Marine Atl.*,
    159 F. Supp. 2d 469 (S.D. Tex. 2000) ....................................................7

*Wyatt v. Kaplan*,
    686 F.2d 276 (5th Cir. 1982) ............................................................5

**Federal Rules**

Federal Rule of Civil Procedure 4 ........................................................6

Federal Rule of Civil Procedure 26 .......................................................12

**State Statutes**

Fla. Stat. § 605.0102 (2017).............................................................11

Fla. Stat. § 605.0401 (2017).............................................................11

HARVEST_RDR_000289

## I.     **INTRODUCTION**

Plaintiffs bypassed all logical and proper venues for this dispute and instead filed their First-Amended Complaint ("FAC") in Houston, Texas, for their own convenience.  Now they face an "emergency" — they have no basis for personal jurisdiction over Defendant Juan José Garcia Mendoza ("Garcia") or the Garcia Corporate Defendants[1], and they need to find one *emergently*.

Perhaps recognizing that the pending Motion to Dismiss for Lack of Personal Jurisdiction presents insurmountable facts and legal arguments, Plaintiffs (without a single sworn statement) ask the Court to permit a "jurisdictional fishing expedition" in an attempt to establish any meaningful contacts between these Defendants and Texas.  The Court should not encourage such "shoot first, ask questions later" tactics[2] or require these Defendants to bear the costs and other burdens associated with diligence that should have been performed prior to filing the lawsuit.[3]

Both this Court and the Fifth Circuit have held that jurisdictional discovery should be ordered only when a plaintiff has already established a preliminary showing of jurisdiction, and where the movant establishes particular facts that would be established through the requested discovery, and how those facts would help establish personal jurisdiction.  *Kelly v. Syria Shell Petroleum v. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (denying discovery where plaintiffs failed to "describe the discovery they contend should have been allowed, what facts they hoped to obtain from such discovery, or how it would produce information that would support specific jurisdiction"); *see*

---

[1] The Garcia Corporate Defendants are (1) Azure 904, LLC; (2) Petroconsultores, Inc.; (3) Petroconsultores (Barbados), Ltd.; (4) Petro Consultores, S.C.; and (5) Petro Consultores International Trading Company, Inc.

[2] The Plaintiffs' diligence has been less-than-surefire thus far.  Soon after filing their Complaint, Plaintiffs amended to add two entities (Azure 406, LLC, and Selle, LLC) claiming that Garcia "operated each of these entities as conduits for illegal activity . . . ." FAC at ¶ 7.  After the undersigned informed Plaintiffs that these were not entities associated in any way with Garcia, Plaintiffs served them anyway.  Plaintiffs were forced to nonsuit these entities a few days later.  *See* ECF Nos. 15, 19, 24–27, 29, and 31.

[3] The FAC covers alleged transactions that occurred between 2012 and 2014.  Thus, Plaintiffs have had plenty of time to research their claims and determine a proper venue for this dispute.

4

HARVEST_RDR_000290

*Bar Grp., LLC v. Bus. Intelligence Advisors*, 215 F. Supp. 3d 524, 545 (S.D. Tex. 2017) ("A court may also deny jurisdictional discovery where the plaintiff only offers speculation as to jurisdiction and is waging a fishing expedition into jurisdictional facts.") (internal quotes omitted).

Not only have Plaintiffs failed to make a preliminary showing of personal jurisdiction over Garcia or the Garcia Corporate Defendants in the FAC, but their Motion's unsworn implications of mystery and deception surrounding Garcia's jurisdictional declaration are misplaced, and the "contested facts," even if subjected to discovery, would not move the jurisdictional needle from its current position (which is on "zero"). The Court should deny the Motion in its entirety and stay all discovery of any kind in this case until it rules on the personal jurisdiction issues.

## II.  BACKGROUND

Plaintiff alleges that a number of Venezuelan nationals engaged in bribery scheme in Venezuela. All of the individual Defendants are Venezuelan. The corporate Defendants, with the exception of a Florida LLC, are foreign. Even HNR Energia, B.V. ("HNR"), one of the Plaintiffs, is a Curacao company doing business in Venezuela.

The only party with any supposed connection to Texas is Plaintiff Harvest Natural Resources, Inc. ("Harvest"), which was a Delaware corporation that primarily did business in Venezuela, but once had an office in Houston, Texas prior to its formal dissolution in May 2017. FAC at ¶¶ 3, 17. Plaintiffs' Motion, like the FAC, proceeds on the incorrect premise that Harvest's purported connections to Texas are relevant to the jurisdictional analysis. They are not. Even if they were, Harvest's involvement in the FAC's allegations is remote.

The FAC alleges that Harvest is the parent company of co-Plaintiff HNR, a Curacao company that conducts business in Venezuela. HNR owns an interest in Harvest-Vinccler Dutch Holding, B.V. ("H-V Dutch Holding"), a Dutch company doing business in Venezuela. H-V

5

Dutch Holding held a 40% interest in Petrodelta, S.A. ("Petrodelta"), a Venezuelan State-owned

company doing business in Venezuela.[4]  Diagram 1 illustrates this relationship for clarity:

### DIAGRAM 1



The FAC further alleges that in June 2012 Juan Franciso Clerico ("Clerico"), a

Venezuelan national and a director of H-V Dutch Holdings, and Garcia, also a Venezuelan

national, had a conversation in Caracas, Venezuela, during which Garcia stated that a sum of

money must be paid to the Venezuelan Oil Ministry before the Venezuelan government would

approve H-V Dutch Holding's sale of its 40% stake in Petrodelta to an Indonesian company.[5]  In

other words, this lawsuit involves an alleged conversation between two _Venezuelans_, in

_Venezuela_, about _Venezuelan_ government approval of the sale of a private _Venezuelan_

company's interest in a _Venezuelan_ State company to an _Indonesian_ company.

Plaintiffs' jurisdictional theory consists of the conclusory and unsupported claim that

Garcia "kn[ew] and intend[ed]" that his conversation with Clerico in Caracas eventually would

---

[4]  Corporacion Venezolana del Petroleo ("CVP"), which is a corporate subsidiary of PDVSA, the Venezuelan national oil company, owned the other 60% of Petrodelta.  FAC at 5–6, ¶ 18.

[5]  Plaintiffs do not state that the Garcia Corporate Defendants played any specific role in the FAC's allegations.

6

be communicated — apparently from Clerico through a series of Venezuelan and Dutch intermediaries[6] — to Harvest's office in Houston, Texas, and that the payment would "come from Harvest's bank accounts in the United States."  FAC at ¶ 25.  The alleged bribe was never paid.

Likewise, Plaintiffs claim that in "approximately fall 2014," another person allegedly told Harvest's CEO that Garcia — through an unspecified manner and means, and at an unspecified location — had again demanded a bribe in connection with a sale of H-V Dutch Holdings' Venezuelan assets, this time to a Netherlands-based company.  *Id.* at ¶ 39.  Again, Plaintiffs make the conclusory and unsupported allegation that Garcia "demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States."  *Id.*  This alleged bribe, too, was never paid.  *Id.* at ¶ 41.

Neither Garcia nor any of the Garcia Corporate Defendants has, or is alleged to have, contacts with Texas sufficient to support a finding of general jurisdiction.  Likewise, Plaintiffs' unsupported allegation that Garcia "kn[ew] and intend[ed]" that a conversation in Venezuela, between Venezuelans, and about Venezuelan governmental approval of the sale of a Venezuelan company, would weave its way to Texas from Venezuela, through a series of corporations and individuals in Venezuela, Curacao, Amsterdam, and/or the Netherlands, does not support a theory of specific jurisdiction.

---

[6] As stated above, Harvest (a now defunct Delaware company that formerly had an office in Texas) is the parent company of HNR (a Curacao company doing business in Venezuela), which was the investor in H-V Dutch Holding (a Netherlands company doing business in Venezuela).  FAC at ¶¶ 3, 4, 18.  Clerico (a Venezuela national) is alleged to have been a director from the Vinccler side of H-V Dutch Holdings.  *Id.* at ¶ 25.  The FAC neither alleges nor explains how or why Garcia intended the conversation to be, or knew that the conversation would be, communicated to Texas.

HARVEST_RDR_000293

### III.    ARGUMENT

**A.    Plaintiffs Must Establish a Preliminary Case for Jurisdiction to be Entitled to Jurisdictional Discovery, and They Have Not.**

To obtain jurisdictional discovery in the Fifth Circuit, a plaintiff must do two things.

First, the plaintiff must allege facts capable of supporting personal jurisdiction. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005). This requires that it both state a valid theory of jurisdiction and allege facts that, if true, would support this theory. *See id.* Jurisdictional discovery is unnecessary if further inquiry could not impact the court's jurisdictional analysis. *Id.* Discovery pertaining to jurisdictional theories not asserted or facts not in dispute is not required. *Patterson v. Dietze, Inc.*, 764 F.2d 1145, 1147–48 (5th Cir. 1985).

Second, the plaintiff must articulate specific discovery that could substantiate its jurisdictional allegations. *Syria Shell Petroleum*, 213 F.3d at 855. It must describe the discovery it seeks, identify the facts it hopes to obtain from this discovery, and explain how these facts will support jurisdiction. *Id.* These details are necessary to assess a request for jurisdictional discovery. *See, e.g.*, *Wyatt v. Kaplan*, 686 F.2d 276, 284–86 (5th Cir. 1982) (assessing jurisdictional theories and the request for discovery to support them).

**B.    Plaintiffs' Allegations, Both in this Motion and their FAC, have Nothing to Do with Texas.**

For the reasons explained in the pending Motion to Dismiss, Plaintiffs do not allege a viable theory of personal jurisdiction against Garcia or the Garcia Corporate Defendants in the FAC. *See generally* Def.s' Mot. to Dismiss, ECF No. 32. Plaintiffs do not allege a theory of general jurisdiction by showing minimum contacts between any Defendant and Texas.[7] Indeed,

---

[7] Plaintiffs fail to make any substantive allegations about the Garcia Corporate Defendants, which are foreign entities (with the exception of Azure 904, LLC, which is a Florida entity). Plaintiffs list the Garcia Corporate Defendants as parties, summarily claim that they are "conduits for illegal activity," and fail to mention them again in the FAC. FAC at ¶¶ 5–7.

HARVEST_RDR_000294

Garcia's sworn jurisdictional declaration unequivocally confirms that no such forum contacts exist.  Garcia Decl., ECF No. 32-1 at ¶ 3, 8–13.  Likewise, although Plaintiffs seem to attempt a theory of specific jurisdiction by summarily claiming that Garcia "kn[ew] and intend[ed]" that a purported bribe would be communicated from Venezuela — through a number of intermediaries — to Texas, Fifth Circuit law is clear that such an allegation is insufficient to establish specific jurisdiction.  ECF No. 32 at 17–18 (quoting *AllChem Performance Prods., Inc. v. Aqualine Warehouse, LLC*, 878 F. Supp. 2d 779, 787 (S.D. Tex. 2012) ("[S]pecific jurisdiction may not be based on the mere fortuity that a plaintiff is a Texas resident.")).  Therefore, Plaintiffs fail to meet the first element of the two-part test to be entitled to jurisdictional discovery, and further inquiry by the Court is not required.  *Northview Christian Church, Inc. v. Monolithic Constructors, Inc.*, No. 3:09-cv-655-M, 2010 WL 2812849, at * 3 (N.D. Tex. July 13, 2010).

Even if the Court was inclined to continue the inquiry, Plaintiffs raise no "factual issue" in their Motion that would aid the Court's jurisdictional analysis because none of the proposed topics of discovery relate to any meaningful contacts with Texas:

• "*Garcia fled the country*."  Plaintiffs claim that, after they filed the lawsuit, Garcia fled the country.  Pl.s' Em. Mot. for Juris. Disc., ECF No. 33 ("Motion") at 1.  Garcia is permitted to visit the United States pursuant to a visa.  ECF No. 32-1 at ¶ 2.  He recently moved from Venezuela, where he has lived for most of his adult life, to Spain.  *Id.* at ¶ 1.  Garcia and the Garcia Corporate Defendants have been served and/or waived service.  ECF No. 33 at 3.  Setting aside the irony of Garcia purportedly "fleeing" a country where he has no citizenship, Plaintiffs do not explain how discovery into this allegation would be relevant to any theory of personal jurisdiction.  This allegation is designed to prejudice the Court, not show minimum contacts with Texas.

HARVEST_RDR_000295

• *"Garcia immediately vacated a Miami condo he once owned."*  Plaintiffs allege that, after this lawsuit was filed, Garcia sold and "immediately vacated" a Miami condo he once owned, and attach a deed showing a transfer of the condo to a new owner several days after the FAC was filed.  ECF Nos. 33 at 1; 33-4 at 1.  The clear implication of this allegation is that Garcia must have done something wrong because is running and hiding.

The fact that Garcia owns real estate in Florida is not a secret — he makes this fact clear in his jurisdictional declaration.  ECF No. 32-1 at ¶ 13 ("Azure 904 currently owns the Florida condominium where my elderly mother lives.").  Importantly, Plaintiffs declined to inform the Court that the Miami condo had been listed for sale for *four months prior* to the filing of this lawsuit, and that the sales contract was executed nearly *two weeks before* this case was filed. Once more, Plaintiffs selectively disclose facts in a manner designed to create a nefarious intent where there is none.  And again, Plaintiffs decline to explain how any discovery regarding Garcia's ownership of Florida real estate (one condo or two) supports jurisdiction over any Defendant in Texas.

• "*Garcia took down his company's website and removed his Miami-area address and phone number*."  Plaintiffs allege that, after this lawsuit was filed, Garcia removed a Miami-area business address and phone number from his company's website.  ECF No. 33 at 1.  This would be quite logical, considering Garcia sold the Miami property and was no longer affiliated with that address.  The fact that Garcia's business once had a public website is no secret — Garcia never contested otherwise.  Garcia suspended his website shortly after this case was filed because his only client, a Venezuelan company, suspended his consulting agreement pending the resolution of this case.

10

HARVEST_RDR_000296

Again, Plaintiffs fail to explain how this website (or the act of taking it down) would be relevant to a theory of personal jurisdiction, such as minimum contacts with Texas.  They cannot give such an explanation because longstanding, black-letter law provides that a passive website which is accessible to persons in the forum state does not provide a basis for personal jurisdiction.  *E.g.*, *Saudi v. S/T Marine Atl.*, 159 F. Supp. 2d 469, 482 (S.D. Tex. 2000) (collecting cases); *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336–37 (5th Cir. 1999) (finding no personal jurisdiction where defendant operated website that was accessible by residents in the forum state but there was no evidence that the defendant conducted business over the Internet). Discovery into whether Garcia did or did not have a website, and whether he did or did not list the address of a Miami condo, would not help establish personal jurisdiction over him or any of the Garcia Corporate Defendants in Texas.

 • *Two colleagues of Garcia have been arrested for corruption.*  Plaintiffs spend a significant portion of the FAC alleging that certain Defendants and other Venezuelan nationals are under criminal investigation and/or defendants in criminal proceedings.  FAC at ¶¶ 50–69.  In their Motion, Plaintiffs again reference that two alleged "co-employees" of Garcia were recently arrested.  ECF No. 33 at 2–3.  The implication seems to be that, because other Venezuelans in the oil industry have been arrested for corruption, and because Garcia is a Venezuelan in the oil industry, Plaintiffs' allegations have merit and the Court should sidestep Due Process considerations.

