# EXHIBIT 24

MR. RAFAEL DARIO RAMIREZ CARRENO
16 E 81ST ST
NEW YORK, NY 10028-0201

9314 8699 0430 0053 4854 21

3.45
0.00
1.50
0.00
1.42
6.37

Craig  Smyser
700 Louisiana, Suite 2300
Houston, TX 77002

MR. RAFAEL DARIO RAMIREZ CARRENO
16 E 81ST ST
NEW YORK, NY 10028-0201

Craig  Smyser
700 Louisiana, Suite 2300
Houston, TX 77002

Craig  Smyser
700 Louisiana, Suite 2300
Houston, TX 77002



9314 8699 0430 0053 4854 21
RETURN RECEIPT (ELECTRONIC)

# Please Discard

HARVEST_RDR_000418



December 18, 2018

Dear Francoise Bernier:

The following is in response to your request for proof of delivery on your item with the tracking number:
**9314 8699 0430 0053 4854 21**.

## Item Details

| | |
|---|---|
| **Status:** | Delivered, Left with Individual |
| **Status Date / Time:** | December 6, 2018, 6:58 pm |
| **Location:** | NEW YORK, NY 10028 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

## Shipment Details

| | |
|---|---|
| **Weight:** | 3.0oz |

## Recipient Signature

| Signature of Recipient: | |
|---|---|
| Address of Recipient: | |

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

**HARVEST_RDR_000419**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES,** | § | |
| **INC., and HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| **v.** | § | |
| | § | |
| **JUAN JOSÉ GARCIA MENDOZA,** | § | |
| **PETRO CONSULTORES, S.C., PETRO** | § | |
| **CONSULTORES INTERNATIONAL** | § | |
| **TRADING COMPANY, INC.,** | § | **CIVIL ACTION: 4:18-cv-00483** |
| **PETROCONSULTORES (BARBADOS),** | § | |
| **LTD., PETROCONSULTORES, INC.,** | § | |
| **AZURE 904, LLC, RAFAEL DARIO** | § | |
| **RAMIREZ CARRENO, EULOGIO** | § | |
| **ANTONIO DEL PINO DIAZ, and JOSE** | § | |
| **ANGEL GONZALEZ ACOSTA,** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST**
**DEFENDANT RAFAEL DARIO RAMIREZ CARRENO**

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V. (collectively "Harvest") file this Motion for Default Judgment against Defendant Rafael Dario Ramirez Carreno ("Ramirez"), and would respectfully show the Court as follows:

**I.      PROCEDURAL HISTORY**

1.      On February 16, 2018, Harvest filed its Original Complaint in the above-captioned proceeding against Ramirez and other defendants, seeking, among other things, recovery of over $470,000,000 in lost profits, which resulted from defendants' years-long extortionate bribery scheme [ECF No. 1].

2.      Service of Summons and Complaint on Ramirez was effected in accordance with Federal Rule of Civil Procedure 4(e)(2)(B) on February 16, 2018 by leaving a copy of the

803758.2

HARVEST_RDR_000420

Complaint at Ramirez's dwelling or usual place of abode with Alexandra Leonardo, a domestic employee who resided at the residence [ECF No. 10].  Proof of service was filed with the Court on February 21, 2018.  *Id.*

3.     The time for Ramirez to file a responsive pleading or otherwise defend the claims brought against him expired on March 9, 2018.  Fed. R. Civ. P. 12(a)(1)(A)(i).  Pursuant to Rule 55(a), Harvest requested an entry of default against Ramirez on July 26, 2018 [ECF No. 59].  To date, Ramirez has not filed an answer or other responsive pleading or otherwise defended this suit.  Harvest now moves for default judgment against Ramirez pursuant to Rule 55(b).

## II.     LEGAL STANDARDS

4.     **Entering a Default.**  "A default occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules."  *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996) (italics omitted).  When a defendant's failure to plead or defend the suit is shown by affidavit or otherwise, "the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).

5.     **Entering a Default Judgment.**  After a default has been entered, the plaintiff may apply for a judgment based on such default.  Fed. R. Civ. P. 55(b); *Brown*, 74 F.3d at 141.  Valid service of process in accordance with Rule 4 is a prerequisite to obtaining a default judgment.  *Thanco Prod. & Imports, Inc. v. Kontos*, No. CIV.A. H-08-3046, 2009 WL 540963, at *2 (S.D. Tex. Mar. 3, 2009) (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)).  Where a defendant has received actual notice of an action, requirements governing service of process are to be "broadly construed."  *Nowell v. Nowell*, 384 F.2d 951, 953 (5th Cir. 1967).

HARVEST_RDR_000421

6.      If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, "the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person." Fed. R. Civ. P. 55(b)(1). In all other cases, a plaintiff must apply to the court for a default judgment. Fed. R. Civ. P. 55(b)(2).

### III.      ARGUMENT

7.      Harvest is entitled to an entry of default and default judgment by the clerk because Ramirez failed to answer, respond, or otherwise appear in this case after being legally served in accordance with Rule 4(e) and because the damages sought herein are a sum certain or a sum that can be made certain by computation.  Fed. R. Civ. P. 55(a)–(b)(1).  As proof that Harvest is entitled to the relief requested, Harvest relies upon the factual allegations laid out in its First Amended Complaint [ECF No. 14], Request for Entry of Default and accompanying exhibit of Alexander M. Wolf [ECF No. 59], and the following documentary evidence:

| | |
|---|---|
| Exhibit A | Affidavit of Keith L. Head, former Vice President and General Counsel of Harvest Natural Resources, Inc. |
| Exhibit A-1 | Press Release, dated June 21, 2012, announcing sale of Harvest's Venezuelan assets to PT Pertamina |
| Exhibit A-2 | SEC Form 8-K, dated June 21, 2012 |
| Exhibit A-3 | Press Release, dated December 16, 2013, announcing sale of Harvest's Venezuelan assets to Petroandina Resources Corporation N.V |
| Exhibit A-4 | SEC Form 8-K, dated December 16, 2013 |
| Exhibit A-5 | Press Release, dated June 30, 2016, announcing sale of Harvest's Venezuelan assets to CT Energy Holding SRL |

HARVEST_RDR_000422

Exhibit A-6              Press Release, dated October 7, 2016, announcing closing
                        of Harvest's sale of Venezuelan assets to CT Energy
                        Holding SRL

8.      Alternatively, should the Court determine that the damages sought are not a sum

certain or a sum that can be made certain by computation, Harvest requests a hearing so that the

proper amount of damages may be determined.  Fed. R. Civ. P. 55(b)(2).

**A.      Ramirez was properly served in accordance with Rule 4(e)(2) when copies of
the summons and complaint were served upon a domestic employee who
resided at Ramirez's New York residence.**

9.      Pursuant to Rule 4(e)(2)(B), "an individual—other than a minor, an incompetent

person, or a person whose waiver has been filed—may be served in a judicial district of the

United States by: . . . leaving a copy of [the summons and the complaint] at the individual's

dwelling or usual place of abode with someone of suitable age and discretion who resides there."

Fed. R. Civ. P. 4(e)(2)(B).  It is beyond dispute that Ramirez is not a minor, an incompetent

person, or a person whose waiver has been filed.  Fed. R. Civ. P. 4(e)(2)(B).  Accordingly,

service under Rule 4(e)(2)(B) is appropriate.

