# EXHIBIT 31

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

| | |
|---|---|
| Harvest Natural Resources, Inc., and HNR Energia B.V. | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) ) Civil Action No.  4:18-cv-00483 |
| Juan Jose Mendoza Garcia, et al. | ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Rafael Darío Ramírez Carreño
16 E. 81st Street
New York, New York 10028

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Lee L. Kaplan, Smyser Kaplan & Veselka,LLP, 700 Louisiana, Ste. 2300, Houston, Texas 77002.

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DAVID J. BRADLEY

*CLERK OF COURT*

Date:   02/16/2018

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   4:18-cv-00483

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*    Rafael Dario Ramírez Carreño

was received by me on *(date)*                                          .

    ❒ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

    ❒ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❒ I returned the summons unexecuted because _____ ; or

    ❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
Server's signature

_____
Printed name and title

_____
Server's address

Additional information regarding attempted service, etc:

HARVEST_RDR_000023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **HARVEST NATURAL RESOURCES, INC.,** | § | |
| **and HNR ENERGIA B.V.** | § | |
| | § | |
| **Plaintiffs,** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **v.** | § | |
| | § | |
| **JUAN JOSE MENDOZA GARCIA,** | § | |
| **PETRO CONSULTORES S.C.,** | § | |
| **PETRO CONSULTORES INTERNATIONAL** | § | |
| **TRADING COMPANY, INC.,** | § | |
| **AZURE 904 LLC,** | § | |
| **RAFAEL DARIO RAMIREZ CARRENO,** | § | |
| **EULOGIO ANTONIO DEL PINO DIAZ, and** | § | |
| **JOSE ANGEL GONZALEZ ACOSTA,** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Harvest Natural Resources, Inc. and HNR Energia B.V. (collectively, "Harvest") file this Original Complaint against Juan Jose Mendoza Garcia, Petro Consultores S.C., Petro Consultores International Trading Company, Inc., Azure 904 LLC, Rafael Dario Ramirez Carreno, Eulogio Antonio Del Pino Diaz, and Jose Angel Gonzalez Acosta.

## INTRODUCTION

1.      For over a decade, Venezuelan national oil company Petroleos de Venezuela, S.A. ("PDVSA"), the Defendants, other high-ranking PDVSA executives, third party "agents," and business partners, and various financial institutions conspired to force American companies to pay-to-play in Venezuela's oil and gas industry in one of the largest bribery and money-laundering schemes in history.  Harvest is just one, but perhaps one of the largest, known victims of this scheme.  In short, because Harvest and its business partners refused four separate $10 million bribe demands solicited by the Defendants, Venezuela's Ministerio del Poder Popular de

**HARVEST_RDR_000024**

Petroleo y Mineria withheld final approval for Harvest to sell its Venezuelan energy assets to two different buyers in 2013 and 2014 (first for $725 million and then for $400 million).  As a result, Harvest was forced to sell the same assets for approximately $255 million, at a loss of $470 million, and unexpectedly to cease doing business and wind up its affairs.

2.      Harvest was directly and immediately harmed by Defendants' wrongful conduct. Harvest was never complicit in that conduct, refusing to participate at every turn.  Harvest seeks compensation for the harm suffered from the Defendants' pattern of wrongful behavior, and for the loss of rights that Harvest otherwise would have been able to obtain in a fair and competitive market untainted by bribery.  Harvest accordingly brings this action asserting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Sherman Act; the Robinson-Patman Act; and the Texas Free Enterprise and Antitrust Act.

## PARTIES

3.      Harvest is a corporation organized under the laws of Delaware, with its principal place of business in Houston, Texas.  From 1989 until May 2017, Harvest operated as a publicly-held independent energy company engaged in the development and production of oil and gas properties.  Harvest formally dissolved on May 4, 2017, and no longer operates as an oil and gas company.  However, as required by Delaware law, Harvest continues to exist for a period of at least three years (until May 2020) for the purposes of prosecuting lawsuits, liquidating, and closing its business.  *See* Del. Code Title 8 § 278.

4.      HNR Energia B.V., a Curacao company ("HNR Energia"), is Harvest's wholly-owned subsidiary.

5.      Defendant Petro Consultores S.C. is an entity organized under the laws of Venezuela, with its principal place of business in Caracas, Venezuela.  Petro Consultores S.C.

HARVEST_RDR_000025

operates permanent offices in Surfside, Florida, and in Madrid, Spain, and conducts business in Houston, Texas.  Defendant Petro Consultores International Trading Company, Inc. is an entity organized under the laws of Panama, with its principal place of business in Panama.

6.      Defendant Azure 904 LLC is an entity organized under the laws of Florida, with its principal place of business in Florida.

7.      Defendant Juan Jose Mendoza Garcia is an individual residing in Surfside, Florida.  Garcia works as a consultant in the oil and gas industry for companies, including U.S. and Texas-based companies, that conduct business in Venezuela.  Garcia is an owner, officer, and employee of Petro Consultores S.C. and Petro Consultores International Trading Company, Inc.  Garcia also was an owner and manager of Azure 904 LLC during the relevant timeframe. On information and belief, Garcia operates or at the time relevant to the allegations herein operated each of these entities as conduits for illegal activity, including that described herein.

8.      Defendant Rafael Dario Ramirez Carreno ("Ramirez") is a former president of PDVSA and Venezuela's former Minister of Energy.   Ramirez held both positions simultaneously between 2004 and 2014.  PDVSA is Venezuela's state-owned oil and gas company, which does business with companies across the globe, including those located in the United States and Texas.

