# EXHIBIT 38

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3  HARVEST NATURAL              )
    RESOURCES, INC., and HNR     )
 4  ENERGIA, B.V.,               )
        Plaintiffs,              )
 5                               )
    vs.                          )Civil Action NO. 4:18-cv-00483
 6                               )
    JUAN JOSE GARCIA MENDOZA,    )
 7  PETRO CONSULTORES, S.C.,     )
    PETRO CONSULTORES            )
 8  INTERNATIONAL TRADING        )
    COMPANY, INC.,               )
 9  PETROCONSULTORES             )
    (BARBADOS), LTD.,            )
10  PETROCONSULTORES, INC.,      )
    AZURE 904, LLC, RAFAEL       )
11  DARIO RAMIREZ CARRENO,       )
    EULOGIO ANTONIO DEL PINO     )
12  DIAZ, and JOSE ANGEL         )
    GONZALEZ ACOSTA,             )
13      Defendants.              )

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   A.   Yes.
 2   Q.   And did she tell you to meet with anyone else?
 3   A.   Yes.
 4   Q.   Who else?
 5   A.   With my natural contact, which was the CFO.
 6   Q.   And who was the CFO?
 7   A.   The CFO was, when Kelly was there, 2014/'15,
 8 Wayne Borduin maybe.
 9             (Reporter inquired.)
10             THE WITNESS:  Wayne Borduin.
11   Q.   (By Mr. Ball)  What about Ali Moshiri?
12   A.   No.
13   Q.   Never met with him?
14   A.   Never met with him on work issues.  He was no
15 longer in Venezuela.
16   Q.   So you never had a work meeting -- so are you
17 referring to a certain time period?
18   A.   Yes.  I'm referring to this.
19   Q.   I'm sorry.  I was not clear.
20             In your time as a consultant for Chevron,
21 did you have face-to-face meetings with Ali Moshiri?
22   A.   During the whole --
23   Q.   Yes.
24   A.   Yes, of course.
25   Q.   What about in the U.S.?  Did you meet with
```



1  Mr. Moshiri in the U.S.?
2      A.   Maybe drop by to say hello when I visited my
3  daughter.
4      Q.   Okay.  So here in Houston?
5      A.   In Houston, yes.
6      Q.   Okay.  So that reminds me.  Your affidavit --
7  or declaration, I'm sorry -- it says that you took
8  various trips to Houston.
9           MR. NGUYEN:  Objection.
10     Q.   (By Mr. Ball)  Correct?
11     A.   Yes.
12     Q.   And that they were personal, right?
13     A.   They were personal, yes.
14     Q.   So during a personal trip, you may pop in to
15 the Chevron office to say hi to Mr. Moshiri?
16     A.   Well, my daughter work in the same building.
17     Q.   Got it.  Okay.  Yeah.  So your daughter worked
18 for Chevron?
19     A.   Yes.
20     Q.   Okay.  Don't read anything into my question.
21 Why didn't you put that in your affidavit?
22     A.   What?
23     Q.   That during your personal trips, you would go
24 into the Chevron office here in Houston?
25     A.   Maybe I did that once.  It's not important to



