# EXHIBIT 75

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
**FILED**

**APR 2 4 2019**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | David J. Bradley, Clerk of Court |
| | § | |
| **v.** | § | **CRIMINAL NO. H-17-514-S** |
| | § | |
| **NERVIS G. VILLALOBOS-CARDENAS,** | § | |
| **ALEJANDRO ISTURIZ-CHIESA,** | § | |
| **RAFAEL E. REITER-MUNOZ,** | § | **UNDER SEAL** |
| **JAVIER ALVARADO-OCHOA,** | § | |
| **DAISY T. RAFOI-BLEULER, &** | § | |
| **PAULO J. D. C. CASQUEIRO-MURTA** | § | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

## GENERAL ALLEGATIONS

At all relevant times, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended,
Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for
the purpose of, among other things, making it unlawful to act corruptly in
furtherance of an offer, promise, authorization, or payment of money or anything
of value, directly or indirectly, to a foreign official for the purpose of obtaining or
retaining business for, or directing business to, any person.

2.     Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-
owned and state-controlled oil company.  PDVSA and its subsidiaries and affiliates
were responsible for the exploration, production, refining, transportation, and trade

in energy resources in Venezuela and provided funding for other operations of the Venezuelan government. PDVSA Services, Inc. was the U.S.-based affiliate of PDVSA located in Houston, Texas, that, at various times, was responsible for international purchasing on behalf of PDVSA. Bariven S.A. ("Bariven") was the PDVSA procurement subsidiary responsible for equipment purchases. PDVSA and its wholly owned subsidiaries, including PDVSA Services, Inc. and Bariven, (hereinafter collectively referred to as "PDVSA") were "instrumentalities" of the Venezuelan government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A). PDVSA officers and employees were "foreign officials" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3.     PDVSA awarded contracts for energy services and equipment in a number of ways, including through a competitive bidding process. One such competitive bidding process began with a PDVSA purchasing analyst assembling a bidding panel, which identified those companies that would be invited to submit bids in connection for a particular project. PDVSA would then issue a request for quotation to the companies included on the bidding panel and those companies would in turn submit formal bids, from which a winner would be selected. PDVSA also awarded sole source contracts, which were not subject to a

competitive bidding process. Ultimately, all contracts needed to be approved by more senior PDVSA employees.

4.     Beginning in at least 2011 and continuing until at least 2013, **NERVIS GERARDO VILLALOBOS CARDENAS, ALEJANDRO ISTURIZ CHIESA, RAFAEL ERNESTO REITER MUNOZ, JAVIER ALVARADO OCHOA,** Luis Carlos De Leon Perez, and Cesar David Rincon Godoy (collectively, the "PDVSA Defendants"), solicited PDVSA vendors for bribes and kickbacks in exchange for providing assistance to those vendors in connection with their PDVSA business, including assisting them in obtaining PDVSA contracts and assisting them in receiving payment priority over other vendors for outstanding PDVSA invoices during the Venezuelan liquidity crisis.

5.     The PDVSA Defendants, with the assistance of **DAISY TERESA RAFOI BLEULER** and **PAULO JORGE DA COSTA CASQUEIRO MURTA** (collectively with the PDVSA Defendants the "Defendants," described more fully below), then laundered the proceeds of the bribery scheme through numerous financial transactions, including through international wire transfers to and from bank accounts that they opened in Switzerland, Curaçao, Dubai, and elsewhere in the names of various companies.

6.     The Defendants sought to conceal the nature of the scheme through various complex financial transactions by directing bribe payments to be sent to

3

various recipients other than the intended PDVSA Defendants, including companies, intermediaries, relatives, friends, creditors, and close personal associates of the PDVSA Defendants.

### The Defendants

7. Defendant **NERVIS GERARDO VILLALOBOS CARDENAS ("VILLALOBOS")**, aka "Enano," was a citizen of Venezuela. **VILLALOBOS** had previously been employed by the Venezuelan government and instrumentalities thereof, but was no longer so employed during the relevant period. **VILLALOBOS** was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

8. Defendant **ALEJANDRO ISTURIZ CHIESA ("ISTURIZ")**, aka "Piojo" and "Paulo," was a citizen of Venezuela. During the relevant time period, **ISTURIZ** was employed by Bariven as an assistant to the president of Bariven. **ISTURIZ** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

9. Defendant **RAFAEL ERNESTO REITER MUNOZ ("REITER")**, aka "Nadal," was a citizen of Venezuela. At all relevant times, **REITER** was employed by PDVSA as head of security and loss prevention. **REITER** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

4

10.     Defendant **JAVIER ALVARADO OCHOA ("ALVARADO")**, aka "Electrico," was a citizen of Venezuela. At all relevant times, **ALVARADO** was employed as the President of Bariven. **ALVARADO** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

11.     Defendant **DAISY TERESA RAFOI BLEULER ("RAFOI")**, was a citizen of Switzerland, and a partner in Swiss Company A. **RAFOI** acted as an agent of De Leon, who is described further below, Shiera, Rincon, , and their U.S.-based companies. **RAFOI** was thus an agent of a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

12.     Defendant **PAULO JORGE DA COSTA CASQUEIRO MURTA ("MURTA")**, was a citizen of Portugal and Switzerland, and an employee in Swiss Company B. **MURTA** acted as an agent of De Leon, Shiera, Rincon, and their U.S.-based companies. **MURTA** was thus an agent of a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

## The Defendants' Associates and Co-Conspirators

13.     Luis Carlos De Leon Perez ("De Leon") was a dual citizen of the United States and Venezuela. De Leon was thus a "domestic concern" as that term

5

is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). De Leon had previously been employed by instrumentalities of the Venezuelan government, but was no longer so employed during the relevant time period.

14.     Cesar David Rincon Godoy ("Cesar Rincon"), aka "Primo," was a citizen of Venezuela. At all relevant times, Cesar Rincon was employed by PDVSA and its subsidiaries, including Bariven, in various capacities, including as the general manager of Bariven. Cesar Rincon was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

15.     "ISTURIZ Associate 1," an individual whose identity is known to the Grand Jury, provided financial services to **ISTURIZ**.

16.     "REITER Associate 1," an individual whose identity is known to the Grand Jury, was a friend of **REITER**.

17.     "REITER Relative 1," an individual whose identity is known to the Grand Jury, was a close relative of **REITER**.

18.     "De Leon Associate 1," an individual whose identity is known to the Grand Jury, was a friend of De Leon.

19.     "ALVARADO Relative 1," an individual whose identity is known to the Grand Jury, was a close relative of **ALVARADO**.

20.     Roberto Enrique Rincon Fernandez ("Rincon"), aka "Pelon," who has been charged separately, was a U.S. lawful permanent resident and a resident of

Texas, and controlled, together with others, a number of closely-held companies, including several U.S. companies, many of which were based in the Southern District of Texas, that Rincon used to secure contracts with PDVSA. Rincon was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

21.     "Rincon Company 1," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 1 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 1 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

22.     "Rincon Company 2," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 2 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 2, along with its Venezuelan-based affiliate (hereinafter collectively referred to as Rincon Company 2), was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

7

23. Rincon Company 3," a company whose identity is known to the Grand Jury, was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

24. "Rincon Company 4," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 4 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 4 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

25. "Rincon Company 5," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 5 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 5 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

26. "Rincon Company 6," a company whose identity is known to the Grand Jury, was controlled by Rincon. Rincon Company 6 was organized under the laws of Texas. Rincon Company 6 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

27.  "Rincon Company 7," a company whose identity is known to the Grand Jury, was organized under the laws of Texas and headquartered in the Southern District of Texas. Rincon Company 7 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon Company 7 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

28.  "Rincon Company 8," a company whose identity is known to the Grand Jury, was organized under the laws of Venezuela and headquartered in Venezuela. Rincon Company 8 was controlled by Rincon and used by Rincon to secure contracts with PDVSA.

29.  "Rincon Associate 1," an individual whose identity is known to the Grand Jury, provided Rincon with certain professional services.

30.  Abraham Jose Shiera Bastidas ("Shiera"), aka "Puma," who has been charged separately, was a Venezuelan national who resided in Florida, and controlled, together with others, a number of closely-held companies, including several U.S. companies, that Shiera used to secure contracts with PDVSA. Shiera was thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Rincon and Shiera worked together on a number of PDVSA contracts and contract bids.

31.   "Shiera Company 1," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 1 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 1 was controlled by Shiera and used by Shiera to secure contracts with PDVSA.

32.   "Shiera Company 2," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 2 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 2 was controlled by Shiera and used by Shiera to secure contracts with PDVSA.

33.   "Shiera Company 3," a company whose identity is known to the Grand Jury, was organized under the laws of Florida and headquartered in Florida. Shiera Company 3 was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Shiera Company 3 was controlled by Shiera and used by Shiera to secure contracts with PDVSA.

34.   "Shiera Company 4," a company whose identity is known to the Grand Jury, was controlled by Shiera.

35.   "Shiera Company 5," a company whose identity is known to the Grand Jury, was controlled by Shiera.