Notably, Plaintiffs do not allege that Garcia has been arrested, or that he is a defendant in any criminal proceeding, because he is not.  Plaintiffs do not allege that Garcia is under criminal investigation, because he is not.   Plaintiffs do not allege that Venezuelan or U.S. law enforcement has ever contacted Garcia in connection with any civil or criminal investigation into

11

HARVEST_RDR_000297

any subject matter, because this has never occurred. ***Remarkably, despite a years-long, cooperative, joint investigation by the governments of Venezuela and the United States into corruption in the oil industry, and the limitless international investigative powers wielded by these two sovereigns, the only persons claiming that Garcia bribed anyone are Plaintiffs.***

Regardless, even if Plaintiffs alleged that Garcia is or was the subject or target of a criminal investigation in the FAC (which he is/was not), it would be irrelevant to the Court's jurisdictional analysis. These allegations are made for one purpose, and it is an improper one.

• *Garcia has done work for other foreign oil companies.* Plaintiffs allege that Garcia has previously done work for other foreign oil companies, including Shell (a British-Dutch company), Total (French), Repsol (Spanish), Suelopetrol (Venezuelan), and Eni (Italian). ECF No. 33 at 5. They argue that this raises "the possible existence" of contacts with Texas because these entities have "offices, subsidiaries, refineries," or other operations in Texas, and because Houston is a major oil/gas hub. ECF No. 33 at 5–6. Unlike Plaintiffs have done in their unsworn Motion, Garcia has unequivocally stated — under oath — that he has "not performed services for any Texas resident or entity, communicated with any Texas residents, registered to do business in Texas, or conducted business with any Texas entities." ECF No. 32-1 at ¶ 9. Plaintiffs have no basis to challenge this statement. Instead, they would like to "test Garcia's credibility under oath." ECF No. 33 at 6. This is the definition of a "fishing expedition," and is not a basis for ordering jurisdictional discovery.

• *Garcia owns real estate in Florida, and stayed in a condo there.* Plaintiffs try to make an issue about whether Garcia owned one or two condos *in Miami*. ECF No. 33 at 7. In his declaration, Garcia makes clear that he owns real estate in Florida. ECF No. 32-1 at 13. Plaintiffs claim that Garcia and his wife have stayed there. ECF No. 33 at 7. They have. Again,

12

HARVEST_RDR_000298

Plaintiffs do not explain why the ownership of Florida real estate, and whether Garcia did or did not stay in a Miami condo, is relevant to a minimum contacts analysis with Texas. It is not, and no amount of discovery into what days Garcia and his wife did or did not stay in a *Miami* condo would establish jurisdictional contacts with *Texas*.[8]

• *Garcia reported no income to Venezuela between 2001 and 2016.* Plaintiffs claim that Garcia did not report any income to Venezuela between 2001 and 2016, which "strongly suggests taxes and residency elsewhere." ECF No. 33 at 8. This is simply false. Plaintiffs creatively attach a printout from the Venezuelan equivalent of the Social Security Administration to their Motion as alleged evidence of Garcia's lack of payment. ECF No. 33-7 at 1.

In Venezuela, however, only government employees pay into the social security system. Private citizens do not. Garcia has not been a government employee since 2000, which is exactly what Exhibit 6 to Plaintiffs' Motion reflects. Garcia makes clear that he has been a resident of Venezuela until recently. ECF No. 32-1 at ¶ 1. As Venezuelan nationals, he and his wife have filed individual income tax returns in Venezuela each year between 2001 and 2016.[9]

• *Garcia's ownership of Petroconsultores, Inc., and Azure 904, LLC.* Plaintiffs' Motion suggests that Garcia falsely claimed to be the "sole owner" of two of the Garcia Corporate

---

[8] Plaintiffs' emphasis throughout their Motion on Garcia's contacts with the United States likely comes from their misinterpretation of Fifth Circuit precedent. Plaintiffs cite an unpublished decision and incorrectly state that "[t]he Fifth Circuit has long held that 'when . . . attempting to exercise personal jurisdiction . . . based upon a federal statute providing for nationwide service . . . the relevant inquiry is whether the defendant has had minimum contacts with the *United States*." Pl.s' Mot. for Juris. Disc., ECF No. 33 at 6 n.8 (citing *Luallen v. Higgs*, 277 Fed. App'x 402, 404 (5th Cir. 2008) (per curiam)). The non-binding case Plaintiffs cite, "however, concerned the nationwide service provisions in the 1934 Securities Exchange Act ('SEA') and the Employee Retirement Income Security Act ('ERISA') . . . . RICO's nationwide service provision has been noted to differ from its SEA and ERISA counterparts." *Domain Prot., LLC v. Keating*, No. 3:15-cv-2244-L, 2016 BL 324787, at *3 (N.D. Tex. Sept. 30, 2016); *see Farmer v. D & O Contractors, Inc.*, 40 F. Supp. 3d 793, 797 (N.D. Miss. 2014). The Fifth Circuit, instead, has held — in a published, binding opinion — personal jurisdiction under RICO "requires that a defendant be conducting business in the forum." *Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 918 (5th Cir. 1987) (per curiam) (rejecting plaintiffs' argument that "district court had personal jurisdiction because the RICO statute provides for nationwide service of process."). The proper test here is whether Garcia and the Garcia Corporate Defendants have minimum contacts with Texas to meet the requirements of Due Process.

[9] Azure 904 LLC is a Florida entity that filed U.S. tax returns in years where taxable events occurred.

HARVEST_RDR_000299

Defendants.   ECF No. 33 at 8.   As Garcia makes clear in his jurisdictional declaration, Petroconsultores, Inc. ("Petro, Inc."), is an "Anguilla British Virgin Islands company" with "no headquarters" because it never "conducted any business in any U.S. state."   ECF No. 32-1 at ¶ 10.  Again, Plaintiffs attach a document from Venezuelan corporate records — that was filed at the time Petro, Inc., was formed — which list Mexican entities that Petro, Inc., had aspired to do business with.  ECF No. 33-8 at 2.  The document does not indicate that Garcia's wife is the 50% owner of Petro, Inc. — rather, an accurate translation makes clear that she is a director and member of Petro, Inc.  *Id.*  Garcia is still the sole owner of Petro, Inc.  ECF No. 32-1 at ¶ 10. Even if Garcia's wife did, at any time, own any part of the foreign entity, Plaintiffs do not explain how this would establish any theory of personal jurisdiction against Garcia or Petro, Inc. in Texas.

In addition, Plaintiffs claim that Garcia's wife is a "Member and Manager" of Azure 904, a Florida LLC, and therefore she is also an owner.  ECF No. 33 at 8.  Garcia makes clear in his jurisdictional declaration that he is the sole owner of Azure 904, LLC, which owns real estate in Florida.  ECF No. 32-1 at ¶ 13.  Plaintiffs summarily claim that being a "Member and Manager" makes Garcia's wife an owner, but provide no authority for this point — under Florida corporate law or otherwise.  ECF No. 33 at 8.  Indeed, Florida corporate law appears to hold the opposite.[10] Nevertheless, Plaintiffs do not explain why a resolution of this point of Florida law (which is not fertile ground for fact discovery) would demonstrate any minimum contacts between Defendants and Texas.

• *Petro Inc. and Petro Barbados actually "got off the ground."*  Plaintiffs take issue with Garcia's statement that Petro, Inc., and Petroconsultores (Barbados), Ltd. ("Petro Barbados"),

---

[10] *See* Fla. Stat. §§ 605.0102 (2017), 605.0401 (2017).

HARVEST_RDR_000300

were entities that he formed, but never had any business operations.  ECF No. 33 at 9.  Plaintiffs attach material indicating that Petro, Inc., is the "exclusive representative" of a Mexican company, and that Venezuela considers the entity to be "valid."  ECF Nos. 33-5 and 33-9.  Garcia stands by his jurisdictional declaration — these entities were formed to accomplish projects that never came to fruition.  ECF No. 32-1 at ¶¶ 10–12.  Petro, Inc., was supposed to import chemicals into Mexico.  Petro Barbados was supposed to do the same.

Importantly, Plaintiffs do not explain how discovery into these two entities — which are foreign companies that were supposed to business with Mexico — would aid in establishing minimum contacts with Texas.

Because they "identif[y] no specific facts that are in dispute, do[] not identify the discovery needed, and fail[] to explain how any information obtained would support personal jurisdiction," Plaintiffs are not entitled to jurisdictional discovery.  *Nat'l Surety Corp. v. Ferguson Enter., Inc.*, No. 3:13-cv-2045-M, slip op. at 4 (N.D. Tex. Oct. 8, 2014).

## C.  Defendants Request a Stay of All Discovery Pending Resolution of Jurisdictional Issues.

This Court scheduled a Case Management Conference with the Parties for May 11, 2018.  Order, ECF No. 8.  Given that Defendants have a Motion to Dismiss for Lack of Personal Jurisdiction pending before the Court and that Plaintiffs' have requested a stay of Defendants' Motion along with jurisdictional discovery, Defendants move this Court to stay all discovery-related matters, including, but not limited to, a conference under Federal Rule of Civil Procedure 26(f), in this case pending resolution of all jurisdictional issues.

## IV.  CONCLUSION

This Court routinely denies requests for jurisdictional discovery where, as here, a plaintiff fails to make a preliminary showing of jurisdiction, and fails to specific facts that would aid in

HARVEST_RDR_000301

the jurisdictional analysis.  *Akerblom v. Ezra Holdings Ltd.*, 848 F. Supp. 2d 673, 690–91 (S.D. Tex. 2012) (Ellison, J.) (refusing to allow jurisdictional discovery where plaintiff "failed to demonstrate how additional discovery would help enhance the Court's analysis"); *S.-Owners Ins. Co. v. Tomac of Fla., Inc.*, No. 09-CV-1697, 2009 WL 7797049, at *3 (S.D. Tex. Oct. 20, 2009) (Ellison, J.) (denying plaintiff's request for jurisdictional discovery where plaintiff failed to assert with any degree of certainty or specificity whether or when discovery would lead to facts supporting jurisdiction); *Marine Geotechnics, LLC v. Williams*, No. H-07-3499, 2009 WL 2144358, at *5 (S.D. Tex. July 13, 2009) (Harmon, J.) ("The story is fully told and does not indicate that further discovery would reveal a smoking jurisdictional gun."); *Mohamed v. Erinys Int'l Ltd.*, No. H-09-3362, 2010 WL 3359518, at *4 (S.D. Tex. Aug. 23, 2010) (Werlein, Jr., J.) ("Plaintiffs still have not specified what evidence they believe discovery would produce and how that evidence would support personal jurisdiction."); *21st Century Fin. Servs. v. Mandelbaum*, No. A-10-CA-803-LY, 2011 WL 3844209, at *2 (W.D. Tex. Aug. 30, 2011) ("Plaintiff has failed to demonstrate how deposing Mandelbaum (or any of the other individuals) would provide Plaintiff with evidence that would support personal jurisdiction in this case.").

None of the supposed mysteries, misstatements, or half-truths when it comes to Garcia or the Garcia Corporate Defendants is relevant to an analysis of minimum contacts with Texas — to the contrary, Garcia's declaration is clear and unequivocal about their lack of contacts with Texas, and Plaintiffs have no meaningful scintilla of evidence to the contrary.  To permit jurisdictional discovery here would be inviting a fishing expedition that places an unfair burden on Garcia, over whom the Court lacks personal jurisdiction.  *Bell Helicopter Textron, Inc. v. Am. Eurocopter, LLC*, 729 F. Supp. 2d 789, 797–98 (N.D. Tex. 2010) (finding that plaintiff's demonstration of the specific facts that it expects to be revealed through jurisdictional discovery

HARVEST_RDR_000302

"is especially important where, as here, the defendant enters declarations into evidence specifically denying certain jurisdictional allegations . . . . The court need not allow a plaintiff to conduct a jurisdictional fishing expedition seeking facts to support a claim of general jurisdiction.").

Date:  April 20, 2018.

HARVEST_RDR_000303

Respectfully submitted,

*s/ Paul E. Coggins*

**Paul E. Coggins**
  *Attorney-in-Charge*
  Federal ID No. 33190
  State Bar No. 04500700
  PCoggins@LockeLord.com

**Kip Mendrygal**
  Federal ID No. 1026277
  State Bar No. 24041472
  KMendrygal@LockeLord.com

**"Mario" Hoang Nguyen**
  Federal ID No. 3173111
  State Bar No. 24105873
  Mario.Nguyen@LockeLord.com

**LOCKE LORD, LLP.**
  2200 Ross Avenue, Suite 2800,
  Dallas, Texas 75201
  T: (214) 740-8000
  F: (214) 740-8800

**ATTORNEYS FOR DEFENDANTS JUAN-JOSÉ MENDOZA GARCIA; PETRO CONSULTORES, S.C.; PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC.; PETROCONSULTORES (BARBADOS), LTD.; PETROCONSULTORES, INC.; and AZURE 904, LLC.**

## CERTIFICATE OF SERVICE

On April 20, 2018, I electronically submitted this Response to Plaintiffs' "Emergency" Motion with the Clerk of Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court.  I certify that I have served all counsel and/or pro se parties of record electronically.

*s/ Kip Mendrygal*
Kip Mendrygal

18

HARVEST_RDR_000304

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### SOUTHERN DISTRICT OF TEXAS

**Notice of Electronic Filing**

The following transaction was entered on 4/23/2018 at 4:44 PM CDT and filed on 4/23/2018

| | |
|---|---|
| **Case Name:** | Harvest Natural Resources, Inc. et al v. Mendoza Garcia et al |
| **Case Number:** | 4:18-cv-00483 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**Minute Entry for proceedings held before Judge Keith P Ellison. MOTION HEARING held on 4/23/2018. The Court is notified of potential conflict and will recuse from the case. Order to issue. Appearances: Paul E Coggins, Kiprian E Mendrygal, Hoang Ngoc Nguyen, Jr, Alexander Michael Wolf, Lee L Kaplan.(Court Reporter: F. Warner)(Law Clerk: M. Medine), filed.(arrivera, 4)**

**4:18-cv-00483 Notice has been electronically mailed to:**

Alexander Michael Wolf    awolf@skv.com, madams@skv.com, mary-adams-1752@ecf.pacerpro.com

Hoang Ngoc Nguyen , Jr    mario.nguyen@lockelord.com

Kiprian E Mendrygal    kmendrygal@lockelord.com, hatchley@lockelord.com, vlong@lockelord.com

Lee L Kaplan    lkaplan@skv.com, madams@skv.com, mary-adams-1752@ecf.pacerpro.com

Paul E Coggins    pcoggins@lockelord.com, hatchley@lockelord.com, vlong@lockelord.com

**4:18-cv-00483 Notice has not been electronically mailed to:**

United States District Court
Southern District of Texas

**ENTERED**

April 23, 2018

David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC.**, *et al*, | § § § | |
| **Plaintiffs,** | § | |
| **VS.** | § § | **CIVIL ACTION NO. 4:18-CV-483** |
| **JUAN JOSE MENDOZA GARCIA**, *et al*, | § § | |
| **Defendants.** | § | |

## <u>ORDER</u>

For the reasons stated on the record at the hearing on April 23, 2018, I hereby recuse.