10.     Service upon a defendant's domestic employee is effective under Rule 4(e)(2)(B),

provided the employee actually lives in the defendant's residence and is of suitable age and

discretion.  *See, e.g.*, *Kelly, Sutter, Mount & Kendrick, P.C. v. Alpert*, 234 F. App'x 246, 247

(5th Cir. 2007) (affirming trial court's finding that service under Rule 4(e)(2) was proper where

housekeeper who received process resided in the defendant's residence); *Home-Stake Prod. Co.*

*v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1016–17 (10th Cir. 1990) (finding that service of

process upon defendant's cook at defendant's residence was sufficient under Rule 4(d)(1) [now

Rule 4(e)(2)], absent showing that cook did not reside at defendant's home).  A process server's

declaration, signed under penalty of perjury, that process was served upon a person of suitable

HARVEST_RDR_000423

age and discretion is prima facie evidence of valid service, "which can be overcome only by strong and convincing evidence." *People's United Equip. Fin. Corp. v. Hartmann*, 447 F. App'x 522, 524 (5th Cir. 2011) (citing *O'Brien v. R.J. O'Brien & Associates, Inc.,* 998 F.2d 1394, 1398 (7th Cir. 1993)).

      11.    Ramirez was legally served under Rule 4(e)(2)(B) when a copy of the summons and complaint was left at his New York residence with Alexandra Leonardo, a domestic employee who resided at the residence. [ECF Nos. 10, 59]. The declaration of Avner Rahimov, signed under penalty of perjury, establishes that Leonardo was approximately 60 years old at the time of service and is a person of suitable age and discretion. [ECF No. 10].

      **B.**    **Ramirez's New York residence is his "dwelling or usual place of abode" within the meaning of Rule 4(e)(2)(B).**

      12.    The Fifth Circuit has explained that "no hard and fast rule can be fashioned to determine what is or is not a party's 'dwelling house or usual place of abode' within the rule's meaning." *Nowell*, 384 F.2d at 953. Instead, the "practicalities of the particular fact situation determine whether service meets the requirements of [4(e)(2)(B)]."[1] *Id.* Notably, a defendant can have more than one dwelling or usual place of abode, provided each contains sufficient indicia of permanence. *Norris v. Causey*, 869 F.3d 360, 368 (5th Cir. 2017); *Blackhawk Heating & Plumbing Co. v. Turner*, 50 F.R.D. 144, 149 (D. Ariz. 1970) (citing *Nowell* and finding that defendant's failure to leave a forwarding address was a factor in determining that apartment where process was served was defendant's dwelling or usual place of abode). Moreover, a defendant need not be living at the location where process is served for that location to qualify as his dwelling or usual place of abode under Rule 4(e)(2). *Thanco Prod. & Imports*, 2009 WL

---

[1] At the time *Nowell* was decided, Rule 4(e)(2)(B) was 4(d)(1).

HARVEST_RDR_000424

540963, at *3 (citing *Ali v. Mid–Atlantic Settlement Services, Inc.,* 233 F.R.D. 32, 36 (D.D.C. 2006)).

13.     Ramirez's New York residence is his "dwelling or usual place of abode" within the meaning of Rule 4(e)(2)(B).  Harvest's independent investigation located a single address for Ramirez at 16 E. 81st Street, New York, New York, 10028.  Process was served at that address and accepted on Ramirez's behalf.

14.     As set forth in Harvest's First Amended Complaint, Ramirez is believed to be the ultimate target of U.S. and Venezuelan probes into corruption within PDVSA.  [ECF No. 14 at ¶ 56].  Accordingly, Ramirez is believed to be on the run, as no additional or forwarding addresses have been identified for him.

15.     The New York residence at which Ramirez was served remains his "dwelling or usual place of abode," because a live-in housekeeper accepted service for Ramirez; mail subsequently sent to Ramirez's attention at the same address was accepted, *infra*; Ramirez did not leave a forwarding address, *see Blackhawk Heating & Plumbing Co*, 50 F.R.D. at 149; and Ramirez had actual notice of the lawsuit.

**C.     Rule 4(e)(2)(B)'s "dwelling or usual place of abode" requirement should be broadly construed because Ramirez had actual notice of the lawsuit.**

16.     To the extent there are any doubts about whether Ramirez was served at his dwelling or usual place of abode, such doubts should be resolved in Harvest's favor, as Ramirez's had actual notice of this suit.  Where a defendant has received actual notice of the suit, Rule 4(e)(2)(B) should be broadly construed.   *Nowell*, 384 F.2d at 953; *Karlsson v. Rabinowitz,* 318 F.2d 666 (4th Cir.1963) (service of process left at defendant's former residence was effective because defendant had actual knowledge of the suit).

HARVEST_RDR_000425

17.     Ramirez's comments to the press on the same day process was served in New York demonstrate that Ramirez received actual notice of the suit.  On February 20, 2018, an Associated Press article regarding Harvest's lawsuit stated: "Ramirez, contacted Friday [February 16, 2018] by AP, *declined to comment on the suit* but *reiterated that he never asked for bribes* or played a role in the selection of PDVSA's business partners."  [ECF No. 59-1].  Ramirez's comments indicate that he had knowledge of the existence of the suit against him *and* of its allegations.

18.     Following service of process at Ramirez's New York residence, counsel for Harvest took additional steps to ensure that Ramirez had actual notice of this lawsuit, including attempting to contact him by phone and leaving voice messages, sending text messages, and sending WhatsApp messages, using numbers obtained during Harvest's investigation.  [ECF No. 59-1].  Harvest's counsel also sent packages containing court documents to Ramirez's New York address via U.S. First-Class Certified Mail, Return Receipt Requested on February 28, 2018, March 9, 2018, and April 6, 2018, all of which were delivered and signed for.  An additional package of court documents was sent to Ramirez's New York address on May 23, 2018.  Only this last package was returned to Harvest's counsel after being marked as "Refused, Unable to Forward."

19.     Ramirez's actual notice of the suit combined with the fact that court documents were delivered to his New York address and accepted—followed by a delivery that was affirmatively refused—warrants broad construction of Rule 4(e)(2)(B)'s requirement that defendants be served at their "dwelling or usual place of abode."  *Nowell*, 384 F.2d at 953.  Because Ramirez was properly served under Rule 4(e)(2)(B) and has since refused to answer or

7

HARVEST_RDR_000426

otherwise defend the claims brought against him, Harvest is entitled to entry of default and a default judgment.

        **D.**    **Harvest's damages are a "sum certain or a sum that can be made certain by computation" within the meaning of Rule 55(b)(1).**

    20.    Pursuant to Rule 55, "[i]f the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—*must* enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person." Fed. R. Civ. P. 55(b)(1) (emphasis added). Harvest is entitled to a default judgment from the clerk in the amount of $472,039,552.66, which is a sum certain or a sum that can be made certain by computation in accordance with Rule 55(b)(1).

    21.    On June 21, 2012, Harvest Natural Resources announced that its wholly-owned subsidiary HNR Energia B.V. had signed a Share Purchase Agreement with PT Pertamina (the "Pertamina Deal") to sell all of its Venezuelan assets for an all-cash transaction totaling $725 million. Exhibits A, A-1, A-2 at 2. The Pertamina Deal was subject to approval by the Venezuelan government. Exhibits A-1, A-2 at 2. Following the announcement of the Pertamina Deal, Ramirez and other co-conspirators directed an associate to solicit a multi-million dollar bribe from Harvest, which Harvest refused to pay. As a result of Harvest's refusal to pay the bribe demand, the Venezuelan government withheld approval, causing the Pertamina Deal to fall through.

    22.    Thereafter on December 16, 2013, Harvest announced that it had entered into a Share Purchase Agreement with Petroandina Resources Corporation N.V. (the "Petroandina Deal"). Exhibits A, A-3, A-4 at 2. The Petroandina Deal involved two transactions for a total cash purchase price of $400 million. Exhibits A-3, A-4 at 2. Harvest closed the first transaction

**HARVEST_RDR_000427**

for $125 million upon execution of the Share Purchase Agreement.  Exhibits A-3, A-4 at 2.  The second all-cash transaction in the amount of $275 million was subject to approval by the Venezuelan government.  Exhibits A-3, A-4 at 2.