9.      Defendant Eulogio Antonio Del Pino Diaz ("Del Pino") is a former president of PDVSA and Venezuela's former Minister of Oil.  Del Pino held both positions simultaneously between 2014 and 2017.  From 2008 until 2013, Del Pino was the Vice President for Exploration and Production at PDVSA.

HARVEST_RDR_000026

10.     Defendant Jose Angel Gonzalez Acosta ("Gonzalez") was a member of PDVSA's executive committee and Venezuela's former Vice Minister for Hydrocarbons.  Gonzalez held these positions throughout the period of the two thwarted deals described herein.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 and 1337 because the claims arise under federal law, including RICO violations under 18 U.S.C. § 1961 *et seq*. and antitrust violations under 15 U.S.C. § 1.

12.     Subject matter jurisdiction also exists over the RICO claims under 18 U.S.C. § 1964(c) and the antitrust claims under Section 4 of the Sherman Act, 15 U.S.C. § 4, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

13.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the federal claims.

14.     This Court has personal jurisdiction over Defendants because they committed unlawful acts in this judicial district.  Defendants also committed acts elsewhere with the purpose and intent that their acts would cause harm to Harvest in this judicial district.  Additionally, Defendants' acts in fact had immediate and direct consequences in this judicial district.  28 U.S.C. § 1605(a)(2).

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.  Venue is proper in this judicial district against those Defendants not resident in the United States under 28 U.S.C. § 1391(c)(3).  Venue is also proper against Defendants under 28

HARVEST_RDR_000027

U.S.C. § 1391(b)(3) because they are subject to the Court's personal jurisdiction with respect to this civil action.

16.     Venue is also proper under 18 U.S.C. § 1965(a) because one or more of the Defendants transact their affairs in this judicial district.  Additionally, venue is proper under 18 U.S.C. § 1965(b) because the ends of justice require that Defendants be brought before this Court to the extent that the federal RICO claims against them would not otherwise be subject to venue in this Court.

**FACTS**

17.     Incorporated in 1988, Harvest was a publicly-held independent energy company engaged in the development and production of oil and gas properties from 1989 until May 2017. Harvest operated at all times with its principal place of business in Houston, Texas.

18.     Harvest conducted substantial business in Venezuela, including with PDVSA, through various subsidiaries and holding companies.  HNR Energia, a wholly-owned subsidiary of Harvest Natural Resources, Inc., held an 80 percent interest in Harvest-Vinccler Dutch Holding B.V., a Netherlands company ("Harvest Holding").  Harvest Holding indirectly owned, through wholly-owned subsidiaries, 40 percent of Petrodelta, S.A., an exploration and production company organized under Venezuelan law ("Petrodelta").  Corporacion Venezolana del Petroleo ("CVP"), a wholly-owned subsidiary of PDVSA, owned the remaining 60 percent of Petrodelta.

**The Thwarted Pertamina Deal: Harvest Rejects 2012 and 2013 Bribe Solicitations**

19.     In June 2012, Harvest entered into a share purchase agreement with PT Pertamina, a state-owned limited liability company existing under the laws of the Republic of Indonesia.  HNR Energia agreed to sell, indirectly through subsidiaries, all of Harvest's interests in Venezuela for a cash purchase price of $725 million ("the Pertamina Deal").  The Pertamina

5

HARVEST_RDR_000028

Deal was subject to approval by the governments of Venezuela and Indonesia. Harvest reported the deal in its Form 8-K filed with the Securities and Exchange Commission on June 21, 2012. The agreement was public and was reported on by industry publications. Securities and Exchange Commission, "Filing Detail" (June 21, 2012), *available at* https://www.sec.gov/Archives/edgar/data/845289/000119312512278671/0001193125-12-278671-index.htm.

20.     Defendant Del Pino, at the time a Vice President at PDVSA, was directly involved in the proposed sale and in subsequent dealings and negotiations with Harvest in the United States.

21.     On July 19, 2012, Harvest CEO James Edmiston sent from Houston, Texas, an email to Defendant Del Pino regarding an inquiry that Edmiston and Harvest had received from an energy reporter. The reporter wrote Edmiston that his "sources tell [him] that Caracas [i.e., individuals at PDVSA or the Oil Ministry] will block the sale of your Venezuelan assets." Edmiston also wrote to Del Pino that Edmiston had "heard some rumors that a bonus of some type will be required for the sale to be approved."

22.     Defendant Del Pino never responded to the email. The sale process continued.

23.     On September 4, 2012, Del Pino commented to reporters that a decision by Venezuela's Oil Ministry could be reached in the "upcoming days." On September 7, 2012, *The Jakarta Post* reported that Del Pino said the acquisition plan "looked positive." In October 2012, Del Pino met with representatives from Pertamina.

24.     Unfortunately, the following month, the dreaded rumor—that a "bonus" would be required—turned out to be true.

HARVEST_RDR_000029

25.     In November 2012, Defendant Garcia approached Juan Francisco Clerico, a director of Harvest-Vinccler, S.A., in Caracas, Venezuela, regarding the agreed sale of Harvest's stake in Petrodelta.  Garcia informed Clerico that Garcia was speaking on behalf of Defendant Ramirez and at Ramirez's request.  Garcia stated that Harvest must pay USD $10 million in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria.  Garcia solicited this bribe knowing and intending that the solicitation would be conveyed to Harvest in Houston, Texas, and that any bribe, if paid, would necessarily come from Harvest's bank accounts in the United States.