```
 1                MR. NGUYEN:  The one labeled page 4 or the
 2   fourth page of the document?
 3                MR. BALL:  It's labeled page 4.
 4       Q.   (By Mr. Ball)  This is an invoice for
 5   reimbursement, right?
 6       A.   Uh-huh.
 7       Q.   And you'll see there it says "Trip to Houston
 8   for meeting with Ali Moshiri," right?
 9       A.   Uh-huh.
10       Q.   Now, you did not include this trip to Houston
11   for a meeting with Ali Moshiri in your affidavit, right?
12       A.   Uh-huh.
13       Q.   Okay.  Why?
14       A.   This trip was -- frankly, it was a trip to meet
15   with my daughter.
16       Q.   But you put in the invoice that it was a trip
17   to meet with Ali Moshiri?
18       A.   Yes.
19       Q.   So were you not being honest in the invoice?
20       A.   Yes.
21       Q.   Okay.  But you did meet with Ali Moshiri?
22       A.   I say hello.
23       Q.   And if you could go -- before we move off that,
24   page 8.  The IVA and VAT numbers have changed to
25   12 percent.  Do you see that?
```



1 lunch with that person.
2    Q.   Got it.  And that's because, you know, going to
3 those conferences is part of your work at Chevron,
4 right?
5    A.   I went to a couple of them, but it's not
6 mandatory.
7    Q.   No, but it's -- you're working on Chevron's
8 behalf as you're there, correct?
9    A.   Yes.
10   Q.   And that's why you'd need to list it in your
11 FCPA report?
12   A.   Yes.
13   Q.   Same would be like OTC here in Houston, right?
14   A.   Uh-huh.
15   Q.   You went to that before, right?
16   A.   Yes.
17   Q.   On Chevron's behalf?
18   A.   Yes.
19   Q.   Was that one of the educational conferences --
20   A.   Yes.
21   Q.   -- that you listed in your affidavit?
22   A.   Yes.
23   Q.   Is that all of the three educational
24 conferences that you listed in your affidavit?
25   A.   In my affidavit, if my memory serves me right,



1  I listed seven trips.
2      Q.   Three educational conferences.  Were those all
3  OTC in Houston?
4      A.   They were OTC, yes.  Maybe two or three.  If I
5  remember correctly, in the affidavit I mention a couple,
6  not three.  You can read it.
7      Q.   So same question I asked before.  I want to be
8  fair to you, so I want to hear your explanation.  Why
9  didn't you list in your affidavit, when you said you
10 went to three educational conferences in your lifetime,
11 that those educational conferences were actually work on
12 Chevron's behalf?
13     A.   Well, they were educational.  At the moment
14 when I traveled to Houston, to OTC, it was part of the
15 contract that I had where I was Local Content manager.
16 Under that, I was basically one of the members that
17 presented Chevron to the local contractors.
18              So I was leader of Local Content, and I
19 had to meet with the contractors who wanted to work with
20 Chevron.
21     Q.   Sure.
22     A.   So I went and I -- they were educational in a
23 way because I went on a lot of --
24              THE REPORTER:  If you could repeat.
25              THE WITNESS:  Yeah.  I'm sorry.  I will



1  A.  MOU is memorandum of understanding.
2  Q.  Got it.  And then you go on.
3  A.  Uh-huh.
4  Q.  Okay.  So what you're saying is that -- when
5  you tell him that you tried to call him, you're saying,
6  I tried to call you for personal reasons?
7  A.  Well, mostly, I said.
8  Q.  Okay.  So not always?
9  A.  Not always, mostly.
10 Q.  You called him for work occasionally, right?
11 A.  Yes.  Well -- yes.
12 Q.  You texted him for work occasionally, right?
13 A.  Yes.
14 Q.  And Mr. Moshiri worked in Houston, right?
15 A.  Mr. Moshiri was based in Houston, yes.
16 Q.  And he was the one in charge of your department
17 at the end of the day, right?
18 A.  Of what?
19 Q.  Of your department, of the Latin American
20 Business Unit.  He was in charge of that?
21 A.  He was the boss of the boss of my boss.
22 Q.  Yeah.  At the end of the day, the people you're
23 working for were controlled by Ali Moshiri in Houston?
24          MR. NGUYEN:  Objection.
25 A.  Yes.



```
 1  right?
 2              MR. NGUYEN:  Objection.
 3       A.   "When are we going to talk."  I don't know
 4  where he -- you mean based?
 5       Q.   (By Mr. Ball)  Yes, I mean based.
 6       A.   Yes, yes.
 7       Q.   I don't mean do you know where he was on this
 8  particular day.
 9       A.   On this particular day, no.
10       Q.   But, I mean, generally he was headquartered in
11  Houston?
12       A.   He was quartered in Houston, although he
13  traveled a lot, yes.
14       Q.   Okay.  And he says, "Call me," right?
15       A.   Yes.
16       Q.   Okay.  I take it you don't remember what this
17  February 17th e-mail was in reference to when he said,
18  "When are we going to talk."
19       A.   No.  It could be personal.  It could be
20  something related to work.  I frankly don't remember.
21              (Exhibit 41 marked.)
22       Q.   (By Mr. Ball)  Okay.  Bottom e-mail, again just
23  you and Mr. Moshiri.  You say, "Jefe, I need to talk to
24  you.  I'm concern about some important issues I'm
25  hearing from my intelligence that may not be read
```



1  lawsuit wasn't filed until the 16th?
2      A.   Yes.
3      Q.   Got it.  Okay.
4           And it's the lawyers that put that part in
5  there, right?
6      A.   Yes.
7      Q.   Got it.
8           Any idea why they agreed to pay you
9  through -- Chevron agreed to pay you through the 21st of
10 February rather than whatever day you informed them of
11 the lawsuit?
12     A.   Maybe it's the last day I was -- I had a
13 contact with a person in Chevron.
14     Q.   Okay.  Now, switching gears here, there's a
15 company that you have or you're an owner in called EPS
16 Consultoria Energia y Petroleo, right?
17     A.   Yes.
18     Q.   Okay.  And one of your partners in that company
19 is Carlos Camera, right?
20     A.   Yes.
21     Q.   Okay.  Now, that person, Carlos Camera, he
22 lives in Houston, right?
23     A.   Currently.
24     Q.   Currently.
25     A.   Yes.



1   A.   This was a business that I -- well, it was
2 posted in our Web page.  We had a lot of expectation on
3 it.  And that was the importation of a de-scaler from
4 Mexico to Venezuela.
5   Q.   Okay.  So you had a little bit of operations
6 but just not --
7   A.   No, no.  You had a pilot test, and it never --
8 that's it.
9   Q.   Okay. All right.  So let's look at the second
10 page.
11  A.   Yeah.
12  Q.   And here are your talking points.  And you see
13 No. 6.  What does that say?
14  A.   Carlos -- Contacto Realizado Carlos Camera
15 Houston.
16  Q.   What does that mean?
17  A.   That means that I called Carlos Camera on this.
18  Q.   And what's the last word?
19  A.   Houston.
20  Q.   In Houston?
21  A.   Yes.
22  Q.   Right?
23  A.   Yes.
24  Q.   So you knew -- in October 2014 you knew that
25 Mr. Camera --