10

36.     "Shiera Company 6," a company whose identity is known to the Grand Jury, was controlled by Shiera.

37.     "Shiera Associate 1," an individual whose identity is known to the Grand Jury, provided financial and accounting services to Shiera and his companies.

38.     "Swiss Company A," whose identity is known to the Grand Jury, was a Swiss wealth management firm.

39.     "Swiss Company B," whose identity is known to the Grand Jury, was a Swiss wealth management firm.

40.     "BES Banker 1," an individual whose identity is known to the Grand Jury, was a Portuguese citizen employed by Banco Espirito Santo, a bank based in Portugal.

41.     "BES Banker 2," an individual whose identity is known to the Grand Jury, was a Brazilian and Portuguese citizen employed by Banco Espirito Santo.

42.     "Official B," an individual whose identity is known to the Grand Jury, was at all relevant times a senior Venezuelan government official.

43.     "Official C," an individual whose identity is known to the Grand Jury, was at all relevant times a Venezuelan government official.

44.     Official B and Official C were each a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A).

11

## Other Entities

45.     "Law Firm 1," whose identity is known to the Grand Jury, was a U.S.-based law firm.

46.     "Production Company A," whose identity is known to the Grand Jury, was a U.S.-based film production company.

47.     "Law Firm 2," whose identity is known to the Grand Jury, was a European law firm.

## COUNT ONE
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

48.     Paragraphs 1 through 47 are realleged and incorporated by reference as though fully set forth herein.

49.     From in or around 2011 and continuing until at least 2013, in the Southern District of Texas and elsewhere, the defendants,

**NERVIS GERARDO VILLALOBOS CARDENAS**
**ALEJANDRO ISTURIZ CHIESA**
**RAFAEL ERNESTO REITER MUNOZ**
**JAVIER ALVARADO OCHOA**
**and**
**DAISY TERESA RAFOI BLEULER,**

did knowingly conspire, confederate, and agree with each other, De Leon, Cesar Rincon, and others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Section 1956, namely:

a. knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, in violation of Title 18, United States Code, Section 1956(a)(1)(B); and

b. with the intent to promote the carrying on of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, transport, transmit, or transfer funds from a place in the United States to a place outside the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## **Manner and Means of the Conspiracy**

50.     The manner and means by which **VILLALOBOS, ISTURIZ, REITER, ALVARADO, RAFOI**, De Leon, Cesar Rincon, and their co-

conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

51.    The PDVSA Defendants promised Rincon, Shiera, and others known and unknown to the Grand Jury assistance with getting paid on outstanding invoices on PDVSA contracts, as well as assistance with winning new PDVSA contracts, in exchange for bribe payments.

52.    **VILLALOBOS, ISTURIZ, ALVARADO,** De Leon, and Cesar Rincon solicited assistance, and in turn Rincon, Shiera, and **RAFOI**, together with others, assisted the PDVSA Defendants in opening bank accounts, including bank accounts in Switzerland, for the PDVSA Defendants and their co-conspirators to receive bribe payments.

53.    The PDVSA Defendants directed bribe payments to be sent to various recipients other than the intended PDVSA Defendants, including companies, intermediaries, relatives, friends, creditors, and close personal associates of the PDVSA Defendants, for the purpose of concealing and disguising the nature, source, and ownership of the bribe payments.

54.    De Leon and **VILLALOBOS**, together with others, participated in meetings in the United States with Rincon and Shiera to discuss the bribe payments.

55.     De Leon, **VILLALOBOS**, and **ALVARADO**, together with others,
engaged in monetary transactions among their various accounts designed to
conceal the nature, source, and ownership of the proceeds of the specified unlawful
activity.

56.     **RAFOI** and Cesar Rincon, each and together with others, created
false justifications for certain of the bribes, including invoices for services that
were never performed, for the purpose of concealing and disguising the nature,
source, and ownership of those bribe payments.

57.     Rincon and Shiera, together with others, directed the wire transfer of,
and caused to be wired, bribe payments from bank accounts which were frequently
in the name of companies other than the companies being awarded PDVSA
contracts and receiving payments from PDVSA, for the purpose of concealing and
disguising the nature, source, and ownership of the bribe payments.

### Acts In Furtherance of the Conspiracy

58.     Beginning in at least 2010, Venezuela began to experience a liquidity
crisis as the profits earned through PDVSA, which historically had been a
significant source of revenue to the Venezuelan government as a result of its oil
reserves, were insufficient to meet the government's expenses.  Numerous analysts
began to speculate that PDVSA could default on its debt, and the government
made public commitments for PDVSA to increase oil production.

15

59.     Given these liquidity problems, PDVSA was unable to pay all of its vendors in a timely manner, but remained under pressure to continue to escalate oil production.

60.     In or about 2011, Rincon and Shiera were approached by De Leon and **VILLALOBOS**, who were acting on behalf of the PDVSA Defendants. Rincon and Shiera also referred to the PDVSA Defendants as the "management team." The PDVSA Defendants offered to give Rincon's and Shiera's companies payment priority over other PDVSA vendors, ensuring that Rincon's and Shiera's companies would get at least partial payment on outstanding PDVSA invoices, and to provide Rincon's and Shiera's companies with assistance in winning future PDVSA business, in exchange for providing a bribe to the PDVSA Defendants in the amount of 10% of all payments Rincon and Shiera received from PDVSA. The PDVSA Defendants made similar offers to other vendors known and unknown to the Grand Jury. In addition, individual PDVSA Defendants, including **ISTURIZ**, **REITER**, and Cesar Rincon solicited additional bribe payments from Rincon and Shiera.

61.     De Leon and **VILLALOBOS** explained that the bribe proceeds would be split and would be shared among **VILLALOBOS, ISTURIZ, REITER, ALVARADO,** De Leon, Cesar Rincon, and Official B.

16

62.     Rincon and Shiera agreed to make the payments to the PDVSA Defendants in exchange for payment priority and assistance in winning future PDVSA contracts.

63.     Because they were able to guarantee payment through the corrupt scheme, Rincon and Shiera continued to supply goods and services to PDVSA, thereby enabling PDVSA to continue to do business with such vendors who might not otherwise accept the risk of non-payment.

64.     Payment allocation decisions for vendors were typically documented by Bariven in weekly reports entitled, as translated into English, "Proposal for Payment to International Providers for the Procurement of Materials, Equipment, and Food in Foreign Markets On Behalf of PDVSA and its Subsidiaries."  These documents, generally referred to in shorthand, as translated into English, as the payment proposals or proposals, typically contained a "Premise" stating, as translated into English, "The invoicing included in this payment schedule was coordinated with the international offices of procurement (Houston and the Netherlands) in line with the agreed upon payment conditions and the operational needs coordinated between the hierarchic levels of Bariven and PDVSA's different businesses to ensure the delivery of materials and equipment in order to safeguard the operational continuity of the Industry," and then set forth the debt and proposed payments to selected vendors.  The payment proposals were the

subject of extensive communications among the PDVSA Defendants and their co-conspirators, including discussions about how much would be allocated to and among Rincon's and Shiera's companies and discussions about the bribe payments due to the PDVSA Defendants as a function of how much Rincon's and Shiera's companies were receiving from PDVSA. Cesar Rincon and **ISTURIZ** had responsibility for developing and approving the payment proposals, which were ultimately authorized by **ALVARADO**.

### Account Set-Up

65.     In order to facilitate the bribe payments and conceal their nature and ownership, Shiera introduced De Leon and **VILLALOBOS** to **RAFOI** and Swiss Company A for the purpose of setting up Swiss bank accounts into which bribe payments could be received and to assist in providing justifications for the payments.

66.     **RAFOI** assisted with setting up accounts for De Leon, **VILLALOBOS,** Cesar Rincon, and **ALVARADO**.

67.     Ultimately, a number of accounts, in Switzerland and elsewhere, were used in connection with the scheme. These accounts were used to funnel the bribes from, to, and through multiple destinations before reaching their ultimate recipient.

68.     "Swiss Account 1," whose identity is known to the Grand Jury, was a Swiss bank account for which De Leon was a beneficial owner and

**VILLALOBOS** and De Leon were authorized signers. Swiss Account 1 was used in connection with the scheme.

69.  "Swiss Account 2," whose identity is known to the Grand Jury, was a Swiss bank account controlled by **VILLALOBOS**. Swiss Account 2 was used in connection with the scheme.

70.  "Swiss Account 3," whose identity is known to the Grand Jury, was a Swiss bank account controlled by De Leon. Swiss Account 3 was used in connection with the scheme.

71.  "Swiss Account 4," whose identity is known to the Grand Jury, was a Swiss bank account controlled by **ALVARADO**, for which ALVARADO Relative 1 was the listed beneficial owner. Swiss Account 4 was used in connection with the scheme.

72.  "Swiss Account 5," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by Rincon and Shiera. Swiss Account 5 was used in connection with the scheme.

73.  "Swiss Account 6," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by Shiera. Swiss Account 6 was used in connection with the scheme.