**SIGNED** this 23rd day of April, 2018.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

Harvest Natural Resources, Inc., et al.      §
                                             §
*versus*                                     §          Civil Action 4:18−cv−00483
                                             §
Juan Jose Mendoza Garcia, et al.             §

## Notice of Reassignment

This case is reassigned to Judge Lee H Rosenthal.

Entered:  April 24, 2018                          David J. Bradley, Clerk

HARVEST_RDR_000307

| AO 435<br>(Rev. 04/18) | ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS | | FOR COURT USE ONLY |
|---|---|---|---|
| | **TRANSCRIPT ORDER** | | DUE DATE: |

*Please Read Instructions:*

| 1. NAME<br>Lee L. Kaplan | 2. PHONE NUMBER<br>(713) 221-2323 | 3. DATE<br>4/23/2018 | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL<br>700 Louisiana Street, Suite 2300 | 5. CITY<br>Houston | 6. STATE<br>TX | 7. ZIP CODE<br>77002 |

| 8. CASE NUMBER<br>4:18-cv-00483 | 9. JUDGE | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 4/23/2018 | 11. TO 4/23/2018 |

| 12. CASE NAME<br>Harvest Natural Resources et al vs. Juan Jose Garcia et al | LOCATION OF PROCEEDINGS | |
|---|---|---|
| | 13. CITY Houston | 14. STATE Texas |

15. ORDER FOR

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☐ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☒ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☒ PRE-TRIAL PROCEEDING (Spcy) | 4/23/18 |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

17. ORDER

| CATEGORY | ORIGINAL<br>(Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☒ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.)<br>By signing below, I certify that I will pay all charges<br>(deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|
| 18. SIGNATURE | PROCESSED BY | |
| 19. DATE<br>4/23/2018 | PHONE NUMBER | |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS | |

| ORDER RECEIVED | DATE | BY | | |
|---|---|---|---|---|
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED<br>TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

DISTRIBUTION:     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

HARVEST_RDR_000308

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

*Please Read Instructions:*

| FOR COURT USE ONLY |
|---|
| DUE DATE: |

| 1. NAME<br>Paul E. Coggins | 2. PHONE NUMBER<br>(214) 740-8104 | 3. DATE<br>4/24/2018 |
|---|---|---|

| 4. DELIVERY ADDRESS OR EMAIL<br>2200 Ross Avenue, Suite 2800 (pcoggins@lockelord.com) | 5. CITY<br>Dallas | 6. STATE<br>TX | 7. ZIP CODE<br>75201 |
|---|---|---|---|

| 8. CASE NUMBER<br>4:18-cv-00483 | 9. JUDGE<br>Ellison (now recused) | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 4/23/2018 | 11. TO 4/23/2018 |

| 12. CASE NAME<br>Harvest Natural Resources et al vs. JJ Garcia et al | LOCATION OF PROCEEDINGS | |
|---|---|---|
| | 13. CITY Houston | 14. STATE Texas |

15. ORDER FOR

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☐ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☒ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | | DATE(S) | PORTION(S) | | DATE(S) |
|---|---|---|---|---|---|
| ☐ | VOIR DIRE | | ☐ | TESTIMONY (Specify Witness) | |
| ☐ | OPENING STATEMENT (Plaintiff) | | | | |
| ☐ | OPENING STATEMENT (Defendant) | | | | |
| ☐ | CLOSING ARGUMENT (Plaintiff) | | ☒ | PRE-TRIAL PROCEEDING (Spcy) | 4/23/2018 |
| ☐ | CLOSING ARGUMENT (Defendant) | | | | |
| ☐ | OPINION OF COURT | | | | |
| ☐ | JURY INSTRUCTIONS | | ☐ | OTHER (Specify) | |
| ☐ | SENTENCING | | | | |
| ☐ | BAIL HEARING | | | | |

17. ORDER

| CATEGORY | ORIGINAL<br>(Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☒ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.)<br>By signing below, I certify that I will pay all charges<br>(deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE<br>/s/ Paul Coggins | PROCESSED BY |
|---|---|
| 19. DATE<br>4/24/2018 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED<br>TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

**DISTRIBUTION:**     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

**HARVEST_RDR_000309**

AO 435
(Rev. 04/18)

INSTRUCTIONS

## GENERAL

**Use.**  Use this form to order the transcription of proceedings.  Complete a separate order form for each case number for which transcripts are ordered.

**Completion**.  Complete Items 1-19.  Do *not* complete shaded areas which are reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Submitting to the Court.**  Submit the form in the format required by the court.

**Deposit Fee.**  The court will notify you of the amount of the required deposit fee which may be mailed or delivered to the court.  Upon receipt of the deposit, the court will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee or for transcripts ordered by the federal government from the date of receipt of the signed order form.

**Completion of Order.**  The court will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the court will notify you of the balance due which must be paid prior to receiving the completed order.

## SPECIFIC

Items 1-19.    These items should always be completed.
Item 8.          Only one case number may be listed per order.
Item 15.        Place an "X" in each box that applies.
Item 16.        Place an "X" in the box for each portion requested.  List specific date(s) of the proceedings for which transcript is requested.  Be sure that the description is clearly written to facilitate processing.  Orders may be placed for as few pages of transcript as are needed.
Item 17.        *Categories.*  There are six (6) categories of transcripts which may be ordered.  These are:
   *Ordinary.*  A transcript to be delivered within thirty (30) calendar days after receipt of an order.  (Order is considered received upon receipt of the deposit.)
   *14-Day.*  A transcript to be delivered within fourteen (14) calendar days after receipt of an order.
   *Expedited.*  A transcript to be delivered within seven (7) calendar days after receipt of an order.
   *3-Day.*  A transcript to be delivered within three (3) calendar days after receipt of an order.
   *Daily.*  A transcript to be delivered following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
   *Hourly.*  A transcript of proceedings ordered under unusual circumstances to be delivered within two (2) hours.
   *Realtime.*  A draft unedited transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

**NOTE**: Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the 14-day *delivery* rate, and if not completed and delivered within 14 calendar days, payment would be at the ordinary delivery rate.

   *Ordering.*  Place an "X" in each box that applies.  Indicate the number of additional copies ordered.
   *Original.*  Original typing of the transcript.  An original must be ordered and prepared prior to the availability of copies.  The original fee is charged only once.  The fee for the original includes the copy for the records of the court.
   *First Copy.*  First copy of the transcript after the original has been prepared.  All parties ordering copies must pay this rate for the first copy ordered.
   *Additional Copies.*  All other copies of the transcript ordered by the same party.
Item 18.        Sign in this space to certify that you will pay all charges.  (This includes the deposit plus any additional charges.)
Item 19.        Enter the date of signing.

Shaded Area.  Reserved for the court's use.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and** | § | |
| **HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE MENDOZA GARCIA,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |

**NOTICE OF WITHDRAWL OF COUNSEL**

Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V. (collectively, "Harvest") respectfully requests that attorney Lee L. Kaplan be permitted to withdraw as counsel of record for Plaintiffs in this matter and be removed from all service lists and the CM/ECF system.

Craig Smyser, Dane Ball, Ty Doyle, Anthony Phillips, and Alexander Wolf of Smyser Kaplan & Veselka, L.L.P. will continue to represent Plaintiffs this action.  As such, the withdrawal of Mr. Kaplan will not delay this proceeding.

744709.1

**HARVEST_RDR_000311**

Respectfully Submitted,

**SMYSER KAPLAN & VESELKA, L.L.P.**

*/s/ Lee Kaplan*
Lee L. Kaplan (Fed. Bar No. 1840)
*Attorney-in-Charge*
Craig Smyser (Fed. Bar No. 848)
Dane Ball (Fed. Bar No. 784400)
Ty Doyle (Fed. Bar No. 1373873)
Anthony J. Phillips (Fed. Bar No. 1123515)
Alexander M. Wolf (Fed. Bar No. 2470631)
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
lkaplan@skv.com
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS
HARVEST NATURAL RESOURCES,
INC. AND HNR ENERGIA B.V**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule 5.1 on the 24th day of April, 2018.

*/s/ Alex Wolf*
Alexander M. Wolf

2

744709.1

**HARVEST_RDR_000312**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and** | § | |
| **HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE MENDOZA GARCIA,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |

## <u>PROPOSED ORDER</u>

Upon consideration of Plaintiffs Motion to Withdraw Certain Counsel of Record, it is

hereby:

ORDERED that Plaintiffs' motion is granted; and it is further

ORDERED that Lee L. Kaplan be withdrawn as counsel of record for Harvest Natural

Resources, Inc. and HNR Energia B.V. in this matter and be removed from all service lists and

the CM/ECF system for this matter.

SIGNED this _____ day of _____, 2018.

_____
HON. LEE ROSENTHAL

HARVEST_RDR_000313

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC.,** | § | |
| **and HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION: 4:18-cv-00483** |
| **JUAN JOSE MENDOZA GARCIA,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>NOTICE OF APPEARANCE</u>

PLEASE TAKE NOTICE that Craig Smyser of the law firm of Smyser Kaplan &

Veselka, L.L.P., 700 Louisiana Street, Suite 2300, Houston, Texas 77002, Telephone (713) 221-

2300, Facsimile (713) 221-2320, hereby enters an appearance as Attorney-in-Charge on behalf of

Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V.

744714.1

**HARVEST_RDR_000314**

Respectfully Submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

*/s/ Craig Smyser*
Craig Smyser (Fed. Bar No. 848)
*Attorney-in-Charge*
Dane Ball (Fed. Bar No. 784400)
Ty Doyle (Fed. Bar No. 1373873)
Anthony J. Phillips (Fed. Bar No. 1123515)
Alexander M. Wolf (Fed. Bar No. 2470631)
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS
HARVEST NATURAL RESOURCES,
INC. AND HNR ENERGIA B.V**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule 5.1. As such, this document was served on all counsel of record who have consented to electronic service on this 24th day of April 2018.

*/s/ Craig Smyser*
Craig Smyser

744714.1

2

HARVEST_RDR_000315

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

Harvest Natural Resources, Inc., et al.

v.                                             Case Number: 4:18−cv−00483

Juan Jose Mendoza Garcia, et al.

---

## NOTICE OF SETTING

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Lee H Rosenthal

**PLACE:**    Courtroom 11B
             United States District Court
             515 Rusk Avenue
             Houston, Texas 77002

**DATE:** 4/27/2018

**TIME:** 03:00 PM

**TYPE OF PROCEEDING:** Motion Hearing
Emergency Motion – #33
Motion for Discovery – #33
Motion to Stay – #33

Date:   April 24, 2018

David J. Bradley, Clerk

**HARVEST_RDR_000316**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC.,** | § | |
| **and HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE MENDOZA GARCIA,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' AMENDED CERTIFICATE OF PERSONS FINANCIALLY INTERESTED IN OUTCOME OF LITIGATION

By and through its undersigned counsel, Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V. hereby file this certificate, pursuant to the Court's order, "listing all person[s], associations of person, firms, partnerships, corporations, affiliates, parent corporations, or other entities that are financially interested in the outcome of this litigation."  Dkt. 8, ¶ 2.  Groups that "can be specified by a general description" are so identified, without listing all the individuals within said group.  *See id.*

1.  Harvest Natural Resources, Inc.[1]

2.  HNR Energia B.V.

3.  All current board members of Harvest Natural Resources, Inc. and HNR Energia B.V.

4.  Smyser Kaplan & Veselka LLP

5.  All named defendants and their counsel

6.  Angel Gonzalez Saltrón

7.  Patricia Piccinini Bergiante (a.k.a. Patricia Piccinini and Patricia Piccinini de Garcia)

---

[1] Harvest Natural Resources, Inc. previously was listed on the New York Stock Exchange.  On May 4, 2017, the entity dissolved, and the listing of its common stock on the NYSE was terminated.

744964.1

**HARVEST_RDR_000317**

8.  Chevron Corporation, Chevron Global Technology Services Company, and Chevron Venezuela Holdings LLC

9.  Alireza Moshiri (a.k.a. Ali Reza Moshiri and Ali Moshiri)

Respectfully Submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

/s/ Craig Smyser
Craig Smyser (Fed. Bar No. 848)
*Attorney-in-Charge*
Dane Ball (Fed. Bar No. 784400)
Ty Doyle (Fed. Bar No. 1373873)
Anthony J. Phillips (Fed. Bar No. 1123515)
Alexander M. Wolf (Fed. Bar No. 2470631)
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS HARVEST NATURAL RESOURCES, INC. AND HNR ENERGIA B.V.**

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule 5.1 on the 25th day of April, 2018.

/s/ Alex Wolf
Alexander M. Wolf

744964.1

2

HARVEST_RDR_000318

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

Harvest Natural Resources, Inc., et al.

v.                                               Case Number: 4:18−cv−00483

Juan Jose Mendoza Garcia, et al.

---

## NOTICE OF RESETTING

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN RESET FOR THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Lee H Rosenthal

**PLACE:**
Courtroom 11B
United States District Court
515 Rusk Ave
Houston, TX

**DATE:** 4/30/2018

**TIME:** 03:00 PM

**TYPE OF PROCEEDING:** Motion Hearing
Emergency Motion – #33
Motion for Discovery – #33
Motion to Stay – #33

Date:   April 26, 2018

David J. Bradley, Clerk

HARVEST_RDR_000319

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.**, | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| | § | |
| *Defendants*. | § | |
| | § | |

## DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

HARVEST_RDR_000320

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................2

II.    FACTUAL ALLEGATIONS ...............................................................3

    A.    The Cast of Relevant Individuals and Entities. ....................................3

    B.    The FAC Centers on Conversations in Venezuela About Venezuelan Government Approval of the Sale of a Venezuelan Company to Foreign Buyers. .........................................................................................5

         1.    The First Alleged Payment Request. ................................................5

         2.    The Second Alleged Payment Request. .............................................6

III.   LEGAL ANALYSIS ............................................................................6

    A.    Plaintiffs Have Not Properly Pled a RICO Claim. ..............................6

         1.    Plaintiffs Lack Standing to Bring this Suit. ....................................7

         2.    Without an Ongoing and Continuous Threat, There is No RICO "Person," "Enterprise," or "Pattern." ..........................................8

         3.    Plaintiffs Failed to Allege Causation. ...........................................10

         4.    Plaintiffs Did Not Plead a Domestic RICO Injury. ......................11

         5.    Plaintiffs Have Not Pled a RICO Conspiracy. .............................12

    B.    Plaintiffs' Antitrust Claims Necessarily Fail. ....................................13

         1.    Plaintiffs Antitrust Claims are Partially Time Barred. ................13

         2.    Plaintiffs Lack Standing to Bring Antitrust Claims. ....................14

         3.    Plaintiffs Fail to Properly Plead a Contract, Combination, or Conspiracy. ....................................................................................15

    C.    Plaintiffs Fail to Allege That the Garcia Corporate Defendants Committed Any Act. ............................................................................16

IV.   CONCLUSION ..................................................................................16

HARVEST_RDR_000321

## TABLE OF AUTHORITIES

Page(s)

**State Cases**

*Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.,*
    500 S.W.3d 26 (Tex. App.—Houston [1st Dist.] 2016) ........................................15

*Maranatha Temple, Inc. v. Enter. Prod. Co.,*
    893 S.W.2d 92 (Tex. App.—Houston [1st Dist.] 1994) ........................................14

*Sw. Energy Prod. v. Berry-Helfand,*
    491 S.W.3d 699 (Tex. 2016) ........................................................................13