23.     Following the announcement of the Petroandina Deal, Ramirez and other co-conspirators directed the same associate to solicit another multi-million dollar bribe from Harvest, which Harvest again refused to pay.  As a result of Harvest's refusal to pay the bribe demand, the Venezuelan government again withheld approval, causing the Petroandina Deal to fall through.

24.     On June 29, 2016, Harvest entered into a Share Purchase Agreement with CT Energy Holding SRL to sell its remaining Venezuelan assets.  Exhibits A, A-5.  The transaction was completed on October 7, 2016 for a total of $127,960,447.34 in cash, promissory notes, debt cancellation, and other assets.  Exhibits A, A-6.

25.     As a result of Ramirez's actions, Harvest suffered a loss of $472,039,552.66:

| $725,000,000 (initial all-cash offer for Pertamina deal) | − | $125,000,000 (successful first transaction in Petroandina Deal) | − | $127,960,447.34 (final sale to CT Energy) | = | Loss of $472,039,552.66 |
|---|---|---|---|---|---|---|

26.     As shown by the equation above, Harvest's damages in the amount of $472,039,552.66 are a sum certain or a sum that can be made certain by computation in accordance with Rule 55(b)(1).  Accordingly, Harvest requests that the Court enter an order directing the Clerk to enter judgment against Ramirez in the amount of $472,039,552.66.

27.     Alternatively, should the Court determine that Harvest's damages are not a sum certain or a sum that can be made certain by computation, Harvest requests a hearing so that the proper amount of damages may be determined. Fed. R. Civ. P. 55(b)(2).

803758.2

HARVEST_RDR_000428

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs Harvest Natural Resources, Inc. and HNR Energia

B.V. respectfully request that this Court:

      1.    enter an order directing the Clerk to enter Defendant Rafael Dario
            Ramirez Carreno's default; and

      2.    enter an order directing the Clerk to enter a default judgment against
            Defendant Rafael Dario Ramirez Carreno in the amount of
            $472,039,552.66.

Dated:  November 30, 2018              Respectfully Submitted,

                       **SMYSER KAPLAN & VESELKA, L.L.P.**

                       By:  _/s/ Dane Ball_____
                       Craig Smyser
                       *Attorney-in-Charge*
                       Fed. Bar No. 848
                       State Bar No. 18777575
                       Dane Ball
                       Federal Bar No. 784400
                       State Bar No. 24051642
                       Ty Doyle
                       Federal Bar No. 1373873
                       State Bar No. 24072075
                       Alexander M. Wolf
                       Federal Bar No. 2470631
                       State Bar No. 24095027
                       700 Louisiana, Suite 2300
                       Houston, Texas 77002
                       (713) 221-2300 (phone)
                       (713) 221-2320 (fax)
                       csmyser@skv.com
                       dball@skv.com
                       tydoyle@skv.com
                       awolf@skv.com

                       **ATTORNEYS FOR PLAINTIFFS
                       HARVEST NATURAL RESOURCES, INC.
                       AND HNR ENERGIA B.V.**

803758.2

HARVEST_RDR_000429

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule 5.1 on November 30, 2018.   A copy of this document was also served on Defendant Rafael Dario Ramirez Carreno via certified mail, return receipt requested, per Local Rule 5.5 on November 30, 2018, at the following address:

16 E. 81st Street
New York, New York 10028

 /s/ Dane Ball
Dane Ball

803758.2

HARVEST_RDR_000430



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC., and HNR ENERGIA B.V.** | § § § | |
| *Plaintiffs* | § § | |
| **v.** | § | |
| **JUAN JOSÉ GARCIA MENDOZA, PETRO CONSULTORES, S.C., PETRO CONSULTORES INTERNATIONAL TRADING COMPANY, INC., PETROCONSULTORES (BARBADOS), LTD., PETROCONSULTORES, INC., AZURE 904, LLC, RAFAEL DARIO RAMIREZ CARRENO, EULOGIO ANTONIO DEL PINO DIAZ, and JOSE ANGEL GONZALEZ ACOSTA,** | § § § § § § § § § § § | **CIVIL ACTION: 4:18-cv-00483** |
| *Defendants.* | § | |

## AFFIDAVIT OF KEITH L. HEAD

BEFORE ME, the undersigned authority, on this day personally appeared KEITH L. HEAD, who is personally known to me and being first duly sworn by me, testified upon oath as follows:

1.  "My name is Keith L. Head.  I am over the age of 18, of sound mind, and competent and legally capable of making this affidavit.  The facts stated herein are true and correct and of my own personal knowledge. I am the former Vice President and General Counsel of Plaintiff Harvest Natural Resources, Inc. ("Harvest").  Harvest formally dissolved on May 4, 2017; however, as required by Delaware law, Harvest continues to exist for a period of at least three years (until May 2020) for the purposes of prosecuting lawsuits, liquidating, and closing its business. *See* Del. Code Title 8 § 278.  Plaintiff HNR Energia B.V. is a wholly-owned subsidiary of Harvest.

2.  On June 21, 2012, Harvest announced that HNR Energia B.V. had signed a Share Purchase Agreement with PT Pertamina (Persero), a state-owned limited liability company existing under the laws of the Republic of Indonesia, to sell all of its Venezuelan assets (hereafter the "Pertamina Deal").  A true and correct copy of the press release announcing the Pertamina Deal is attached as Exhibit A-1.  Pursuant to the Pertamina Deal, HNR Energia B.V. agreed to sell its 80 percent (80%) interest in Harvest-Vinccler Dutch Holding B.V. to PT Pertamina for a cash purchase price of $725 million.  Harvest-Vinccler Dutch Holding B.V., in turn, owned assets in Petrodelta, S.A., an exploration and production company organized under Venezuelan law.  The Pertamina

**HARVEST_RDR_000431**

Deal was subject to approval by Venezuela's Ministerio del Poder Popular y Mineria and the Government of the Republic of Indonesia. A true and correct copy of Harvest's Form 8-K filed with the Securities and Exchange Commission and reflecting the details of the Pertamina Deal is attached as Exhibit A-2.

3.      Following the announcement of the Pertamina Deal, Defendant Rafael Dario Ramirez Carreno ("Ramirez") and other co-conspirators directed an associate to solicit a $10 million bribe from Harvest, which Harvest refused to pay. As a result of Harvest's refusal to pay the bribe demand, the Venezuelan government withheld approval, causing the Pertamina Deal to fall through on February 20, 2013.

4.      On December 16, 2013, Harvest announced that it had entered into a Share Purchase Agreement with Petroandina Resources Corporation N.V., a Netherlands limited liability company and its parent company, Pluspetrol Resources Corporation B.V. (hereafter the "Petroandina Deal"). A true and correct copy of the press release announcing the Petroandina Deal is attached as Exhibit A-3. Although the Petroandina Deal concerned the sale of the same 80% interest detailed in paragraph 2, *supra*, the Petroandina Deal called for a total cash purchase price of $400 million in two transactions of 29 percent (29%) and 51 percent (51%) respectively. The first transaction in the amount of $125 million for HNR Energia B.V.'s 29% interest was closed upon execution of the Share Purchase Agreement. The second transaction in the amount of $275 million for the remaining 51% required approval by Venezuela's Ministerio del Poder Popular y Mineria. A true and correct copy of Harvest's Form 8-K filed with the Securities and Exchange Commission and reflecting the details of the Petroandina Deal is attached as Exhibit A-4.

5.      Following the announcement of the Petroandina Deal, Ramirez and other co-conspirators directed the same associate to solicit another $10 million bribe from Harvest, which Harvest again refused to pay. As a result of Harvest's refusal to pay the bribe demand, the Venezuelan government again withheld approval, causing the second transaction of the Petroandina Deal to fall through on January 1, 2015.