26.     As intended, following the meeting with Garcia, Clerico contacted Edmiston in Houston and requested an immediate meeting in Miami.  Clerico and Edmiston met in Miami on November 7, 2012, at Miami International Airport, where Clerico informed Edmiston that Garcia had demanded a $10 million bribe, on behalf of Ramirez and at Ramirez's request, for final contract approval.  Edmiston and Harvest were unwilling to pay the bribe and declined to do so.

27.     In late November or early December 2012, Pertamina informed Edmiston that Pertamina had received a similar bribe demand from Defendant Garcia.  Pertamina also declined to pay the bribe.

28.     In the subsequent months, Defendants made unreasonable demands to try to force Harvest to pay the bribe.  For example, for no legitimate business reason, Defendants made ongoing changes to the financing requirements to approve the contract.

29.     On January 23, 2013, Defendant Del Pino again met with Pertamina.  Pertamina reported to Harvest in a January 27, 2013 email that "basically there was no further movement from [Del Pino] on the Business Plan."

726544.1

HARVEST_RDR_000030

30.     On February 13, 2013, Defendant Ramirez, then Venezuela's oil minister, was quoted in a *Bloomberg* article as stating that Venezuela was "still analyzing a proposed asset sale."  Tellingly, Ramirez stated: "Both the buyer and seller know what they need to do in order to obtain government approval."

31.     What Harvest and Pertamina "need[ed] to do to obtain government approval" was pay a $10 million bribe.  Both companies nevertheless refused.

32.     Because Harvest refused to pay the $10 million bribe, the Pertamina Deal fell through.

33.     On February 20, 2013, one week after Defendant Ramirez's comments to the press, Harvest announced the termination of the Pertamina Deal.  Defendants had substantially and materially changed the conditions for contract approval by the Venezuelan government because of Harvest and Pertamina's refusal to pay the bribes.  As a result of the increased financing obligations, among other onerous terms and conditions demanded by Defendants because their bribes were refused, and the resulting withholding of final contract approval in Venezuela, the Indonesian government, too, refused to approve the deal.

**The Thwarted Petroandina Deal: Harvest Rejects 2013 and 2014 Bribe Solicitations**

34.     Throughout the remainder of 2013, Harvest searched for other sale opportunities for its Venezuelan assets.

35.     Defendant Garcia visited Houston from October 10, 2013, to October 20, 2013.

36.     On December 16, 2013, Harvest entered into a share purchase agreement with Petroandina Resources Corporation N.V. ("Petroandina") and Petroandina's parent company, Pluspetrol Resources Corporation B.V. ("Pluspetrol"), to sell Harvest's entire 80 percent equity interest in Harvest Holding to Petroandina ("the Petroandina Deal").   The Petroandina Deal

726544.1

**HARVEST_RDR_000031**

would involve two closings for a total cash purchase price of $400 million.  The first closing occurred on December 16, 2013, contemporaneously with the signing of the share purchase agreement, where Harvest sold a 29 percent equity interest in Harvest Holding to Petroandina for $125 million.  This closing did not require contract approval from the Venezuelan government.

37.    The second closing under the share purchase agreement, for the sale of the remaining 51 percent equity interest in Harvest Holding for a cash purchase price of $275 million, was subject to contract approval by Venezuela's Ministerio del Poder Popular de Petroleo y Mineria.  Harvest reported the deal in its Form 8-K filed with the Securities and Exchange Commission on December 20, 2013.  The agreement was public and was reported on by industry publications.  Securities and Exchange Commission, "Filing Detail" (Dec. 20, 2013), *available at* https://www.sec.gov/Archives/edgar/data/845289/000119312513480266/000119312 5-13-480266-index.htm.

38.    Once again, however, the Defendants delayed approval of the second closing and actively took steps to scuttle it.  For example, after the parties agreed on and made arrangements for $850 million in financing—a figure that the Venezuelan government had previously indicated would be acceptable—the Defendants increased the demand to $1.5 billion for no legitimate reason.  The Defendants made it clear that a bribe was required to resolve such issues and secure Venezuelan approval.

39.    In approximately fall 2014, Javier Alfredo Iguacel, Vice President of Business Development at Pluspetrol, informed Edmiston in Houston that he had been contacted by Defendant Garcia.  Yet again, Garcia demanded a bribe payment in order to receive contract approval from Venezuela's Ministerio del Poder Popular de Petroleo y Mineria.  Garcia

HARVEST_RDR_000032

demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States. Harvest and Pluspetrol refused to pay the bribe.

40.     On November 19, 2014, Defendant Del Pino sent a letter to Harvest in Houston explaining that CVP, PDVSA's subsidiary, would block the second closing unless Harvest both paid an extra "bonus" to the Ministerio del Poder Popular de Petroleo y Mineria, "in addition to those [bonuses] approved in the original Business Plan," and satisfied other new, stringent financing requirements. Del Pino carbon-copied Defendant Gonzalez and Asdrubal Chavez. The letter was sent on CVP letterhead.