```
 1      Q.    Boss and friend?
 2      A.    Yes.
 3      Q.    -- to help you grow that?
 4      A.    To help me establish because we didn't have any
 5 foot in any place.
 6      Q.    Right.  And you asked him to set up meetings
 7 here with people here in Houston, right?
 8      A.    Uh-huh.
 9      Q.    And then you attach the English presentation
10 "to better guide the matter in proper circles."
11      A.    Uh-huh.
12      Q.    Meaning for him to pass on to people who speak
13 English --
14      A.    Yeah.
15      Q.    -- right?  So that would be the better version
16 for those people, right?
17      A.    Uh-huh.
18      Q.    Okay.  So this is very recent.  So you're
19 saying that this just -- this company wasn't successful
20 because this lawsuit came after it?
21      A.    Yes.
22      Q.    Okay.  But you certainly were trying hard to
23 have it be successful, right?
24      A.    I was certainly -- before this lawsuit came
25 about, I have a different world than I have today.
```



1  about protecting information.  And that was for the
2  first time I saw a person that was not myself in the
3  office while I was away.
4      Q.   Real quick, just a few more questions.
5           Earlier Mr. Ball showed you an invoice for
6  a trip to Houston.  Do you remember that?
7      A.   Yes.
8      Q.   Did you not include that trip in your
9  declaration because you were intentionally trying to
10 hide it?
11     A.   No.
12     Q.   Then why wasn't it included in your
13 declaration?
14     A.   The actual purpose of the trip was to visit my
15 daughter.  And the way that my contract is stipulated
16 and the way that you have seen here, Chevron had little
17 troubles accepting that I would, say, bill them for this
18 trip.  But I know that Chevron knew that I was basically
19 visiting my daughter, and I was going into Chevron's
20 offices with my daughter and say hello to former friends
21 of mine who lived in Venezuela for a long time.
22     Q.   And, in fact, Chevron gave you permission to
23 charge that personal trip as a business expense?
24     A.   Yes.
25     Q.   And how did they do that?



1   A.   They did it because -- Mr. Moshiri told me, You
2 can tell them that you're going to come and visit me,
3 which it wasn't the reason of the trip.
4   Q.   And Mr. Moshiri is your friend?
5   A.   He's my friend.
6   Q.   One last question.  You were shown what was
7 Exhibit No. 44.  It was a January 9, 2018 e-mail to Ali
8 Moshiri.  And it was about this Blast presentation in
9 English.  Do you remember that?
10   A.   Yes.
11   Q.   Okay.  And did any of the operations in Houston
12 actually start?
13   A.   No.  Not even Moshiri responded to the mail.
14   Q.   That's all my questions.
15        MR. BALL:  Passing him back to me?
16        MR. NGUYEN:  Pass the witness.
17              RE-EXAMINATION
18 QUESTIONS BY MR. BALL:
19   Q.   Okay.  I'm going to start where Mr. Nguyen left
20 off.
21        So are you telling me, Mr. Garcia, that
22 Ali Moshiri told you it was okay to be dishonest on your
23 Chevron invoice?
24   A.   It's not being dishonest.  It's not being
25 dishonest.



1  Q.  Well, let's walk through whether it was or
2 wasn't.  You went on a trip to Houston, right?
3  A.  Yes.
4  Q.  You're saying now that it was to visit your
5 daughter, right?
6  A.  Mainly that.
7  Q.  Mainly.  You marked it down as travel for a
8 meeting with Mr. Moshiri in Houston, correct?
9  A.  Uh-huh, yes.
10  Q.  And you thought that was okay, correct?
11  A.  Yes.
12  Q.  And that's because Mr. Moshiri said it was
13 okay, right?
14  A.  Yes.
15  Q.  It is not true that the purpose of your -- your
16 story now is that the purpose of your travel to Houston
17 was not to meet Mr. Moshiri but was to see your
18 daughter, correct?
19  A.  Yes.
20  Q.  So the statement on the invoice is not true,
21 correct?
22  A.  It is not.
23  Q.  Okay.  And Mr. Moshiri said that's okay by him?
24  A.  Well, he doesn't participate in the invoice.
25  Q.  But you told Mr. Nguyen that you checked first