74. "Swiss Account 7," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by **ISTURIZ**. Swiss Account 7 was used in connection with the scheme.

75. "Swiss Account 8," whose identity is known to the Grand Jury, was a Swiss bank account owned and controlled by Cesar Rincon. Swiss Account 8 was used in connection with the scheme.

76. "Swiss Account 9," whose identity is known to the Grand Jury, was a Swiss bank account. Swiss Account 9 was used in connection with the scheme.

77. "Curaçao Account 1," whose identity is known to the Grand Jury, was a Curaçaoan bank account. Curaçao Account 1 was used in connection with the scheme.

78. "U.S. Account 1," whose identity is known to the Grand Jury, was a U.S. bank account. U.S. Account 1 was used in connection with the scheme.

79. Some of these accounts were not simply used to funnel bribe payments, but also to provide false justifications for the payments themselves. For example, on or about September 12, 2011, a letter and services agreement was submitted through Swiss Company A to a Swiss bank in connection with the request to open Swiss Account 1. The letter set forth a purported sub-contracting arrangement between Swiss Account 5 and Swiss Account 1 in which Swiss Account 1 was to assist Swiss Account 5 in providing services to Rincon Company

1. Similarly, on or about April 19, 2012, Swiss Accounts 2, 3, and 4 sent a letter to Swiss Company A and Swiss Account 1 stating the general fund distribution from Swiss Account 1 to Swiss Accounts 2, 3, and 4 and setting forth various services purportedly provided by Swiss Accounts 2, 3, and 4 on behalf of Swiss Account 1 to Swiss Account 5 and Shiera Company 5.

80. **RAFOI**, the PDVSA Defendants, Shiera, Rincon, and their co-conspirators communicated, including via e-mail, phone, and various messaging applications, about the account set-up and the need to submit documentation to justify the payments. For example, on or about September 8, 2011, Shiera sent **VILLALOBOS** a message using BlackBerry Messenger ("BBM") stating, as translated into English, "The institution has not accepted the stick. They are asking me for invoices and purchase orders. I already submitted them. I hope it is resolved tomorrow." The conspirators frequently used the word "stick" (as translated into English) to refer to money.

81. The Defendants ultimately established a complex web of bank accounts through which to conduct the financial transactions in connection with the scheme and conceal the nature and ownership of the proceeds. On or about September 16, 2011, **RAFOI** wrote to Shiera, **VILLALOBOS,** and De Leon to report that Swiss Company A had set up four bank accounts – Swiss Account 1, which **RAFOI** referred to as the "main account," Swiss Account 2, which **RAFOI**

21

identified as being for **VILLALOBOS**, Swiss Account 3, which **RAFOI** identified as being for De Leon, and Swiss Account 4, which **RAFOI** identified as being for **ALVARADO**. **RAFOI** concluded the e-mail by stating, "We will **email you next week the new account numbers and the wiring instructions** to begin transfer of funds into the main a/c ([Swiss Account 1]) for distribution into the 3 accounts."

82. **RAFOI**, facilitated by Rincon and Shiera, also assisted the PDVSA Defendants in opening individual accounts in the names of various entities rather than in the PDVSA Defendants' own names. For example, on or about February 1, 2013, Cesar Rincon sent Shiera an e-mail attaching a copy of his passport and utility bill. Shiera then forwarded this information to **RAFOI**, who requested in addition a curriculum vitae. **RAFOI** asked Shiera, "Shall I go ahead and order a new Nevis company for Cesar?" Shiera replied to the e-mail, noting his agreement.

83. On or about February 6, 2013, **RAFOI** sent Shiera an e-mail stating, "A new Nevis company called [Swiss Account 8] will be formed with Cesar as the Director/BO/Shareholder."

### Payments to the PDVSA Defendants and Official Assistance to Rincon and Shiera

84. Rincon and Shiera made payments for the benefit of **VILLALOBOS, ISTURIZ, REITER, ALVARADO,** De Leon, and Cesar Rincon using a variety of bank accounts in the United States (including in the Southern District of Texas),

22

Switzerland, and Panama, to a variety of bank accounts, including, but not limited

to, the accounts referenced in Paragraphs 68 to 78 above.

    85.    For example, in total, accounts controlled by Rincon and Shiera

transferred over $27 million to Swiss Account 1, which transferred over $10

million to Swiss Account 2, over $16 million to Swiss Account 3, and over $1

million to Swiss Account 4, in connection with the scheme.

    86.    In exchange for these bribe and kickback payments, the PDVSA

Defendants provided assistance to Rincon and Shiera in getting paid on

outstanding PDVSA invoices and obtaining new PDVSA contracts.

    87.    For example, on or about October 10, 2011, **ISTURIZ** sent Shiera a

BBM message stating, as translated into English, "I got for you and Pelon [Rincon]

[Rincon Company 4] 1.3mm [Rincon Company 2] 1.2mm and [Shiera Company 2]

6.9." Shiera replied, as translated into English, "That [Shiera Company 2] is his. I

need in [Shiera Company 1] and [Shiera Company 3]. Check it please."

**ISTURIZ** later responded, as translated into English, "Shit, bro', I had sent it

already! Let me see what I can do!", to which Shiera replied, "Change it please."

**ISTURIZ** responded, as translated into English, "Pumita ! [Shiera] Relax, let

Piojo [**ISTURIZ**] pamper you!", to which Shiera replied, as translated into

English, "I'm in need of love $$$$$$ hahahaha."

88.    Consistent with **ISTURIZ**'s BBM message, on or about October 17, 2011, PDVSA sent $6,980,000 to Shiera Company 2.

89.    After several inter-company transfers, the funds referenced in Paragraph 88 above were ultimately transferred to Rincon Company 2. On or about October 26, 2011, Rincon Company 2 transferred $515,513.20 to Swiss Account 1. Shortly thereafter, on or about November 2, 2011, Shiera Company 5 transferred $179,552.52 to Swiss Account 1. Then, on or about November 16, 2011, Swiss Account 1 transferred $100,000 to Swiss Account 2, $330,000 to Swiss Account 3, and $215,000 to Swiss Account 4.

90.    The PDVSA Defendants frequently checked with Rincon and Shiera on the status of the bribe payments. For example, on or about December 20, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "don't forget to talk with your administrator, it Is vital the flow comes in December," which the conspirators understood to refer to bribe payments. Shiera responded, as translated into English, "He just confirmed you'll have it before this Friday."

91.    On or about December 22, 2011, Shiera Company 5 made two transfers to Swiss Account 1, one in the amount of $299,901.85 and another in the amount of $362,485.68.

92.     The PDVSA Defendants transferred the disbursed funds in Swiss
Account 1 amongst themselves, as discussed in Paragraph 89, and occasionally
also used Swiss Account 1 for other expenses incurred by the PDVSA Defendants.
For example, on or about June 15, 2012, **VILLALOBOS** instructed **RAFOI** to
transfer CHF 75,000 from Swiss Account 1 to an account in the name of Law Firm
2.  Law Firm 2 had provided legal services to **ALVARADO**.

93.     Rincon and Shiera frequently used De Leon and **VILLALOBOS** as
intermediaries for communications with or about the PDVSA Defendants.  For
example, on or about November 24, 2011, Shiera sent **VILLALOBOS** a BBM
message stating, as translated into English, "Brother, Piojo [**ISTURIZ**] never fails.
He put mine at like $3.5M on the proposal and 5 for the ones from Pelon [Rincon]
according to what we talked about at dinner.  Give him support." **VILLALOBOS**
responded, as translated into English, "That guy is good."

94.     In addition to help getting paid on outstanding invoices, Rincon and
Shiera also asked the PDVSA Defendants for their assistance in winning PDVSA
contracts.  For example, on or about January 4, 2012, Shiera sent **VILLALOBOS**
a BBM message requesting **VILLALOBOS**'s assistance in securing a contract
over a competitor to supply equipment in relation to a PDVSA project.

95.     On or about February 8, 2012, Shiera sent **ISTURIZ** a BBM message
asking, as translated into English, "What's happened with the Motorgenerators?"

25

to which **ISTURIZ** replied, as translated into English, "Cesar must sign it! I'll tell him."

96. The PDVSA Defendants corresponded with Rincon and Shiera about PDVSA bidding panels as well as the official actions the PDVSA Defendants would take on behalf of Rincon and Shiera. For example, on or about February 24, 2012, Shiera sent **ISTURIZ** a BBM message with a proposed panel of bidders for an electric equipment panel. **ISTURIZ** responded, as translated into English, "Good! Give me the panels for the others!! Get people moving on that! Look, I have all the purchasers in my office beating them hard", to which Shiera replied, as translated into English, "That is my Piojo."

97. In addition to allowing Rincon and Shiera to have input on PDVSA bidding panels, as discussed in Paragraph 96 above, the PDVSA Defendants gave Rincon and Shiera inside information on upcoming PDVSA projects so that they could choose the projects that their companies bid on. For example, on or about February 28, 2012, **ISTURIZ** e-mailed Rincon and Shiera, stating, as translated into English, "I'm sending you a list of the process that we need to start tomorrow. For the moment, they're processes for E&P [exploration and production] and Gas. I started with e&p, because that's where the strength lies! I need to know before 10 am in which processes you want to participate in and the panel."