*Winston v. Am. Med. Int'l, Inc.,*
    930 S.W.2d 945 (Tex. App. 1996) ...............................................................13

**Federal Cases**

*Adhikari, et al. v. KBR, Inc., et al.,*
    No. 4:16-cv-2478, slip op. (S.D. Tex. Aug 12, 2016) ..........................................11

*Anza v. Ideal Steel Supply Corp.,*
    547 U.S. 451 (2006) ..................................................................................10

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ..................................................................................14

*Bell v. Dow Chem. Co.,*
    847 F.2d 1179 (5th Cir. 1988) ...............................................................13, 14

*Bridge v. Phoenix Bond & Indem. Co.,*
    553 U.S. 639 (2008) ............................................................................10, 11

*Chaney v. Dreyfus Serv. Corp.,*
    595 F.3d 219 (5th Cir. 2010) .....................................................................12

*Crowe v. Henry,*
    43 F.3d 198 (5th Cir. 1995) .......................................................................12

*Delta Truck & Tractor, Inc. v. J.I. Case Co.,*
    855 F.2d 241 (5th Cir. 1988) ....................................................................8, 9

*Eagle v. Star–Kist Foods, Inc.,*
    812 F.2d 538 (9th Cir. 1987) .....................................................................14

*Golden Bridge Tech., Inc. v. Motorola, Inc.,*
    547 F.3d 266 (5th Cir. 2008) ...............................................................14, 15

HARVEST_RDR_000322

*Heden v. Hill,*
    937 F. Supp. 1230 (S.D. Tex. 1996) ......................................................................8

*Hemi Grp., LLC v. N.Y.C.,*
    559 U.S. 1 (2010) .......................................................................................10

*Holmes v. Sec. Inv'r Prot. Corp.,*
    503 U.S. 258 (1992) ...................................................................................7

*In re Burzynski,*
    989 F.2d 733 (5th Cir. 1993) ...............................................................7, 8

*Jayco Sys., Inc. v. Savin Bus. Machs. Corp.,*
    777 F.2d 306 (5th Cir. 1985) ..............................................................14

*Monsanto Co. v. Spray–Rite Serv. Corp.,*
    465 U.S. 752 (1984) ...................................................................................15

*Nolen v. Nucentrix Broadband Networks, Inc.,*
    293 F.3d 926 (5th Cir. 2002) ..............................................................11

*RJR Nabisco, Inc. v. Eur. Cmty.,*
    136 S. Ct. 2090 (2016) ...........................................................................11

*Sedima, S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985) .....................................................................................6

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,*
    975 F.2d 1134 (5th Cir. 1992) .......................................................12, 13

*Torres v. S.G.E. Mgmt., L.L.C.,*
    838 F.3d 629 (5th Cir. 2016) ..............................................................10

*Varela v. Gonzales,*
    773 F.3d 704 (5th Cir. 2014) ..............................................................10

*Walker v. Beaumont Indep. Sch. Dist.,*
    No. 1:15-cv-3792016, 2016 WL 6666828 (E.D. Tex. Mar. 11, 2016) ...................12

*World of Faith World Outreach Ctr. Church, Inc. v. Sawyer,*
    90 F.3d 118 (5th Cir. 1996) ...................................................................9

**Federal Rules**

Federal Rule of Civil Procedure 12 ...............................................................2, 16

**State Statutes**

Tex. Bus. & Com. Code Ann. § 15.05 (2017) ...........................................13, 14, 15

HARVEST_RDR_000323

Tex. Bus. & Com. Code Ann. § 15.25 (2017) ...................................................13

Tex. Civ. Prac. & Rem. Code § 16.003 (2017) ................................................13

**Federal Statutes**

15 U.S.C. § 1 (2018) ..................................................................................13, 14

15 U.S.C. § 2 (2018) ........................................................................................13

15 U.S.C. § 15 (2018) ......................................................................................13

18 U.S.C. § 1864 (2018) ..................................................................................10

18 U.S.C. § 1962 (2018) ...........................................................................6, 7, 10

iv

**HARVEST_RDR_000324**

## I.    INTRODUCTION

Defendant Juan José Garcia Mendoza ("Garcia") and the Garcia Corporate Defendants[1] move this Court to dismiss this case with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") because Plaintiffs Harvest Natural Resources, Inc. ("Harvest") and HNR Energia, B.V. ("HNR") have failed to state a viable claim for relief against them.

Taking the allegations in the First-Amended Complaint ("FAC") as true, this dispute involves an alleged conspiracy that took place entirely in Venezuela. The supposed co-conspirators are Venezuelan individuals.  The supposed victims are Venezuelan, Dutch, and Indonesian companies.  The supposed bribes were never paid, and were allegedly orchestrated by Venezuelan government officials who are no longer in their positions of power.  The only party with any arguable connection to Texas is Harvest, which is remotely affiliated with the transactions at issue, and which used to have an office in the Houston area.[2]

The Garcia Corporate Defendants, in particular, should be dismissed from this case because there is no viable claim of any kind asserted against them.  The FAC introduces them as Defendants in the lawsuit, makes a conclusory and unsupported allegation that they are "conduits for illegal activity," and never mentions them again.  These entities are not alleged to have played any role in the transactions at issue.

Plaintiffs, furthermore, fail to assert any viable legal claims against Garcia (and, again, the Garcia Corporate Defendants).  First, Plaintiffs fail to state their RICO claims because Plaintiffs (1) do not have standing under RICO; (2) have not pled a RICO person, enterprise, or pattern; (3) fail to plead causation; (4) have not alleged a domestic injury under RICO; and (5)

---

[1] The Garcia Corporate Defendants are (1) Azure 904, LLC; (2) Petroconsultores, Inc.; (3) Petroconsultores (Barbados), Ltd.; (4) Petro Consultores, S.C.; and (5) Petro Consultores International Trading Company, Inc.

[2] The Court lacks personal jurisdiction over Garcia or the Garcia Corporate Defendants.  *See* Def.'s Mot. to Dismiss, ECF No. 32.  By filing this Motion under Rule 12(b)(6), neither Defendant Garcia nor the Garcia Corporate Defendants waive their challenges to personal jurisdiction.

HARVEST_RDR_000325

do not properly plead a RICO conspiracy.  Second, Plaintiffs fail to state their antitrust claims because Plaintiffs (1) brought their claims past the applicable limitations period; (2) do not have standing to bring antitrust claims; and (3) failed to properly plead a contract, combination, or conspiracy.  This Court should dismiss all of Plaintiffs' claims against Garcia and the Garcia Corporate Defendants accordingly.

## II.    FACTUAL ALLEGATIONS

### A.        The Cast of Relevant Individuals and Entities.

Because the FAC references a large number of individuals and entities, a brief introduction is warranted.

1.      Plaintiff Harvest Natural Resources, Inc., is a Delaware corporation that Plaintiffs state "operated at all times with its principal place of business in Houston, Texas."  FAC at ¶¶ 3, 17.  Harvest dissolved in May 2017, and now exists solely for the purposes of prosecuting lawsuits and closing its business.  FAC at ¶ 19.

2.      Plaintiff HNR Energia, B.V., is a Curacao company and wholly-owned subsidiary of Harvest.  *Id.* at ¶ 4.  During the timeframe relevant to the FAC, HNR conducted business in Venezuela.  *Id.* at ¶¶ 18–19.

3.      Non-party Harvest-Vinccler Dutch Holding, B.V. ("H-V Dutch Holding"), is a Netherlands company with its principal place of business in the Netherlands.  *Id*. at ¶ 19.  However, during the timeframe relevant to the FAC, H-V Dutch Holding conducted business in Venezuela.  *Id.* at ¶ 18.  HNR owns 80% of H-V Dutch Holding.  *Id.*

4.      Non-party Juan Francisco Clerico ("Clerico") is a Venezuelan national and a director of Vinccler, S.A. ("Vinccler").  *Id.* at ¶ 25.  Vinccler, along with the Curacao company HNR, are the principles of H-V Dutch Holding.

HARVEST_RDR_000326

5.      Non-party Petrodelta, S.A. ("Petrodelta"), is a Venezuelan company with its principal place of business in Venezuela.  *Id.* at ¶ 18.   H-V Dutch Holding owns 40% of Petrodelta.  *Id*.  Corporacion Venezolana del Petroleo, a Venezuelan company that is a subsidiary of PDVSA (the Venezuelan national oil company), owns the other 60% of Petrodelta.  *Id.*

A chart showing how the relevant parties are owned is shown in Diagram 1 below:

### DIAGRAM 1



6.      Defendant Juan-José Mendoza Garcia ("Garcia") is a Venezuelan national.  *Id.* at ¶ 7.  During the time specified in the FAC, Garcia worked as a consultant in the oil and gas industry for companies that do business in Venezuela.  *Id.*

7.      Defendants Rafael Dario Ramirez Carreno ("Ramirez"), Eulogio Antonio Del Pino Diaz ("Del Pino"), and Jose Angel Gonzalez Acosta ("Gonzalez") are/were executives of

HARVEST_RDR_000327

the Venezuelan State-owned oil company, PDVSA, and Venezuelan government officials, during the time period specified in the FAC. *Id.* at ¶¶ 8–10.[3]

**B.     The FAC Centers on Conversations in Venezuela About Venezuelan Government Approval of the Sale of a Venezuelan Company to Foreign Buyers.**

8.     The FAC focuses on the sale by H-V Dutch Holding (a Netherlands company doing business in Venezuela) of its 40% interest in Petrodelta (a Venezuelan joint venture doing business in Venezuela).

*1.     The First Alleged Payment Request.*

9.     In 2012, H-V Dutch Holding attempted to sell its interest in Petrodelta to Pertamina, an Indonesian State-owned company. FAC at ¶ 19. Because Petrodelta was owned 60% by the Venezuelan government, and because Pertamina was an Indonesian State-owned company, both the Venezuelan and Indonesian governments were required to approve the sale of Petrodelta. *Id.*

10.     The FAC alleges that, in November 2012, Garcia approached Clerico (a Venezuelan national and a director of H-V Dutch Holdings) in Caracas, Venezuela, and stated that the Venezuelan government would approve the sale of Petrodelta in exchange for a sum of money. *Id.* at ¶ 25.

11.     In late November or early December 2012, Pertamina allegedly informed Harvest's CEO that Pertamina had received a similar demand from Garcia. *Id*. at ¶ 27. The FAC does not identify the location or other details of the supposed communication from Garcia. *Id*. at ¶¶ 26–27, 31–32. The alleged bribe was never paid. *Id.* at ¶¶ 31–32.

---

[3] As of the date of this filing, the Court's docket sheet does not indicate that any of these three individuals have made an appearance in this case so far. Indeed, Plaintiffs have not even requested issuance of a summons to serve Defendants Del Pino or Gonzalez. *See* ECF Nos. 2–6, 15–19.

HARVEST_RDR_000328

12.     On February 20, 2013, Harvest announced the termination of its sale of Petrodelta to Pertamina, apparently after the Indonesian government had communicated its rejection of sale. *See id.* at ¶ 33.

### 2.     *The Second Alleged Payment Request.*

13.     In December 2013, HNR allegedly entered into an agreement to sell its Venezuelan holdings to Petroandina Resources Corporation, N.V. ("Petroandina Corp."), and its parent company, Pluspetrol Resources Corporation, B.V. ("Pluspetrol Corp.").  *Id*. at ¶¶ 36–37. Both Petroandina and Pluspetrol are Netherlands companies.  *See id.* at ¶ 37.

14.     Non-party Javier Alfredo Iguacel ("Iguacel"), a Pluspetrol employee, allegedly informed Harvest's CEO in "approximately fall 2014" that Garcia demanded a bribe in order for the Venezuelan government to approve the Petroandina Deal.  *Id*. at ¶ 39.  Plaintiffs do not identify the date that this supposed demand occurred, where it occurred, or who was present.

15.     On January 1, 2015, HNR terminated the Petroandina Deal.  *Id*. at ¶ 42.  No alleged bribe was paid.  *Id.* at ¶ 39.

## III.     LEGAL ANALYSIS

### A.     Plaintiffs Have Not Properly Pled a RICO Claim.

Plaintiffs in this case assert two RICO claims: (1) Count One under 18 U.S.C. § 1962(c) (2018), which makes it unlawful for a person employed by or associated with an enterprise to conduct or participate in conducting the affairs of such enterprise through a pattern of racketeering activity; and (2) Count Two under 18 U.S.C. § 1962(d), civil conspiracy to commit the primary RICO violation asserted in Count One.  FAC at ¶¶ 76–97.  Because Plaintiffs have not alleged a domestic injury under RICO and Plaintiffs have not sufficiently alleged a RICO person, enterprise, or pattern, neither of Plaintiffs' RICO claims state a cause of action upon which relief may be granted and they should both be dismissed with prejudice.

6

### 1.      *Plaintiffs Lack Standing to Bring this Suit.*

A "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  However, "'[a] defendant who violates [RICO] is not liable for [] damages to everyone he might have injured by other conduct . . . .'" *Id.* at 496–97 (quoting *Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*, 747 F.2d 384, 398 (7th Cir. 1984)).

In *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 261 (1992), for example, the plaintiff corporation alleged that the defendant engaged in a stock manipulation scheme that forced the plaintiff to liquidate two of its broker-dealers.  The Supreme Court, nevertheless, held that because the plaintiff corporation's claims were "purely contingent on the harm suffered by the broker-dealers" the plaintiff lacked standing because the alleged RICO violation (i.e., stock manipulation) was "too remote" from the harm.  *Id.* at 271.

Plaintiffs in this case are also 'too remote' from any alleged RICO violations to have standing to bring this suit.  The allegations in the FAC concern the sale of a Venezuelan company, Petrodelta, in which non-party H-V Dutch Holdings owned a minority interest.  *Id*. at ¶ 18.  As explained in the FAC, Plaintiff HNR is a partial owner of H-V Dutch Holding.  *Id.* at ¶ 18.  Plaintiff Harvest, which formally dissolved almost a year ago, owned HNR.  *Id.* at ¶ 3. Therefore, similar to the plaintiff in *Holmes*, Plaintiffs seek standing in this case 'purely contingent' on the harm suffered by entities that they have an interest in through a series of corporate intermediaries.  Indeed, Plaintiffs alleged injuries cannot be separated from those that could be alleged by H-V Dutch Holding.  As such, this Court should dismiss Plaintiffs' RICO claims with prejudice for want of standing.

HARVEST_RDR_000330

2.      *Without an Ongoing and Continuous Threat, There is No RICO "Person," "Enterprise," or "Pattern."*

Among other things, RICO makes it unlawful for "a person who is employed by or associated with an enterprise" to "conduct the enterprise's affairs through a pattern of racketeering" or to conspire to do the same.  18 U.S.C. § 1962(c)–(d).  Three common elements are required in any civil RICO claim: (1) a *person* who engages in, (2) a *pattern of racketeering activity*, (3) connected to the acquisition, establishments conduct, or control of an *enterprise*.  *In re Burzynski*, 989 F.2d 733, 741 (5th Cir. 1993) (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)).