6.      On June 29, 2016, Harvest entered into a Share Purchase Agreement with CT Energy Holding SRL, a Barbados Society with Restricted Liability, to sell the remaining 51% interest from the failed second transaction of the Petroandina Deal (hereafter the "CT Energy Deal"). A true and correct copy of the press release announcing the CT Energy Deal and detailing its terms is attached as Exhibit A-5. The CT Energy Deal was completed on October 7, 2016 for a total of $127,960,447.34, divided as follows:

| Asset | Value |
|-------|-------|
| Cash | $80,000,000.00 |
| 8,667,597 shares of Harvest common stock | $4,247,000.00 |
| Promissory note | $12,000,000.00 |
| Debt cancellation | $30,000,000.00 |
| Warrants to purchase 34,070,820 shares of Harvest common stock | $1,713,447.34 |
| **TOTAL** | **$127,960,447.34** |

HARVEST_RDR_000432

A true and correct copy of the press release announcing the closing of CT Energy Deal is attached as Exhibit A-6.

7.   The $127,960,447.34 loss can also be calculated by looking to a settlement agreement and concordant purchase and sale agreement reached between Harvest, Petroandina, and CT Energy, under which Petroandina sold the 29% interest, which it had previously acquired as detailed in paragraph 4, *supra*, to CT Energy for $72,761,823.00.  Pursuant to the settlement agreement, the parties valued the 29% interest at $72,761,823.00. Accordingly, the remaining 51% interest was valued at $127,960.447.34.[1]

8.      Taken together, Harvest received a total of $252,960,447.34 for the sale of its Venezuelan assets:  $125,000,000 for the first Petroandina transaction and $127,960,447.34 for the CT Energy Deal.  This represented a loss of $472,039,552.66 from the initial all-cash purchase price of $725 million offered by PT Pertamina."

FURTHER AFFIANT SAYETH NOT.

_____
KEITH L. HEAD

GIVEN UNDER MY HAND AND SEAL OF OFFICE and SWORN AND SUBSCRIBED BEFORE ME on this the  30  day of  November  , 2018.

SUEMY CRUZ
Notary ID # 130899036
My Commission Expires
November 11, 2020

_____
Notary Public in and for the
State of Texas

Printed name and commission expiration
date (or seal stating the same information)

---

[1] $72,761,823.00 equals 0.29 multiplied by *x*, with *x* being the value of 100% of HNR Energia, B.V.'s assets.  That means *x* equals $72,761,823.00 divided by 0.29, which is $250,902,837.93.   $250,902,837.93 multiplied by 0.51 yields the value of 51% of HNR Energia B.V.'s assets, which is $127,960.447.34.

805667.3

HARVEST_RDR_000433

10/26/2018                    Press Release Issued by Harvest Natural Resources, Inc. on June 21, 2012

EX-99.1 4 d370176dex991.htm PRESS RELEASE ISSUED BY HARVEST NATURAL RESOURCES, INC.
ON JUNE 21, 2012

Exhibit 99.1





### Harvest Natural Resources Announces
### Share Purchase Agreement to Sell Interests
### in Venezuela

HOUSTON, June 21, 2012, Harvest Natural Resources, Inc. (NYSE: HNR) (Harvest or the Company) today announced that its wholly-owned subsidiary, HNR Energia B.V., has signed a definitive Share Purchase Agreement (SPA) with PT Pertamina (Persero), the national oil company of Indonesia (the Buyer), to sell all of the Company's interests in Venezuela for $725.0 million in an all-cash transaction. Net proceeds from the sale are estimated to be approximately $525.0 million after deductions for transaction related costs and taxes.

The Buyer will purchase Harvest's 32 percent interest in Petrodelta, S.A. by purchasing HNR Energia B.V.'s 80 percent interest in Harvest-Vinccler Dutch Holding B.V. The effective date of the transaction is January 1, 2012.

The closing of the transaction is subject to, among other things, approval by the Government of the Bolivarian Republic of Venezuela, the Government of Indonesia in its capacity as the Buyer's sole shareholder and a majority of the Company's stockholders. If all of the conditions to closing are not satisfied or not waived on or before March 21, 2013, either the Buyer or Harvest may terminate the SPA. The Boards of Directors of Harvest and Pertamina have each approved the transaction.

James A. Edmiston, President and CEO of Harvest, said, "The signing of the SPA represents a significant step forward in the strategic alternatives initiative we began in 2010 and clearly validates the potential of Petrodelta's business and Harvest's twenty year partnership with PDVSA in Venezuela."

Edmiston continued, "This transaction will not only provide Harvest and its shareholders with numerous options for the future, but will also provide Petrodelta and PDVSA with a strong, well-financed international partner capable of contributing to Petrodelta's future growth."

### Conference call

Harvest will hold a conference call at 10:00 a.m. CDT on Wednesday, June 27, 2012, during which management will discuss this transaction. To access the conference call, dial 888-219-1217 or 913-312-0981, five to ten minutes prior to the start time. At that time you will be asked to provide the conference number, which is 4239456. A recording of the conference call will also be available for replay at 719-457-0820 passcode 4239456, until July 2, 2012.

1177 Enclave Parkway, Suite 300 • Houston, Texas 77077 • ph: 281.899.5700 fax: 281.899.5700

HARVEST_RDR_000434

10/26/2018                     Press Release Issued by Harvest Natural Resources, Inc. on June 21, 2012

The conference call will also be transmitted over the internet through the Company's website at www.harvestnr.com. To listen to the live webcast, enter the web site fifteen minutes before the call to register, download and install any necessary audio software. For those who cannot listen to the live broadcast, a replay of the webcast will be available beginning shortly after the call, and will remain on the web site for approximately 90 days.

About Harvest Natural Resources:

Harvest Natural Resources, Inc., headquartered in Houston, Texas, is an independent energy company with principal operations in Venezuela, exploration assets in Indonesia, West Africa, China and Oman and business development offices in Singapore and the United Kingdom. For more information visit the Company's website at www.harvestnr.com.

CONTACT:

Stephen C. Haynes

Vice President, Chief Financial Officer

(281) 899-5716

This press release may contain projections and other forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. They include estimates and timing of expected oil and gas production, oil and gas reserve projections of future oil pricing, future expenses, planned capital expenditures, anticipated cash flow and our business strategy. All statements other than statements of historical facts may constitute forward-looking statements. Although Harvest believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. Actual results may differ materially from Harvest's expectations as a result of factors discussed in Harvest's 2011 Annual Report on Form 10-K and other public filings.

Page 2 of 2

HARVEST_RDR_000435

10/26/2018                                          Form 8-K

**Exhibit A-2**

8-K 1 d370176d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): June 21, 2012

# HARVEST NATURAL RESOURCES, INC.
### (Exact name of registrant as specified in its charter)

| DELAWARE | 1-10762 | 77-0196707 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1177 Enclave Parkway, Suite 300**
**Houston, Texas 77077**
(Address of principal executive offices) (Zip Code)

**(281) 899-5700**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

HARVEST_RDR_000436

10/26/2018                                                                                Form 8-K

**Item 1.01 Entry into a Material Definitive Agreement.**

On June 21, 2012, Harvest Natural Resources, Inc., a Delaware corporation (the "Company"), and its wholly owned subsidiary HNR Energia BV, a Curacao company ("HNR Energia"), entered into a share purchase agreement (the "Share Purchase Agreement") with PT Pertamina (Persero), a state-owned limited liability company existing under the laws of the Republic of Indonesia ("Buyer"). The following is a summary description of the Share Purchase Agreement and is qualified in its entirety by reference to the Share Purchase Agreement, which is attached to this Form 8-K as Exhibit 2.1 and incorporated into this Item 1.01 by reference.