41.     In late 2014, in Buenos Aires, Argentina, Defendant Gonzalez, PDVSA executive committee member, met with Francisco Pulit, Senior Vice President of Corporate Development at Pluspetrol, the agreed buyer of Harvest's assets. The meeting concerned the deal with Harvest, including the financing requirements that Venezuela would demand in order to approve the deal. Gonzalez informed Pulit that "a bribe can make it all go away"—i.e., resolve the fabricated issues that were delaying approval. Gonzalez demanded the bribe knowing that the demand would again be conveyed to Harvest in the United States. Pulit conveyed this information to Edmiston in Houston, Texas, but both Harvest and Pluspetrol again refused to pay any bribe.

42.     On January 1, 2015, knowing that it would never receive Venezuelan approval because of its refusal to pay the bribe demand, Harvest exercised its right through HNR Energia to terminate the share purchase agreement for the Petroandina Deal in accordance with the Deal's terms. Thus, the second closing, and the sale of Harvest's remaining 51 percent interest in Harvest Holding, never took place.

726544.1

HARVEST_RDR_000033

**Harvest Finally Sells its Venezuelan Assets at a $470 Million Loss**

43.     After losing a second deal because of its refusal to pay bribes, Harvest spent 2015 and 2016 searching for yet another buyer of its remaining Venezuelan assets.

44.     Finally, on June 29, 2016, Harvest entered into a share purchase agreement for the sale of HNR Energia's remaining interest in Harvest Holding to CT Energy Holding SRL, a Barbados Society with Restricted Liability.  The sale was completed on October 7, 2016.

45.     No bribe demands were made during this third and final attempted sale. Defendant Ramirez had left PDVSA after the second attempted sale, and thus was no longer PDVSA's President (rather, he was serving as Venezuela's ambassador to the United Nations).

46.     The sale price, including cash, promissory notes, and other assets, was approximately $130 million.

47.     Thus, Harvest sold the same assets that it had previously found buyers for at $725 million (the Pertamina Deal) for a total of $255 million: $125 million (the 29 percent interest in Harvest Holding sold to Petroandina) plus $130 million (the 51 percent interest in Harvest Holding sold to CT Energy).  This amounted to a loss of approximately USD $470 million.

48.     Harvest Natural Resources, Inc. sold its remaining assets in other countries in late 2016 and early 2017.  On February 23, 2017, its stockholders authorized its dissolution following the sale of its last remaining operating assets.  Harvest Natural Resources, Inc. dissolved on May 4, 2017.

49.     HNR Energia B.V. continues to exist in all capacities.

**Criminal Investigations into Corruption in Venezuela's Oil and Gas Industry**

50.     The U.S. Bureau of Economic and Business Affairs ranks Venezuela as the most corrupt country in Latin America (11th most corrupt country in the world).  The Bureau has explained that "[c]orruption is endemic in Venezuela."  U.S. Department of State, Bureau of

HARVEST_RDR_000034

Economic and Business Affairs, "Investment Climate Statements for 2017: Venezuela" (no date), *available at*

https://www.state.gov/e/eb/rls/othr/ics/investmentclimatestatements/index.htm?year=2017&dlid=270104#wrapper.

51.    The oil and gas sector is responsible for a substantial part of Venezuela's economy; PDVSA "still accounts for nearly all the country's export earnings, roughly half of government revenues and about a quarter of the shrinking gross domestic product." Unsurprisingly, the oil sector has seen rampant corruption.  "Corruption has been a chronic and well-known problem for years at Pdvsa and has helped to undercut its operations and profits." Kirk Semple & Clifford Krauss, *The New York Times*, "Politics Shadow Arrests of Citgo Executives in Venezuela Graft Inquiry" (Nov. 22, 2017), *available at* https://www.nytimes.com/2017/11/22/world/americas/venezuela-citgo-oil-arrests-corruption.html.

52.    In October 2017, the U.S. Department of Homeland Security arranged for the arrest by Spanish authorities of Venezuelan national Rafael Ernesto Reiter Munoz ("Reiter"), PDVSA's head of security and loss prevention under Defendant Ramirez, "as part of a broadening inquiry of Pdvsa stemming from allegedly fraudulent contracts dispensed for bribes." *Id*.

53.    Spanish police also arrested Nervis Gerardo Villalobos Cardenas ("Villalobos"), "former deputy Venezuelan energy minister [under Ramirez]. . . on a U.S. warrant for alleged involvement in [a] $1 billion bribery scheme involving Venezuela's state-run oil company PDVSA."  Aritz Parra & Joshua Goodman, *Associated Press*, "Venezuelan ex-official detained

HARVEST_RDR_000035

in Spain on US warrant" (Oct. 27, 2017), *available at* http://www.chicagotribune.com/sns-bc-lt--spain--venezuela-ex-officials-arrested-20171026-story.html.

54.     Also in October 2017, Venezuelan authorities arrested the President of PDVSA subsidiary CVP as part of a corruption investigation.  *Telesur*, "Venezuela: Ex-Pdvsa Vice President, 10 Managers Arrested for Corruption, Sabotage (Oct. 27, 2017), *available at* https://www.telesurtv.net/english/opinion/Venezuela-Ex-Pdvsa-Vice-President-10-Managers-Arrested-for-Corruption-Sabotage-20171027-0012.html.

55.     On November 30, 2017, Venezuelan authorities arrested Defendant Del Pino as part of a corruption probe.  The Chief Prosecutor announcing the arrest stated: "We're talking about the dismantling of a cartel of organized crime that had taken over PDVSA."  Nestor Martinez, the former President of PDVSA, was also arrested.  Alexandra Ulmer & Deisy Buitrago, *Reuters*, "Venezuela arrests ex-oil bosses for graft in widening purge" (Nov. 30, 2017), *available at* https://ca.reuters.com/article/topNews/idCAKBN1DU1X4-OCATP.