```
 1             CHANGES AND SIGNATURE
 2 PAGE LINE   CHANGE                    REASON
 3 _____
 4 _____
 5 _____
 6 _____
 7 _____
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```



```
 1      I, JUAN JOSE MENDOZA GARCIA, have read the foregoing
 2 deposition and hereby affix my signature that same is
 3 true and correct, except as noted above.
 4
 5                                  _____
 6                                  JUAN JOSE MENDOZA GARCIA
 7
 8 THE STATE OF _____)
 9 COUNTY OF _____)
10
11      Before me, _____, on this day
12 personally appeared JUAN JOSE MENDOZA GARCIA, known to
13 me or proved to me on the oath of _____ or
14 through _____ (description of
15 identity card or other document) to be the person whose
16 name is subscribed to the foregoing instrument and
17 acknowledged to me that he/she executed the same for the
18 purpose and consideration therein expressed.
19      Given under my hand and seal of office on this _____
20 day of _____, _____.
21
22                                  _____
23                                  NOTARY PUBLIC IN AND FOR
24                                  THE STATE OF _____
25 My Commission Expires: _____
```



800.211.DEPO (3376)
*EsquireSolutions.com*

```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
                           HOUSTON DIVISION

HARVEST NATURAL             )
RESOURCES, INC., and HNR    )
ENERGIA, B.V.,              )
      Plaintiffs,           )
                            )
vs.                         )Civil Action NO. 4:18-cv-00483
                            )
JUAN JOSE GARCIA MENDOZA,   )
PETRO CONSULTORES, S.C.,    )
PETRO CONSULTORES           )
INTERNATIONAL TRADING       )
COMPANY, INC.,              )
PETROCONSULTORES            )
(BARBADOS), LTD.,           )
PETROCONSULTORES, INC.,     )
AZURE 904, LLC, RAFAEL      )
DARIO RAMIREZ CARRENO,      )
EULOGIO ANTONIO DEL PINO    )
DIAZ, and JOSE ANGEL        )
GONZALEZ ACOSTA,            )
      Defendants.           )
```

                    REPORTER'S CERTIFICATE

 ORAL VIDEOTAPED DEPOSITION OF JUAN JOSE GARCIA MENDOZA

                        June 7, 2018


    I, Melinda Barre, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

    That the witness, JUAN JOSE GARCIA MENDOZA, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

       That the original deposition was delivered to



1  Dane Ball.
2      That a copy of this certificate was served on all
3  parties and/or the witness shown herein
4  on _____.
5      I further certify that pursuant to FRCP Rule
6  30(f)(1), that the signature of the deponent:
7      ____ was requested by the deponent or a party before
8  the completion of the deposition and that the signature is
9  to be before any notary public and returned within 30 days
10 from date of receipt of the transcript.  If returned,
11 the attached Changes and Signature Page contains any
12 changes and the reasons therefor:
13     ____was not requested by the deponent or a
14 party before the completion of the deposition.
15     I further certify that I am neither counsel for,
16 related to, nor employed by any of the parties or
17 attorneys in the action in which this proceeding was
18 taken, and further that I am not financially or
19 otherwise interested in the outcome of the action.
20     Certified to by me on this, the _____ day
21 of _____, 2018.
22                              
23                              _____
24                              Melinda Barre
                                Texas CSR 2192
25                              Expiration:  12/31/18