98.     On or about March 1, 2012, Rincon responded to the e-mail from
**ISTURIZ** referenced in Paragraph 97 above, copying Shiera, stating, as translated
into English, "Attached you will find what we are going to work on highlighted in
YELLOW.  These are drilling parts and equipment.  There is one from Abraham."
Attached was a highlighted list of equipment PDVSA sought to purchase with the
corresponding internal budgets.

99.     The PDVSA Defendants frequently sent Rincon and Shiera updates of
the money they expected to receive in bribes in exchange for the payments Rincon
and Shiera were receiving on outstanding PDVSA invoices as a result of the
bribery scheme.  The PDVSA Defendants occasionally sent Rincon and Shiera the
payment proposals themselves, either in draft form for input or in final form so
Rincon and Shiera could see how much money their companies were expected to
receive (and, in turn, how much they would need to pay in bribes).  For example,
on or about January 5, 2012, **ISTURIZ** sent Rincon an e-mail stating, as translated
into English, "I need you to check these numbers.  They are the payments for
payment proposal.  The date that is on each payment corresponds to the Monday of
the week of the proposal.  The date will not coincide with the one on which you
received the money, don't focus on that, just the amounts."  Attached was a
PDVSA payment proposal document setting forth vendors to be paid, (including a
number of Rincon's companies) and the dates and amounts of the payments.

100.  In addition, on or about May 17, 2013, Cesar Rincon sent himself a PDVSA payment proposal from his PDVSA e-mail account to a personal e-mail account.  He forwarded it to **VILLALOBOS**, Shiera, and Rincon with the message, as translated into English, "I've attached the proposal reviewed and approved by Javier [**ALVARADO**]."  The attached payment proposal included payments to a number of Shiera's and Rincon's companies, including Shiera Company 1, Shiera Company 2, Shiera Company 3, Rincon Company 2, Rincon Company 5, and Rincon Company 7.

101.  The PDVSA Defendants also frequently reminded Rincon and Shiera of how much they owed in bribe payments, using coded or vague language to conceal what they were talking about.  For example, on or about March 15, 2012, De Leon sent Shiera a BBM message stating, as translated into English, "Were you able to able to buy the things?  Debt from the friends as of today $1,093,232", which the conspirators understood to be a reference to outstanding bribe payments.

102.  Within a week of De Leon's message, accounts controlled by Rincon and Shiera then made a series of transfers to Swiss Account 1, totaling just over $1 million.  On or about March 19, 2012, Swiss Account 5 transferred $536,005.42 to Swiss Account 1.  The next day, March 20, 2012, Shiera Company 5 transferred $281,781.34 to Swiss Account 1.  Finally, on or about March 22, 2012, Shiera Company 5 transferred $193,021.47 to Swiss Account 1.

103. In order to conceal the nature and ownership of the bribe proceeds, **ISTURIZ** sent Rincon and Shiera instructions to pay various bank accounts, held in the names of various companies. **ISTURIZ** made coded references to paying bribes in exchange for future PDVSA business. For example, on or about March 22, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "Hi P and P, I'm sending you the coordinates in order for you to send me something to buy coal to keep cooking the stew. . . . We can use this account while we're opening the other one." **ISTURIZ** concluded the e-mail with the account and wire information for Curaçao Account 1.

104. On or about April 2, 2012, Rincon Company 2 transferred $450,000 from its bank account in the Southern District of Texas to Curaçao Account 1. Over the following several weeks, Curaçao Account 1 made a series of transfers to Swiss Account 7.

105. On or about May 13, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "Dear friends, I'm sending you the coordinates to move ahead somewhat on the payments while the other account is being opened. I need to notify the friend at the bank before the money arrives. Attached is a spreadsheet showing a summary of payments over the past 3 weeks." Set forth below was the account and wire information for Swiss Account 7. Attached was a chart setting forth various Rincon and Shiera companies, the

29

amounts they had been paid by PDVSA for a three-week period, and two figures representing bribe payments due in the amount of 10% and 2%.

106.   On or about May 16, 2012, Rincon Company 2 transferred $116,949.72 to Curaçao Account 1.  Subsequently, Curaçao Account 1 made two transfers to Swiss Account 7.

107.   On or about June 1, 2012, Rincon Company 2 transferred $766,428.39 to Swiss Account 7.

108.   On or about June 18, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "Dear colleagues, I am sending you the Excel file with the summary of the payments and the great debt you have with Paulo!"

109.   On or about June 19, 2012, Rincon responded to **ISTURIZ**, stating, as translated into English, "To date we have transferred the following amounts: 450,000 [Curaçao Account 1], 116,949.72 [Curaçao Account 1], 766,428.39 [Swiss Account 7], 367,069.19 [Swiss Account 7].  THE TOTAL IS…USD 1,700,447.30. . . .  Paulo, the problem is that sometimes we take the amount considering the entire payment and sometimes we need to subtract 5% for our allies'. . . .  Forgive the trouble but it is being deposited today and this way we have a difference of USD 00000000000000000000000000000.00."

110. On or about June 19, 2012, Rincon Company 2 transferred $367,069.19 to Swiss Account 7.

111. On or about June 21, 2012, Rincon Company 6 transferred $69,427.81 to Swiss Account 7.

112. Rincon frequently sent confirmations of bribe payments he had made to the PDVSA Defendants. For example, on or about May 15, 2012, Rincon Company 2 transferred $200,000 to Swiss Account 9. The following day, Rincon sent the wire confirmation to Cesar Rincon.

113. Similarly, on or about June 19, 2012, Rincon Company 2 transferred $115,000 to Swiss Account 9. On or about June 21, 2012, Rincon forwarded the wire confirmation to Cesar Rincon, who replied, as translated into English, "All good, Thanks."

114. On several occasions, **ISTURIZ** referenced the fact that the financial transactions through which he sought to receive bribe payments were designed to conceal the nature and ownership of the proceeds. On or about July 12, 2012, **ISTURIZ** forwarded account and wire information for U.S. Account 1 from ISTURIZ Associate 1 to Rincon and Shiera, copying ISTURIZ Associate 1. **ISTURIZ** stated, as translated into English, "I am sending the instructions in order to start using this route. Copy to the person who is responsible for setting everything up so that it is all really well shielded."

115.   On or about July 24, 2012, Shiera Company 6 transferred $323,045.27 to U.S. Account 1.

116.   On or about July 31, 2012, Rincon Company 2 transferred $450,000 from its account in the Southern District of Texas to U.S. Account 1.

117.   On or about August 1, 2012, Rincon Company 2 transferred $533,729.77 from its account in the Southern District of Texas to U.S. Account 1.

118.   On or about August 10, 2012, U.S. Account 1 transferred $445,785 to Swiss Account 7.

119.   On or about August 13, 2012, U.S. Account 1 transferred $625,056 to Swiss Account 7.

120.   On or about August 29, 2012, **ISTURIZ** sent Rincon and Shiera an e-mail stating, as translated into English, "I am sending you the list up to this week's proposal, which I am putting together.  The numbers are going to stay like this!  Merry Christmas even though it isn't."  Attached were four charts – the first two set forth various Rincon companies and various Shiera companies, along with the amounts that each had been paid by PDVSA over the course of several weeks.  The second two, entitled "RR" and "AS," respectively, set forth various payment amounts and payment destinations for bribe payments to **ISTURIZ**.

121.   On or about November 30, 2012, Shiera sent De Leon a BBM message stating, as translated into English, "I have $20MM approved to collect for

this week. I'd appreciate your help with at least one invoice for $15MM. Let me

know." On the same day, De Leon replied, "I'll help you with the payment."

122. On or about February 19, 2013, Rincon Company 2 transferred

$200,000 to an account in the name of REITER Relative 1. Rincon sent the

payment confirmation to **REITER** by e-mail.

123. On or about February 21, 2013, Rincon Company 2 transferred

$250,000 to an account in the name of REITER Relative 1. Rincon sent the

payment confirmation to **REITER** by e-mail.

124. De Leon and **VILLALOBOS** continued to act as intermediaries

between Rincon and Shiera and **ISTURIZ**, **ALVARADO**, **REITER**, Cesar

Rincon, and Official B. For example, on or about March 11, 2013,

**VILLALOBOS** sent Shiera a BBM message stating, as translated into English,

"Did you get the second one for Nadal [**REITER**]? The one for 130?" Shiera sent

**VILLALOBOS** a BBM message stating, as translated into English, "The $130k

transfer was returned to me, they say that the iban is wrong. Can you ask for it

again? This is Nadal's [**REITER's**]." **VILLALOBOS** responded, as translated

into English, "Yes that is it, I'm going to ask for it."

125. For example, in or about March 13, 2013, **VILLALOBOS** sent Shiera

a BBM message stating, as translated into English, "Brother, I met with Primo

[Cesar Rincon], I asked him to adjust the proposal with around 75 percent of your invoice to convince J [**ALVARADO**] to sign it. . . .”