Each of the three common elements of a civil RICO claim, however, require that the underlying allegations have some form of continuous or ongoing threat: (1) A RICO person must "pose[] or [have] posed a continuous threat of engaging in acts of racketeering."  *Delta*, 855 F.2d at 242 ("The continuous threat requirement may not be satisfied if no more is pled than that the person has engaged in a limited number of predicate racketeering acts.").  (2) "To prove a pattern of racketeering activity a plaintiff must show that the predicate acts . . . either constitute or threaten long-term continued criminal activity."  *Burzynski*, 989 F.2d at 742 (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989)); *see Heden v. Hill*, 937 F. Supp. 1230, 1244–45 (S.D. Tex. 1996).  (3) Establishing an association-in-fact enterprise requires a plaintiff to show "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit."  *Atkinson*, 808 F.2d at 440 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see Delta*, 855 F.2d at 244 ("[T]he enterprise must not be one that briefly flourishes and fades.").

Plaintiffs have not demonstrated any such continuing threat here.  At best, Plaintiffs' allege facts surrounding a discrete, single transaction — namely, H-V Dutch Holding's

8

attempted sale of its 40% interest in Petrodelta to two different buyers.  *See* FAC at ¶ 1. According to the FAC, the sale was consummated October of 2016, though not at the price that Plaintiffs wanted.  *Id.* at ¶¶ 44, 47.

Even assuming Plaintiffs' allegations are true, there is no threat of continuing racketeering activity.  As Plaintiffs themselves pled, the three individuals at Venezuela's Oil Ministry, who purportedly had the power to withhold approval of contracts, are no longer in those positions.  FAC at ¶¶ 8–10, 52, 55.  Plaintiffs, in fact, concede the absence of an ongoing threat, stating, "[n]o bribe demands were made during this third and final attempted sale. Defendant Ramirez had left PDVSA after the second attempted sale, and thus was no longer PDVSA's President . . . ."  *Id.* at ¶ 45.

Moreover, Plaintiffs' citation to civil and criminal investigations in both the United States and Venezuela are unrelated to Garcia and the Garcia Corporate Defendants, *see* FAC at ¶¶ 50–69, nor does it establish continuity under RICO.  *World of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 124 (5th Cir. 1996) ("Pleading the mere existence of lawsuits is not the same as pleading the facts that demonstrate predicate illegal acts as the defendant's regular way of doing business.") (dismissing RICO claims for lack of continuity).  In the absence of factual allegations that demonstrate that Garcia or the Garcia Corporate Defendants pose a continuous or ongoing threat, Plaintiffs have not alleged a RICO person, pattern, or enterprise. Plaintiffs' RICO claims, accordingly, should be dismissed.

Indeed, Fifth Circuit precedent calls for dismissal.  In *Delta Truck & Tractor*, the Fifth Circuit affirmed the trial court's dismissal of the plaintiff's RICO claims for failure to state a claim, despite the fact that the three separate defendants allegedly committed "numerous acts of mail and wire fraud" to appropriate the assets of over 400 franchises following a merger, because

HARVEST_RDR_000332

"the pleadings [did] not assert that the [] defendants posed a continuous threat as RICO persons."

855 F.2d at 244.  In reasoning, the Court explained that there was no ongoing threat because the

"multiple acts of fraud [] were part and parcel of a single, discrete and otherwise lawful

commercial transaction."  *Id.* at 244.  With the alleged sale of Petrodelta complete, the Court

here should follow Fifth Circuit precedent and dismiss Plaintiffs' RICO claims with prejudice.

### 3.    *Plaintiffs Failed to Allege Causation.*

To properly plead a claim, the RICO statute requires a plaintiff to show that they have

been injured "by reason of" a violation of one of the RICO statute's criminal prohibitions.  18

U.S.C. § 1864(c) (2018); *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016).

Under the Supreme Court's interpretation of the RICO statute, a plaintiff must establish both

"but-for cause" and "proximate cause."  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639,

654 (2008).  Proximate cause "should be evaluated in light of its common-law foundations [and]

. . . requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"

*Hemi Grp., LLC v. N.Y.C*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268).  "When a

court evaluates a RICO claim for proximate causation, the central question it must ask is whether

the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*,

547 U.S. 451, 461 (2006).  A court, furthermore, "need not accept [] conclusory allegations [of

causation] as true."  *Varela v. Gonzales*, 773 F.3d 704, 710 (5th Cir. 2014).

In the FAC, Plaintiffs allege that they were injured because H-V Dutch Holding had to

sell Petrodelta at an amount less than what they had allegedly negotiated with other buyers.  FAC

at ¶¶ 43–47.  Plaintiffs' allegations, nevertheless, consist of only conclusory statements.  For

example, "[a]s a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c),

Harvest was injured in its business and property . . . . Harvest lost two deals to sell its assets . . .

and as a result, was forced to sell those same assets at a significant loss."  FAC at ¶ 84.  At the

10

same time, however, Plaintiffs also include in their FAC that the first attempted sale of Petrodelta required approval by Indonesia's government. *Id.* at ¶ 19. Notably, Plaintiffs do not allege that H-V Dutch Holding secured such approval.

In fact, in both of the attempted sales that the Defendants allegedly "thwarted," Plaintiffs willingly admit that Plaintiffs themselves terminated the deals. *Id.* at ¶¶ 33 ("Harvest announced the termination of the Pertamina Deal."), 42 ("Harvest exercised its right through HNR Energia to terminate the share purchase agreement for the Petroandina Deal in accordance with the Deal's terms."). The Supreme Court has definitively required plaintiffs to establish both but-for and proximate cause. *Bridge*, 553 U.S. at 654. The FAC does neither and should be dismissed with prejudice.

### 4.     *Plaintiffs Did Not Plead a Domestic RICO Injury.*

RICO applies only to "a *domestic* injury to [a plaintiff's] business or property." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2106 (2016). In determining whether an injury is foreign or domestic, courts look to "the location where the injury was suffered, not where it was caused . . . ." *Adhikari, et al. v. KBR, Inc., et al.*, No. 4:16-cv-2478, slip op. at 10 (S.D. Tex. Aug 12, 2016) (citing *RJR Nabisco*, 136 S. Ct. at 2111). Without a domestic injury, a plaintiff's RICO claim necessarily fails. *Id.*

Plaintiffs here have not alleged a domestic injury. The fact that Harvest owned HNR (a Curacao company), and HNR had a partial interest in H-V Dutch Holding (a Venezuelan company) does not make any alleged suffered a domestic injury. The alleged bribe was communicated by one Venezuelan to another Venezuelan in Venezuela. The supposed bribe was going to be paid to Venezuelan government officials. The supposed bribe was purportedly to gain Venezuelan government approval of H-V Dutch Holding's interest in Petrodelta to

HARVEST_RDR_000334

Pertamina, an Indonesian company.   There is simply no domestic injury that is (or can be) alleged here.

### 5.   *Plaintiffs Have Not Pled a RICO Conspiracy.*

Because Plaintiffs have failed to state viable claims for alleged primary RICO violations, their RICO conspiracy claims necessarily fail, too.  *See Nolen v. Nucentrix Broadband Networks, Inc.*, 293 F.3d 926, 930 (5th Cir. 2002) (upholding dismissal of a RICO conspiracy claim based on failure to plead a substantive RICO violation).   Nonetheless, even if the Court finds that Plaintiffs successfully pled a RICO claim, the Court should still dismiss Plaintiffs' RICO conspiracy claim for failure to allege a sufficient agreement to support a conspiracy.

To establish a RICO conspiracy, Plaintiffs must plead (1) that two or more people agreed to a commit a substantive RICO offense; and (2) that the defendants knew of and agreed to the overall objective of the RICO offense.  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).  "A person cannot be held liable for a RICO conspiracy merely by evidence that he associated with other conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul."  *Id*.  An actionable conspiracy requires that the alleged conspirator "at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor."  *Id*. (citations omitted).

Thus, "the core of a RICO civil conspiracy is an agreement to commit predicate acts," and the plaintiff must "allege specifically such an agreement."  *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140–41 (5th Cir. 1992).  Conclusory allegations of an agreement are insufficient, and the plaintiff must allege specific facts "implying [any] agreement to commit predicate acts of racketeering."  *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995); *see Walker v. Beaumont Indep. Sch. Dist.*, No. 1:15-cv-3792016, WL 6666828, at \*16 (E.D. Tex. Mar. 11,

HARVEST_RDR_000335

2016) (dismissing a RICO conspiracy claim because plaintiff "pleads no facts whatsoever that [the defendants] knew of or agreed to a RICO conspiracy").

Plaintiffs in this case have not pled any specific agreement to commit a RICO offense between Garcia, the Garcia Corporate Defendants, or any other person or entity. Plaintiffs' conspiracy claim, instead, is comprised of speculative quotations from newspapers and conclusory allegations. Such allegations are nowhere near sufficient to meet the Fifth Circuit's requirement that Plaintiffs "allege specifically" an agreement to violate RICO. *See Tel-Phonic*, 975 F.2d at 1140–41. This Court, then, should dismiss Plaintiffs' RICO conspiracy claim against Garcia and the Garcia Corporate Defendants.

### B.     Plaintiffs' Antitrust Claims Necessarily Fail.

Plaintiffs also allege three antitrust claims against Garcia and the Garcia Corporate Defendants: (1) the Sherman Act, 15 U.S.C. § 1 (2018); (2) the Robinson-Patman Act, 15 U.S.C. § 2 (2018); and (3) The Texas Free Enterprise and Antitrust Act ("TFEAA"), Tex. Bus. & Com. Code Ann. § 15.05(a) (2017). FAC at ¶¶ 98–116. Plaintiffs, however, have not only brought their claims past the applicable limitations periods, but Plaintiffs also do not have standing to bring antitrust claims nor have they pled the existence of an antitrust conspiracy, combination, or agreement. All three of Plaintiffs' antitrust claims, thus, fail and should be dismissed.[4]

#### 1.     *Plaintiffs Antitrust Claims are Partially Time Barred.*

The limitations period for Plaintiffs' antitrust claims is four years after the cause of action accrued. 15 U.S.C. § 15 (2018); Tex. Bus. & Com. Code Ann. § 15.25(a) (2017); Tex. Civ. Prac. & Rem. Code § 16.003(a) (2017). An antitrust cause of action accrues each time a defendant

---

[4] Because the TFEAA is "taken from" federal antitrust law, Texas courts "look to federal judicial interpretations . . . ." *Winston v. Am. Med. Int'l, Inc.*, 930 S.W.2d 945, 951 (Tex. App. 1996). Defendants, therefore, address all three claims together.

HARVEST_RDR_000336

commits an act that injures the plaintiff.  *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988); *see Sw. Energy Prod. v. Berry-Helfand*, 491 S.W.3d 699, 721 (Tex. 2016).

Here, Plaintiffs claim that the first alleged bribe demand from Garcia took place "in November or December 2012."  FAC at ¶¶ 27, 82.  The second in "fall 2014."  *Id.* at ¶¶ 39, 82.  After this, "[n]o bribe demands were made . . . ."  *Id.* at ¶ 45.  These alleged bribe demands were made of two separate purported possible purchasers.  *Id.* at ¶ 27, 39.  At minimum, then, the first alleged bribe demand cannot serve as a basis for Plaintiffs' antitrust claims because it is outside of the four-year limitations period.  Plaintiffs do not allege any concealment or other circumstance that would trigger the discovery rule or tolling.  Therefore, this Court should dismiss as time barred Plaintiffs' antitrust claims that accrued outside of the limitations period.

### 2.    *Plaintiffs Lack Standing to Bring Antitrust Claims.*

Whether a plaintiff has standing to bring an antitrust claim is the initial inquiry in antitrust cases.  *See Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 313 (5th Cir. 1985).  The issue of standing to bring an antitrust claim is a question of law.  *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir. 1987).  While harm to the plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, a court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 551 (1983).  To properly plead an antitrust injury for purposes of standing, a "plaintiff's injury must be the type that the antitrust laws were intended to prevent" — specifically, "consumers and competitors" of the defendant.  *Bell*, 847 F.2d at 1183 (citing *Associated Gen. Contractors*, 459 U.S. at 539); *see Maranatha Temple, Inc. v. Enter. Prod. Co.*, 893 S.W.2d 92, 105 (Tex. App.— Houston [1st Dist.] 1994).

HARVEST_RDR_000337

Plaintiffs have not pled an antitrust injury because they are not consumers or competitors of the Defendants.   Nowhere in the FAC do Plaintiffs allege that Harvest or HNR were competitors or consumers of any Defendant.   *See generally* FAC.   If anything, Plaintiffs allege that Pluspetrol, CT Energy, and Pertamina were consumers of HNR.   *Id.* at ¶¶ 19, 36, 44. Without being a consumer or competitor of the Defendants, Plaintiffs cannot maintain an antitrust injury and, therefore, do not have standing to bring this suit.   Absent standing, Plaintiffs cannot state an antitrust cause of action and their claims should be dismissed.

### 3.   *Plaintiffs Fail to Properly Plead a Contract, Combination, or Conspiracy.*

A necessary element to Plaintiffs' antitrust claims is a contract, combination, or conspiracy in restraint of trade or commerce.   15 U.S.C. § 1; Tex. Bus. & Com. Code Ann. § 15.05(a).   *See Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008). As such, a plaintiff must present evidence that a defendant engaged in concerted action, defined as having "a conscious commitment to a common scheme designed to achieve an unlawful objective."   *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).   "Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy . . . ."   *Golden Bridge Tech.*, 547 F.3d at 271. *See Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 500 S.W.3d 26, 48 (Tex. App.—Houston [1st Dist.] 2016) (finding that plaintiff did not state a TFEAA claim where it "point[ed] to no evidence supporting its claim there was any agreement to restrain trade in violation of Section 15.05(a).").

The FAC is glaringly devoid of any allegation that Garcia or the Garcia Corporate Defendants agreed to a common scheme to restrain trade or commerce.   At best, Plaintiffs state that "Defendants knowingly and voluntarily entered into a series of contracts, combinations, or

15

conspiracies in restraint of trade or commerce . . . ."  FAC at ¶¶ 99, 111.  Such conclusory allegations do not sufficiently state 'a conscious commitment to a common scheme designed to achieve an unlawful objective' and should be dismissed.

###### C.   Plaintiffs Fail to Allege That the Garcia Corporate Defendants Committed Any Act.

Plaintiffs do not plead any case-specific conduct by any of the Garcia Corporate Defendants.  Plaintiffs list the companies as parties, claim they are "conduits for illegal activity," and never mention them again.  FAC at ¶¶ 5–7.  Not once in the FAC do Plaintiffs allege that the Garcia Corporate Defendants, or anyone acting on their behalf, committed any act.[5]  Without more, Plaintiffs have failed to state any claim — RICO, antitrust, conspiracy, or otherwise — as to any of the Garcia Corporate Defendants.

### IV.   <u>CONCLUSION</u>

For the reasons stated above, Garcia and the Garcia Corporate Defendants respectfully request that this Court grant this Motion, dismiss all of Plaintiffs' claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6) with prejudice, and grant any further legal or equitable relief that this Court deems just.

Date:  April 30, 2018.

---

[5] Plaintiffs do not even attempt to establish a convention to collectively and generally plead acts on behalf of all "Defendants."  (Such general pleading, of course, would still not be sufficient.)