Under the Share Purchase Agreement, HNR Energia will sell all of its 80% interest in Harvest-Vinccler Dutch Holding B.V., a Netherlands company ("Harvest-Vinccler"), to Buyer or a newly formed wholly owned subsidiary of Buyer for a cash purchase price of $725 million, subject to adjustment as described in the Share Purchase Agreement. Harvest-Vinccler owns, indirectly through wholly owned subsidiaries, a 40% interest in Petrodelta, S.A. ("Petrodelta"), a sociedad anonima mixed company organized under Venezuelan law. Under the Share Purchase Agreement, the Company will, indirectly through subsidiaries, be selling all of its interests in Venezuela, which consists of its 32% interest in Petrodelta. The effective date of the transaction is January 1, 2012. The Company has also executed a guarantee in Buyer's favor by which it guarantees HNR Energia's obligations under the Share Purchase Agreement.

The closing of the transaction is subject to receipt of three approvals, in addition to satisfaction of other conditions standard in transactions of this type: (a) approval by the Ministerio del Poder Popular de Petroleo y Mineria representing the Government of Venezuela (which indirectly owns the other 60% interest in Petrodelta); (b) approval by the Government of the Republic of Indonesia in its capacity as Buyer's sole shareholder; and (c) approval by the holders of a majority of the Company's common stock. If the approval of Buyer's shareholder is not obtained within five months after the date of the Share Purchase Agreement, the Company may terminate the agreement. If the approval of the Company's stockholders is not obtained within 90 days after approval of Buyer's shareholder is obtained, Buyer may terminate the Share Purchase Agreement. The Company does not intend to solicit proxies for stockholder approval of the transaction until after approval of Buyer's shareholder is obtained, and this Form 8-K should not be deemed to be a solicitation of any proxies.

Contemporaneously with signing the Share Purchase Agreement, Buyer deposited 15% of the purchase price in escrow. The deposit constitutes liquidated damages, and if Buyer defaults, the Company's sole remedy is to retain the deposit and any earned interest. The deposit and any earned interest will be returned to Buyer if the Company or HNR Energia defaults or if the approval by the Company's stockholders, Buyer's shareholder or the Government of Venezuela is not obtained.

The Company has agreed not to solicit other offers to acquire the Company as a whole or the Petrodelta assets while the Share Purchase Agreement is in effect. If the Company receives an unsolicited offer before the Company's stockholders have approved the transaction, the Company may enter into discussions with the potential purchaser. The Company has the right to terminate the Share Purchase Agreement and accept a superior proposal if it first offers Buyer the opportunity to modify the transaction so that the competing offer is no longer superior and pays Buyer a break-up fee equal to 3% of the purchase price.

HARVEST_RDR_000437

10/26/2018                                                          Form 8-K

Under the Share Purchase Agreement, the parties will meet during the week of September 5, 2012, to assess progress toward obtaining the required governmental approvals and satisfaction of other conditions to closing. At that time, HNR Energia or Buyer may terminate the Share Purchase Agreement without surrender of Buyer's deposit or payment of any break-up fee.

The Share Purchase Agreement includes representations and warranties, tax provisions and indemnification provisions typical in transactions of this type. Reference should be made to the Share Purchase Agreement regarding those provisions and all other provisions pertinent to a complete understanding of the transaction.

Approval of the transaction will be submitted to the Company's stockholders for their consideration, and the Company will file a proxy statement to be used to solicit stockholder approval of the transaction with the Securities and Exchange Commission ("SEC"). The Company's stockholders are urged to read the proxy statement regarding the transaction when it becomes available and any other relevant documents filed with the SEC, as well as any amendments or supplements to those documents, because they will contain important information. A free copy of the proxy statement, as well as other filings with the SEC containing information about the Company and the transaction, may be obtained, when available, at the SEC's website at www.sec.gov. Copies of the proxy statement may also be obtained, when available, without charge, by directing a request to Harvest Natural Resources, Inc., Investor Relations, 1177 Enclave Parkway, Suite 300, Houston, Texas 77077 or at the Company's Investor Relations page on its corporate website at www.harvestnr.com. The Company and its directors and executive officers may be deemed to be participants in the solicitation of proxies from the Company's stockholders in connection with the approval of the transaction.

### Item 7.01 Regulation FD Disclosure

On June 21, 2012, the Company issued a press release that is attached to this Form 8-K as Exhibit 99.1.

### Item 9.01 Exhibits.

2.1      Share Purchase Agreement dated June 21, 2012, by and among HNR Energia BV, Harvest Natural Resources, Inc. and PT Pertamina (Persero)

2.2`     Guarantee of Harvest Natural Resources, Inc. dated June 21, 2012

99.1     Press Release Issued by Harvest Natural Resources, Inc. on June 21, 2012

HARVEST_RDR_000438

10/26/2018                                                            Form 8-K

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

                                          HARVEST NATURAL RESOURCES, INC.

Dated: June 21, 2012

                                          By:  /s/ Keith L. Head
                                              Keith L. Head
                                              Vice President and General Counsel

HARVEST_RDR_000439

10/26/2018                                    Form 8-K

## EXHIBIT INDEX

2.1   Share Purchase Agreement dated June 21, 2012, by and among HNR Energia BV, Harvest Natural Resources, Inc. and PT Pertamina (Persero)

2.2   Guarantee of Harvest Natural Resources, Inc. dated June 21, 2012

99.1   Press Release Issued by Harvest Natural Resources, Inc. on June 21, 2012

HARVEST_RDR_000440

10/26/2018                                                    EX-99.2

**Exhibit
A-3**

EX-99.2 4 d645117dex992.htm EX-99.2

Exhibit 99.2



*FOR IMMEDIATE RELEASE*

**Harvest Natural Resources Announces**

**Share Purchase Agreement to Sell**

**Interests in Venezuela**

HOUSTON, December 16, 2013. Harvest Natural Resources, Inc. (NYSE: HNR) (Harvest or the Company) today announced that it and its wholly-owned subsidiary, HNR Energia B.V. (HNR Energia), have entered into a Share Purchase Agreement with Petroandina Resources Corporation N.V. (Buyer) and Pluspetrol Resources Corporation B.V. (Pluspetrol) to sell, in two separate transactions, all of the Company's interests in Venezuela, for an aggregate of $400.0 million in cash. The Buyer will purchase Harvest's 32% interest in Petrodelta, S.A. by purchasing HNR Energia's 80% interest in Harvest-Vinccler Dutch Holding B.V. (Harvest Vinccler) in two transactions of 29% and 51%, respectively. Harvest Vinccler owns, indirectly through wholly-owned subsidiaries, a 40% interest in Petrodelta, S.A.

HNR Energia and Buyer closed the first transaction today for a cash purchase price of $125 million. The closing of the second transaction for a cash purchase price of $275 million is subject to, among other things, approval by the holders of a majority of the Company's common stock and the Government of the Bolivarian Republic of Venezuela.

Net proceeds after taxes and transaction-related costs from the two transactions are estimated to be approximately $122 million and $208 million, respectively. Proceeds from the first transaction will be used to pay Harvest's long-term debt with the remaining proceeds used for working capital.

James A. Edmiston, President and CEO of Harvest, said, "Closing of the first transaction is a major step forward for the Company as it sets a clear path for our amicable exit from our Venezuelan business while at the same time allowing us to redeem our outstanding debt and providing the required liquidity for us to continue our efforts to unlock the value of the assets of Harvest for the benefit of our shareholders."

Edmiston continued, "With respect to timing, we expect to file our proxy statement for the second transaction before the end of January and obtain shareholder approval in the first quarter of 2014. Subject to Venezuelan government approval, we envision the closing of the second transaction around mid-year. In the interim, we welcome Pluspetrol as a new shareholder in Harvest-Vinccler and look forward to working with them to both grow Petrodelta and close the second transaction."

HARVEST_RDR_000441

In connection with the transactions with Pluspetrol, the board of directors of Harvest received a fairness opinion from BofA Merrill Lynch. In addition, the Company was advised by law firms Norton Rose Fulbright, Baker Botts L.L.P., and Baker McKenzie LLP.