56.     It was reported in December 2017 that Defendant Ramirez "is believed to be the ultimate target of the PDVSA housecleaning as well as an ongoing probe in the U.S. that has led to the arrest of more than 10 individuals for paying bribes and kickbacks, including two former close aides to Ramirez arrested last month in Spain."  Jorge Rueda & Joshua Goodman, *Associated Press*, "Venezuela arrests top oil officials in corruption probe" (Dec. 1, 2017), *available at* http://www.chicagotribune.com/news/nationworld/sns-bc-lt--venezuela-oil-arrests-20171130-story.html.

57.     It was also reported that "U.S. officials have sought to enlist [Ramirez] as an informant as federal prosecutors looked into alleged corruption and drug-profit laundering through the state oil company, known as PdVSA, according to people familiar with those

HARVEST_RDR_000036

requests."  A "former senior U.S. official" told the *Wall Street Journal* that he "can confirm that the U.S. has had an interest in possible criminal activity by Mr. Ramirez since 2011."  Kejal Vyas, Jose de Cordoba & Anatoly Kurmanaev, *Wall Street Journal*, "Venezuela's U.N. Envoy Rafael Ramirez Resigns" (Dec. 5, 2017), *available at* https://www.wsj.com/articles/venezuelas-u-n-envoy-rafael-ramirez-resigns-1512499605.

58.     Similarly, another publication reported that "[y]et another diplomat cited Caracas sources who intimated Ramirez may already be working a deal with U.S. authorities who have implicated him in illegal activities, to inform on higher-ups and receive asylum in the United States."  Benny Avni, *Daily Beast*, "Will the Feds Nail Venezuela's (Ex) U.N. Ambassador?" (Nov. 30, 2017), *available at* https://www.thedailybeast.com/will-the-feds-nail-venezuelas-ex-un-ambassador.

59.     Also in December 2017, it was reported that the Venezuelan Attorney General's office "opened a criminal investigation into former oil minister and ex-head of state oil company PDVSA, Rafael Ramirez, over documents [the Attorney General] said show he illegally acted as an intermediary in oil sales."  "The top prosecutor said the investigation was part of a probe the AG's office is carrying out into the use of Andorran lender Banca Privada D'Andorra to launder some 4.2 billion euros ($5 billion) in state oil funds since 2006."  *Latin American Tribune*, "Venezuela AG's Office Opens Criminal Probe into Ex-Oil Minister" (no date), *available at* http://www.laht.com/article.asp?ArticleId=2447592&CategoryId=10717.

60.     Similarly, the United States Department of the Treasury issued a Notice of Finding in 2015 concluding that Banca Privada D'Andorra was involved in a money-laundering scheme to deposit the proceeds of public corruption in Venezuela.  The network engaged in the scheme "was well connected to Venezuelan government officials and relied on various methods

726544.1

HARVEST_RDR_000037

to move funds, including false contracts, mischaracterized loans, over- and under-invoicing, and other trade-based money laundering schemes."  The Department of the Treasury found that a third party money lender "gave High-Level Manager B false contracts to support transactions purported to be on behalf of Venezuelan public institutions including Petroleos de Venezuela S.A. ('PDVSA'), the public oil company of Venezuela."  In total, Banca Privada D'Andorra "facilitated the movement of $4.2 billion in transfers related to Venezuelan money laundering." *Federal Register*, "Notice of Finding that Banca Privada d'Andorra Is a Financial Institution of Primary Money Laundering Concern" (Mar. 13, 2015), *available at* https://www.federalregister.gov/documents/2015/03/13/2015-05911/notice-of-finding-that-banca-privada-dandorra-is-a-financial-institution-of-primary-money-laundering.

61.  In October 2016, U.S. Senator Marco Rubio issued a press release "urg[ing] the Obama Administration to sanction Venezuelan government official Rafael Ramirez for corruption during his tenure as head of [PDVSA]."  The press release quoted Senator Rubio as stating: "Rafael Ramirez oversaw corruption at PDVSA to the tune of $11 billion, which is not just criminal; it's downright cruel and inhumane when you consider the daily challenges confronting the Venezuelan people.  Mr. Ramirez belongs in jail along with everyone else who stole this $11 billion, and it's an outrage that he can instead be seen gallivanting today around Manhattan, living the high life as Venezuela's United Nations envoy."  Marco Rubio Senate Website, Press Releases, "Rubio Calls For Sanctions Against Corrupt Former Head of Venezuela's State-Owned Oil Company" (Oct. 21, 2016), *available at* https://www.rubio.senate.gov/public/index.cfm/press-releases?ID=A4E50648-F90A-4D77-B317-46C6821385FF.

726544.1

HARVEST_RDR_000038

62.     In a Southern District of Texas indictment, the government has alleged that PDVSA officials were involved in a widespread bribery conspiracy.  The indictment identifies "Officials A–E" as foreign officials who were employed by PDVSA at all relevant times. Indictment, Doc. 1, *United States v. Rincon et al.*, No. 4:15-cr-00654 (S.D. Tex. Dec. 10, 2015).