126.  In addition, on or about May 3, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, “J [**ALVARADO**] wrote to me, he said he got a good ration this week.”

127.  In order to disguise the nature and ownership of the bribe proceeds, instead of having money sent directly to an account he controlled, **REITER** frequently directed bribe money to third parties for his benefit.  For example, **REITER** directed that some of the money he was owed in connection with the scheme be used to purchase a condominium in the name of a company controlled by REITER Relative 1.  On or about August 17, 2012, a representative of Law Firm 1 sent Rincon Associate 1 the closing documents for a condominium at the Four Seasons in Miami and requested that Rincon Associate 1 direct REITER Relative 1 to execute the documents.  The documents reflected that the buyer of the condominium was a Florida corporation of which REITER Relative 1 was the president.

128.  On or about August 17, 2012, Rincon sent **REITER** an e-mail, attaching the closing documentation referenced in Paragraph 127 above, stating, as translated into English, “I need this signed by [REITER Relative 1] and returned to

me." On or about August 21, 2012, **REITER** returned the documents referenced in Paragraph 127 to Rincon by e-mail, executed by REITER Relative 1.

129.   On or about August 23, 2012, Rincon Company 5 transferred $867,619.62 to Law Firm 1's attorney trust account, in connection with the purchase of the condominium for **REITER** referenced in Paragraph 127 above.

130.   **REITER** also directed Rincon to invest in a film on his behalf.  After **REITER** forwarded Rincon an investment agreement from Production Company A to invest in a film, on or about May 21, 2013, at the direction of Rincon Associate 1, Rincon Company 7 transferred $1.5 million to Production Company A.  Rincon sent the confirmation of the transfer to **REITER** by e-mail on or about May 22, 2013.

131.   On or about September 14, 2013, Rincon, copying Cesar Rincon, directed a relative by e-mail to send $200,000 to Swiss Account 8.  Cesar Rincon replied, as translated into English, "Thank you cousin!"

132.   On or about September 16, 2013, Rincon Company 2 transferred $200,000 to Swiss Account 8.

### Gifts and Other Things of Value

133.   In addition to monetary bribes, Rincon and Shiera provided the PDVSA Defendants with gifts, recreational travel, and other things of value in

exchange for their assistance in connection with Rincon's and Shiera's business with PDVSA.

134.   For example, on or about November 30, 2011, Shiera received a reservation confirmation by e-mail for a beach house in Parrot Cay in the Bahamas made in the name of **ISTURIZ**, which Shiera then forwarded on to **ISTURIZ** noting, as translated into English, "Done, Piojo."

135.   In addition, on or about January 15, 2013, Rincon Company 2 purchased a $107,500 armored car from a company in Texas for the benefit of **REITER**.   On or about March 18, 2013, Rincon Company 2 purchased a second $107,500 armored car from a company in Texas for the benefit of **REITER.**

136.   On or about February 28, 2013, Shiera received an e-mail requesting that he pay $26,170.00 to a grocery store in Aruba where multiple people, including the PDVSA Defendants, would charge items to Shiera's account.   On March 1, 2013, Shiera forwarded the email to Shiera Associate 1, attaching an spreadsheet listing various grocery items and prices, and directed Shiera Associate 1 to pay the grocery store and charge the expense to Shiera Company 1.The spreadsheet included items charged by **VILLALOBOS**, **ALVARADO**, and Cesar Rincon, including cases of lobster and steak, bottles of wine, and bottles of Scotch.

137.   Similarly, on or about June 6, 2013, a luxury hotel in Aruba sent Shiera confirmations for a number of hotel rooms, including rooms for Cesar

Rincon and **REITER**. A note next to both Cesar Rincon's and **REITER**'s room confirmations stated, "This room will be paid by Mr. Shiera."

138. On or about August 1, 2013, Rincon purchased a $10,300 handbag for REITER Relative 1 at a store in the Southern District of Texas.

139. On or about July 3, 2014, **REITER** forwarded Rincon invoices dated June 26, 2014, for English classes for two of Official B's children, one in the amount of $16,672 and the other in the amount of $8,755.

140. On or about July 4, 2014, Rincon Company 2 made two transfers, one in the amount of $16,672 and the other in the amount of $8,755, to a bank account in the name of the school where Official B's children were taking English classes.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT TWO
### (Conspiracy – 18 U.S.C. § 371)

141.  Paragraphs 1 through 47 and 50 through 140 are realleged and incorporated by reference as though fully set forth herein.

142.  Beginning in at least 2011 and continuing through at least 2013, in the Southern District of Texas, and elsewhere, the defendants,

### NERVIS GERARDO VILLALOBOS CARDENAS
### and
### DAISY TERESA RAFOI BLEULER

did willfully and knowingly conspire, confederate, and agree with each other, De Leon, and others known and unknown to the Grand Jury to commit offenses against the United States, that is:

a.  to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of:  (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and

38

(iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Rincon, Shiera, and their U.S. companies in obtaining and retaining business for and with, and directing business to, Rincon, Shiera, their companies, and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a); and

b.  while in the territory of the United States, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a

foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Rincon, Shiera, and their U.S. companies in obtaining and retaining business for and with, and directing business to, Rincon, Shiera, their companies, and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-3(a).

### Purpose of the Conspiracy

143.   The purpose of the conspiracy was for De Leon, **VILLALOBOS**, **RAFOI**, and their co-conspirators to enrich themselves and others by directing bribes to the PDVSA Defendants, including a portion of which De Leon and **VILLALOBOS** kept for themselves, to assist Rincon, Shiera, and others in obtaining and retaining lucrative energy contracts with PDVSA through corrupt and fraudulent means.

### Manner and Means of the Conspiracy

144.   The manner and means by which De Leon, **VILLALOBOS**, **RAFOI**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

145. De Leon and **VILLALOBOS** offered Rincon and Shiera, as well as others, the opportunity to receive payment priority over other PDVSA vendors on outstanding PDVSA invoices and to receive assistance in winning future PDVSA contracts, in exchange for bribes paid to the PDVSA Defendants, of which De Leon and **VILLALOBOS** would receive a portion.

146. At the direction of De Leon and **VILLALOBOS**, Rincon and Shiera, together with others, paid bribes to the PDVSA Defendants through the use of interstate and foreign wires in order to secure any improper business advantage, influence acts and decisions of Cesar Rincon, **ISTURIZ**, **REITER**, and **ALVARADO** in their official capacities, and to induce Cesar Rincon, **ISTURIZ**, **REITER**, and **ALVARADO** to do and omit to do certain acts, including, but not limited to:

   a. including Rincon's and Shiera's companies on payment proposals and approving those payment proposals so that Rincon's and Shiera's companies could receive payments on outstanding PDVSA invoices;

   b. assisting Rincon's and Shiera's companies in winning PDVSA contracts;

   c. providing Rincon and Shiera with inside information concerning the PDVSA bidding process;

   d. placing one or more of Rincon's and Shiera's companies on certain bidding panels for PDVSA projects; and

e. ensuring that Rincon and Shiera were not subject to any internal investigations at PDVSA.

147. At their request, **RAFOI** opened Swiss bank accounts for De Leon, **VILLALOBOS**, and **ALVARADO**. Each account was opened in the name of a Scottish partnership, to hide the true owner.

148. At the direction of De Leon and **VILLALOBOS**, Rincon and Shiera, together with others, caused bribe payments to be wired from the bank accounts of Rincon's companies and Shiera's companies to bank accounts set up by **RAFOI** and controlled by De Leon and **VILLALOBOS** with the understanding that the funds would be split among De Leon, **VILLALOBOS**, Cesar Rincon, **ISTURIZ**, **REITER**, **ALVARADO**, and Official B.

149. De Leon and **VILLALOBOS** then provided additional directions to **RAFOI** regarding disbursement of the funds.

150. **RAFOI** also discussed opening an account for Official B with **VILLALOBOS** and Shiera.

151. In addition to monetary bribes, Rincon and Shiera, together with others, provided other things of value to the PDVSA Defendants including recreational travel, vehicles, gifts (including watches and wine), meals, and entertainment, in order to receive payment priority on outstanding PDVSA invoices and to obtain and retain business with PDVSA.

42

## Overt Acts

152.   In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

153.   On or about September 16, 2011, **RAFOI** e-mailed Shiera, **VILLALOBOS**, and De Leon, stating that Swiss Company A had set up four bank accounts – Swiss Account 1, which **RAFOI** referred to as the "main account," Swiss Account 2, which **RAFOI** identified as being for **VILLALOBOS**, Swiss Account 3, which **RAFOI** identified as being for De Leon, and Swiss Account 4, which **RAFOI** identified as being for **ALVARADO**.  **RAFOI** concluded the e-mail by stating, "We will **email you next week the new account numbers and the wiring instructions** to begin transfer of funds into the main a/c ([Swiss Account 1]) for distribution into the 3 accounts."