HARVEST_RDR_000339

Respectfully submitted,

*s/ Paul E. Coggins*

**Paul E. Coggins**
 *Attorney-in-Charge*
 Federal ID No. 33190
 State Bar No. 04500700
 PCoggins@LockeLord.com

**Kip Mendrygal**
 Federal ID No. 1026277
 State Bar No. 24041472
 KMendrygal@LockeLord.com

**"Mario" Hoang Nguyen**
 Federal ID No. 3173111
 State Bar No. 24105873
 Mario.Nguyen@LockeLord.com

**LOCKE LORD, LLP.**
 2200 Ross Avenue, Suite 2800,
 Dallas, Texas 75201
 T: (214) 740-8000
 F: (214) 740-8800

**ATTORNEYS FOR DEFENDANTS JUAN-JOSÉ MENDOZA GARCIA; PETRO CONSULTORES, S.C.; PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC.; PETROCONSULTORES (BARBADOS), LTD.; PETROCONSULTORES, INC.; and AZURE 904, LLC.**

## CERTIFICATE OF SERVICE

On April 30, 2018, I electronically submitted this Motion to Dismiss for Failure to State a Claim with the Clerk of Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court.  I certify that I have served all counsel and/or pro se parties of record electronically.

*s/ Kip Mendrygal*
Kip Mendrygal

HARVEST_RDR_000340

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.**, | § § § § | |
| *Plaintiffs*, | § § | |
| **vs.** | § § § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| *Defendants*. | § § § | |

### ORDER OF DISMISSAL

Defendant Juan José Garcia Mendoza ("Garcia") and Defendants Azure 904, LLC; Petroconsultores, Inc.; Petroconsultores (Barbados), Ltd.; Petro Consultores, S.C.; and Petro Consultores International Trading Company, Inc (collectively, the "Garcia Corporate Defendants") filed a Motion to Dismiss for Failure to State a Claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Garcia and the Garcia Corporate Defendants request dismissal of all claims against them in the above-captioned case with prejudice.

After considering the Record, the pleadings filed, the Motion to Dismiss, and Plaintiffs' Response, the Court finds that Plaintiffs have not stated a claim against Garcia or the Garcia Corporate Defendants upon which relief can be granted. As such, the Court **GRANTS** Defendants' Motion to Dismiss for Failure to State a Claim in all respects. Therefore,

1

HARVEST_RDR_000341

**THE COURT ORDERS** that all of Plaintiffs' claims against Defendant Garcia and the Garcia Corporate Defendants in this case are **DISMISSED WITH PREJUDICE** and that this is a **FINAL JUDGMENT** as to all claims asserted against Defendant Garcia and the Garcia Corporate Defendants in this case.

SIGNED on May ____, 2018, in Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

HARVEST_RDR_000342

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## SOUTHERN DISTRICT OF TEXAS

**Notice of Electronic Filing**

The following transaction was entered on 5/3/2018 at 2:10 PM CDT and filed on 4/30/2018

**Case Name:**      Harvest Natural Resources, Inc. et al v. Mendoza Garcia et al

**Case Number:**    4:18-cv-00483

**Filer:**

**Document Number:** 46(No document attached)

**Docket Text:**

**Minute entry for proceedings before the Hon. Lee H. Rosenthal. Motion hearing held on April 30, 2018. The court heard argument on the plaintiff's motion for jurisdictional discovery. The court took the matter under advisement. All deadlines are extended by 60 days. Appearances: Alexander Wolf/Dane Ball for Pltf. and Kiprian Mendrygal/Hoang Nguyen for Defts.(Court Reporter: K. Metzger), filed.(leddins, 4)**

**4:18-cv-00483 Notice has been electronically mailed to:**

Alexander Michael Wolf     awolf@skv.com, madams@skv.com, mary-adams-1752@ecf.pacerpro.com

Craig Smyser     csmyser@skv.com, craig-smyser-1952@ecf.pacerpro.com, tmatthies@skv.com

Hoang Ngoc Nguyen , Jr     mario.nguyen@lockelord.com

Kiprian E Mendrygal     kmendrygal@lockelord.com, hatchley@lockelord.com, vlong@lockelord.com

Paul E Coggins     pcoggins@lockelord.com, hatchley@lockelord.com, vlong@lockelord.com

**4:18-cv-00483 Notice has not been electronically mailed to:**

United States District Court
Southern District of Texas

**ENTERED**

May 11, 2018

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HARVEST NATURAL RESOURCES, INC., | § | |
| *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-483 |
| | § | |
| JUAN JOSE MENDOZA GARCIA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

**I.      Background**

In this lawsuit, Harvest alleges that in November 2012, Juan Jose Garcia Mendoza[1] approached Juan Francisco Clerico, a Harvest-Vinccler director, in Caracas, Venezuela, and demanded that Harvest pay a $10 million bribe as a condition to securing the Venezuelan government's approval of Harvest's planned sale of its stake in Petrodelta, a Venezuelan exploration and production company. *Id.* at ¶¶ 25.  Harvest alleges that Garcia had demanded similar bribes on two prior occasions from companies that had also entered into agreements to purchase Harvest's interests in Venezuela. *Id.* at ¶¶ 27, 39.  Harvest alleges that Garcia solicited these bribes "knowing and intending that the solicitation[s] would be conveyed to Harvest in Houston, Texas, and that any bribe, if paid, would necessarily come from Harvest's bank accounts in the United States." *Id.* at ¶¶ 25, 39.  Because Harvest and the purchasing companies refused to pay the bribes, the sales that

---

[1] Harvest alleges that Garcia "works as a consultant in the oil and gas industry for companies, including United States- and Texas-based companies, that conduct business in Venezuela.  Garcia is an owner, officer, and employee of Petro Consultores S.C., Petro Consultores International Trading Company, Inc., Petroconsultores (Barbados) Ltd., and Petroconsultores, Inc.  Garcia also was an owner and manager of Azure 904 LLC during the relevant timeframe."  (Docket Entry No. 14 at ¶ 7).

1

HARVEST_RDR_000344

had been publicly announced were thwarted. *Id.* at ¶¶ 32, 42.  Harvest alleges that its refusal to pay

the bribe made it unable to sell its Venezuelan assets for four years, and then only at a discount of

more than $470 million from the original deal.  *Id.* at ¶¶ 43-47.

Garcia's wife accepted service of process for him, and his sister accepted service as the

registered agent for two of the entity defendants, and Garcia waived service of process as to himself

and the entity defendants.  On April 13, 2018, all of these defendants moved to dismiss for lack of

personal jurisdiction, relying on Garcia's declaration.  (Docket Entry No. 32).  Harvest disputed

most, if not all, of Garcia's declaration and moved for jurisdictional discovery.  (Docket Entry No.

33).  On April 30, 2018, the court heard oral argument on Harvest's motion.  (Docket Entry No. 46).

The court took the issue under advisement and extended the deadlines by 60 days.

Based on the pleadings, the briefing, the record, the parties' arguments, and the applicable

law, the court grants Harvest's motion for jurisdictional discovery.  (Docket Entry No. 33).  The

parties have until **June 28, 2018**, to conduct discovery limited to the defendants' jurisdictional ties

and contacts.  Harvest may depose Garcia, and he must appear, but he may choose to appear in either

Miami, Florida, or Houston, Texas.  The deposition is to take place at a date, location, and time that

the parties agree to or that the court orders.

The parties must complete jurisdictional discovery by **July 6, 2018**.  Harvest must respond

to the defendants' motion to dismiss by **August 3, 2018**.  The defendants must file a reply by

**August 10, 2018**.  Oral argument will be held on **August 24, 2018**, at **1:00 p.m.**

## II.     The Legal Standard for Jurisdictional Discovery

A court may grant jurisdictional discovery when the plaintiff makes a "preliminary showing

of jurisdiction" over a defendant.  *See Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th

Cir. 2005) (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)).  A

HARVEST_RDR_000345

preliminary showing is less than a prima facie showing.  When the plaintiff makes a prima facie showing, jurisdictional discovery is unnecessary.  When the lack of personal jurisdiction is clear, discovery is also unnecessary.  *Kelly v. Syria Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (internal quotation marks omitted).  The Fifth Circuit "affirms denials of discovery on questions of personal jurisdiction in cases where discovery sought could not have added any significant facts."  *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000) (internal quotation marks omitted).

"If the plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between the party and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained."  *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 157 (3d Cir. 2010) (internal quotation marks and alterations omitted); *see also Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1235 (Fed. Cir. 2010) (in the Ninth Circuit, jurisdictional "discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary" (internal quotation marks omitted)).

## III.    Analysis

Harvest alleges the following:

25. In November 2012, Defendant Garcia approached Juan Francisco Clerico, a director of Harvest-Vinccler, S.A., in Caracas, Venezuela, regarding the agreed sale of Harvest's stake in Petrodelta.  Garcia informed Clerico that Garcia was speaking on behalf of Defendant Ramirez and at Ramirez's request. Garcia stated that Harvest must pay USD $10 million in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria.  Garcia solicited this bribe knowing and intending that the solicitation would be conveyed to Harvest in Houston, Texas, and that any bribe, if paid, would necessarily come from Harvest's bank accounts in the United States.
. . .

27. In late November or early December 2012, Pertamina informed Edmiston that

3

Pertamina had received a similar bribe demand from Defendant Garcia.  Pertamina also declined to pay the bribe.

. . .

35. Defendant Garcia visited Houston from October 10, 2013, to October 20, 2013.

. . .

39. In approximately fall 2014, Javier Alfredo Iguacel, Vice President of Business Development at Pluspetrol, informed Edmiston in Houston that he had been contacted by Defendant Garcia.  Yet again, Garcia demanded a bribe payment in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria. Garcia demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States.  Harvest and Pluspetrol refused to pay the bribe.

(Docket Entry No. 14 at ¶¶ 25, 27, 35, 39).

In its motion for jurisdictional discovery, Harvest asserts that Garcia's declaration contains misrepresentations that understate and distort his jurisdictional contacts.  (Docket Entry No. 33 at 2).  Specifically, Harvest argues that:

• Garcia removed facts from his website touting his and his companies' work for oil and gas companies such as Chevron, Shell, and Total, each of whom has operations in Texas, contrary to his statements that his entities had never done business with Texas, directly or indirectly (Docket Entry No. 32-1 at ¶ 8), and that he had never performed services for any Texas residents or entities registered to do business in Texas and had never conducted business with any Texas entities, *id.* at ¶ 9;

• Garcia omitted mentioning his United States residency in his declaration, *id.* at 1; and

• Garcia incorrectly stated that several of his entities are defunct, never conducted any actual business, or were failed business ventures that never got off the ground, *id.* at ¶¶ 8, 10–12.

(Docket Entry No. 33 at 5–9).

Harvest has sufficiently put at issue Garcia's credibility and pointed to facts that, while disputed, would make a preliminary showing of jurisdiction.  *Fielding*, 415 F.3d at 429.  Harvest seeks discovery into facts and issues that are reasonably particularized and that, if proved, would show the contacts between Garcia and the United States necessary for personal jurisdiction as to Harvest's Racketeer Influenced and Corrupt Organizations Act claim.

4

HARVEST_RDR_000347

The Fifth Circuit has held that "when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien*, 11 F.3d 1255, 1258 (5th Cir. 1994). Subsection (b) of the civil RICO section on service of process states:

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965.

"Although the Fifth Circuit has not expressly decided this issue, many courts within this Circuit and elsewhere have concluded that RICO provides for nationwide service of process." *Dimas v. Vanderbilt Mortg. & Fin., Inc.*, No. CIV. A. C-10-68, 2010 WL 1875803, at *4 (S.D. Tex. May 6, 2010) (collecting cases); *Meganathan v. Signal Int'l L.L.C.*, No. 1:13-CV-497, 2014 WL 11512241, at *2 (E.D. Tex. July 3, 2014), *report and recommendation adopted*, No. 1:13-CV-497, 2014 WL 11512244 (E.D. Tex. Sept. 9, 2014) ([T]he majority of circuit courts have determined that § 1965(b) confers nationwide service of process in RICO cases."). Section 1965(b) permits service in "any judicial district" when "the ends of justice require it," suggesting nationwide service of process. This interpretation is consistent with congressional intent. H.R.Rep. No. 91-1549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4034 ("Subsection (b) provides nationwide service of process on parties, if the ends of justice require it, in actions under section 1964 [civil remedies].").

The court agrees that RICO allows for nationwide service of process. The question is whether the discovery Harvest seeks would suggest with reasonable particularity that Garcia has minimum contacts with the United States. *Busch*, 11 F.3d at 1258.

HARVEST_RDR_000348

A defendant has minimum contacts with a forum state if she or it "purposefully avails [her or] itself of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Minimum contacts are "subdivided into contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Oblio Telecom, Inc. v. Patel*, 711 F. Supp. 2d 668, 673 (N.D. Tex. 2008) (citing *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999). The information Harvest seeks could plausibly show either, or both.

Jurisdictional discovery may show that Garcia's contacts with Florida or another state are so "'continuous and systematic' as to render [him] essentially at home in the forum," subjecting him to jurisdiction in Texas under RICO. *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Operations v. Brown*, 131 S. Ct. 2846, 2851 (2011)). Although "[t]he 'continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum,'" *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Submersible Sys. Inc. v. Perforadora Cent., S.A.*, 249 F.3d 413, 419 (5th Cir. 2001)), Harvest has made a showing that Garcia resided and operated business entities out of Florida, which could establish the requisite continuous and systematic contacts.

Jurisdictional discovery may show that Garcia "purposefully directed [his] activities at [Texas] and [that] the litigation results from alleged injuries that arise out of or relate to those activities." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008). Though specific jurisdiction requires that the defendant's contacts with the forum be more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person," even "isolated or sporadic contacts" can support specific jurisdiction "so long as the plaintiff's claim relates to or arises out of those contacts." *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498-99

HARVEST_RDR_000349

(5th Cir. 2012) (internal quotation marks omitted).  Harvest alleges that Garcia "kn[ew] and intend[ed] that [his] solicitation would be conveyed to Harvest in Houston, Texas, and that any bribe, if paid, would necessarily come from Harvest's bank accounts in the United States." (Docket Entry No. 14 at ¶ 25).  Although Garcia's connection to Texas may be too attenuated to confer specific jurisdiction—Garcia allegedly bribed Harvest-Vinccler, a Dutch company, largely owned by HNR Energia, a Curacao company, which was owned by Harvest—if discovery establishes that Garcia's bribe solicitation was an intentional tort directed at Texas, that may suffice.  *See Lewis Fresne*, 252 F.3d 352, 358–59 (5th Cir. 2001) (citing *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir.1999)).  "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien*, 195 F.3d at 213.

Harvest has made a sufficient showing that Garcia's declaration may misrepresent, distort, or conceal Garcia's contacts with the United States.  (Docket Entry No. 33 at 4–11).  Harvest has put Garcia's credibility and knowledge directly at issue, and Harvest is not "in a position to test [that] credibility and knowledge."  Harvest has met its burden to make a preliminary showing of jurisdiction to warrant jurisdictional discovery. *Fielding*, 415 F.3d at 429.  Harvest has "present[ed] factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts" between Garcia and Texas or Florida or both, under more than one theory of specific or general jurisdiction. *Eurofins Pharma*, 623 F.3d at 157.  The motion for jurisdictional discovery is granted.

## IV.    Conclusion

Harvest's motion for jurisdictional discovery, (Docket Entry No. 33), is granted.  The parties have until **June 28, 2018**, to conduct jurisdictional discovery limited to the defendants' jurisdictional ties and contacts.  Harvest may depose Garcia, and he must appear, but he may choose to appear in

HARVEST_RDR_000350

either Miami, Florida, or Houston, Texas.  The parties must have completed jurisdictional discovery by **July 6, 2018**.  Harvest must respond to the defendants' motion to dismiss by **August 3, 2018**; the defendants must reply by **August 10, 2018**; and oral argument will be held on **August 24, 2018**, at **1:00 p.m.** in Courtroom 11-B.