About Harvest Natural Resources:

Harvest Natural Resources, Inc., headquartered in Houston, Texas, is an independent energy company with principal operations in Venezuela, exploration assets in Indonesia, West Africa, and China and business development offices in Singapore and the United Kingdom. For more information visit the Company's website at www.harvestnr.com.

CONTACT:
Stephen C. Haynes
Vice President, Chief Financial Officer
(281) 899-5716

This press release may contain projections and other forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. They include estimates and timing of expected oil and gas production, oil and gas reserve projections of future oil pricing, future expenses, planned capital expenditures, anticipated cash flow, timing and certainty of future transactions and our business strategy. All statements other than statements of historical facts may constitute forward-looking statements. Although Harvest believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. Actual results may differ materially from Harvest's expectations as a result of factors discussed in Harvest's 2012 Annual Report on Form 10-K and other public filings.

HARVEST_RDR_000442

10/26/2018 — Form 8-K

**Exhibit A-4**

8-K 1 d645117d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

## FORM 8-K

---

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): December 16, 2013

---

# HARVEST NATURAL RESOURCES, INC.
(Exact name of registrant as specified in its charter)

---

| DELAWARE | 1-10762 | 77-0196707 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

1177 Enclave Parkway, Suite 300
Houston, Texas 77077
(Address of principal executive offices) (Zip Code)

(281) 899-5700
(Registrant's telephone number, including area code)

Not Applicable
(Former name or former address, if changed since last report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

HARVEST_RDR_000443

10/26/2018                                                                                      Form 8-K

**Item 1.01 Entry into a Material Definitive Agreement.**

On December 16, 2013, Harvest Natural Resources, Inc., a Delaware corporation (the "Company"), and its wholly owned subsidiary HNR Energia BV, a Curacao company ("HNR Energia"), entered into a share purchase agreement (the "Share Purchase Agreement") with Petroandina Resources Corporation N.V., a Netherlands company with limited liability ("Petroandina" or "Buyer"), and Pluspetrol Resources Corporation B.V., a Netherlands private company with limited liability ("Buyer Guarantor"), pursuant to which HNR Energia agreed to sell to Buyer all of HNR Energia's 80% interest in Harvest-Vinccler Dutch Holding B.V., a Netherlands company ("Harvest Holding"), for an aggregate cash purchase price of $400 million in two closings – one (the "First Closing") to sell 29% of HNR Energia's interest in Harvest Holding and a second (the "Second Closing") to sell the remaining 51% of HNR Energia's interest in Harvest Holding. Harvest Holding owns, indirectly through wholly owned subsidiaries, a 40% interest in Petrodelta, S.A., a sociedad anonima mixed company organized under Venezuelan law ("Petrodelta"). Under the Share Purchase Agreement, the Company will, indirectly through subsidiaries, be selling all of its interests in Venezuela, which consists of its 32% interest in Petrodelta. The following is a summary description of the Share Purchase Agreement and is qualified in its entirety by reference to the Share Purchase Agreement, which is attached to this Form 8-K as Exhibit 2.1 and incorporated into this Item 1.01 by reference.

Upon execution of the Share Purchase Agreement, HNR Energia and Buyer effected the First Closing for a cash purchase price of $125 million. The Second Closing, for a cash purchase price of $275 million, will be subject to, among other things, approval by the holders of a majority of the Company's common stock and approval by the Ministerio del Poder Popular de Petroleo y Mineria representing the Government of Venezuela (which indirectly owns the other 60% interest in Petrodelta).

The Company has agreed not to solicit other offers to acquire the Company as a whole or the Petrodelta assets while the Share Purchase Agreement is in effect. If the Company receives an unsolicited offer before the Company's stockholders have approved the Second Closing, the Company may enter into discussions with the potential purchaser. The Company has the right to terminate the Share Purchase Agreement and accept a superior proposal if it first offers Buyer the opportunity to modify the transaction so that the competing offer is no longer superior and pays Buyer a break-up fee equal to $9.6 million. If the Share Purchase Agreement is terminated because of failure to obtain the approval of the Company's stockholders, the Company will be required to pay Buyer a termination fee of $3 million.

Petroandina and HNR Energia have certain put/call rights related to the 29% interest in Harvest Holding sold in the First Closing if the Share Purchase Agreement is terminated. Petroandina's right to sell this interest to HNR Energia may be exercised:

- at an exercise price equal to the greater of $125 million and the fair market value if (i) the stockholders vote not to approve the Second Closing, (ii) the Company's board of directors recommends against approving the Second Closing without accepting a superior proposal, or (iii) there are certain breaches of representations, warranties or covenants by the Company or HNR Energia;

- at an exercise price equal to the same price per share for Harvest Holding if the Company accepts a superior proposal from another party for a sale of Harvest Holding; and

- at an exercise price equal to the greater of $125 million and an agreed upon proportionate share of the accepted price for the Company if the Company accepts a superior proposal with respect to the Company.

HNR Energia's right to purchase the interest from Petroandina may be exercised:

- at an exercise price equal to the lower of the fair market value and $125 million if there are certain breaches of representations, warranties or covenants by Petroandina;

- at an exercise price equal to the same price per share for Harvest Holding if HNR Energia accepts a superior proposal from another party for a sale of Harvest Holding; and

- at an exercise price equal to the greater of $125 million and an agreed upon proportionate share of the accepted price for the Company if the Company accepts a superior proposal with respect to the Company.

1

HARVEST_RDR_000444

10/26/2018                                                  Form 8-K

The Share Purchase Agreement may be terminated by either HNR Energia or Buyer if the Second Closing has not occurred on or before the later of June 30, 2014 or the date that is four months after the date of the special meeting of the Company's stockholders. However, if certain conditions have not been satisfied, including obtaining approval for the sale of the Venezuelan interests from the Government of Venezuela, Buyer may extend the termination date for up to six one-month periods, but in no event will the closing date or the termination date be after December 31, 2014. If the termination date is so extended, Buyer will, if so required by HNR Energia, lend to HNR Energia $2.0 million for each month of extension, on terms and conditions substantially the same as the terms of the Company's indenture for its existing 11% senior notes. If the Second Closing occurs, the purchase price will be reduced by the amount of any such outstanding loans. If the Share Purchase Agreement is terminated, the principal amount of the loans will be due one year from the date of the termination.

The Company agreed to guarantee HNR Energia's obligations, and the Buyer Guarantor agreed to guarantee Buyer's obligations, under the Share Purchase Agreement.

The Share Purchase Agreement includes representations and warranties, tax provisions and indemnification provisions typical in transactions of this type. Reference should be made to the Share Purchase Agreement regarding those provisions and all other provisions pertinent to a complete understanding of the transaction.

Approval of the Second Closing will be submitted to the Company's stockholders for their consideration, and the Company will file a proxy statement to be used to solicit stockholder approval of the Second Closing with the Securities and Exchange Commission ("SEC"). The Company's stockholders are urged to read the proxy statement regarding the transaction when it becomes available and any other relevant documents filed with the SEC, as well as any amendments or supplements to those documents, because they will contain important information. A free copy of the proxy statement, as well as other filings with the SEC containing information about the Company and the transaction may be obtained, when available, at the SEC's website at www.sec.gov. Copies of the proxy statement may also be obtained, when available, without charge, by directing a request to Harvest Natural Resources, Inc., Investor Relations, 1177 Enclave Parkway, Suite 300, Houston, Texas 77077 or at the Company's Investor Relations page on its corporate website at www.harvestnr.com. The Company and its directors and executive officers may be deemed to be participants in the solicitation of proxies from the Company's stockholders in connection with the approval of the Second Closing.