63.     In a press release, the Department of Justice stated that one of the defendants in that matter was "the sixth individual to plead guilty as part of a larger, ongoing investigation by the U.S. government into bribery at PDVSA."  In March 2016, the Court "also unsealed charges against four other individuals charged in connection with the ongoing investigation, including three foreign officials.  The foreign officials admitted that while employed by PDVSA or its wholly owned subsidiaries or affiliates, they accepted bribes from [the named defendants in that matter] in exchange for taking certain actions to assist companies owned by [the defendants] in winning energy contracts with PDVSA.  The foreign officials also conspired with [the defendants] to launder the proceeds of the bribery scheme, they admitted."  *See* Department of Justice, "Businessman Pleads Guilty to Foreign Bribery and Tax Charges in Connection with Venezuela       Bribery       Scheme"       (June       16,       2016),       *available       at* https://www.justice.gov/opa/pr/businessman-pleads-guilty-foreign-bribery-and-tax-charges-connection-venezuela-bribery-scheme.

64.     In the same matter, the government filed a response to a motion by Bariven S.A., a PDVSA subsidiary, in which Bariven sought recognition of its rights as a "victim" and entitlement to restitution.  Government's Response, Doc. 113, *United States v. Rincon et al.*, No. 4:15-cr-00654 (S.D. Tex. Feb. 20, 2017).  In its response, the government explained that its "investigation into corruption at PDVSA and Bariven remains ongoing."  *Id*. at 6.  The government opposed Bariven's attempt to seek victim status, arguing that "Bariven's extensive

726544.1

HARVEST_RDR_000039

participation in the bribery and money laundering schemes charged in these related cases"
preclude it from being recognized as a victim.  *Id.* at 11.

65.     At the end of December 2017, it was reported that the Venezuelan state
prosecutor announced that his office was "investigating Rafael Ramirez, a once powerful oil
minister and former head of state oil company PDVSA, in connection with an alleged $4.8
billion Vienna-based corruption scheme."  "Prosecutor Tarek Saab said Ramirez and at least four
other oil executives from the South American OPEC nation sold crude oil at below market prices
in exchange for bribes."   Saab informed the press that "(Ramirez) appears as the main
intellectual author of what happened."  Deisy Buitrago & Marianna Parraga, *World Energy
News*, "Ex-PDVSA oil czar Ramirez Probed in $4.8B Scandal" (Dec. 30, 2017),
*available at* https://www.worldenergynews.com/news/pdvsa-oil-czar-ramirez-probed-scandal-
667979.

66.     In February 2018, the government unsealed an August 2017 indictment against
five former Venezuelan government officials—including Nervis Villalobos and Rafael Reiter,
both of whom were arrested in Spain in 2017.  The indictment alleged that from at least 2011 to
2013 the former officials, both inside and outside PDVSA, were part of a "management team"
that wielded significant influence at PDVSA, and conspired with each other and others to solicit
bribes from companies seeking approval for PDVSA-related contracts.   The conspirators
laundered the bribery scheme proceeds through a complex series of international financial
transactions.  Indictment, Doc. 1, *United States v. De Leon et al*., No. 4:17-cr-00514 (S.D. Tex.
Aug. 23, 2017).

67.     The *De Leon* indictment identifies "Official B" as "an individual whose identity is
known to the Grand Jury, [who] was at all relevant times a senior Venezuelan government

HARVEST_RDR_000040

official." *Id*. ¶ 35.  The indictment alleges that he was part of the "management team" engaged in bribery and money laundering.  *Id*. ¶¶ 51, 132, 134.  The indictment also alleges that the bribes were split between the defendants and other unindicted co-conspirators, including Official B, and that illicit funds were used, e.g., to pay tuition for Official B's children in 2014.  *Id*. ¶¶ 51, 126–27, 132, 134.

68.     According to a U.S. official who spoke on condition of anonymity, Official B is Defendant Ramirez.  Joshua Goodman, *Associated Press*, "Official: US says ex-Venezuela oil czar took bribes" (Feb. 13, 2018), *available at* http://www.chicagotribune.com/news/nationworld/sns-bc-lt--venezuela-corruption-20180213-story.html.

69.     The bribery and money-laundering scheme and RICO and antitrust violations discussed herein, which directly harmed Harvest, were part of this same conspiracy and criminal activity outlined above.

**Defendants Harmed Competition and Caused a Substantial Effect in the United States**

70.     In addition to constituting RICO violations, as set forth herein, the Defendants' bribery and related conduct has harmed competition in multiple markets in violation of the antitrust laws and caused a substantial effect in the United States.

71.     The Defendants' unlawful conduct affected the market for American and other companies engaged in oil and gas production in Venezuela.  Because of the Defendants' unlawful conduct, companies doing business lawfully in Venezuela that refused to engage in anticompetitive bribery, such as Harvest, were effectively crippled in the market.  The Defendants ensured that Harvest and similarly law-abiding companies either could not sell assets, purchase assets, or otherwise conduct business in Venezuela, or could do so only subject

726544.1

HARVEST_RDR_000041

to frequent, unnecessary, anticompetitive, and expensive hurdles.  As a result of the Defendants'

behavior, U.S. oil and gas companies could not engage in fair and lawful competition activity.

72.     The Defendants' unlawful conduct also affected the consumer market for gasoline

in the United States.  Because of the Defendants' unlawful conduct, consumers were required to

pay for an end product that effectively included a "corruption tax" as a cost of producing oil

from Venezuela.  The Defendants' behavior negatively affected competition activity in the

consumer market.