154.   On or about December 7, 2011, Swiss Account 5 transferred $602,790.96 to Swiss Account 1.

155.   On or about December 16, 2011, Shiera Company 5 transferred $47,212.14 to Swiss Account 1.

156.   On or about December 18, 2011, **RAFOI** sent Shiera an e-mail stating, "The meeting with Nervis regarding Grey Hair [Official B] was very positive, open and excellent."

157.   On or about December 20, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "don't forget to talk with your administrator, It Is vital the flow comes in December," which the conspirators understood to refer to bribe payments.  Shiera responded, as translated into English, "He just confirmed you'll have it before this Friday."

158.   On or about December 21, 2011, Swiss Account 1 made two transfers to Swiss Account 3, one in the amount of $587,269.20 and another in the amount of $1,370,294.80.

159.   On or about December 22, 2011, Shiera Company 5 made two transfers to Swiss Account 1, one in the amount of $299,901.85 and another in the amount of $362,485.68.

160.   On or about December 23, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "[D]o you know if that invoice of mine was paid?"  Shiera replied, as translated into English, "Brother, the 1000 will be deposited on Monday."

161.   On or about December 27, 2011, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "The deposit for the little stick has not arrived, sorry to bother you, but it is vital for this week."

162.   On or about January 4, 2012, Shiera Company 5 transferred $60,658.26 to Swiss Account 1.

163.   On or about February 10, 2012, Swiss Account 5 transferred $1,373,227.89 to Swiss Account 1.

164.   On or about February 13, 2012, Shiera Company 5 transferred $121,300.70 to Swiss Account 1.

165.   On or about February 15, 2012, Shiera sent De Leon a BBM message stating, as translated into English, "Last week the payment for $322,021 was completed in two parts, one is for $121,400 and the other is $200,621.  On the other hand, this week we are paying $1,785,223 corresponding to $1,000,000 for the plane and $788,255 from the last collection received."

166.   On or about February 15, 2012, Swiss Account 5 transferred $611,211.52 to Swiss Account 1.

167.   On or about February 16, 2012, Shiera Company 5 transferred $200,522.43 to Swiss Account 1.

168.   On or about February 16, 2012, De Leon provided handwritten instructions to **RAFOI**, directing **RAFOI** to transfer $4,000,000 from Swiss

Account 1 to Swiss Account 3, and $1,400,000 from Swiss Account 1 to Swiss Account 4.

169.   On or about February 17, 2012, Rincon Company 3 transferred $257,436 to Swiss Account 1.

170.   On or about February 21, 2012, Swiss Account 1 transferred $4,000,000 to Swiss Account 3 and $1,400,000 to Swiss Account 4.

171.   On or about February 27, 2012, **VILLALOBOS**, De Leon, Rincon, Shiera, and others met at a Capital Grille in Florida and discussed the scheme.

172.   On or about March 15, 2012, De Leon sent Shiera a BBM message stating, as translated into English, "Were you able to able to buy the things?  Debt from the friends as of today $1,093,232," which the conspirators understood to be a reference to outstanding bribe payments.

173.   On or about March 19, 2012, Swiss Account 5 transferred $536,005.42 to Swiss Account 1.

174.   On or about March 20, 2012, Shiera Company 5 transferred $281,781.34 to Swiss Account 1.

175.   On or about March 22, 2012, Shiera Company 5 transferred $193,021.47 to Swiss Account 1.

176.   On or about November 30, 2012, Shiera sent De Leon a BBM message stating, as translated into English, "I have $20MM approved to collect for

this week.  I'd appreciate your help with at least one invoice for $15MM.  Let me know."  On the same day, De Leon replied, as translated into English, "I'll help you with the payment."

177.   On or about January 21, 2013, De Leon sent Shiera a BBM message stating, "Enano [**VILLALOBOS**] told me to transfer you what's pending up to mid Dec.  It's about 1.5 M."

178.   On or about March 13, 2013, **VILLALOBOS** sent Shiera a BBM message stating, as translated into English, "Brother, I met with Primo [Cesar Rincon], I asked him to adjust the proposal with around 75 percent of your invoice to convince J [**ALVARADO**] to sign it. . . . "

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

179.   Paragraphs 1 through 47, 50 through 140, and 143 through 178 are reableged and incorporated by reference as though fully set forth herein.

180.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendants,

**NERVIS GERARDO VILLALOBOS CARDENAS**
**JAVIER ALVARADO OCHOA**
**and**
**DAISY TERESA RAFOI BLEULER,**

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, as follows:  a $515,513.20 wire from Rincon Company 2 to Swiss Account 1 on or about October 26, 2011.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS FOUR-EIGHT
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

181.   Paragraphs 1 through 47, 50 through 140, and 143 through 178 are realleged and incorporated by reference as though fully set forth herein.

182.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### ALEJANDRO ISTURIZ CHIESA,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Four | June 1, 2012 | $766,428.39 wire transfer from Rincon Company 2 to Swiss Account 7 |
| Five | June 19, 2012 | $367,069.19 wire transfer from Rincon Company 2 to Swiss Account 7 |
| Six | June 21, 2012 | $69,427.81 transfer from Rincon Company 6 to Swiss Account 7 |
| Seven | August 10, 2012 | $445,785 wire transfer from U.S. Account 1 to Swiss Account 7 |

| COUNT | DATE | MONETARY TRANSACTION |
|:---:|:---:|:---|
| Eight | August 13, 2012 | $625,056 wire transfer from U.S. Account 1 to Swiss Account 7 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

and 2.

## COUNTS NINE-TWELVE
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

183.   Paragraphs 1 through 47, 50 through 140, and 143 through 178 are realleged and incorporated by reference as though fully set forth herein.

184.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### RAFAEL ERNESTO REITER MUNOZ,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, that is, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Nine | August 23, 2012 | $867,619.62 wire transfer from Rincon Company 5 to Law Firm 1 |
| Ten | February 19, 2013 | $200,000 wire transfer from Rincon Company 2 to REITER Relative 1 |
| Eleven | February 21, 2013 | $250,000 wire transfer from Rincon Company 2 to REITER Relative 1 |
| Twelve | May 21, 2013 | $1,500,000 wire transfer from Rincon Company 7 to Production Company A |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNT THIRTEEN
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

185.   Paragraphs 1 through 47, 50 through 140, and 143 through 178 are realleged and incorporated by reference as though fully set forth herein.

186.   From in or around 2012 and continuing until at least 2013, in the Southern District of Texas and elsewhere, the defendants,

**JAVIER ALVARADO OCHOA**
**and**
**PAULO JORGE DA COSTA CASQUIERO MURTA**

did knowingly conspire, confederate, and agree with each other, **VILLALOBOS**, De Leon, Rincon, Shiera, and others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Section 1956 namely:

a.  knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, in violation of Title 18, United States Code, Section 1956(a)(1)(B); and

53

b. with the intent to promote the carrying on of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2 and 78dd-3, transport, transmit, or transfer funds from a place in the United States to a place outside the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## Manner and Means of the Conspiracy

187. The manner and means by which **ALVARADO**, **MURTA**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

188. **ALVARADO**, De Leon, and **VILLALOBOS** promised Rincon, Shiera, and others known and unknown to the Grand Jury assistance with getting paid on outstanding invoices on PDVSA contracts, as well as assistance with winning new PDVSA contracts, in exchange for bribe payments.

189. **VILLALOBOS** and BES Banker 1 told Rincon and Shiera that Rincon and Shiera should open bank accounts at Banco Espirito Santo ("BES"), the bank PDVSA used, to facilitate continued payments from PDVSA.

190. **MURTA**, together with others, assisted the PDVSA Defendants, Rincon, Shiera, and others known and unknown to the grand jury, in opening bank

accounts, including bank accounts in Dubai, for the PDVSA Defendants and their

co-conspirators to receive bribe payments.

191. **MURTA**, who was not a BES employee, worked closely with BES

Banker 1 and BES Banker 2 to set up the structures and accounts used in the

money laundering scheme.

192. De Leon, **VILLALOBOS**, and **ALVARADO** directed bribe

payments to be sent to various recipients other than the intended PDVSA

Defendants, including companies, intermediaries, relatives, friends, and close

personal associates of the PDVSA Defendants, for the purpose of concealing and

disguising the nature, source, and ownership of the bribe payments.

193. **MURTA**, Shiera, and Shiera Associate 1, each and together with

others, created false justifications for certain of the bribes, including loan

documents for false loans that were never intended to be repaid, and contracts

intended to obscure the purpose of the wire transfers, for the purpose of concealing

and disguising the nature, source, and ownership of those bribe payments.

194. Rincon and Shiera, together with others, directed and caused the wire

transfer of bribe payments to bank accounts as instructed by **MURTA**,

**VILLALOBOS**, and others, for the purpose of promoting the bribery and money

laundering scheme.

## Acts In Furtherance of the Conspiracy

## Account Structure and Set-Up

195.    Prior to 2012, **MURTA**, BES Banker 1, and BES Banker 2 had assisted **VILLALOBOS, ALVARADO, REITER,** and De Leon in setting up accounts at BES.

196.    "BES Account 1," whose identity is known to the Grand Jury, was a BES Dubai account under **VILLALOBOS**'s control.  BES Account 1 was used in connection with the scheme.