SIGNED on May 11, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

HARVEST_RDR_000351

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.**, | § § § § | |
| *Plaintiffs*, | § § | |
| **vs.** | § § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| *Defendants*. | § § § | |

## JOINT MOTION TO ENTER AGREED PROTECTIVE ORDER

Plaintiffs Harvest Natural Resources, Inc., and HNR Energia, B.V. (collectively, "Plaintiffs"), and Defendants Juan José Garcia Mendoza; Azure 904, LLC; Petroconsultores, Inc.; Petroconsultores (Barbados), Ltd.; Petro Consultores, S.C.; and Petro Consultores International Trading Company, Inc. (collectively, the "Garcia Defendants"), jointly file this Motion to Enter an Agreed Protective Order pursuant to Federal Rule of Civil Procedure 26(c). The Parties have conferred and agreed upon the terms of a protective order to protect and facilitate the exchange of information between the Parties during discovery in this matter. The Parties now respectfully request that this Court sign and enter the Agreed Protective Order, attached as Exhibit A, as an Order of this Court.

HARVEST_RDR_000352

Dated: May 21, 2018.

Respectfully submitted,

_s/ Craig Smyser (MHN w/ permission)_      _s/ Paul E. Coggins_

Craig Smyser (Fed. Bar No. 848)        **Paul E. Coggins**
_Attorney-in-Charge_                       _Attorney-in-Charge_
Dane Ball (Fed. Bar No. 784400)        Federal ID No. 33190
Ty Doyle (Fed. Bar No. 1373873)        State Bar No. 04500700
Anthony J. Phillips (Fed. Bar No.        PCoggins@LockeLord.com
1123515)
Alexander M. Wolf (Fed. Bar No.        **Kip Mendrygal**
2470631)                                Federal ID No. 1026277
700 Louisiana, Suite 2300             State Bar No. 24041472
Houston, Texas 77002                KMendrygal@LockeLord.com
(713) 221-2300 (phone)
(713) 221-2320 (fax)                "**Mario**" Hoang Nguyen
csmyser@skv.com                    Federal ID No. 3173111
dball@skv.com                        State Bar No. 24105873
tydoyle@skv.com                   Mario.Nguyen@LockeLord.com
aphillips@skv.com
awolf@skv.com                    LOCKE LORD, LLP.
                                      2200 Ross Avenue, Suite 2800,
**ATTORNEYS FOR PLAINTIFFS**     Dallas, Texas 75201
**HARVEST NATURAL**            T: (214) 740-8000
**RESOURCES, INC., & HNR**       F: (214) 740-8800
**ENERGIA, B.V.**

                                      **ATTORNEYS FOR DEFENDANTS JUAN-JOSÉ MENDOZA GARCIA; PETRO CONSULTORES, S.C.; PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC.; PETROCONSULTORES (BARBADOS), LTD.; PETROCONSULTORES, INC.; & AZURE 904, LLC.**

## CERTIFICATE OF SERVICE

      I electronically submitted, via the Court's ECF filing system, the foregoing Joint Motion to the Clerk of the Court for the U.S. District Court of the Southern District of Texas on May, 21, 2018.  As such, I certify that I have served all counsel and parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                                       _s/ Mario H. Nguyen_
                                       Mario H. Nguyen

**HARVEST_RDR_000353**

# EXHIBIT A

HARVEST_RDR_000354

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § | Civil Action No. 4:18-cv-00483 |
| | § | |
| *Defendants*. | § | |

## AGREED PROTECTIVE ORDER

On February 16, 2018, Plaintiffs Harvest Natural Resources, Inc., and HNR Energia, B.V. (collectively, "Plaintiffs"), brought this action against Defendants Juan José Garcia Mendoza; Azure 904, LLC; Petroconsultores, Inc.; Petroconsultores (Barbados), Ltd.; Petro Consultores, S.C.; and Petro Consultores International Trading Company, Inc. (collectively, the "Garcia Defendants"), among others. ECF No. 1. The Court subsequently ordered the Garcia Defendants to engage in jurisdictional discovery on May 11, 2018. ECF No. 48. Now, Plaintiffs and the Garcia Defendants (collectively, "the Parties") agree, pursuant to Federal Rule of Civil Procedure 26(c) ("Rule 26(c)"), that the provisions of this Agreed Protective Order will govern the Parties' disclosure and use of all materials and information exchanged in this case.

1.      **Proceedings and Information Governed.**  This Protective Order applies to any document, information, or other tangible or intangible thing (collectively, "documents") furnished by a party to any other party, as well as documents furnished by non-parties who receive requests and/or subpoenas in connection with this action, if and when the documents are designated by a party or non-party as "Confidential Information" in accordance with the terms of this Protective Order.  This Protective Order also applies to copies, excerpts, abstracts, analyses, summaries, descriptions, or other forms of recorded information or data containing, reflecting, or disclosing all or parts of designated documents.

2.      **Designation and Maintenance of Documents and Information.**  "Confidential Information" designation means that the document contains sensitive personal information or commercial information not publicly known, in accordance with Rule 26(c)(7), or other information required by law or agreement to be kept confidential.  "Confidential Information" does not include, and this Protective Order does not apply to, documents already in the possession of the party to whom disclosure is made unless that party is already bound by an agreement or obligation not to disclose such information, or information that has been disclosed to the public or third persons in a manner making such information no longer confidential.

3.      **Documents Exchanged in Discovery.**  Documents and things produced during the course of this litigation within the scope of Paragraph 2 above may be designated by the producing party as containing "Confidential Information" by placing on each page and each thing a legend substantially as follows:

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

4.     **Depositions.**

a.   For deposition testimony or exhibits to be entitled to protection under this Order, a party must designate the testimony and exhibits disclosed at a deposition as "Confidential Information" by requesting the reporter to so designate the transcript or any portion of the transcript at the time of the deposition.

b.   If no such designation is made at the time of the deposition, any party has fourteen (14) days after delivery by the court reporter of the transcript of the deposition session to designate, in writing to the other parties and to the court reporter, what portions of the transcript and which exhibits the party designates as "Confidential Information."

c.   During the transcription and following fourteen (14) day period after a deposition session, the transcript and exhibits must be treated as Confidential Information, unless the disclosing party consents to less confidential treatment of the information.

d.   Each party and the court reporter must attach a copy of any final and timely written designation notice to the transcript and each copy of the transcript in its possession, custody or control, and the portions designated in such notice must thereafter be treated in accordance with this Protective Order. It is the responsibility of counsel for each party to maintain materials containing Confidential Information in a secure manner and appropriately identified so as to allow access to such information only to such persons and under such terms as is permitted under this Protective Order.

    e.   If no such designation is made at the deposition or within the fourteen (14) day period following delivery of the transcript, then the entire deposition will be considered devoid of Confidential Information.

    5.    **Inadvertent Failure to Designate.**   The inadvertent failure to designate a documents as "Confidential Information" will not be a waiver of a claim that the document contains confidential information, and will not prevent the producing party from designating such information as confidential at a later date in writing, so long as the designation is done with particularity.   In the event a producing party late designates a document as "Confidential Information," the document must be treated by the receiving party as confidential from the time of receipt of the notice of the "Confidential Information."

    6.    **Challenges to Designations.**  A party's designation of documents "Confidential Information" is not binding if the procedures below are followed:

    a.   A receiving party may challenge a producing party's designation at any time. Any receiving party may request in writing that the producing party change the designation. The producing party within fourteen (14) days after receipt of a written challenge, must advise the receiving party whether or not it will change the designation.

    b.   If the parties are unable to reach agreement after the expiration of this fourteen (14) day period, they shall confer. If they cannot resolve the issue, the receiving party may seek an order to alter the confidential status of the designated information.

    c.   Until the presiding judge has ruled on a dispute under this paragraph, the "Confidential Information" designation will remain in full force and effect, and the document continues to be protected by this Protective Order.

7.    **Disclosure and Use of Confidential Information.**

    a.   Information designated as "Confidential Information" may only be used for purposes of preparation, trial, and appeal of this action. "Confidential Information" may not be used under any circumstances for any other purpose.

    b.   Subject to Paragraph 9 below, "Confidential Information" may be disclosed by the receiving party only to the following individuals, provided that such individuals are informed of the terms of this Protective Order:

        i.   Employees of the receiving party who are required in good faith to provide assistance in the conduct of this litigation, including any settlement discussions, and who are identified as such in writing to counsel for the designating party in advance of the disclosure;

        ii.   In-house counsel who are identified by the receiving party;

        iii.   Outside counsel of record for the receiving party;

        iv.   Supporting personnel employed by (ii) and (iii), such as paralegals, legal secretaries, data entry clerks, legal clerks, and private photocopying services;

        v.   Experts or consultants; and

        vi.   Any persons requested by counsel to furnish services such as document coding, image scanning, mock trial, jury profiling, translation services,

court reporting services, demonstrative exhibit preparation, or the creation of any computer database from documents.

    c.  Counsel is responsible for the adherence by third-party vendors to the terms and conditions of this Protective Order.

8.    **Non-Party Information.**  The existence of this Protective Order must be disclosed to any person producing documents, tangible things, or testimony in this action who may reasonably be expected to desire confidential treatment for such documents, tangible things or testimony.  Any such person may designate documents, tangible things, or testimony confidential pursuant to this Protective Order.

9.    **Filing Documents with the Court.**  Any party may submit Confidential Information to the court under seal by designating the document "sealed" in the CM/ECF system of the court or may deliver the document for filing by the Clerk's Office.  If a party delivers a copy to the court, the document must be in a sealed envelope bearing the caption of this action and a label containing the following:

**CONFIDENTIAL INFORMATION**
***Harvest Nat. Res., Inc., et al., v. Garcia Mendoza, et al., Civ. A.
No. H-18-483 (S.D. Tex.)***
*This envelope, which is being filed under seal, contains documents
that are subject to a Protective Order governing the use of
confidential discovery material.*

10.   **No Prejudice.**  Producing or receiving "Confidential Information" or otherwise complying with the terms of this Protective Order, will not:

    a.  Operate as an admission by any party that any particular "Confidential Information" contains or reflects trade secrets or any other type of confidential or proprietary information;

HARVEST_RDR_000360

b.  Prejudice the rights of a party to object to the production of information or material that the party does not consider to be within the scope of discovery;

c.  Prejudice the rights of a party to seek a determination by the presiding judge that particular materials be produced;

d.  Prejudice the rights of a party to apply to the presiding judge for further protective orders; or

e.  Prevent the parties from agreeing in writing to alter or waive the provisions or protections provided for in this Protective Order with respect to any particular information or material.

11.  **Conclusion of Litigation.**  Within sixty (60) days after final judgment in this action, including the exhaustion of all appeals, or within sixty (60) days after dismissal pursuant to a settlement agreement, each party or other person subject to the terms of this Protective Order is under an obligation to destroy or return to the producing party all materials and documents containing "Confidential Information" and to certify to the producing party that this destruction or return has been done.  However, outside counsel for any party is entitled to retain all court papers, trial transcripts, exhibits, and attorney work provided that any such materials are maintained and protected in accordance with the terms of this Protective Order.

12.  **Other Proceedings.**  By entering this Protective Order and limiting the disclosure of information in this case, the presiding judge does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this Protective Order who may be subject to a motion to disclose another party's information designated "Confidential Information" pursuant to this Protective Order must

promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

     13.    **Remedies.**  It is **ORDERED** that this Protective Order will be enforced by the sanctions set forth in Federal Rule of Civil Procedure 37(a) and any other sanctions as may be available to the presiding judge, including the power to hold parties or other violators of this Protective Order in contempt.  All other remedies available to any person injured by a violation of this Protective Order are fully reserved.

     14.    **Relief from Protective Order.**  Any party may petition the presiding judge for good cause shown if the party desires relief from a term or condition of this Protective Order.

[Signature Page Follows]

**SO ORDERED.**

SIGNED on May _____, 2018, in Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

AGREED by and between on May 18, 2018:

| | |
|---|---|
| *s/ Craig Smyser (MHN w/ permission)* | *s/ Paul E. Coggins* |

Craig Smyser (Fed. Bar No. 848)
*Attorney-in-Charge*
Dane Ball (Fed. Bar No. 784400)
Ty Doyle (Fed. Bar No. 1373873)
Anthony J. Phillips (Fed. Bar No. 1123515)
Alexander M. Wolf (Fed. Bar No. 2470631)
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS HARVEST NATURAL RESOURCES, INC., & HNR ENERGIA, B.V.**

**Paul E. Coggins**
*Attorney-in-Charge*
Federal ID No. 33190
State Bar No. 04500700
PCoggins@LockeLord.com

**Kip Mendrygal**
Federal ID No. 1026277
State Bar No. 24041472
KMendrygal@LockeLord.com

**"Mario" Hoang Nguyen**
Federal ID No. 3173111
State Bar No. 24105873
Mario.Nguyen@LockeLord.com

Locke Lord, LLP.
2200 Ross Avenue, Suite 2800,
Dallas, Texas 75201
T: (214) 740-8000
F: (214) 740-8800

**ATTORNEYS FOR DEFENDANTS JUAN-JOSÉ MENDOZA GARCIA; PETRO CONSULTORES, S.C.; PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC.; PETROCONSULTORES (BARBADOS), LTD.; PETROCONSULTORES, INC.; & AZURE 904, LLC.**

HARVEST_RDR_000363

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V.,** | § § § | |
|  | § | |
| *Plaintiffs*, | § § | |
|  | § | |
| **vs.** | § § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
|  | § | |
| *Defendants*. | § § | |

**ORDER**

After considering the Parties' Joint Motion to Enter a Protective Order under Federal Rule of Civil Procedure 26(c), it is **ORDERED** that:

The Parties' Motion is **GRANTED**, and that the provisions of the Parties' Agreed Protective Order, as attached to their Motion, governs the Parties' disclosure and use of all materials and information exchanged in this case.

**SO ORDERED.**

SIGNED on May ____, 2018, in Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

1

HARVEST_RDR_000364

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC.,** | § | |
| **and HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE GARCIA MENDOZA,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' NOTICE OF ORAL/VIDEO DEPOSITION
OF JUAN JOSE GARCIA MENDOZA**

To:     Defendant, Juan Jose Garcia Mendoza, by and through his counsel of record, Locke Lord LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201.

PLEASE TAKE NOTICE that counsel for Plaintiffs, Harvest Natural Resources, Inc. and HNR Energia B.V., will take the oral and videotaped deposition of Juan Jose Garcia Mendoza on Thursday, June 7, 2018, at 9:30 a.m.

The deposition will take place at the offices of Locke Lord LLP, 600 Travis, Suite 2800, Dallas, Texas 77002.  The deposition will be recorded stenographically before a court reporter authorized to administer oaths, and will continue from day to day until completed.  The deposition will be videotaped.

750973.1

DATED:  May 22, 2018             Respectfully Submitted,

S‌MYSER K‌APLAN & V‌ESELKA, L.L.P.