**Item 2.01 Completion of Acquisition or Disposition of Assets.**

On December 16, 2013, HNR Energia and Buyer effected the First Closing under the Share Purchase Agreement for a cash purchase price of $125 million. The description of the Share Purchase Agreement included in Item 1.01 above is incorporated herein by reference.

Attached to this Form 8-K as Exhibit 99.1 are certain unaudited pro forma condensed consolidated balance sheets and unaudited pro forma condensed consolidated statements of

2

HARVEST_RDR_000445

10/26/2018                                        Form 8-K

operations, which are derived from the Company's historical consolidated financial statements, and which give effect to the First Closing, the receipt of the net proceeds from the sale and the assumptions and adjustments described in the accompanying notes to the unaudited pro forma condensed consolidated financial statements.

**Item 7.01 Regulation FD Disclosure**

On December 16, 2013, the Company issued a press release regarding the execution of the Share Purchase Agreement and the effecting of the First Closing, which is attached to this Form 8-K as Exhibit 99.2.

**Item 9.01 Exhibits.**

2.1    Share Purchase Agreement, dated as of December 16, 2013, by and among HNR Energia BV, Harvest Natural Resources, Inc., Petroandina Resources Corporation N.V. and Pluspetrol Resources Corporation B.V.

99.1    Pro forma unaudited financial statements.

99.2    Press release issued by Harvest Natural Resources, Inc. on December 16, 2013.

3

HARVEST_RDR_000446

10/26/2018                                                    Form 8-K

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

HARVEST NATURAL RESOURCES, INC.

Dated: December 20, 2013                            By:   /s/ Keith L. Head
                                                          Keith L. Head
                                                          Vice President and General Counsel

4

HARVEST_RDR_000447

10/26/2018                                    Form 8-K

## EXHIBIT INDEX

2.1    Share Purchase Agreement, dated as of December 16, 2013, by and among HNR Energia BV, Harvest Natural
       Resources, Inc., Petroandina Resources Corporation N.V. and Pluspetrol Resources Corporation B.V.

99.1   Pro forma unaudited financial statements.

99.2   Press release issued by Harvest Natural Resources, Inc. on December 16, 2013.

HARVEST_RDR_000448



# Harvest Natural Resources Announces Agreement To Sell Interests In Venezuela

NEWS PROVIDED BY
**Harvest Natural Resources, Inc.** →
Jun 30, 2016, 06:30 ET

HOUSTON, June 30, 2016 /PRNewswire/ -- Harvest Natural Resources, Inc. (Harvest or the Company) (NYSE: HNR) today announced that it and its wholly-owned subsidiary, HNR Energia B.V. (HNR Energia), have entered into a Share Purchase Agreement with CT Energy Holding SRL, a private investment firm (CT Energy), to sell all of the Company's interest in Venezuela.

Under the terms of the Share Purchase Agreement, CT Energy will acquire HNR Energia's 51% interest in Harvest-Vinccler Dutch Holding B.V., a Netherlands company, through which all of Harvest's Venezuelan interests are owned, and CT Energy or an affiliate will deliver to Harvest $80 million in cash, subject to certain adjustments, and a $12 million six-month 11% note payable by CT Energy or such affiliate.

At the closing, Harvest will also receive cancellation of (i) $30 million of outstanding debt held by CT Energy, (ii) CT Energy's 8,667,597 shares of Harvest common stock, and (iii) warrants held by CT Energy to purchase 34,070,820 shares of Harvest common stock, exercisable under certain circumstances, at an exercise price of $1.25 per share.  Based on the closing price of the Company's stock on June 28, 2016, the market value of the shares of Harvest common stock held by CT Energy was $4.247 million.  As of March 31, 2016, the Company carried on its books a liability of $9.564 million in connection with the warrants held by CT Energy.

After giving effect to the transaction, Harvest would cease to have a presence in Venezuela, and the existing relationship between Harvest and CT Energy, which currently owns 16.8% of Harvest's outstanding common stock, would terminate.  In addition, at the closing, the two CT

Energy non-independent directors appointed in connection with CT Energy's initial investment in Harvest would resign from the Board of Directors. Going forward, Harvest's primary asset would be its oil and gas interests in Gabon and cash.

A special committee comprised of three independent and disinterested directors of Harvest, which did not include the three directors nominated by CT Energy (the Special Committee), with the assistance of its financial and legal advisors, carefully analyzed CT Energy's offer, and after in-depth negotiations and thorough consideration, concluded that the agreement was in the best interests of Harvest's stockholders and unanimously approved the Share Purchase Agreement. The Harvest Board unanimously approved the Share Purchase Agreement based on the Special Committee's recommendation.

In addition to approval by stockholders representing a majority of outstanding shares of Harvest common stock, the closing of the transaction is subject to, among other things, approval by a majority of outstanding shares held by non-CT Energy affiliated stockholders and approvals by the Government of the Bolivarian Republic of Venezuela. Availability of financing is not a condition to the transaction. Closing of the transaction would constitute a change of control under agreements the Company has in place with Corporacion Venezolana del Petroleo S.A. (CVP), a PDVSA affiliate, and Petroandina Resources Corporation N.V. (Petroandina), as well as the Company's incentive plans and employment agreements with its executive officers and key employees.

At closing of the transaction, Harvest will repay all remaining outstanding debt held by CT Energy in excess of the $30 million cancelled at closing. The current outstanding principal of the debt held by CT Energy stands at $31,961,241. The Company expects to issue additional debt to CT Energy of $2 million a month between now and closing. Assuming a September 30, 2016 closing, the remaining principal and accrued interest the Company would pay CT Energy at closing would be approximately $10 million. Net proceeds after payment of the remaining CT Energy debt, taxes and transaction-related costs from the transaction are estimated to be $63 million. These transaction-related costs include a reservation for potential change-of-control payments that could become payable under pre-existing agreements. Subject to determinations to be made by the Board, the remaining proceeds may be used to pay dividends, to continue to operate our business, or some combination of the two. The decision of the Board regarding how to use the remaining proceeds will be based on its determination of what is in the best interests of Harvest and its stockholders at the time a decision is made.

Case 4:18-cv-00483   Document 65-6   Filed in TXSD on 11/30/18   Page 3 of 4

Harvest will also continue to seek opportunities to sell its Gabon assets. To the extent the Company has not sold its Gabon assets, Harvest intends to operate and develop those assets in the ordinary course of business.

Tudor, Pickering, Holt & Co. served as financial advisor and Mayer Brown LLP acted as legal counsel to the Special Committee.

Norton Rose Fulbright acted as legal counsel to the Company.

Wachtell, Lipton, Rosen & Katz acted as legal counsel to CT Energy.

About Harvest Natural Resources

Harvest Natural Resources, Inc., headquartered in Houston, Texas, is an independent energy company with principal operations in Venezuela and exploration and exploitation assets in Gabon.  For more information visit Harvest's website at www.harvestnr.com.

CONTACT:
Stephen C. Haynes
Vice President, Chief Financial Officer
(281) 899-5716

Forward Looking Statements

This press release may contain projections and other forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934.  They may include the potential benefits of the transaction with CT Energy, expected use of proceeds, future expenses, planned capital expenditures, anticipated cash flow and our business strategy.  All statements other than statements of historical facts may constitute forward-looking statements.  Although Harvest believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will be correct.  Actual results may differ materially from Harvest's expectations due to uncertainties and risks outside of Harvest's control.  Such risks and uncertainties, include, among others, the following possibilities:  the failure to obtain the requisite

Case 4:18-cv-00483   Document 65-6   Filed in TXSD on 11/30/18   Page 4 of 4

stockholder approvals of the proposed transaction; the possibility that the closing conditions to the contemplated transaction may not be satisfied or waived, including that a governmental entity may prohibit, delay or refuse to grant a necessary regulatory approval; delay in closing the transaction or the possibility of non-consummation of the transaction; the occurrence of any event that could give rise to termination of the Share Purchase Agreement; risks related to the disruption of the transaction to Harvest and its management; the effect of announcement of the transaction on Harvest's ability to retain and hire key personnel and maintain relationships with its partners, suppliers and other third parties; difficult global economic and commodity and capital markets conditions; changes in the legal and regulatory environment ; and other risks, including those discussed in Harvest's 2015 Annual Report on Form 10-K and other public filings.