73.     Harvest was not the only entity injured by the Defendants' actions.  The agreed

buyers for Harvest's first two deals, Pertamina and Petroandina, were also injured, as were other

American companies engaged in business in Venezuela.

74.     Bribery is not competition on the merits, and injuries resulting from

anticompetitive bribery are injuries of the type that the antitrust laws were designed to prevent.

The Department of Justice recognizes this; as the Assistant Attorney General for the Criminal

Division explained in 2016: "The effects of foreign corruption are not just felt overseas.  In

today's global economy, the negative effects of foreign corruption flow back to the United

States.  American companies are harmed by global corruption when they are denied the ability to

compete in a fair and transparent marketplace.  Instead of being rewarded for their efficiency,

innovation and honest business practices, U.S. companies suffer at the hands of corrupt

governments and lose out to corrupt competitors."  Leslie Caldwell, "Remarks Highlighting

Foreign Corrupt Practices Act Enforcement at The George Washington University School of

Law"  (Nov.  3,  2016),  *available at* https://www.justice.gov/opa/speech/assistant-attorney-

general-leslie-r-caldwell-delivers-remarks-highlighting-foreign.

726544.1

HARVEST_RDR_000042

75.     The Defendants' unlawful conduct had a substantial effect in the United States because it directly harmed Harvest, other American companies, and the consumer market for fuel.

## CAUSES OF ACTION

### Count I: RICO § 1962(c)

76.     Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

77.     At all relevant times, Harvest was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

78.     At all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

79.     At all relevant times, Defendants formed an association-in-fact for the purpose of bribing Harvest.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

80.     At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

81.     At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

82.     Specifically, at all relevant times, Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above, including: Defendant Garcia's solicitation of a $10 million bribe from Harvest in November 2012 on behalf of Defendant Ramirez; Defendant Garcia's solicitation of a bribe from Harvest's agreed buyer, Pertamina, in November or December 2012; Defendant Garcia's solicitation of a bribe from

HARVEST_RDR_000043

Harvest's agreed buyer, Pluspetrol, in fall 2014; and Defendant Gonzalez's solicitation of a bribe from Pluspetrol in late 2014.  The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 371; and 15 U.S.C. § 78dd-1 *et seq.* (FCPA).  Defendants each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

83.     The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, a common victim (Harvest), a common method of commission, a common purpose (obtaining a bribe from Harvest), and the common result of scuttling purchase and sale agreements entered into by Harvest and other companies.  The illegal scheme continued for many years—and as to Harvest's failed deals, for over two years, from approximately July 2012 through the end of 2014—and threatens to continue against other American companies conducting business in Venezuela.

84.     As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Harvest was injured in its business and property, losing approximately $470 million.  Harvest lost two deals to sell its assets, the first for $725 million and the second for $400 million, and as a result, was forced to sell those same assets at a significant loss.

85.     As a result of their misconduct, Defendants are liable to Harvest for its losses in an amount to be determined at trial.

86.     Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum

726544.1

HARVEST_RDR_000044

amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

### Count II: RICO Conspiracy § 1962(d)

87.    Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

88.    At all relevant times, Harvest was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

89.    At all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

90.    At all relevant times, Defendants formed an association-in-fact for the purpose of bribing Harvest.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

91.    At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

92.    At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

93.    At all relevant times, Defendants each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).  Defendants knew that their predicate acts were part of a racketeering activity and agreed to the commission of those acts to further the schemes described above.

HARVEST_RDR_000045

94.     Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

95.     As a direct and proximate result of Defendants' conspiracy, acts taken in furtherance of the conspiracy, and other violations of 18 U.S.C. § 1962(d), Harvest was injured in its business and property, losing approximately $470 million.  Harvest lost two deals to sell its assets, the first for $725 million and the second for $400 million, and as a result, was forced to sell those same assets at a substantial loss.

96.     As a result of their misconduct, Defendants are liable to Harvest for its losses in an amount to be determined at trial.

97.     Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

**Count III: Sherman Act § 1**

98.     Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

99.     Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce among the several states and with foreign nations, which substantially lessened or eliminated competition in the relevant markets in violation of 15 U.S.C. § 1.

100.    Defendants' wrongful conduct substantially affected interstate and foreign commerce and occurred within the flow of interstate and foreign commerce.

726544.1

HARVEST_RDR_000046

101.    To the extent Defendants' activities concerned trade outside the United States, they had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

102.    Harvest has suffered antitrust injury and has been proximately and directly injured in its business by reason of Defendants' aforementioned Sherman Act violations with respect to the relevant markets.

103.    Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

### Count IV: Robinson-Patman Act § 2(c)

104.    Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

105.    Defendants engage and have engaged in commerce by consulting on oil and gas contracts in Venezuela.  Defendants have solicited unlawful bribe payments from Harvest and planned purchasers of Harvest's assets in order for the sales to be approved by Venezuela.

106.    By soliciting bribes and preventing Harvest from selling its assets, Defendants have engaged, attempted to engage, and/or conspired to engage in commercial bribery in violation of Section 2 of the Robinson-Patman Act, 15 U.S.C. § 13(c).

107.    Defendants' bribery scheme is *per se* unlawful and constitutes *per se* competitive injury.

108.    Defendants' unlawful commercial bribery and attempted commercial bribery has injured Harvest because Venezuela failed to approve two separate share purchase agreements that Harvest entered into with specific purchasers to sell its Venezuela assets.  Harvest ultimately

726544.1

HARVEST_RDR_000047

sold the same assets for approximately $470 million less than the previously agreed market value.  Thus, as a direct, substantial, and proximate result of Defendants' unlawful conduct, Harvest has suffered an antitrust injury and has been injured in its business.