197.    "BES Account 2," whose identity is known to the Grand Jury, was a BES Dubai account under **VILLALOBOS**'s control.  BES Account 2 was used in connection with the scheme.

198.    "BES Account 3," whose identity is known to the Grand Jury, was a BES Dubai account under **ALVARADO**'s control.  In or about 2013, BES Account 3 was closed in Dubai and then reopened in Switzerland.  BES Account 3 was used in connection with the scheme.

199.    "BES Account 4," whose identity is known to the Grand Jury, was a BES Dubai account under De Leon's control, for which De Leon Associate 1 was the listed beneficial owner.  BES Account 4 was used in connection with the scheme.

200. "BES Account 5," whose identity is known to the Grand Jury, was a BES Dubai account under Shiera's control. BES Account 5 was opened for the purpose of being used in the scheme.

201. "BES Account 6," whose identity is known to the Grand Jury, was a BES Dubai account under Rincon's control. BES Account 6 was opened for the purpose of being used in the scheme.

202. "BES Account 7," whose identity is known to the Grand Jury, was a BES Portugal account under Shiera's control. BES Account 7 was used in connection with the scheme.

203. "BES Account 8," whose identity is known to the Grand Jury, was a BES Dubai account. BES Account 8 was used in connection with the scheme.

204. "Macau Account 1," whose identity is known to the Grand Jury, was an account at the Bank of China, Macau Branch. Macau Account 1 was used in connection with the scheme.

205. After **VILLALOBOS** and BES Banker 1 requested that Rincon and Shiera begin using BES to receive payments from PDVSA and to pay the PDVSA Defendants, **MURTA**, BES Banker 1, and BES Banker 2 assisted Rincon and Shiera in opening their own accounts at BES.

206. On or about February 28 or 29, 2012, **MURTA** traveled to Miami, Florida, to meet with Shiera, Shiera Associate 1, and others in connection with the scheme.

207. **MURTA**, the PDVSA Defendants, Shiera, Rincon, and their co-conspirators communicated, including via e-mail, phone, various messaging applications, and meeting in person, about the BES accounts and the need to submit documentation to justify the payments.

208. On or about May 3, 2012, **MURTA** sent Shiera Associate 1 an e-mail providing the bank account information for, as translated into English, "our friends," and identifying BES Accounts 2, 3, and 4, as being for **VILLALOBOS**, **ALVARADO**, and De Leon, respectively. Documents related to BES Accounts 5 and 6 were attached to this e-mail.

209. In or about February 2013, **MURTA**, **VILLALOBOS**, Shiera, and others met in Dubai to discuss the scheme.

210. A few weeks later, on or about March 21, 2013, **MURTA** sent Shiera an e-mail attaching a hand-drawn diagram depicting the financial structure the group planned to use. The diagram showed funds from Rincon's and Shiera's businesses being transferred to a common account, and then being disbursed to accounts for "Amigo 1," "Amigo 2," and "Amigo 3."

211.   On or about March 8, 2013, Shiera sent **MURTA** a BBM stating, as translated into English, "Hi.  Please give [Shiera Associate 1] any info [Shiera Associate 1] needs about the friends' recipient companies.  It's in order to set up the contracts.  Thank you so much."  **MURTA** responded, as translated into English, "Hi.ok."  On March 11, 2013, **MURTA** sent Shiera a BBM asking Shiera to confirm, as translated into English, "as agreed [Shiera Associate 1] will do the contracts for yours and Roberto's.  Correct?"

### The $4.8 Million "Loan" to BES Account 1

212.   One of the methods that **MURTA**, Sheira, Rincon, and Shiera Associate 1 used to pay bribes to **VILLALOBOS**, **ALVARADO**, and De Leon was through a fake loan between Swiss Account 5 and BES Account 1.  To that end, on May 8, 2012, **MURTA** sent Shiera Associate 1 an e-mail providing the bank account information for BES Account 1.

213.   On or about May 8, 2012, Shiera Associate 1 sent an e-mail to the lawyer preparing the loan contracts stating "as for the terms and terms of payment, as we discussed yesterday being that the loan will not be repaid place the usual market conditions."

214.   On or about May 15, 2012, Shiera Associate 1 sent an e-mail to **RAFOI** attaching wire instructions for BES Account 1.

215.   On or about May 15, 2012, Shiera Associate 1 sent an e-mail to **MURTA** stating, as translated into English, "Enclosed you will find the loan document, as you will see no date because it has not been signed by [BES Account 1], if you can please place the date yesterday 14 and send them to us as soon as possible to make the transfer."

216.   On or about May 16, 2016, **MURTA** sent an e-mail to Shiera Associate 1 stating, as translated into English, "I am sending the attached signed contract," and attaching the signed contract.

217.   On or about May 16, 2012, Swiss Account 5 wired $4.8 million to BES Account 1.

218.   On or about May 17, 2012, **RAFOI** sent an e-mail to Shiera Associate 1 stating "[t]he contract is not valid as there is no date on it."

219.   On or about May 17, 2012, Shiera Associate 1 sent an e-mail to **MURTA** asking him to date the contract and send it back to [Shiera Associate 1]. Approximately two hours later, **MURTA** sent Shiera Associate 1 an e-mail stating, as translated into English, "I've attached the contract," and attaching the signed and dated contract.

220.   On or about May 17, 2012, Shiera Associate 1 sent an e-mail to **RAFOI** attaching the signed and dated loan contract.

221.   On or about June 1, 2012, BES Account 2 wired $4.8 million to BES Account 3 through two intermediary BES accounts.

222.   On or about June 27, 2012, BES Account 1 wired $1.6 million to BES Account 4 through two intermediary BES accounts.

223.   On or about August 9, 2012,  Shiera Associate 1 sent an e-mail to Shiera stating, as translated into English, "To deliver to friends, attached is the cancellation of the loan document between [Swiss Account 5] and [BES Account 1].

### Additional Payments and Communications

224.   The PDVSA Defendants would often check in on the bribe payments owed by Rincon and Shiera.  For example, on or about March 5, 2013, **VILLALOBOS** sent Shiera a BBM stating, as translated into English, "Javier [**ALVARADO**] is asking me for accounts, send me a table with your numbers please."  Shiera responded, as translated into English, "[w]hat I have pending with the group is exactly $6,413,235."  **VILLALOBOS** then asked, as translated into English, "did you deduct Nadal's [**REITER**'s]?" and Shiera responded that he had not.

225.   On or about March 6, 2013, **VILLALOBOS** sent an e-mail to Rincon with the subject line "Fwd: Coordenadas" containing the account information for Macau Account 1 and **MURTA**'s signature block at the bottom.

226.  In or about March 2013, **VILLALOBOS** requested that Rincon sent the money to Macau Account 1 from an account not located in the United States.

227.  On or about March 18, 2013, Shiera sent a BBM to Shiera Associate 1 stating, as translated into English, "Remember to send to the new friends.  Let Murta know what you are sending before you do it.  Thank you."

228.  On or about March 18, 2013, **VILLALOBOS** sent Shiera a BBM asking, as translated into English, "when are you sending what is pending?  The electrico [**ALVARADO**] came early asking for it."  Shiera responded that the payment would be sent that week.

229.  On or about March 20, 2013, **VILLALOBOS** sent Shiera a BBM asking, as translated into English, "Have you been able to do something with the transfer brother?"  **VILLALOBOS** sent Shiera a second BBM in which **VILLALOBOS** explained, as translated into English, "The thing is that J [**ALVARADO**] is nervous because he hasn't seen anything since last year." Shiera responded, as translated in English, "It will be sent today," and further explained to **VILLALOBOS** that the amount to be transferred was $6,145,587.70.

230.  On or about March 21, 2013, Shiera sent **MURTA** a BBM stating, as translated into English, "[Shiera Associate 1] needs to transfer the $6.1M to the friends urgently.  Can they process the transfer while the contracts are being signed?  I promised them that money by tomorrow."  **MURTA** replied, as

translated into English, "Yes you can send, but the funds are going to go into [BES Account 5] and they won't be in the friends' accounts tomorrow." That same day, **MURTA** sent Shiera bank account information for BES Account 8.

231.   On or about March 22, 2013, Shiera forwarded to Rincon a March 21, 2013 e-mail from **MURTA** that contained account information for Macau Account 1, and told Rincon to compare this account information with the information Rincon had received from "Enano" [**VILLALOBOS**].

232.   On March 25, 2013, BES Account 7 wired $6,145,580.70 to BES Account 8, and Shiera Associate 1 sent Shiera an e-mail with the subject line "Wire Transfer processed" that contained the wire transfer details for the transfer from BES Account 7 to BES Account 8. On March 26, 2013, Shiera forwarded the e-mail to **VILLALOBOS**.

233.   On April 23, 2013, Rincon sent an e-mail to **VILLALOBOS**; the text of the e-mail was "FYI." Attached to the e-mail was a wire transfer confirmation showing that Rincon Company 8 had sent $5,011,231.00 to Macau Account 1 on April 19, 2013.