/s/ Craig Smyser
Craig Smyser
Attorney-in-Charge
Fed. Bar No. 848
Dane Ball
Fed. Bar No. 784400)
Ty Doyle
Fed. Bar No. 1373873
Anthony J. Phillips
Fed. Bar No. 1123515
Alexander M. Wolf
Fed. Bar No. 2470631
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 221-2300
Fax: (713) 221-2320
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS
HARVEST NATURAL
RESOURCES, INC. AND HNR
ENERGIA B.V**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record via electronic service on May 22, 2018.

/s/ Dane Ball
Dane Ball

2

HARVEST_RDR_000366

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC.,** | § | |
| **and HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | CIVIL ACTION: 4:18-cv-00483 |
| **JUAN JOSE GARCIA MENDOZA,** *et al.* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' AMENDED NOTICE OF ORAL/VIDEO DEPOSITION
OF JUAN JOSE GARCIA MENDOZA**

To:     Defendant, Juan Jose Garcia Mendoza, by and through his counsel of record, Locke Lord LLP, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201.

PLEASE TAKE NOTICE that counsel for Plaintiffs, Harvest Natural Resources, Inc. and HNR Energia B.V., will take the oral and videotaped deposition of Juan Jose Garcia Mendoza on Thursday, June 7, 2018, at 9:30 a.m.

The deposition will take place at the offices of Locke Lord LLP, 600 Travis, Suite 2800, Houston, Texas 77002.  The deposition will be recorded stenographically before a court reporter authorized to administer oaths, and will continue from day to day until completed.  The deposition will be videotaped.

750973.1

DATED:  May 22, 2018

Respectfully Submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

*/s/ Craig Smyser*
Craig Smyser
*Attorney-in-Charge*
Fed. Bar No. 848
Dane Ball
Fed. Bar No. 784400)
Ty Doyle
Fed. Bar No. 1373873
Anthony J. Phillips
Fed. Bar No. 1123515
Alexander M. Wolf
Fed. Bar No. 2470631
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 221-2300
Fax: (713) 221-2320
csmyser@skv.com
dball@skv.com
tydoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS HARVEST NATURAL RESOURCES, INC. AND HNR ENERGIA B.V**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record via electronic service on May 22, 2018.

*/s/ Dane Ball*
Dane Ball

750973.1

HARVEST_RDR_000368

United States District Court
Southern District of Texas

**ENTERED**

May 22, 2018

David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA, B.V., | § § § § | |
| *Plaintiffs,* | § § § | |
| vs. | § § § | |
| JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA, | § § § § § § § § § § § § § | Civil Action No. 4:18-cv-00483 |
| *Defendants.* | § § | |

### AGREED PROTECTIVE ORDER

On February 16, 2018, Plaintiffs Harvest Natural Resources, Inc., and HNR Energia, B.V. (collectively, "Plaintiffs"), brought this action against Defendants Juan José Garcia Mendoza; Azure 904, LLC; Petroconsultores, Inc.; Petroconsultores (Barbados), Ltd.; Petro Consultores, S.C.; and Petro Consultores International Trading Company, Inc. (collectively, the "Garcia Defendants"), among others.  ECF No. 1.  The Court subsequently ordered the Garcia Defendants to engage in jurisdictional discovery on May 11, 2018.  ECF No. 48.  Now, Plaintiffs and the Garcia Defendants (collectively, "the Parties") agree, pursuant to Federal Rule of Civil Procedure 26(c) ("Rule 26(c)"), that the provisions of this Agreed Protective Order will govern the Parties' disclosure and use of all materials and information exchanged in this case.

HARVEST_RDR_000369

1.      **Proceedings and Information Governed.**  This Protective Order applies to any document, information, or other tangible or intangible thing (collectively, "documents") furnished by a party to any other party, as well as documents furnished by non-parties who receive requests and/or subpoenas in connection with this action, if and when the documents are designated by a party or non-party as "Confidential Information" in accordance with the terms of this Protective Order.  This Protective Order also applies to copies, excerpts, abstracts, analyses, summaries, descriptions, or other forms of recorded information or data containing, reflecting, or disclosing all or parts of designated documents.

2.      **Designation and Maintenance of Documents and Information.**  "Confidential Information" designation means that the document contains sensitive personal information or commercial information not publicly known, in accordance with Rule 26(c)(7), or other information required by law or agreement to be kept confidential.  "Confidential Information" does not include, and this Protective Order does not apply to, documents already in the possession of the party to whom disclosure is made unless that party is already bound by an agreement or obligation not to disclose such information, or information that has been disclosed to the public or third persons in a manner making such information no longer confidential.

3.      **Documents Exchanged in Discovery.**  Documents and things produced during the course of this litigation within the scope of Paragraph 2 above may be designated by the producing party as containing "Confidential Information" by placing on each page and each thing a legend substantially as follows:

**CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

*Agreed Protective Order (Civ. A. No. H-18-483)*
Page **2** of **9**

4.     **Depositions.**

a.  For deposition testimony or exhibits to be entitled to protection under this Order, a party must designate the testimony and exhibits disclosed at a deposition as "Confidential Information" by requesting the reporter to so designate the transcript or any portion of the transcript at the time of the deposition.

b.  If no such designation is made at the time of the deposition, any party has fourteen (14) days after delivery by the court reporter of the transcript of the deposition session to designate, in writing to the other parties and to the court reporter, what portions of the transcript and which exhibits the party designates as "Confidential Information."

c.  During the transcription and following fourteen (14) day period after a deposition session, the transcript and exhibits must be treated as Confidential Information, unless the disclosing party consents to less confidential treatment of the information.

d.  Each party and the court reporter must attach a copy of any final and timely written designation notice to the transcript and each copy of the transcript in its possession, custody or control, and the portions designated in such notice must thereafter be treated in accordance with this Protective Order. It is the responsibility of counsel for each party to maintain materials containing Confidential Information in a secure manner and appropriately identified so as to allow access to such information only to such persons and under such terms as is permitted under this Protective Order.

HARVEST_RDR_000371

e. If no such designation is made at the deposition or within the fourteen (14) day period following delivery of the transcript, then the entire deposition will be considered devoid of Confidential Information.

5. **Inadvertent Failure to Designate.** The inadvertent failure to designate a documents as "Confidential Information" will not be a waiver of a claim that the document contains confidential information, and will not prevent the producing party from designating such information as confidential at a later date in writing, so long as the designation is done with particularity. In the event a producing party late designates a document as "Confidential Information," the document must be treated by the receiving party as confidential from the time of receipt of the notice of the "Confidential Information."

6. **Challenges to Designations.** A party's designation of documents "Confidential Information" is not binding if the procedures below are followed:

a. A receiving party may challenge a producing party's designation at any time. Any receiving party may request in writing that the producing party change the designation. The producing party within fourteen (14) days after receipt of a written challenge, must advise the receiving party whether or not it will change the designation.

b. If the parties are unable to reach agreement after the expiration of this fourteen (14) day period, they shall confer. If they cannot resolve the issue, the receiving party may seek an order to alter the confidential status of the designated information.

*Agreed Protective Order (Civ. A. No. H-18-483)*
Page **4** of **9**

HARVEST_RDR_000372

c. Until the presiding judge has ruled on a dispute under this paragraph, the "Confidential Information" designation will remain in full force and effect, and the document continues to be protected by this Protective Order.

7. **Disclosure and Use of Confidential Information.**

a. Information designated as "Confidential Information" may only be used for purposes of preparation, trial, and appeal of this action. "Confidential Information" may not be used under any circumstances for any other purpose.

b. Subject to Paragraph 9 below, "Confidential Information" may be disclosed by the receiving party only to the following individuals, provided that such individuals are informed of the terms of this Protective Order:

   i. Employees of the receiving party who are required in good faith to provide assistance in the conduct of this litigation, including any settlement discussions, and who are identified as such in writing to counsel for the designating party in advance of the disclosure;

   ii. In-house counsel who are identified by the receiving party;

   iii. Outside counsel of record for the receiving party;

   iv. Supporting personnel employed by (ii) and (iii), such as paralegals, legal secretaries, data entry clerks, legal clerks, and private photocopying services;

   v. Experts or consultants; and

   vi. Any persons requested by counsel to furnish services such as document coding, image scanning, mock trial, jury profiling, translation services,

HARVEST_RDR_000373

court reporting services, demonstrative exhibit preparation, or the creation

of any computer database from documents.

   c.  Counsel is responsible for the adherence by third-party vendors to the terms and

conditions of this Protective Order.

   8.    **Non-Party Information.**   The existence of this Protective Order must be disclosed to any person producing documents, tangible things, or testimony in this action who may reasonably be expected to desire confidential treatment for such documents, tangible things or testimony.  Any such person may designate documents, tangible things, or testimony confidential pursuant to this Protective Order.

   9.    **Filing Documents with the Court.**  Any party may submit Confidential Information to the court under seal by designating the document "sealed" in the CM/ECF system of the court or may deliver the document for filing by the Clerk's Office.  If a party delivers a copy to the court, the document must be in a sealed envelope bearing the caption of this action and a label containing the following:

**CONFIDENTIAL INFORMATION**
***Harvest Nat. Res., Inc., et al., v. Garcia Mendoza, et al., Civ. A.***
***No. H-18-483 (S.D. Tex.)***
*This envelope, which is being filed under seal, contains documents*
*that are subject to a Protective Order governing the use of*
*confidential discovery material.*

   10.    **No Prejudice.**  Producing or receiving "Confidential Information" or otherwise complying with the terms of this Protective Order, will not:

   a.  Operate as an admission by any party that any particular "Confidential

Information" contains or reflects trade secrets or any other type of confidential or

proprietary information;

*Agreed Protective Order (Civ. A. No. H-18-483)*
Page **6** of **9**

HARVEST_RDR_000374

b.  Prejudice the rights of a party to object to the production of information or material that the party does not consider to be within the scope of discovery;

c.  Prejudice the rights of a party to seek a determination by the presiding judge that particular materials be produced;

d.  Prejudice the rights of a party to apply to the presiding judge for further protective orders; or

e.  Prevent the parties from agreeing in writing to alter or waive the provisions or protections provided for in this Protective Order with respect to any particular information or material.

11.  **Conclusion of Litigation.**  Within sixty (60) days after final judgment in this action, including the exhaustion of all appeals, or within sixty (60) days after dismissal pursuant to a settlement agreement, each party or other person subject to the terms of this Protective Order is under an obligation to destroy or return to the producing party all materials and documents containing "Confidential Information" and to certify to the producing party that this destruction or return has been done.  However, outside counsel for any party is entitled to retain all court papers, trial transcripts, exhibits, and attorney work provided that any such materials are maintained and protected in accordance with the terms of this Protective Order.

12.  **Other Proceedings.**  By entering this Protective Order and limiting the disclosure of information in this case, the presiding judge does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this Protective Order who may be subject to a motion to disclose another party's information designated "Confidential Information" pursuant to this Protective Order must

HARVEST_RDR_000375

promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

13.     **Remedies.**  It is **ORDERED** that this Protective Order will be enforced by the sanctions set forth in Federal Rule of Civil Procedure 37(a) and any other sanctions as may be available to the presiding judge, including the power to hold parties or other violators of this Protective Order in contempt.  All other remedies available to any person injured by a violation of this Protective Order are fully reserved.

14.     **Relief from Protective Order.**  Any party may petition the presiding judge for good cause shown if the party desires relief from a term or condition of this Protective Order.

[Signature Page Follows]

*Agreed Protective Order (Civ. A. No. H-18-483)*
Page **8** of **9**

HARVEST_RDR_000376

**SO ORDERED.**

SIGNED on May 22, 2018, in Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

AGREED by and between on May 18, 2018:

| | |
|---|---|
| *s/ Craig Smyser (MHN w/ permission)* | *s/ Paul E. Coggins* |
| Craig Smyser (Fed. Bar No. 848) | **Paul E. Coggins** |
| *Attorney-in-Charge* | *Attorney-in-Charge* |
| Dane Ball (Fed. Bar No. 784400) | Federal ID No. 33190 |
| Ty Doyle (Fed. Bar No. 1373873) | State Bar No. 04500700 |
| Anthony J. Phillips (Fed. Bar No. | PCoggins@LockeLord.com |
| 1123515) | |
| Alexander M. Wolf (Fed. Bar No. | **Kip Mendrygal** |
| 2470631) | Federal ID No. 1026277 |
| 700 Louisiana, Suite 2300 | State Bar No. 24041472 |
| Houston, Texas 77002 | KMendrygal@LockeLord.com |
| (713) 221-2300 (phone) | |
| (713) 221-2320 (fax) | **"Mario" Hoang Nguyen** |
| csmyser@skv.com | Federal ID No. 3173111 |
| dball@skv.com | State Bar No. 24105873 |
| tydoyle@skv.com | Mario.Nguyen@LockeLord.com |
| aphillips@skv.com | |
| awolf@skv.com | **LOCKE LORD, LLP.** |
| | 2200 Ross Avenue, Suite 2800, |
| **ATTORNEYS FOR PLAINTIFFS** | Dallas, Texas 75201 |
| **HARVEST NATURAL** | T: (214) 740-8000 |
| **RESOURCES, INC., & HNR** | F: (214) 740-8800 |
| **ENERGIA, B.V.** | |
| | **ATTORNEYS FOR DEFENDANTS JUAN-** |
| | **JOSÉ MENDOZA GARCIA; PETRO** |
| | **CONSULTORES, S.C.; PETRO** |
| | **CONSULTORES INTERNATIONAL** |
| | **TRADING COMPANY, INC.;** |
| | **PETROCONSULTORES (BARBADOS),** |
| | **LTD.; PETROCONSULTORES, INC.; &** |
| | **AZURE 904, LLC.** |

HARVEST_RDR_000377

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

FOR COURT USE ONLY

DUE DATE:

*Please Read Instructions:*

| | | |
|---|---|---|
| 1. NAME <br> Lee L. Kaplan | 2. PHONE NUMBER <br> (713) 221-2300 | 3. DATE <br> 5/3/2018 |

| | | | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL <br> 700 Louisiana, #2300; lkaplan@skv.com | 5. CITY <br> Houston | 6. STATE <br> TX | 7. ZIP CODE <br> 77002 |

| | | DATES OF PROCEEDINGS | |
|---|---|---|---|
| 8. CASE NUMBER <br> 4:18-cv-00483 | 9. JUDGE <br> Lee H. Rosenthal | 10. FROM 4/30/2018 | 11. TO 4/30/2018 |

| | LOCATION OF PROCEEDINGS | |
|---|---|---|
| 12. CASE NAME <br> Harvest Natural Resources, Inc., et al. v. Juan Jose Garcia | 13. CITY Houston | 14. STATE Texas |

**15. ORDER FOR**

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☐ BANKRUPTCY |
| ☐ NON-APPEAL | ☒ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☒ PRE-TRIAL PROCEEDING (Spcy) | 4/30/2018 |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☒ | ☐ | NO. OF COPIES <br> 1 | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.) <br> By signing below, I certify that I will pay all charges <br> (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| | |
|---|---|
| 18. SIGNATURE <br> /s/ Lee L. Kaplan | PROCESSED BY |
| 19. DATE <br> 5/3/2018 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | | |

| | | |
|---|---|---|
| DEPOSIT PAID | | DEPOSIT PAID |
| TRANSCRIPT ORDERED | | TOTAL CHARGES 0.00 |
| TRANSCRIPT RECEIVED | | LESS DEPOSIT 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | | TOTAL DUE 0.00 |

**DISTRIBUTION:**    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

**HARVEST_RDR_000378**