Important Information about the Transaction and Additional Information

Harvest and its directors and officers and CT Energy and its principals and employees may be deemed to be participants in the solicitation of proxies from Harvest's stockholders in connection with the transaction.  Information about Harvest's directors and executive officers and their ownership of Harvest stock is set forth in Harvest's 2015 Annual Report on Form 10-K, which was filed with the SEC on March 29, 2016, and Amendment No. 1 to its 2015 Annual Report on Form 10-K, which was filed with the SEC on April 29, 2016.  Other information regarding the participants in the proxy solicitation, and a description of their direct and indirect interests, will be contained in the proxy statement and other relevant materials to be filed with the SEC when they become available, which may be obtained free of charge at the SEC web site at www.sec.gov.  **Investors should read the proxy statement carefully when it becomes available before making any voting decision because it will contain important information about the proposed transaction.**

SOURCE Harvest Natural Resources, Inc.

Related Links

http://www.harvestnr.com

HARVEST_RDR_000452



**Exhibit**

**A-6**

# Harvest Natural Resources Announces Closing Of Sale Of Venezuelan Interests

NEWS PROVIDED BY
**Harvest Natural Resources, Inc.** →
Oct 07, 2016, 05:30 ET

HOUSTON, Oct. 7, 2016 /PRNewswire/ -- Harvest Natural Resources, Inc. (Harvest or the Company) (NYSE: HNR) has sold all of its Venezuelan interests in a closing that became effective this morning.  The closing occurred in accordance with Harvest's previously announced share purchase agreement dated June 29, 2016 among Harvest, its subsidiary HNR Energia B.V. and CT Energy Holding SRL.  Delta Petroleum N.V., as a permitted assignee, fulfilled CT Energy's obligations under the share purchase agreement.  Harvest's stockholders approved the transaction on September 15, 2016.

At the closing, Harvest received $80 million in cash, a $12 million six-month 11% note payable to Harvest by the purchaser, and cancellation of $30 million in debt owed by Harvest to CT Energy.  Harvest used part of this cash consideration to pay the remaining debt it owed to CT Energy and for other expenses and adjustments associated with the transaction.  Net cash proceeds received after paying the above closing adjustments and other expenses was $69.4 million.  Also at the closing, CT Energy relinquished its 8,667,597 shares of Harvest common stock, which will be held as treasury shares, and agreed to terminate the warrant, issued in June 2015, to purchase up to an additional 34,070,820 shares of Harvest common stock.  With the return of the shares held by CT Energy, Harvest now has 44,318,567 outstanding shares.

After receiving payment of the purchaser's note payable of $12.0 million less taxes, funding a reserve for potential change of control payments and working capital, the estimated cash remaining is expected to be $62 million.  Upon the potential exercise of vested options held by

employees, the estimated outstanding shares of Harvest common stock is expected to be 48,693,768 shares.

As a result of the transaction, Harvest has ceased to have a presence in Venezuela, two of the directors appointed by CT Energy to Harvest's board resigned, Harvest owes no debt to CT Energy, and the relationship between Harvest and CT Energy has terminated.

Going forward, Harvest's primary tangible asset is its oil and gas interests in Gabon.  Harvest has received two proposals for the purchase of its Gabon interests and is in discussions with both potential buyers; however, there can be no assurances that these discussions or either proposal may lead to a definitive transaction.  Harvest is currently evaluating the possible sale of its Gabon interests, distributions of cash to its stockholders, and possible dissolution of the Company.

Concurrently with the closing of Harvest's sale of its Venezuelan interests (through the sale of its 51% equity interest in Harvest-Vinccler Dutch Holding B.V.), Petroandina Resources Corporation N.V. sold its 29% equity interest in Harvest-Vinccler to the same purchaser.  As a result, the parties terminated the December 2013 shareholders' agreement regarding their holdings in Harvest-Vinccler, Petroandina released Harvest from all claims in connection with the shareholders' agreement, and Petroandina's lawsuit against Harvest and HNR Energia is expected to be dismissed by the Delaware Court of Chancery next week, in accordance with Harvest's settlement agreement with Petroandina.

<u>About Harvest Natural Resources</u>

Harvest Natural Resources, Inc., headquartered in Houston, Texas, is an independent energy company with exploration and exploitation assets in Gabon.  For more information visit Harvest's website at www.harvestnr.com.

CONTACT:
Stephen C. Haynes
Vice President, Chief Financial Officer
(281) 899-5716

HARVEST_RDR_000454

Forward Looking Statements

This press release may contain projections and other forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934.  This information may include expected use of proceeds, possible transactions, future plans and business strategy.  All statements other than statements of historical fact may constitute forward-looking statements.  Although Harvest believes that the expectations reflected in these forward-looking statements are reasonable, it can give no assurance that these expectations will be correct.  Actual results may differ materially from Harvest's expectations due to uncertainties and risks outside of Harvest's control.  These risks and uncertainties include, among others, the following:  difficult economic, global and commodity and capital markets conditions; changes in the legal or regulatory environment; uncertainties associated with Harvest's ability to enter into a definitive purchase agreement regarding its Gabon assets on terms that it believes are in the best interests of its stockholders; uncertainties regarding business opportunities that may or may not be available to Harvest; and other risks, including many of those included in Harvest's Annual Report on Form 10-K for 2015, Harvest's proxy statement relating to its annual stockholders' meeting held in September 2016, and other public filings made with the Securities and Exchange Commission.

SOURCE Harvest Natural Resources, Inc.

Related Links

http://www.harvestnr.com

HARVEST_RDR_000455

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES,** | § | |
| **INC., and HNR ENERGIA B.V.** | § | |
| | § | |
| *Plaintiffs* | § | |
| **v.** | § | |
| **JUAN JOSÉ GARCIA MENDOZA,** | § | |
| **PETRO CONSULTORES, S.C., PETRO** | § | |
| **CONSULTORES INTERNATIONAL** | § | |
| **TRADING COMPANY, INC.,** | § | **CIVIL ACTION: 4:18-cv-00483** |
| **PETROCONSULTORES (BARBADOS),** | § | |
| **LTD., PETROCONSULTORES, INC.,** | § | |
| **AZURE 904, LLC, RAFAEL DARIO** | § | |
| **RAMIREZ CARRENO, EULOGIO** | § | |
| **ANTONIO DEL PINO DIAZ, and JOSE** | § | |
| **ANGEL GONZALEZ ACOSTA,** | § | |
| | § | |
| *Defendants.* | § | |

**ORDER**

The Court has considered Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V.'s Motion for Default Judgment against Defendant Rafael Dario Ramirez Carreno and supporting affidavit.

The Court finds that Defendant Ramirez was properly served in accordance with Federal Rule of Civil Procedure 4(e), and that he failed to answer, respond, or otherwise defend the claims brought against him within the time period prescribed by Federal Rule of Civil Procedure 12(a)(1)(A)(i).

The Court also finds that the damages sought by Plaintiffs in the amount of $472,039,552.66 is a sum certain or a sum that can be made certain by computation in accordance with Federal Rule of Civil Procedure 55(b)(1).  Accordingly, Plaintiffs' motion is granted.

810654.1

**HARVEST_RDR_000456**

IT IS HEREBY ORDERED that the Clerk:

1.     enter Defendant Rafael Dario Ramirez Carreno's default; and

2.     enter a default judgment against Defendant Rafael Dario Ramirez Carreno in the amount of $472,039,552.66.

SIGNED on _____, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

2810654.1