109.    Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

### Count V: Texas Free Enterprise and Antitrust Act

110.    Harvest incorporates paragraphs 1 through 75 as if fully set forth herein.

111.    Defendants knowingly and voluntarily entered into a series of contracts, combinations, or conspiracies in restraint of trade or commerce in violation of Texas Business & Commercial Code § 15.05(a).

112.    Defendants' wrongful conduct substantially affected Texas, interstate, and foreign commerce, and occurred within the flow of Texas, interstate, and foreign commerce.

113.    To the extent Defendants' activities concerned trade outside Texas and the United States, they had direct, substantial, and reasonably foreseeable effects on competition in Texas.

114.    Harvest has suffered antitrust injury and has been proximately and directly injured in its business or property by reason of Defendants' aforementioned violations with respect to the relevant markets.

115.    Relief would promote competition in Texas and benefit Texas consumers.

116.    Harvest requests that this Court enter judgment against the Defendants as follows: actual damages suffered by Harvest; treble damages; Harvest's reasonable attorneys' fees in this

726544.1

HARVEST_RDR_000048

suit; Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and any and all other relief to which Harvest may be entitled at law or in equity.

## **PRAYER**

For the foregoing reasons, Harvest prays that Defendants be commanded to answer the foregoing claims and allegations, and that Harvest recover the following orders and judgments from Defendants:

a)  actual damages suffered by Harvest;

b)  treble damages;

c)  Harvest's reasonable attorneys' fees incurred in prosecuting this action;

d)  Harvest's costs of suit and pre-judgment and post-judgment interest in the maximum amounts allowed by law;

e)  any and all other relief to which Harvest may be entitled at law or in equity.

726544.1

HARVEST_RDR_000049

Respectfully Submitted,

**SMYSER KAPLAN & VESELKA, L.L.P.**

*/s/ Lee Kaplan*_____
Lee L. Kaplan
Attorney-in-Charge
Federal Bar No. 1840
State Bar No. 11094400
Dane Ball
Federal Bar No. 784400
State Bar No. 24051642
Ty Doyle
Federal Bar No. 1373873
State Bar No. 24072075
Anthony J. Phillips
Federal Bar No. 1123515
State Bar No. 24094089
Alexander M. Wolf
State Bar No. 24095027
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
lkaplan@skv.com
dball@skv.com
tdoyle@skv.com
aphillips@skv.com
awolf@skv.com

**ATTORNEYS FOR PLAINTIFFS
HARVEST NATURAL
RESOURCES, INC. AND HNR
ENERGIA B.V**

726544.1

27

HARVEST_RDR_000050

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
HARVEST NATURAL RESOURCES, INC.,
and HNR ENERGIA B.V.

### DEFENDANTS
Juan Jose Mendoza Garcia, Petro Consultores S.C., Petro Consultores International Trading Company, Inc., Azure 904 LLC, Rafael Dario Ramirez Carreno, Eulogio Antonio Del Pino Diaz, and Jo

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Miami Dade, Florida
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lee L. Kaplan
Smyser Kaplan & Veselka,LLP
700 Louisiana, Ste. 2300, Houston, Texas 77002 (713) 221-2300

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1 U.S. Government Plaintiff
- ❏ 2 U.S. Government Defendant
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | ❏ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | | | ❏ 790 Other Labor Litigation | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 791 Employee Retirement Income Security Act | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | | ❏ 895 Freedom of Information Act |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 950 Constitutionality of State Statutes |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1961 et seq.; 15 U.S.C. § 1
Brief description of cause:
RICO and Antitrust Conspiracy

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
470,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE  Gray H. Miller    DOCKET NUMBER  4:17-cr-00514

DATE
02/16/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Lee L. Kaplan

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

HARVEST_RDR_000051

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**     **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**     **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**     **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**     **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**     **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**     **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**     **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**     **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

HARVEST_RDR_000052



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**HARVEST_RDR_000053**

| From: | TrackingUpdates@fedex.com |
|---|---|
| To: | Bernier, Francoise |
| Subject: | FedEx Shipment 771507337852 Delivered |
| Date: | Monday, February 19, 2018 8:45:01 AM |

FedEx®

# Your package has been delivered

## Tracking # 771507337852

Ship date:
**Fri, 2/16/2018**

Lee L. Kaplan
Houston, TX 77002
US

**Delivered**

Delivery date:
**Mon, 2/19/2018 9:42 am**

**Rafael Dario Ramirez Carreno**
16 E. 81st Street
NEW YORK, NY 10028
US

## Shipment Facts

Our records indicate that the following package has been delivered.

| | |
|---|---|
| Tracking number: | 771507337852 |
| Status: | Delivered: 02/19/2018 09:42 AM Signed for By: Signature not required |
| Reference: | 115202 - Harvest |
| Signed for by: | Signature not required |
| Delivery location: | NEW YORK, NY |
| Delivered to: | Residence |
| Service type: | FedEx Standard Overnight |
| Packaging type: | FedEx Envelope |
| Number of pieces: | 1 |
| Weight: | 0.50 lb. |
| Special handling/Services: | Deliver Weekday |
| | Residential Delivery |
| Standard transit: | 2/19/2018 by 8:00 pm |

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:45 AM CST on 02/19/2018.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2018 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

HARVEST_RDR_000054