234.   On May 15, 2013, Rincon sent an e-mail to **VILLALOBOS** with the subject line "Rm: [Macau Account 1];" the text of the e-mail was "FYI." The e-mail contained a screenshot showing that over $5,083,000 had been deducted from Rincon Company 8's account.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FOURTEEN
### (Conspiracy – 18 U.S.C. § 371)

235.    Paragraphs 1 through 47, 50 through 140, 143 through 178, and 187-234 are realleged and incorporated by reference as though fully set forth herein.

236.    Beginning in at least 2012 and continuing through at least 2013, in the Southern District of Texas, and elsewhere, the defendant,

**PAULO JORGE DA COSTA CASQUIERO MURTA,**

did willfully and knowingly conspire, confederate, and agree with

**VILLALOBOS**, De Leon, BES Banker 1, BES Banker 2, Rincon, Shiera, and others known and unknown to the Grand Jury to commit offenses against the United States, that is:

   a.  to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of:  (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and

65

(iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Rincon, Shiera, and their U.S. companies in obtaining and retaining business for and with, and directing business to, Rincon, Shiera, their companies, and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a); and

b. while in the territory of the United States, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a

foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Rincon, Shiera, and their U.S. companies in obtaining and retaining business for and with, and directing business to, Rincon, Shiera, their companies, and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-3(a).

## Purpose of the Conspiracy

237. The purpose of the conspiracy was for **MURTA**, **VILLALOBOS**, De Leon, and their co-conspirators, to enrich themselves and others by directing bribes to PDVSA officials, a portion of which De Leon and **VILLALOBOS** kept, to assist Rincon, Shiera, and others in obtaining and retaining lucrative energy contracts with PDVSA through corrupt and fraudulent means.

## Manner and Means of the Conspiracy

238. The manner and means by which **MURTA**, **VILLALOBOS**, De Leon, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

239. As explained in Paragraphs 58 through 64 and 144 through 150, Rincon and Shiera agreed to pay bribes to the PDVSA Defendants in exchange for business advantages in connection with their business with PDVSA.

240. At the direction of De Leon and **VILLALOBOS**, Rincon and Shiera, together with others, caused bribe payments to be wired from the bank accounts of Rincon's and Shiera's companies to bank accounts set up by **MURTA** and controlled by De Leon and **VILLALOBOS** with the understanding that the funds would be disbursed to the PDVSA Defendants and Official B.

241. **MURTA** often provided, either directly or through **VILLALOBOS**, to Rincon and Shiera the account information for the specific bank accounts into which they were to make payments.

242. **VILLALOBOS** instructed Rincon to pay bribes from accounts outside the United States. Rincon transferred money from inside the United States to accounts outside the United States for the purpose of paying bribes from the accounts outside the United States.

243. In addition to monetary bribes, Rincon and Shiera, together with others, provided other things of value to the PDVSA Defendants, including recreational travel, vehicles, gifts (including watches and wine), meals, and entertainment, in order to receive payment priority on outstanding PDVSA invoices and to obtain and retain business with PDVSA.

68

244.   Rincon and Shiera also paid bribes to other PDVSA officials in addition to the bribes paid to the PDVSA Defendants.  One such official was Official C, who assisted Shiera in winning contracts with PDVSA and provided Shiera with inside information regarding PDVSA in exchange for bribe payments.

245.   **MURTA** assisted Shiera in opening BES Account 9, a bank account whose identity is known to the Grand Jury, and which **MURTA** opened for Official C in the name of a relative of Official C, knowing that Official C was a Venezuelan official and that the account would be used to receive bribe payments.

246.   Prior to 2012, **MURTA** had opened BES Account 10, a bank account whose identity is known to the Grand Jury, and which was opened in the name of REITER Associate 1 for **REITER**'s benefit.

## Overt Acts

247.   In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

248.   On or about January 25, 2012, **MURTA** sent Shiera an e-mail containing a breakdown of the fees that needed to be paid in order to re-activate **REITER**'s account at BES.

249. On or about February 14, 2012, **MURTA** sent Shiera an e-mail containing account information for **REITER**'s account at BES.

250. On or about March 6, 2013, **VILLALOBOS** sent an e-mail to Rincon with the subject line "Fwd: Coordenadas" containing the account information for Macau Account 1 and **MURTA**'s signature block at the bottom.

251. In or about March 2013, **VILLALOBOS** requested that Rincon send bribe money to Macau Account 1 from an account not located in the United States.

252. On or about March 14, 2013, Shiera sent **MURTA** a BBM stating, as translated into English, "Hi Paulo. Please confirm for me that [Official C's]'s account in the name of [a relative of Official C's] is ready to be funded. Also let me know the costs that have to be paid for the opening of the structure and the account."

253. On or about March 14, 2013, **MURTA** responded, as translated into English, "Yes the account is ready. I'll send the costs later[.]"

254. On or about March 15, 2013, **MURTA** sent Shiera a BBM asking, as translated into English, "Please give me an email address in order to send banking details[.]"

255. On or about March 15, 2013, **MURTA** sent Shiera an e-mail containing the amount owed for the opening of Official C's account, and bank account information for Swiss Company B.

256.    On or about March 17, 2013, **MURTA** sent Shiera an e-mail containing the account information for BES Account 9.

257.    On or about March 18, 2013, **MURTA** sent Shiera a BBM stating, as translated into English, "Hello I also already sent [BES Account 9] details.  Warm regards[.]"

All in violation of Title 18, United States Code, Section 371.

## COUNTS FIFTEEN-SEVENTEEN
### (Money Laundering – 18 U.S.C. § 1956(a)(2)(A); 18 U.S.C. § 2)

258.   Paragraphs 1 through 47, 50 through 140, 143 through 178, 187 through 234, and 237 through 257 are realleged and incorporated by reference as though fully set forth herein.

259.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### JAVIER ALVARADO OCHOA,

did with the intent to promote the carrying on of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, transport, transmit, or transfer funds, and aid, abet, and cause others to transport, transmit, or transfer funds, from a place in the United States to a place outside the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Fifteen | April 16, 2012 | $15,359,287.09 wire from a Bariven account in Portugal to Rincon Company 2 |
| Sixteen | May 30, 2012 | $14,611,955.00 wire from a Bariven account in Portugal to Rincon Company 5 |
| Seventeen | July 31, 2012 | $13,220,796.20 wire from a Bariven account in Portugal to Rincon Company 7 |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## COUNTS EIGHTEEN-NINETEEN
### (Money Laundering – 18 U.S.C. § 1956(a)(2)(A); 18 U.S.C. § 2)

260.   Paragraphs 1 through 47, 50 through 140, 143 through 178, 187 through 234, and 237 through 257 are realleged and incorporated by reference as though fully set forth herein.

261.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

### PAULO JORGE DA COSTA CASQUIERO MURTA,

did with the intent to promote the carrying on of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, transport, transmit, or transfer funds, and aid, abet, and cause others to transport, transmit, or transfer funds, from a place in the United States to a place outside the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Eighteen | March 25, 2013 | $4,456,336.31 transfer from Rincon Company 2 to Rincon Company 8 |
| Nineteen | May 8, 2013 | $4,000,000.00 transfer from Rincon Company 2 to Rincon Company 8 |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

262.    Pursuant to Title 28, United States Code, Section 2461(c) and Title

18, United States Code, Section 981(a)(1)(C), the United States gives notice to

defendants

**NERVIS GERARDO VILLALOBOS CARDENAS,
DAISY TERESA RAFOI BLEULER,
and
PAULO JORGE DA COSTA CASQUIRO MURTA**

that in the event of conviction of either of the offenses charged in Counts 2 and 14

of this Superseding Indictment, the United States intends to seek forfeiture of all

property, real or personal, which constitutes or is derived from proceeds traceable to

such offenses.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

263.    Pursuant to Title 18, United States Code, Section 982(a)(1), the

United States gives notice to defendants

**NERVIS GERARDO VILLALOBOS CARDENAS,
ALEJANDRO ISTURIZ CHIESA,
RAFAEL ERNESTO REITER MUNOZ,
JAVIER ALVARADO OCHOA,
DAISY TERESA RAFOI BLEULER,
and
PAULO JORGE DA COSTA CASQUIRO MURTA**

that upon conviction of any of the offenses charged in Count 1, Counts 3 through

12, and Counts 15 through 19 of this Superseding Indictment, the United States

74

intends to seek forfeiture of all property, real or personal, involved in money laundering offenses or traceable to such property.

## **PROPERTY IN SUBSTITUTION**

264. In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States may seek to forfeit any other property of the defendants in substitution up to the total value of the property subject to forfeiture. The United States may seek the imposition of a money judgment against each defendant.

A TRUE BILL

Original signature on File

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ROBERT ZINK
ACTING CHIEF, FRAUD
  SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BY: _____
JOHN P. PEARSON
ROBERT S. JOHNSON
ASSISTANT UNITED STATES
ATTORNEYS

BY: _____
SARAH E. EDWARDS
SONALI D. PATEL
TRIAL ATTORNEYS